## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| **MARGARET P. BYERS** and **MICHAEL C.** **BYERS**, Co-Administrators of the Estate of **CHARLES M. BYERS,** Deceased**,** Plaintiffs, | § § § § § |
| v. | § § |
| **CITY OF RICHMOND** Serve:  Laura K. Drewry, City Attorney           900 East Broad Street, Suite 400           Richmond, Virginia 23219 **CHIPPENHAM & JOHNSTON-WILLIS HOSPITALS, INC.**, a subsidiary of **HCA HEALTHCARE, INC.** Serve:  CT Corporation System, Registered Agent           4701 Cox Road, Suite 285           Glen Allen, Virginia 23060 **STEVEN M. GIBSON** Serve:  Laura K. Drewry, City Attorney           900 East Broad Street, Suite 400           Richmond, Virginia 23219 **DAVID R. HYDE, JR.** Serve:  450 Perimeter Drive, Apt. 1122           Midlothian, Virginia 23113 **JOHN / JANE DOE SECURITY GUARDS (1-5)** Serve:  Chippenham & Johnston-Willis Hospitals,           Inc., CT Corporation System, RA           4701 Cox Road, Suite 285           Glen Allen, Virginia 23060 Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § § |

**Civil Action No.:**

## <u>COMPLAINT</u>

COMES NOW the plaintiffs, Margaret P. Byers and Michael C. Byers, Co-Administrators of

the Estate of Charles M. Byers, Deceased, by counsel, and move for judgment against defendants,

the City of Richmond, Steven M. Gibson ("Officer Gibson"), individually and in his official capacity

as a police officer for the City of Richmond and in his capacity as an "extra-duty" officer and agent

of Chippenham & Johnston-Willis Hospital, Inc., Chippenham & Johnston-Willis Hospitals, Inc., a

Virginia corporation ("HCA-Chippenham"), David R. Hyde, Jr. ("Nurse Hyde"), in his individual

capacity and as an employee and agent of HCA-Chippenham, and John / Jane Doe Security Guards

(1-5), all employees of HCA-Chippenham, on the following grounds:

## INTRODUCTION

1.      This Complaint asserts claims pursuant to 42 U.S.C. § 1983, as well as claims

pursuant to Virginia's wrongful-death and survival claims statutes. On July 8, 2023, Charles M.

Byers was killed as a direct, proximate and foreseeable result of the actions and omissions of HCA-

Chippenham and its employees, as named herein, and the City of Richmond, through its police

department and officers ("RPD"), as named herein, who, at all relevant times, acted jointly in concert

and under the color of law to deprive Charles M. Byers of the individually enforceable rights

unambiguously conferred upon him by 42 U.S.C. § 290ii,  the Protection and Advocacy for

Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.,* the Social Security Act § 1861, 42

U.S.C. § 1395 *et seq,* and 42 C.F.R. § 482.13, specifically: a) his right to appropriate treatment for

his severe mental illness under an individualized, written, treatment plan in a setting and under

circumstances that are most supportive of a patient's personal liberty and his right to be free from

reprisal in the form of denial of treatment; and b) his right to be free from physical or mental abuse

and his right to be free from restraints and seclusion; and, pursuant to the Fourth and Fourteenth

Amendment to the U.S. Constitution, c) his right to be free from excessive force; and d) his right to

be free from unlawful/false arrest.  The overall purpose of the above cited federal statutes and

regulations is to ensure that hospitals participating in federal programs and receiving federal funding,

including HCA-Chippenham, protect their patients' health, safety, and dignity, which HCA-

2

Chippenham and its employees, as named herein, acting jointly in concert with the RPD and its employees, as named herein, under the color of law, failed to do in the case of Charles Byers on July 5-6, 2023.  In these applicable statutes and regulations, Congress expressly provided or reiterated rights that must be accorded to patients, including Charles Byers, in addition to Constitutional and other statutory rights.  The plaintiffs are enforcing these rights, as well as the rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, under the express cause of action provided by 42 U.S.C. § 1983 and the recent United States Supreme Court case of <u>Health and Hosp. Corp. of Marion Cnty. v. Talevski</u>, 21-806, 599 U.S. _____ (June 08, 2023).

2.      Charles M. Byers came to HCA-Chippenham on July 5, 2023 seeking treatment for his severe mental illness in a compassionate and safe setting but instead found himself a falsely criminalized victim of conscious-shocking callousness, ineptitude, and outright intentional wrongdoing perpetrated by HCA-Chippenham and the RPD, and the broken, ill-conceived, and mismanaged partnership between HCA-Chippenham and the RPD at HCA-Chippenham's Tucker Pavilion, as described herein.   The foreseeable result was the senseless and tragic shooting of Charles M. Byers, a kind young man with serious mental illness who only wanted help.

## JURISDICTION

3.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over 42 U.S.C. § 1983 claims.  Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a) over the state law claims, including claims alleged pursuant to Virginia Code § 8.01-50, *et seq.* (wrongful death statute), or, alternatively, pursuant to Virginia Code § 8.01-25, *et seq.* (survival statute).  All relief available under these statutes is sought herein by plaintiffs.

4.      Pursuant to Virginia Code § 15.2-209, and upon information and belief as more fully

3

detailed below, the attorney, chief executive or mayor of the City of Richmond, or an insurer or entity providing coverage or indemnification to this claim had actual knowledge of this matter, including the nature of the claim and the time and place at which the decedent's injury and death occurred, within six months after the cause of action accrued.  Additionally, a true copy of this Complaint has been delivered to the City of Richmond Attorney prior to the filing of the Complaint with this Court, which is within six months after the cause of action accrued.

## VENUE

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to plaintiffs' claims occurred in this district.

6.      Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C) because a substantial part of the acts and omissions giving rise to plaintiffs' claims occurred in this division.

## PARTIES

7.      Plaintiffs, Margaret P. Byers and Michael C. Byers, Co-Administrators of the Estate of Charles M. Byers, Deceased ("plaintiffs" or "Mr. and/or Mrs. Byers"), are and were at the time of the incidents described herein, adults over the age of 18 and residents of the Commonwealth of Virginia.  At all relevant times, plaintiffs were married to each other and the biological parents of Charles M. Byers.  Charles M. Byers, Deceased, was 34 years old at the time of his death.

8.      Plaintiffs qualified and were duly appointed as Co-Administrators of the Estate of Charles M. Byers, Deceased, by the Circuit Court of Chesterfield County on August 4, 2023.  A true copy of the Certificate of Qualification is attached hereto as Exhibit "A".

9.      Defendant, City of Richmond, is a municipal corporation operating under the laws of

the Commonwealth of Virginia and is hereby sued directly for purposes of 42 U.S.C. § 1983 claims, pursuant to <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), and under *respondeat superior* for the gross negligence of its officers as described herein.  At all relevant times, the City of Richmond operated and controlled the Richmond Police Department (collectively "the RPD").

10. Defendant, Steven M. Gibson ("Officer Gibson" or "defendant"), was at the time of the incidents described herein an adult resident of the Commonwealth of Virginia.  At all relevant times, Officer Gibson was employed by and acting as an agent for the RPD.  At all relevant times, Officer Gibson was also employed by and acting as an agent for defendant, HCA-Chippenham, as an "extra-duty" officer, which was officially sanctioned and controlled by the RPD and HCA-Chippenham.  Pursuant to this officially sanctioned dual-agency, Officer Gibson was acting as an agent, servant and/or employee of <u>both</u> the RPD and HCA-Chippenham, in his official RPD uniform and under the color of state law pursuant to 42 U.S.C. § 1983.  Officer Gibson is hereby sued individually for purposes of 42 U.S.C. § 1983 claims, and individually and, under *respondeat superior*, as an employee and/or agent of both the RPD and HCA-Chippenham for the state law tort claims of gross negligence.

11. Defendant, HCA-Chippenham, is a Virginia corporation, which controls and operates that certain hospital located at 7101 Jahnke Road, in the City of Richmond, Virginia.  As part of such hospital, HCA-Chippenham controls and operates the Tucker Pavilion, a psychiatric facility accepting mentally ill patients who are experiencing crisis and in need of emergent care.  HCA-Chippenham is hereby sued directly for purposes of 42 U.S.C. § 1983 claims, pursuant to <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), acting jointly in concert with the RPD and its officers, including Officer Gibson, and under *respondeat superior* for the gross negligence of its

employees, agents and/or servants as described herein.

12.     Defendant, David R. Hyde, Jr. ("Nurse Hyde"), was at the time of the incidents described herein an adult resident of the Commonwealth of Virginia.  At all relevant times, Nurse Hyde was an employee, agent, and/or servant of HCA-Chippenham.  Nurse Hyde, who, at all relevant times acted jointly in concert under the color of law with Officer Gibson, is hereby sued individually for purposes of 42 U.S.C. § 1983 claims, and individually and, under *respondeat superior*, as an employee and/or agent of HCA-Chippenham for the state law tort claims of gross negligence.

13.     John / Jane Doe Security Guards (1-5), and each of them, were at all relevant times, security guards at HCA-Chippenham.  At all relevant times, John / Jane Doe Security Guards (1-5) were employees, agents, and/or servants of HCA-Chippenham.  John / Jane Doe Security Guards (1-5), who, at all relevant times acted jointly in concert under the color of law with Officer Gibson, are hereby sued individually for purposes of 42 U.S.C. § 1983 claims, and individually and, under *respondeat superior*, as employees and/or agents of HCA-Chippenham for the state law tort claims of gross negligence.

## FACTS COMMON TO ALL COUNTS

### A.     PARTNERSHIP/JOINT ACTION/CUSTOM AND PRACTICE BETWEEN HCA-CHIPPENHAM AND THE RPD – THE "CRISIS TRIAGE CENTER"

14.     HCA-Chippenham is a medical and surgical facility, which claims to be the "region's first choice" for behavioral health services, provided through its "Tucker Pavilion".  According to HCA-Chippenham, "Tucker Pavilion" is a "safe haven and treatment center for children, teens, adults and seniors who need mental health services in Richmond, Virginia, providing compassionate care for those suffering from severe mental illness".  HCA-Chippenham is a subsidiary and a part of

HCA Healthcare, Inc. ("HCA"), the largest hospital company in America, with more than 180 hospitals in 20 states and more than 280,000 employees, and one of the most profitable companies in the world. Upon information and belief, HCA routinely engages in practices that maximize profits at the expense of patient care, working conditions, and responsible corporate behavior. Upon information and belief, HCA staffs its hospitals at very low levels, typically about 30% below the national average. In Virginia, HCA staffs its hospitals at approximately 32% below the national average, including HCA-Chippenham, directly contributing to diminished patient care, including the care (or lack thereof) provided to Charles M. Byers. HCA's understaffing of its hospitals, including HCA-Chippenham, played a significant role in laying the groundwork for the incidents complained of herein. In addition to the direct patient care impact, the understaffing of HCA hospitals, including HCA-Chippenham, impacts the physical, mental, and emotional health of its frontline caregivers, thus creating an even worse environment for its patients. At all relevant times and as described herein, Tucker Pavilion was understaffed and, in addition to the other reasons set forth herein, was not "a safe haven and treatment center providing compassionate care for those suffering from severe mental illness" – far from it.

15. For many years prior to and continuing through July 2023, HCA-Chippenham and the RPD have engaged in a partnership whereby the RPD places officers inside of the HCA-Chippenham hospital to be stationed within the Tucker Pavilion to act as security and to help facilitate the transfer of seriously mentally ill patients from police custody to the Tucker Pavilion to receive necessary mental health treatment. In or about October 2013, to much public relations' fanfare, officials from the City of Richmond and HCA-Chippenham unveiled the "Crisis Triage Center" at Tucker Pavilion, which was funded in part through a grant from the Virginia Department

of Behavioral Health and Developmental Services ("VDBHDS"), which receives its funds from the

federal Substance Abuse and Mental Health Services Administration ("SAMHSA"), pursuant to 42

U.S.C. §§ 300w and 300x.    According to HCA-Chippenham and the RPD, the partnership

underlying the Crisis Triage Center "brings together law enforcement, medical, psychiatric and

emergency mental health services in a single location" and that the Crisis Triage Center is staffed at

all times by a mental health clinician and Richmond police officers so that "people who come for

evaluation under an emergency custody order can be seen immediately and evaluated for further

treatment".  According to James W. Stewart, III, state commissioner of behavioral health in 2013,

the Crisis Triage Center at Tucker Pavilion and similar centers, "enable law enforcement personnel

to connect individuals in mental health crisis with critically needed evaluation and treatment services

without delay and to divert them from unnecessary and inappropriate placement in jails and

involvement with the justice system".  In the Crisis Triage Center there is a small office used by a

nurse-receptionist and another locked room known as the "patient interview room" or "search room"

that is equipped with a one-way observational window.  As stated above and at all relevant times, at

least one officer from the RPD is stationed in the Crisis Triage Center[1] inside the HCA-Chippenham

Hospital at all times.

16.    RPD officers working within and/or stationed at the Tucker Pavilion, whether known

as the Crisis Triage Center or Tucker Intake or otherwise, are performing such work for HCA-

Chippenham and the RPD as "Extra-Duty" officers of the RPD.  It is well known to the RPD officers

as "Chippenham duty".  According to RPD General Order 4-6, as true copy of which is attached

hereto and made a part hereof as Exhibit "B", "Extra-Duty" is defined as "any outside employment

---

[1] At some point Chippenham and the RPD may have discontinued the use of the name "Crisis Triage Center" but, at all times relevant to the incidents giving rise to these actions, HCA-Chippenham and the RPD operated in the same

that is conditioned upon the actual or potential use of law enforcement powers", as opposed to "Off-Duty", which is defined as "any outside employment wherein the use of law enforcement powers is not anticipated".  At all times relevant hereto, HCA-Chippenham and the RPD willingly engaged in a joint venture, partnership, and/or custom and practice with each other with the full awareness that the RPD and its officers were acting under the color of law with full law enforcement powers and that the RPD delegated the police powers of the RPD officers stationed at HCA-Chippenham to HCA-Chippenham for its use.  It is this joint venture, partnership, and/or established custom and practice of stationing and using RPD officers, acting under the color of law, within Tucker Pavilion, a psychiatric facility, to manage mentally ill patients, that created the environment leading to the unlawful treatment that proximately caused the death of Charles M. Byers.

17.     The RPD, at all relevant times, controlled the stationing of RPD officers working within the Tucker Pavilion, pursuant to General Order 4-6 and its partnership with HCA-Chippenham.  The RPD controlled the rate of pay for the officers, generally 1 ½ times the officer's rate of pay, required that the officers wear their uniforms and be fully armed, and controlled the roster of officers who were dispatched to Tucker Pavilion through an RPD police coordinator for the center at HCA-Chippenham.  The RPD willingly provided law enforcement officers to HCA-Chippenham for HCA-Chippenham's use of those RPD officers as security and for the management of psychiatric patients with serious mental illnesses, which HCA-Chippenham willingly accepted, and delegated to HCA-Chippenham the police powers of the RPD through its officers stationed at HCA-Chippenham, which powers are traditionally reserved to the state and city, under state law.  And, the RPD willingly provided RPD officers to HCA-Chippenham without providing to those officers any specialized training for working with mentally ill patients in a medical setting, a

psychiatric hospital, failed to establish any guidelines regarding the RPD officers' role in the behavior management of mentally ill patients in a psychiatric hospital, particularly with respect to the use of force and the use of restraints and seclusion with mentally ill patients that would comply with the multitude of federal laws applicable to hospitals for the protection of mentally ill patients, and failed to supervise its officers working "Chippenham duty".  At all relevant times, the RPD was the final policymaker with respect to the matter of establishing official policy of the RPD, selecting the officers employed, training the officers employed, supervising the officers employed, and imposing warranted discipline on officers employed and, at all relevant times, the RPD had affirmative duties to not be deliberately indifferent to the need for necessary specialized training and supervision of its police officers managing mentally ill patients in a medical setting.  These particular employees, *i.e.* RPD officers working at HCA-Chippenham with mentally ill patients in a psychiatric hospital, were certain to face the obvious constitutional and other duties under federal law that are involved with the patient's rights provided by 42 U.S.C. § 290ii, the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq,* the Social Security Act § 1861, 42 U.S.C. § 1395 *et seq,* and the regulations codified at 42 C.F.R. § 482.13.   In fact, the RPD officers involved in patient management at HCA-Chippenham would be faced with these obligations with virtually every interaction with a mentally ill patient at HCA-Chippenham.  At all relevant times, it was the official policy, custom and/or practice of the City of Richmond, through the RPD, of allowing its police officers, including Officer Gibson, to work at HCA-Chippenham's Tucker Pavilion, a psychiatric hospital subject to the multitude of federal laws applicable to hospitals, including HCA-Chippenham, for the protection of mentally ill patients, without providing any specialized training to those officers for working with mentally ill patients in a medical setting in

10

compliance with those laws.  The need for specialized training is so obvious and the inadequacy of the training is so likely to result in violations of 42 U.S.C. § 290ii, the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq,* the Social Security Act § 1861, 42 U.S.C. § 1395 *et seq,* and the regulations codified at 42 C.F.R. § 482.13 that it illustrates reckless and deliberate indifference by the RPD.  In its response to the plaintiffs' FOIA request, a true copy of which is attached hereto as Exhibit "C", the RPD conceded that it did not provide any specialized training to the officers working at HCA-Chippenham, further evidencing its official policy, and the lack of training is apparent in the actions of its officers, including Officer Gibson[2].

18.     While HCA-Chippenham willingly accepted and used RPD officers as security and to manage psychiatric patients, at all relevant times HCA-Chippenham also failed to provide specialized training to the RPD officers for the management of psychiatric patients in a medical setting and, more importantly, HCA-Chippenham, both expressly through its written policies and through the established custom and practice between HCA-Chippenham and the RPD, purposefully excluded the RPD from the application of its policies relative to the use of force and use of restraints with patients, which policies closely follow the statutes and regulations applicable to HCA-Chippenham for the protection of mentally ill patients.  In other words, HCA-Chippenham joined with the RPD and its officers, acting under the color of law, to violate patients' rights, including the rights of Charles M.  Byers, in an apparent effort to circumvent the law, which attempted circumvention apparently allowed HCA-Chippenham to manage mentally ill patients more "conveniently" – the same patients HCA-Chippenham and the RPD are required by law to protect.

---

2 While the City of Richmond claims in its FOIA response that the "Crisis Triage Center" no longer exists and, therefore, the RPD does not specially train its officer to work at the "Crisis Triage Center", the partnership between HCA-Chippenham and the RPD continues, regardless of the name given by HCA-Chippenham and the RPD.  The same customs, practices, and routines still exist, including the lack of specialized training for RPD officers.

19.     HCA-Chippenham, as a hospital participating in Medicare and Medicaid and accepting other federal and state funding, is subject to the requirements of 42 U.S.C. § 290ii, the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq,* the Social Security Act § 1861, 42 U.S.C. § 1395 *et seq,* and the regulations codified at 42 C.F.R. § 482.13.  The overall purpose of these statutes and regulations is to ensure that hospitals participating in federal programs and receiving federal funding, including HCA-Chippenham, protect their patients' health, safety, and dignity.  In these applicable statutes and regulations, Congress expressly provided or reiterated rights that must be accorded to patients, including Charles M. Byers, in addition to Constitutional and other statutory rights.  As in Health and Hosp. Corp. of Marion Cnty. v. Talevski, 21-806, 599 U.S. _____ (June 08, 2023), these statutes and regulations "unambiguously confer individually enforceable rights" on mentally ill patients in HCA-Chippenham, including Charles M. Byers.

20.     Pursuant to 42 U.S.C. § 290ii(a):

> A public or private general hospital, nursing facility, intermediate care facility, or other health care facility, that receives support in any form from any program supported in whole or in part with funds appropriated to any Federal department or agency shall protect and promote the **rights** of each resident of the facility, including the **right to be free from physical or mental abuse, corporal punishment, and any restraints or involuntary seclusions imposed for purposes of discipline or convenience**.

42 U.S.C. § 290ii(a) (**emphasis added**).

21.     42 U.S.C. § 10841 reads in pertinent part and requires that:

> **(1)** A person admitted to a program or facility for the purpose of receiving mental health services should be accorded the following:

>> **(A)** The **right** to appropriate treatment and related services in a setting and under conditions that—

**(i)** are the most supportive of such person's personal liberty; and
**(ii)** restrict such liberty only to the extent necessary consistent with such person's treatment needs, applicable requirements of law, and applicable judicial orders.

**(B)** The **<u>right</u>** to an individualized, written, treatment or service plan (such plan to be developed promptly after admission of such person), the **<u>right</u>** to treatment based on such plan, the **<u>right</u>** to periodic review and reassessment of treatment and related service needs, and the **<u>right</u>** to appropriate revision of such plan, including any revision necessary to provide a description of mental health services that may be needed after such person is discharged from such program or facility.

\*\*\*

**(F)** The **<u>right</u>** to freedom from restraint or seclusion, other than as a mode or course of treatment or restraint or seclusion during an emergency situation if such restraint or seclusion is pursuant to or documented contemporaneously by the written order of a responsible mental health professional.

**(G)** The **<u>right</u>** to a humane treatment environment that affords reasonable protection from harm and appropriate privacy to such person with regard to personal needs.

\*\*\*

**(N)** The **<u>right</u>** to exercise the rights described in this section without reprisal, including reprisal in the form of denial of any appropriate, available treatment.

**(2)**      **(A)** The **<u>rights</u>** described in this section should be in addition to and not in derogation of any other statutory or constitutional **<u>rights</u>**.

42 U.S.C. § 10841 (**<u>emphasis added</u>**).

22.      42 C.F.R. § 482.13 reads in pertinent part and requires that:

A hospital must protect and promote each patient's rights.

\*\*\*

(c) **Standard: Privacy and Safety**.

(1) The patient has the **<u>right</u>** to personal privacy.
(2) The patient has the **<u>right</u>** to receive care in a safe setting.

13

(3) The patient has the **<u>right</u>** to be free from all forms of abuse or harassment.

\*\*\*

(e) **Standard: Restraint and Seclusion**.  All patients have the **<u>right</u>** to be free from physical or mental abuse and corporal punishment. All patients have the **<u>right</u>** to be free from restraint or seclusion, of any form, imposed as a means of coercion, discipline, convenience, or retaliation by staff. Restraint or seclusion may only be imposed to ensure the immediate physical safety of the patient, a staff member, or others and must be discontinued at the earliest possible time.

> (1) **Definitions.**
> > (i) A *restraint* is—
> > > (A) Any manual method, physical or mechanical device, material, or equipment that immobilizes or reduces the ability of a patient to move his or her arms, legs, body, or head freely; or
> > > (B) A drug or medication when it is used as a restriction to manage the patient's behavior or restrict the patient's freedom of movement and is not a standard treatment or dosage for the patient's condition.
> > > (C) A restraint does not include devices, such as orthopedically prescribed devices, surgical dressings or bandages, protective helmets, or other methods that involve the physical holding of a patient for the purpose of conducting routine physical examinations or tests, or to protect the patient from falling out of bed, or to permit the patient to participate in activities without the risk of physical harm (this does not include a physical escort).
> >
> > (ii) *Seclusion* is the involuntary confinement of a patient alone in a room or area from which the patient is physically prevented from leaving. Seclusion may only be used for the management of violent or self-destructive behavior.
>
> (2) Restraint or seclusion may only be used when less restrictive interventions have been determined to be ineffective to protect the patient a staff member or others from harm.
>
> (3) The type or technique of restraint or seclusion used must be the least restrictive intervention that will be effective to protect the patient, a staff member, or others from harm.
>
> (4) The use of restraint or seclusion must be—
> > (i) In accordance with a written modification to the patient's plan

14

of care; and

(ii) Implemented in accordance with safe and appropriate restraint and seclusion techniques as determined by hospital policy in accordance with State law.

(5) The use of restraint or seclusion must be in accordance with the order of a physician or other licensed practitioner who is responsible for the care of the patient and authorized to order restraint or seclusion by hospital policy in accordance with State law.

(6) Orders for the use of restraint or seclusion must never be written as a standing order or on an as needed basis (PRN).

(7) The attending physician must be consulted as soon as possible if the attending physician did not order the restraint or seclusion.

(8) Unless superseded by State law that is more restrictive—

(i) Each order for restraint or seclusion used for the management of violent or self-destructive behavior that jeopardizes the immediate physical safety of the patient, a staff member, or others may only be renewed in accordance with the following limits for up to a total of 24 hours:

(A) 4 hours for adults 18 years of age or older;

(B) 2 hours for children and adolescents 9 to 17 years of age; or

(C) 1 hour for children under 9 years of age; and

(ii) After 24 hours, before writing a new order for the use of restraint or seclusion for the management of violent or self-destructive behavior, a physician or other licensed practitioner who is responsible for the care of the patient and authorized to order restraint or seclusion by hospital policy in accordance with State law must see and assess the patient.

(iii) Each order for restraint used to ensure the physical safety of the non-violent or non-self-destructive patient may be renewed as authorized by hospital policy.

(9) Restraint or seclusion must be discontinued at the earliest possible time, regardless of the length of time identified in the order.

(10) The condition of the patient who is restrained or secluded must be monitored by a physician, other licensed practitioner, or trained staff that have completed the training criteria specified in paragraph (f) of this section at an interval determined by hospital policy.

(11) Physician and other licensed practitioner training requirements must be specified in hospital policy. At a minimum, physicians and other licensed practitioners authorized to order restraint or seclusion by hospital policy in accordance with State law must have a working knowledge of hospital policy regarding the use of restraint or seclusion.

(12) When restraint or seclusion is used for the management of violent or self-destructive behavior that jeopardizes the immediate physical safety of the patient, a staff member, or others, the patient must be seen face-to-face within 1 hour after the initiation of the intervention—

   (i) By a—
      (A) Physician or other licensed practitioner.
      (B) Registered nurse who has been trained in accordance with the requirements specified in paragraph (f) of this section.

   (ii) To evaluate—
      (A) The patient's immediate situation;
      (B) The patient's reaction to the intervention;
      (C) The patient's medical and behavioral condition; and
      (D) The need to continue or terminate the restraint or seclusion.

(13) States are free to have requirements by statute or regulation that are more restrictive than those contained in paragraph (e)(12)(i) of this section.

(14) If the face-to-face evaluation specified in paragraph (e)(12) of this section is conducted by a trained registered nurse, the trained registered nurse must consult the attending physician or other licensed practitioner who is responsible for the care of the patient as soon as possible after the completion of the 1-hour face-to-face evaluation.

(15) All requirements specified under this paragraph are applicable to the simultaneous use of restraint and seclusion. Simultaneous restraint and seclusion use is only permitted if the patient is continually monitored—

   (i) Face-to-face by an assigned, trained staff member; or

(ii) By trained staff using both video and audio equipment. This monitoring must be in close proximity to the patient.

(16) When restraint or seclusion is used, there must be documentation in the patient's medical record of the following:

(i) The 1-hour face-to-face medical and behavioral evaluation if restraint or seclusion is used to manage violent or self-destructive behavior;

(ii) A description of the patient's behavior and the intervention used;

(iii) Alternatives or other less restrictive interventions attempted (as applicable);

(iv) The patient's condition or symptom(s) that warranted the use of the restraint or seclusion; and

(v) The patient's response to the intervention(s) used, including the rationale for continued use of the intervention.

(f) **Standard: Restraint or seclusion: Staff training requirements.** The patient has the right to safe implementation of restraint or seclusion by trained staff.

(1) **Training intervals.** Staff must be trained and able to demonstrate competency in the application of restraints, implementation of seclusion, monitoring, assessment, and providing care for a patient in restraint or seclusion—

(i) Before performing any of the actions specified in this paragraph;

(ii) As part of orientation; and

(iii) Subsequently on a periodic basis consistent with hospital policy.

(2) **Training content.** The hospital must require appropriate staff to have education, training, and demonstrated knowledge based on the specific needs of the patient population in at least the following:

(i) Techniques to identify staff and patient behaviors, events, and environmental factors that may trigger circumstances that require the use of a restraint or seclusion.

(ii) The use of nonphysical intervention skills.

(iii) Choosing the least restrictive intervention based on an individualized assessment of the patient's medical, or behavioral status or condition.

(iv) The safe application and use of all types of restraint or

seclusion used in the hospital, including training in how to recognize and respond to signs of physical and psychological distress (for example, positional asphyxia);

(v) Clinical identification of specific behavioral changes that indicate that restraint or seclusion is no longer necessary.

(vi) Monitoring the physical and psychological well-being of the patient who is restrained or secluded, including but not limited to, respiratory and circulatory status, skin integrity, vital signs, and any special requirements specified by hospital policy associated with the 1-hour face-to-face evaluation.

(vii) The use of first aid techniques and certification in the use of cardiopulmonary resuscitation, including required periodic recertification.

\*\*\*

42 C.F.R. § 482.13 (**emphasis added**).

23.    Pursuant to the federal statutes and regulations cited herein, HCA-Chippenham is required to have written policies on the use of force and the use of restraints, among other things. HCA-Chippenham's written policies on "Use of Force" and "Patient Restraint/Seclusion" closely follow the language contained in the various federal statutes and regulations, as described above, relative to patient's rights and safety.  True copies of the policies are attached hereto as Exhibits "D" (Use of Force) and "E" (Patient Restraint/Seclusion), respectively.  However, through these written policies and/or as part of the custom and practice between HCA-Chippenham and the RPD, HCA-Chippenham and the RPD attempt to specifically exclude "law enforcement officials", including the RPD, from the application of the HCA-Chippenham policies.   In its "Patient Restraint/Seclusion" policy, HCA-Chippenham limits the "scope" of the policy to healthcare professionals, to-wit:

**This policy/procedure applies to healthcare professionals operating within HCA healthcare facilities that have responsibility for ordering, assessing, care planning, restraining, or monitoring restrained patients.  This policy is applicable to all age groups of patients, including neonates.**

In its "Use of Force" written policy, HCA-Chippenham, while referencing 42 C.F.R. § 482.13(e)

18

(Restraints and Seclusion), expressly and specifically excludes law enforcement officials, including the RPD, from the application of the policy. In the "Use of Force" policy, HCA-Chippenham defines "**Law Enforcement Official**" as "**a government employee appointed to enforce the law (e.g. police officer or sheriff)**" and "'**Security' Personnel**" as "**individuals employed or contracted by the facility to protect patients, people, assets, systems and facilities; <u>excludes law enforcement officials</u>**", expressly stating that law enforcement officials, whether employed or contracted by HCA-Chippenham, are <u>not</u> "security personnel", and, thus, its policies do not apply to law enforcement officials, including the RPD officers working at HCA-Chippenham. Additionally, and to make the exclusion of law enforcement officials, including the RPD, from the application of the policy crystal clear, HCA-Chippenham states as policy number "1" that "**<u>This policy does not restrict or provide guidance to law enforcement officials or Conservators of the Peace acting pursuant to their sworn duty</u>**". In other words, even though HCA-Chippenham has employed and actively and jointly worked with the RPD and its officers for ten years or more to manage mentally ill patients in its Tucker Pavilion, developing a custom and practice of directing the actions of the RPD officers and willingly using the police powers delegated to it by the RPD to manage mentally ill patients, as it did in this case, it is HCA-Chippenham's express policy that the federal laws and regulations that are restated in its policy documents do not apply to the RPD and its officers, which fact is fully supported by the joint actions of Officer Gibson, Lt. Waite, Nurse Hyde and the other unnamed employees who interacted with and deprived Charles M. Byers of his rights as a mentally ill patient at HCA-Chippenham's Tucker Pavilion on July 5-6, 2023.

24.     According to the RPD's "Crime Incident Information Center", during the ten years in which HCA-Chippenham and the RPD have been partners, as described herein, there have been

approximately 1,200 incidents involving the RPD and either patients of HCA-Chippenham or others located at HCA-Chippenham, resulting in many patients or others at HCA-Chippenham being charged and/or arrested for, among other things, assault, disorderly conduct, and destruction of property.  One need only compare the incidents involving the RPD at HCA-Chippenham to the incidents involving the RPD at other hospitals located in the City of Richmond to understand how strong and pervasive the presence of RPD officers at HCA-Chippenham has been and how much HCA-Chippenham has used the police powers of the RPD for patient management during their partnership over the last ten years.  For the same ten-year period, October 13, 2013 to October 13, 2023, there were approximately:

- 1200 incidents involving RPD officers at HCA-Chippenham

   But only --

- 200 incidents involving RPD officers at VCU/MCV Hospital

- 380 incidents involving RPD officers at Richmond Community Hospital

- 180 incidents involving RPD officers at Retreat Hospital

However, even though there has been an obvious and pervasive RPD presence at HCA-Chippenham pursuant to the partnership between HCA-Chippenham and the RPD, resulting in many patients of HCA-Chippenham being charged with crimes and arrested by RPD officers, there have been virtually no internal investigations by the RPD into the many incidents involving RPD officers and the patients of HCA-Chippenham, which further illustrates the long-term pattern, practice, custom and policy of the RPD and HCA-Chippenham of allowing RPD officers to charge, arrest and use force against patients of HCA-Chippenham with little to no real oversight from a police department that has had at least six different police chiefs over this time span; 4 in the last three years, and has

been grossly understaffed for years, according to its own reports and staffing numbers, and no oversight from HCA-Chippenham.  For the past three years, 2021-2023, there have been approximately 326 incidents involving RPD officers and patients or others at HCA-Chippenham, resulting in many patients or others at HCA-Chippenham being charged and/or arrested for, among other things, assault, disorderly conduct, and destruction of property.  However, there have been:

- Zero (0) internal investigations by the RPD into the actions of RPD officers at HCA-Chippenham in 2021

- Zero (0) internal investigations by the RPD into the actions of RPD officers at HCA-Chippenham in 2022

- One (1) internal investigation by the RPD into the actions of RPD officers at HCA-Chippenham in 2023 – the case of Charles M. Byers, which received immediate media attention

In the rare instance in which incidents involving RPD officers and patients at HCA-Chippenham has undergone an internal investigation by the RPD (1 in the last 3 years), the case of Charles M. Byers, the investigation was only conducted because of the immediate and extensive media attention it received and to provide a public relations' talking point to the RPD interim police chief, Rick Edwards, who was under building pressure from reporters to provide information regarding Charles M. Byers' case [3].  After several days following the incidents complained of herein, the RPD opened a "fact finding investigation" on July 12, 2023, conveniently providing the RPD interim police chief with a talking point that "an investigation is ongoing".  However, in this rare instance (first and only?) in which the RPD performed an internal investigation of incidents involving RPD officers at HCA-Chippenham, the RPD determined that "no improper action" was taken by Officer Gibson,

---

[3] In the WTVR CBS 6 story and article dated July 13, 2023 entitled "Police shooting timeline: Why was a man in 'crisis' removed from hospital, arrested by RPD, then released?", reporter, Tyler Layne reported that: the "RPD still has not released any details about the assault, nor have they answered why they would remove someone in crisis from a psychiatric facility" and that "in response to CBS 6's repeated inquiries, RPD spokesperson Tracy Walker

when there is overwhelming evidence that Officer Gibson violated Charles M. Byers' rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, as well as the Fourth and Fourteenth Amendments to the U.S. Constitution and was otherwise grossly negligent.   And, while the RPD apparently believes that such a finding helps its cause, it only strengthens the plaintiffs' claims against the RPD, as it further illustrates that the RPD sanctions and approves of actions by its officers working with HCA-Chippenham that violate 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, as well as the Fourth and Fourteenth Amendments to the U.S. Constitution.    This approval and sanctioning of Officer Gibson's actions and omissions by the RPD also illustrates the RPD's total and purposeful ignorance of the laws and regulations that apply to mentally ill patients in a hospital setting.  This purposeful ignorance by the RPD directly benefits HCA-Chippenham in its partnership with the RPD, as HCA-Chippenham uses the RPD's purposeful ignorance of the laws and regulations that apply to mentally ill patients in a hospital setting, coupled with HCA-Chippenham's purposeful attempted exclusion of the RPD officers from its "Use of Force" and "Patient Restraint/Seclusion" policies, to allow HCA-Chippenham to claim that any actions involving RPD officers and its patients at HCA-Chippenham are official "law enforcement actions" over which, it claims, HCA-Chippenham has no control. While HCA-Chippenham's claim of lack of control is entirely untrue, this is precisely how HCA-Chippenham uses the RPD's police powers and the RPD's ignorance of the laws and regulations applicable to mentally ill patients in a medical setting as a sword against patients and a shield against criticism or liability.  This is exactly what HCA-Chippenham did and continues to do in this case. When asked to comment on Charles M. Byers' release from HCA-Chippenham, Pryor Green, spokesperson for HCA, confirmed that "while at our facility, Mr. Byers was arrested by the

said in an email Thursday, 'There is no further information available at this time, an investigation is underway.'"

Richmond Police Department for battery" and wrote in an email dated July 11, 2023 to WTVR CBS 6, "[p]lease reach out to the Richmond Police Department. We are referring all inquiries to them" – further illustrating the partnership between HCA-Chippenham and the RPD and HCA-Chippenham's use of the RPD and its officers to manage its patients and then HCA-Chippenham's use of the RPD for deflection when the actions of the RPD officers it employs are questioned in any way. By sanctioning and fully approving of Officer Gibson's unlawful actions, as it has done for years regarding its officers' actions with patients at HCA-Chippenham by either purposefully ignoring and/or failing to investigate the RPD officers' actions or through its reckless indifference/purposeful ignorance of the laws and regulations that apply to mentally ill patients in a hospital setting, the RPD has effectively sanctioned and fully approved of the next RPD officer's unlawful actions at HCA-Chippenham and has effectively provided cover to HCA-Chippenham, which cover HCA-Chippenham willingly accepts and uses to its benefit. And, thus, the long and established pattern of the RPD and HCA-Chippenham violating mentally ill patients' rights continues as it has for the last ten years or more with no oversight from the RPD or HCA-Chippenham and with little criticism from others, as the violations of patient's rights go unnoticed by anyone other than the mentally ill patients who have little to no power to change the broken system and are otherwise effectively covered up as part of the partnership between HCA-Chippenham and the RPD. Had the case of Charles M. Byers not received immediate and extensive media attention, the actions of Officer Gibson, the RPD, HCA-Chippenham, Nurse Hyde, and the John / Jane Doe Security Guards (1-5), would never have been questioned in any way, just as the hundreds of cases before his have been purposefully ignored by the RPD and HCA-Chippenham, as part of their partnership and longstanding and unchecked custom and practice.

25. HCA-Chippenham and the RPD, through its officers working at HCA-Chippenham, were, at all relevant times, fully aware of the conditions at HCA-Chippenham Tucker Pavilion that were created by its understaffing and its use of RPD officers to bully and manage mentally ill patients, with no oversight by the RPD and HCA-Chippenham, as part of the partnership between the RPD and HCA-Chippenham, and their policies, customs, and practices. The following are a small sample of the overwhelming (in numbers and tone) reviews about HCA-Chippenham Tucker Pavilion[4] from former patients and employees during the partnership between the RPD and HCA-Chippenham:

"They treat depression like it's **illegal**. You get treated like an **inmate**."

"Tuckers is a HORRIBLE place. I wouldn't recommend it to my worst enemy. I didn't see a doctor until 2 days after I was in the facility. **It feels more like a jail than a hospital**. … They pump you full of psych meds so that you don't know what is going on. Substance abuse patients are housed in the same area as the seriously mentally ill. It's a scary place. All they do is dispense drugs like they're candy. All the patients (**inmates**) line up when it's time for the pills to be handed out. You're cured when your insurance money runs out. I would strongly advise anyone considering this horrendous facility to seek treatment elsewhere. Basically you'll be in Hell until they tell you that you can leave. The state should shut them down."

"This place should not be in business. **They treat patients like inmates**. They try to talk you in to saying something that would enable them to lock you down for 72 hours or more. Some of the nicer staff that actually have compassion confirmed this was the case and that I should complain. The facility is similar to a **jail cell**. The food is not edible. The doctors do not care, clearly they are using this as a stepping stone to a different career or they are just not skilled enough this is the only job they could get. I don't know who to complain to. Don't subject anyone you care for to this cruelty. If they are struggling, this is a sure fire way to make any problems worse."

"**The nurses are rude and they treat you like an annoyance and a burden when you're having a mental health crisis**. I hope other people can actually get help

4 The reviews, to which HCA-Chippenham responded, are not offered for the truth of the matters asserted in the reviews but rather as further evidence of HCA-Chippenham's notice of the unsafe conditions at Tucker Pavilion and HCA-Chippenham's and the RPD's willful and reckless violations of patient's rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, and 42 C.F.R. § 482.13.

from these people, but for me it was a waste of time.  The way they treat you will make you want to give up completely."

"The wait for mental health patients is ridiculous.  I'm a therapist myself, I've been here with my friend since 11 a.m., and it's 8 p.m. now I'm still waiting."

"You're better off in **jail**.  Biggest waste of time.  There is no individual therapy. Only poorly run group and doctors who treat you like a monster.  **The nurses are callous and could care less about your basic needs**. *** Do not waste your time. They will happily force you to spend a week here on your insurance without your cell phone to find resources.  They do not want to help anyone but themselves. *** **They will not tell you your rights or the facility rules**. *** They're lucky I don't have time to seek legal repercussions.  Find actual help at another facility.  They will imprison you and expect you to pay for that."

"This place worsens depression and suicidal thoughts.  I wouldn't recommend coming here at all if you want to get treated.  The staff and how things are run will just make you want to kill yourself even more if you're already feeling suicidal. **Jails treat their inmates better than this place**. …"

"I would rate them a zero if I could.  Horrible, miserable and absolutely horrid experience… Avoid and bypass Tucker at all cost.  Heed this warning and go elsewhere.  You have been warned."

"This place is HORRIBLE.  The staff has no care for the patients and will give them prescription medication without caring about the risk it will have on the individual. If you care about your loved ones, DO NOT GO HERE!"

"**This place is just prison**, I went there for depression and **they treated me like I committed a crime**, the nurses and staff would lie to my parents about my behavior, and say 'she needs to stay longer and we're not letting her leave charging you every minute you're there for not even helping you. *** Please please close this place down and don't put your children through this."

"This place is terrible and I wouldn't recommend.  Didn't get anything out of it and spoke to the doctor 1 time when I was there for maybe 3 minutes."

"Don't bring your loved one here!  They treated my mom so terribly!!!  I am going to figure out a way to report them."

"Do not recommend anyone ever check themselves in here – **staff is rude & they'll end up putting you in their unit that looks like jail** if you tell them they suck.  DO NOT check yourself in here!!!!"

"Employees in the hospital's ER yelled, **bullied and threatened** me into signing into this place.  If I did not, they insisted, they would consult the judge in charge of admissions and he would both admit me and make sure I 'never got out'.  *** If you have insurance, they will keep you for as long as possible in order to suck it dry. **The staff is atrocious and mean** and constantly threatened to report patients to doctors as 'non-compliant' which, they sneered, would ensure we would 'never get out'…"

EMPLOYEE REVIEWS

"The morale at Chippenham is very poor.  Staff are dropping like flies and complaints are rampant about **not having enough staffing for it to be safe for patients** and employees. Management is unhelpful and don't appear to care about morale, employee development or safety. …"

"I was contracted to work as a nurse at Chippenham Hospital, and was subject to caring for an **unsafe ratio of patients**. *** When my concern about staffing ratios was mentioned to the nurse manager, she became defensive and said 'we are not going to talk about ratios'.  As if it were an inappropriate or invalid concern.  I decided to leave my shift due to being dismissed and disrespected on top of dealing with unsafe patient ratios."

## B.    CHARLES M. BYERS ("Charlie")

26.    In or about 1999, when Charlie was 9 years old, his parents began noticing that Charlie would become anxious and paranoid, believing that people were out to hurt him or his family members.  To assuage Charlie's paranoia, Charlie's parents developed, in consultation with Charlie's doctor, a "safety plan" that included routines to assure Charlie that he and his family were safe, such as going through the house each night showing Charlie that the windows and doors were shut and locked and that no one was in the house or able to enter the house to harm them.

27.    In or about August 2008, when Charlie was 19 years old, his mental health condition(s) precipitously worsened, and he was confined to a psychiatric facility under a temporary detention order ("TDO") for a period of approximately 11 days.  During this involuntary inpatient

hospitalization at a mental health facility, Charlie was diagnosed with schizoaffective disorder, a rare

mental illness that, in Charlie's case, is related to both schizophrenia and bipolar disorder.   To

receive a schizoaffective disorder diagnosis, which Charlie did, someone must meet all the primary

criteria for schizophrenia and have prominent mood disorder symptoms as well.   According to the

America Psychiatric Association DSM-5, the accepted authority on mental and personality disorders,

someone with schizoaffective disorder has a major mood disorder, such as bipolar mania, as in

Charlie's case, and meets the primary criteria for schizophrenia, which include two or more of the

following:

- Delusions

- Hallucinations

- Disorganized speech (speech that is easily derailed or is incoherent)

- Grossly disorganized or catatonic behavior

- Negative symptoms (not expressing any feelings or emotions, flat expressions, loss of pleasure/anhedonia, lack of motivation/avolition, and other experiences that are "taken away" from the person)

Schizoaffective disorder typically involves symptoms such as:

- Feelings of elation for an extended period of time

- Rapid speech

- Racing thoughts

- Bizarre behavior

- Agitation

- Grandiose delusions

- Hallucinations

27

28.    As a result of his diagnosis with schizoaffective disorder and the symptoms associated therewith, Charlie was prescribed psychotropic medications and underwent various behavioral and meditation therapies.

29.    Despite outpatient treatment, which allowed Charlie to go for long periods of time with little to no apparent symptoms and leading a normal life, the severity of Charlie's mental health conditions caused him to be hospitalized at various times between 2008 to 2023.  However, aside from the hospitalization in 2008, the remaining hospitalizations between 2008 and December 2022 were voluntary, as Charlie and Charlie's parents generally knew when Charlie needed help with his mental health conditions and voluntarily sought the care and treatment necessary under the circumstances.

30.    Beginning in or around May 2023, Charlie's condition began to worsen, and Charlie's parents noticed that he was decompensating, becoming more isolated, paranoid, and anxious. During this time, Charlie would drive his car to soothe himself but would lose his car, which happened three times – having no idea where he left it.  In the days leading up to July 5, 2023, Charlie told his parents that he needed help and Charlie's parents noticed that he was very anxious, confused, and delusional – often having conversations with someone who was not there, sometimes mumbling and laughing to himself.  He would often see things that were not there and believe that things that were there were fake.  In other words, Charlie was struggling with reality, and desperately needed help for his mental illness.

31.    On July 5, 2023 at approximately 4 p.m. Charlie's mother drove Charlie, a Medicaid recipient, to HCA-Chippenham and waited while Charlie went through intake at HCA-Chippenham. At approximately 5 p.m., Charlie was given a green gown, indicating that he was going to the mental

28

health unit at Tucker Pavilion, and Charlie's mother was told by an employee of HCA-Chippenham that Charlie was being admitted and that HCA-Chippenham would contact her if there were any problems, as, the HCA-Chippenham employee recognized, she was "Charlie's ride".  Mrs. Byers told the intake nurse at HCA-Chippenham that if Charlie was left unattended, he would wander and that he could possibly walk home from the hospital, as he had done on a previous visit to HCA-Chippenham.  In response, the intake nurse assured Mrs. Byers that Charlie would be assigned a "sitter" and that the hospital would contact her if there were any issues.  No one from HCA-Chippenham ever contacted Mrs. Byers.

32.     After Mrs. Byers left HCA-Chippenham on July 5, 2023, Charlie was apparently left alone in the waiting room for several hours and, in his confused and delusional state, began wandering the halls of the hospital until he was met by an unknown security guard at HCA-Chippenham and Lt. Waite of the RPD, who was performing "extra-duty" police services for HCA-Chippenham, pursuant to the partnership between the RPD and HCA-Chippenham.  Lt. Waite described that "it was obvious that [Charlie] was having some type of mental health issue, he was mumbling under his breath and what it seems to me he was hearing voices or seeing things that were not there".

33.     In the evening hours of July 5, 2023, after Charlie was found wandering the halls of the hospital, Charlie was locked in a room in the Tucker Pavilion intake by HCA-Chippenham and RPD officer, Lt. Waite, in violation of his right to be free from seclusion under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, and 42 C.F.R. § 482.13.  At approximately 7:47 p.m. on July 5, 2023, Lt. Waite issued a "paperless" Emergency Custody Order ("ECO") for Charlie, pursuant to Virginia Code § 37.2-808(G).  To issue the ECO, Lt. Waite must have found that:

Pursuant to § 37.2-808, [Charlie] is incapable of volunteering or unwilling to volunteer for treatment, has a mental illness and is in need of hospitalization or treatment, and there exists a substantial likelihood that, as a result of mental illness, [Charlie] will, in the near future, cause serious physical harm to self or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information OR suffer serious harm due to [Charlie's] lack of capacity to protect self from harm or to provide for his own basic human needs.

34.     Since Charlie was already at Chippenham seeking treatment for his mental illness, it was unnecessary for Lt. Waite to transport Charlie to "an appropriate location to assess the need for hospitalization or treatment".  However, as with many things involving the partnership between the RPD and HCA-Chippenham, it is unclear whether Lt. Waite transferred custody of Charlie to HCA-Chippenham, pursuant to Virginia Code § 37.2-808(E), or whether the RPD and Lt. Waite retained custody of Charlie –another example of the blurred (or non-existent) lines between the RPD and HCA-Chippenham.  In either case, at approximately 8:30 p.m. on July 5, 2023, Lt. Waite called the Richmond Behavioral Health Authority ("RBHA") to request an evaluation of Charlie for a temporary detention order ("TDO").  While Lt. Waite, and by extension the RPD, were aware that Charlie would be issued a TDO, as Lt. Waite had already found that Charlie met the required criteria for an ECO, which is identical to the criteria for a TDO, and specifically reached out to RBHA to have a TDO issued for Charlie, Lt. Waite did not document or record his issuance of the ECO until several days later – only after Charlie was dead.

35.     Following the call from Lt. Waite on July 5, 2023, Charlie was evaluated in person by Julia Sauder, a licensed clinical social worker with RBHA, and she spoke with Charlie's parents by phone.  In her progress note, a true copy of which is attached hereto and made a part hereof as Exhibit "F", Ms. Sauder found Charlie asleep when she arrived but that "he did wake up to talk to me but it was hard to get any information of substance from him – [h]e told me one thing and then

told me another". Ms. Sauder found Charlie's appearance to be unusual in that "he is sunburned and his pupils were pinpoint". Ms. Sauder noted that Charlie said that he wanted to be admitted and that Charlie's mom says "he always goes voluntarily" but found that "given his confusion and going back and forth on the information, it seems that a TDO might be more appropriate at this time. Based on Ms. Sauder's evaluation, she found that Charlie met the criteria for a TDO and stated that "one will be obtained before his ECO runs out".

36.    Ms. Sauder of RBHA called Mrs. Byers at approximately 9:30 p.m. on July 5, 2023. Ms. Sauder told Mrs. Byers that HCA-Chippenham is admitting Charlie, but they were waiting for a bed. Ms. Sauder also told Mrs. Byers that they are "going to TDO [Charlie]". Ms. Sauder indicated to Mrs. Byers that she would be getting off at 7 a.m. and that she would call her with updates.

37.    On July 6, 2023 at 2:08 a.m., Magistrate Martesha M. Bishop issued a TDO (TDO 763GM-2300000955 – "TDO") for Charlie. A true and accurate copy of the TDO issued for Charlie is attached hereto as Exhibit "G" and incorporated herein by reference.

38.    As of July 6, 2023, and indeed continuing to the present, under Virginia law, a TDO can only be issued for those individuals with a mental illness for which there is a substantial likelihood that, as a result of mental illness, the person will in the near future:

      a)    cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any; or

      b)    suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs.

See Va. Code § 37.2-809(B).

39.    The TDO was served upon Charlie at 2:51 a.m. on July 6, 2023. However, Charlie

31

was not admitted to Tucker Pavilion until 3:00 p.m. on July 6, 2023. Upon information and belief, Charlie was left in Tucker intake, presumably locked up in seclusion by HCA-Chippenham and the RPD, for more than eighteen hours before he was assigned a room at Tucker Pavilion and taken to his room, in flagrant violation of his rights to be free from abuse and involuntary seclusion for convenience, and his right to appropriate treatment under conditions that are most supportive of his personal liberty, which rights are guaranteed under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13. Charlie was assigned to Room 354B at "Tucker 3E", and the attending doctor assigned to him was Dr. Khalon. Pursuant to Virginia Code § 37.2-813, upon the issuance of the TDO and Charlie's assignment to HCA-Chippenham, Charlie could <u>only</u> be lawfully released from the TDO and HCA-Chippenham, prior to his commitment hearing, by a district court judge or special justice, upon finding that Charlie no longer met the criteria for a TDO, or by the director of HCA-Chippenham's Tucker Pavilion, upon finding, based on an evaluation conducted by the psychiatrist or clinical psychologist treating Charlie, that Charlie no longer met the criteria for a TDO. None of this ever happened. Charlie was <u>never</u> lawfully released from the TDO or from HCA-Chippenham. In fact, Charlie was never evaluated by a psychiatrist or clinical psychologist at HCA-Chippenham.

40. After waiting in intake for more than eighteen hours locked in a room in violation of 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, and just one or two hours (or less) after Charlie had finally been admitted to a room at Tucker Pavilion and assigned a doctor, the staff at HCA Chippenham sought to move Charlie from his room on the third floor to the second floor, for reasons unknown to the plaintiffs. However, upon information and belief, the HCA-Chippenham staff likely attempted to move Charlie to the second floor because of

understaffing or lack of beds at HCA-Chippenham's Tucker Pavilion.

41.     At approximately 5:30 p.m. on July 6, 2023, HCA-Chippenham staff, including Nurse Hyde and John / Jane Doe Security Guards (1-5), attempted to move Charlie from the 3rd floor to the 2nd floor.  In his paranoid and delusional state, Charlie told the HCA-Chippenham nurses and security officers that he did not want to take the elevator to the second floor, apparently believing that he was going to be harmed.  However, instead of acting in compliance with 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, the HCA-Chippenham staff called in the RPD officer stationed at HCA-Chippenham to bully Charlie into following their instructions by threat of force, threat of arrest and the use of restraints, as was the longstanding and unchecked practice and custom of HCA-Chippenham and the RPD of the RPD providing untrained officers to HCA-Chippenham and HCA-Chippenham's acceptance and use of such officers for such purposes.  The RPD officer called to enforce the directions of HCA-Chippenham was Officer Gibson.

42.     At approximately 5:40 p.m. on July 6, 2023, Officer Gibson approached Charlie demanding that he follow the instructions of HCA-Chippenham staff to get on the elevator to go to the second floor.  As was the policy, custom and/or practice of the RPD and HCA-Chippenham for RPD officers working at HCA-Chippenham pursuant to their partnership, Officer Gibson had received no training on the rights of patients in a medical setting, as set forth in 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, in violation of the statutes and regulations requiring such training.  Also, as part of the longstanding and unchecked policy, custom and/or practice of the RPD and HCA-Chippenham for RPD officers working at HCA-Chippenham pursuant to their partnership, HCA-Chippenham staff used the officers from the RPD to enforce their

instructions, apparently knowing that they [HCA-Chippenham staff] could not act by themselves and use any methods that would violate the patient's rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13 – instead combining their actions with and using the RPD officers (and the RPD's useful and purposeful ignorance of patient's rights) to violate patient's rights under the threat and color of law.  In this vein, Officer Gibson did no investigation to independently establish:

- why Charlie was being moved from the 3rd floor to the 2nd floor

- why Charlie was hospitalized

- whether Charlie was paranoid and delusional

- whether Charlie had a severe mental illness or medical condition

- whether there existed alternatives to the use of restraints and use of force

- whether the federal or state statutes and regulations regarding patient's rights prohibited the use of restraints (particularly handcuffs) under the circumstances

- whether Charlie's doctor had been consulted

- whether there was a written order from Charlie's doctor for the use of restraints

- whether handcuffs could be used as a convenience to the staff at HCA-Chippenham

- whether probable cause existed for the use of handcuffs

- whether probable cause existed for detaining Charlie, and/or

- whether Charlie was a voluntary patient or whether Charlie was hospitalized pursuant to an ECO or TDO.

This useful and purposeful ignorance by the RPD and its officers working at HCA-Chippenham, including that of Officer Gibson, allowed HCA-Chippenham and the RPD to willingly and/or recklessly violate patient's rights, including Charlie's rights, under 42 U.S.C. § 290ii(a), 42 U.S.C. §

10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, and resulted in:

1) Charlie's unlawful restraint on July 6, 2023 by Officer Gibson, Nurse Hyde and the John / Jane Doe Security Guards (1-5), acting jointly and in concert under the color of law;

2) The unlawful use of force against Charlie on July 6, 2023 by Officer Gibson, Nurse Hyde and the John / Jane Doe Security Guards (1-5), acting jointly and in concert under the color of law;

3) Charlie's unlawful arrest and removal from HCA-Chippenham on July 6, 2023 by Officer Gibson, Nurse Hyde and the John / Jane Doe Security Guards (1-5), acting jointly and in concert under the color of law;

4) The unlawful denial of treatment and care pursuant to the TDO that Charlie was under on July 6-8, 2023 by Officer Gibson, Nurse Hyde and the John / Jane Doe Security Guards (1-5), acting jointly and in concert under the color of law; and

5) Charlie's tragic yet foreseeable death on July 8, 2023.

43. Had HCA-Chippenham and the RPD properly and specially trained the RPD officers working at HCA-Chippenham, including Officer Gibson, Officer Gibson would have and should have recognized that his actions, in concert with Nurse Hyde and the John / Jane Doe Security Guards, were prohibited by 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, and that the HCA-Chippenham staff was simply using him to bully Charlie into complying with their instructions for their convenience. Had HCA-Chippenham and the RPD properly and specially trained the RPD officers working at HCA-Chippenham, including Officer Gibson, Officer Gibson would have recognized that Charlie was paranoid and delusional and that his presence and the use of force, handcuffs, and the threat of arrest would be harmful to Charlie and unlawful, particularly because Charlie was not an <u>immediate</u> threat of any kind. Charlie was mentally ill and in need of treatment to which he had a right to receive under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13. What he received instead was

abuse, harassment, bullying, threats of force, handcuffs, and arrest, and then, the use of force, handcuffs, arrest, and the denial of treatment to which he was entitled by law. If Officer Gibson had received the necessary and specialized training from either the RPD or HCA-Chippenham, he would have investigated the situation and not simply followed the instructions of the HCA-Chippenham staff. He would have and should have protected Charlie and his rights. Instead, following the longstanding and unchecked policy, custom and/or practice of the RPD and HCA-Chippenham for RPD officers working at HCA-Chippenham pursuant to their partnership, Officer Gibson recklessly and indifferently failed to investigate, failed to consult Charlie's doctor, failed to follow the law, as set forth in 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, and failed to protect Charlie and his rights. Had Officer Gibson received the necessary and specialized training, he would have recognized that Charlie was paranoid and delusional, and that Charlie's bizarre behavior was symptomatic of his severe mental illness. When Officer Gibson first approached Charlie on July 6, 2023, Charlie told Officer Gibson that "I do not trust you specifically" and "I do not trust the others", referencing the large group of nurses and security guards surrounding him and who were attempting to force him to take the elevator to go to the second floor. His expressions were flat and his speech disorganized and rapid. While it is difficult to understand each word said by Charlie on Officer Gibson's body cam video, it is obvious that Charlie was experiencing symptoms of his severe mental illness, schizoaffective disorder. At times on the recorded video, Charlie accuses Officer Gibson of being a fake police officer and says that the nurses are also fake. Charlie tells Officer Gibson to "take off your fake hat and uniform" and requests that Officer Gibson show him the fake bullets in his gun, as a fake police officer would not have a real gun in a hospital. Notwithstanding Charlie's obvious paranoia and delusions, Officer Gibson

36

directed Charlie to cooperate and to get on the elevator. Charlie responded that "I can't cooperate" and that "I need to wait here for my hearing and then the real cops will show up". Charlie also said, "I'm supposed to wait here that's what 'they' told me". Even though Charlie is paranoid and delusional, he is calm and not combative in any way. Charlie is not a threat to himself or others during his interaction with Officer Gibson. He simply wants to wait for his hearing and is obviously scared and reluctant to get on an elevator with strangers, whom he seemingly believed wanted to harm him. Charlie is suffering from his mental illness. However, instead of complying with the requirements of 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, Nurse Hyde and the Jane / John Doe Security Guards (1-5), acting jointly and in concert with Officer Gibson, unlawfully resort to the use of force and they grabbed Charlie, who was sitting in a chair with his hands clasped and a threat to no one, and they violently wrestle Charlie to the ground attempting to put him in handcuffs. At the time Officer Gibson, Nurse Hyde and the John / Jane Doe Security Guards (1-5) grabbed Charlie and attempted to put him in handcuffs, Charlie had committed no crime and there was no reasonable suspicion that he was about to commit a crime. Such use of force and unlawful restraint by Officer Gibson, Nurse Hyde and the John / Jane Doe Security Guards (1-5), acting jointly, in concert and under the color of law, violated Charlie's rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, as well as his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.

44.     During the exchange between Officer Gibson and Charlie, Charlie is surrounded by as many as 10-12 or more HCA-Chippenham employees, who are either standing around watching and being entertained by an exchange between Officer Gibson and a mentally ill patient under a TDO, or they are actively instructing and encouraging Officer Gibson to handcuff Charlie and force him on

the elevator. The John / Jane Doe Security Guards (1-5) instruct and encourage Officer Gibson to use force and handcuffs on Charlie by saying things like "we just need to 'clink-clink'[making the sound of handcuffs] him, with one officer on each side and put him in the elevator", indicating to Officer Gibson that Charlie should be handcuffed and forcefully put in the elevator. The HCA-Chippenham nurses, including Nurse Hyde, likewise encourage Officer Gibson by saying things like "put 'em [handcuffs] on and take him down", also indicating that Officer Gibson should handcuff Charlie and force him into the elevator. After unlawfully but unsuccessfully attempting to handcuff Charlie and force him into the elevator, Officer Gibson pulled out his taser, pointed it at Charlie, and screamed at Charlie to comply or he would tase him, again recklessly and indifferently violating Charlie's rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13 and the Fourth and Fourteenth Amendment to the U.S. Constitution. During the entire episode, Charlie was calm and non-combative. After pointing his taser at Charlie, Officer Gibson asked Charlie "do you want to go to jail, or do you want to go to the second floor?" However, before Charlie could respond in any way, Nurse Hyde said "at this point, we just want you [Officer Gibson] to take him away", instructing Officer Gibson to arrest Charlie, despite the important fact that Charlie had committed no crime. In response, Officer Gibson asked Nurse Hyde, "was it you who he [Charlie] kicked?" Nurse Hyde said "yes", even though Charlie did not kick Nurse Hyde or anyone else. Upon information and belief, Officer Gibson, acting jointly and in concert with Nurse Hyde, fabricated an assault charge so that Officer Gibson could arrest Charlie and remove him from HCA-Chippenham, as Charlie and his mental illness had apparently become too much of an inconvenience for HCA-Chippenham and its staff. At the very most, Charlie could have accidentally struck someone with his leg while Officer Gibson and Nurse Hyde were

attempting to unlawfully restrain, handcuff and arrest Charlie. In no case could such action be seen as criminal assault, as Charlie was lawfully resisting an unlawful arrest, and Officer Gibson and Nurse Hyde used the false claim that Charlie had assaulted Nurse Hyde to arrest Charlie and to remove him from HCA-Chippenham, with no accounting for Charlie's rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, the Fourth and Fourteenth Amendment to the U.S. Constitution, or the fact that Charlie was under a TDO and in desperate need of mental health treatment to which he had a right to receive under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13. In any case, at the instruction of HCA-Chippenham, through Nurse Hyde, Officer Gibson arrested Charlie and forcibly removed him from HCA-Chippenham, where Charlie had been ordered to stay for treatment of his mental illness. Oddly, and again illustrating Officer Gibson's and Nurse Hyde's complete ignorance/intentional violation of Charlie's rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, as well as their joint action to make their unlawful arrest and removal of Charlie from HCA-Chippenham seem lawful, Officer Gibson asked Nurse Hyde to provide him with Charlie's "discharge papers", which, of course, Nurse Hyde could not lawfully do, as, again, pursuant to Virginia Code § 37.2-813, Charlie could <u>only</u> be lawfully released from the TDO and HCA-Chippenham, prior to his commitment hearing, by a district court judge or special justice, upon finding that Charlie no longer met the criteria for a TDO, or by the director of HCA-Chippenham's Tucker Pavilion, upon finding, based on an evaluation conducted by the psychiatrist or clinical psychologist treating Charlie, that Charlie no longer met the criteria for a TDO. Since Nurse Hyde was unable to lawfully release Charlie from HCA-Chippenham, he, in joint action with and at the request of Officer Gibson, printed off a form that appeared to be a discharge

summary with a scribbled signature in the middle, which was likely written by Nurse Hyde, and "DC/HOME" written on the form, attempting to falsely show that Charlie was being lawfully discharged to his home. The form provided by Nurse Hyde to Officer Gibson to make it appear as though Charlie had been lawfully released and "discharged to home" was not a lawful release of Charlie, pursuant to Virginia Code § 37.2-813, and the form was never seen or endorsed by a physician and/or the director of the HCA-Chippenham facility. Importantly, and to again make the unlawful arrest and removal of Charlie from HCA-Chippenham by Officer Gibson, Nurse Hyde and the John / Jane Doe Security Guards (1-5) seem lawful, there was no mention or reference in the "discharge summary" to the ECO issued by Lt. Waite or the TDO issued by the Richmond Magistrate. The manufactured "discharge summary" was also devoid of any evaluations, diagnoses, or treatment plan, to which Charlie was entitled 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13. According to the manufactured "discharge summary" Charlie was being "discharged to home", which was obviously untrue. Given the ease at which Officer Gibson and Nurse Hyde quickly fabricated an assault charge against Charlie and produced discharge papers in violation of every right provided to Charlie by the Constitution and/or patient's rights legislation, it is obvious that their actions were customary and symptomatic of the ill-conceived and broken partnership between HCA-Chippenham and the RPD. In any case, Charlie was removed from HCA-Chippenham shackled to some type of specialized restraint chair and taken to a transport vehicle driven by Officer Pearce of the RPD. While Charlie was in the transport vehicle, Officer Pearce asked Officer Gibson "why was he [Charlie] here, wasn't he on the third floor – the most secure?" Officer Gibson replied, "**I have no idea**", again displaying his reckless indifference for Charlie's safety and his rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42

U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13 and the Fourth and Fourteenth Amendments to the U.S. Constitution.

45.     Charlie was taken from HCA-Chippenham to the Richmond City Jail located at 1701 Fairfield Way, Richmond, Virginia and appeared before a magistrate with Officer Gibson.  At no time did Officer Gibson inform the magistrate that Charlie was under a TDO; that Charlie had been hospitalized for his severe mental illness; that Charlie had rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, which rights had been violated; and/or that Charlie was in need of mental health treatment, as, once again, Officer Gibson was recklessly indifferent to Charlie's safety and his rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, as was the policy, custom, and practice of the RPD and HCA-Chippenham for RPD officers working at HCA-Chippenham pursuant to their partnership, and was otherwise grossly and wantonly negligent.  Such reckless indifference and gross and wanton negligence caused Charlie to be released by the magistrate on his own recognizance without receiving the mental health treatment to which Charlie was entitled by law and of which Charlie was in desperate need, while Charlie was still under a TDO and assigned to HCA-Chippenham for care and treatment for his severe mental illness.

46.     In the evening hours of July 6, 2023, Charlie, a diagnosed schizophrenic, who was paranoid, delusional, and under a TDO in need of mental health treatment, was released from the City of Richmond jail.  In his paranoid and delusional state, Charlie walked from the City of Richmond jail to his home in Chesterfield, approximately fourteen (14) miles away.  However, Charlie, suffering from his mental illness, was unable to find his home, so he wandered around his neighborhood and adjoining neighborhoods searching for his home for approximately thirty-six (36)

hours.  At one point Charlie attempted to enter a house that was not his and he was asked by the homeowner "what are you doing?"  Charlie responded, "my parents live here" and "this is my house".  At some point someone in the neighborhood in which Charlie was wandering and searching for his house called the Chesterfield County Police Department.  On July 8, 2023 at approximately noon, the CCPD responded, and its officers interacted with Charlie, who, the CCPD claims, was holding a hatchet that he had apparently found.  The CCPD claims that Charlie was instructed to drop the hatchet but, Charlie, who was paranoid, delusional and likely suffering from his horrific experience with the RPD and HCA-Chippenham, had been wandering around lost for thirty-six (36) hours, refused to drop the hatchet.  In response, the CCPD claims, the CCPD officer tased Charlie but, according to the CCPD, the taser failed.  According to the CCPD, the officers then shot Charlie six times killing him.  Charlie died in the street just a few blocks from his home, while still under a TDO and assigned to HCA-Chippenham for care and treatment for his severe mental illness.  Had HCA-Chippenham, the RPD, Officer Gibson, Nurse Hyde, and the John / Jane Doe Security Guards (1-5) not violated Charlie's rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13 and the Fourth and Fourteenth Amendments to the U.S. Constitution and/or been otherwise grossly and wantonly negligent, depriving Charlie of the treatment for his mental illness that he desperately needed and which he was entitled by law, Charlie would have been hospitalized and receiving treatment in "a safe haven and treatment center providing compassionate care for those suffering from severe mental illness" until at least July 9, 2023, making his death on July 8, 2023 an impossibility.  However, as a direct and proximate result of the actions and/or inactions of HCA-Chippenham, the RPD, Officer Gibson, Nurse Hyde, and the John / Jane Doe Security Guards (1-5) depriving Charlie of his rights under 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841,

42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13 and the Fourth and Fourteenth Amendments to the U.S. Constitution, and their gross and wanton negligence, Charlie is dead.  Charlie's death was foreseeable and totally avoidable.  The broken, ill-conceived, and mis-managed partnership between HCA-Chippenham and the RPD must be fixed or completely dissolved to avoid such a tragedy in the future.

## COUNT ONE – DEPRIVATION OF CIVIL RIGHTS –42 U.S.C. § 1983

### (Denial and Withholding of Medical Care)

47.    Plaintiffs restate and incorporate herein the allegations set forth in paragraph 1 through 46 of the Complaint.

48.    At all times relevant to the allegations in this Complaint, Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, acted jointly in concert and under the color of law.  42 U.S.C. § 1983 provides that:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

49.    42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, unambiguously confer the individually enforceable right to appropriate treatment under an individualized, written, treatment plan in a setting and under circumstances that are most supportive

of a patient's personal liberty and the right to exercise the rights set forth in the above cited statutes and regulations without reprisal in the form of denial of treatment.

50.     As described in the Complaint, the Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson failed to provide the necessary medical care and mental health care to Charles M. Byers and/or purposefully and/or recklessly denied Charles M. Byers treatment.

51.     The Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson engaged in this injurious conduct with deliberate indifference to Charles M. Byers' health and safety, especially in light of his extensive and detailed record of mental health diagnoses and the fact that he had been ordered to receive treatment pursuant to a TDO, thereby placing Charles M. Byers in substantial risk of serious harm.

52.     The acts or omissions of the Defendants were conducted within the scope of their official duties and employment.

53.     As a direct, proximate, and foreseeable result of the Defendants' conduct, Charles M. Byers was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Defendants' actions, all attributable to the deprivation of his rights guaranteed by 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13.

54.     As a direct, proximate, and foreseeable result of the Defendants' conduct, Charles M. Byers died, all attributable to the deprivation of his rights guaranteed by 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13.

55.     The Defendants' aforesaid actions and omission constitute a willful, wanton, reckless, and conscious disregard of Charles M. Byer's rights.

56.     The Defendants' violations of 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13 establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, jointly and severally, in the amount of Twenty-Five Million Dollars ($25,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest, attorney's fees, punitive damages in the amount of Ten Million Dollars ($10,000,000.00), or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem just and proper.  A trial by jury is hereby demanded.

## COUNT TWO – DEPRIVATION OF CIVIL RIGHTS –42 U.S.C. § 1983

### (DENIAL OF RIGHTS TO BE FREE FROM PHYSICAL AND MENTAL ABUSE, AND RESTRAINTS AND SECLUSION)

57.     Plaintiffs restate and incorporate herein the allegations set forth in paragraph 1 through 56 of the Complaint.

58.     At all times relevant to the allegations in this Complaint, Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, acted jointly in concert and under the color of law.  42 U.S.C. § 1983 provides that:

Every person who, under the color of any statute, ordinance, regulation, custom, or

usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

59. 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13, unambiguously confer the individually enforceable right to be free from physical or mental abuse and the right to be free from restraints and seclusion.

60. As described in the Complaint, the Defendants physically and mentally abused Charles M. Byers and unlawfully restrained him and placed him in seclusion in violation of 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13.

61. The Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, engaged in this injurious conduct with deliberate indifference to Charles M. Byers' health and safety, especially in light of his extensive and detailed record of mental health diagnoses and the fact that he had been ordered to receive treatment pursuant to a TDO, thereby placing Charles M. Byers in substantial risk of serious harm.

62. The acts or omissions of the Defendants were conducted within the scope of their official duties and employment.

63. As a direct, proximate, and foreseeable result of the Defendants' conduct, Charles M. Byers was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Defendants' actions, all attributable to the

deprivation of his rights guaranteed by 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13.

64.     As a direct, proximate, and foreseeable result of the Defendants' conduct, Charles M. Byers died, all attributable to the deprivation of his rights guaranteed by 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13.

65.     The Defendants' aforesaid actions and omission constitute a willful, wanton, reckless, and conscious disregard of Charles M. Byer's rights.

66.     The Defendants' violations of 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13 establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, jointly and severally, in the amount of Twenty-Five Million Dollars ($25,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest, attorney's fees, punitive damages in the amount of Ten Million Dollars ($10,000,000.00), or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem just and proper.  A trial by jury is hereby demanded.

## COUNT THREE – DEPRIVATION OF CIVIL RIGHTS –42 U.S.C. § 1983

## (EXCESSIVE FORCE – FOURTEENTH AMENDMENT)

67.     Plaintiffs restate and incorporate herein the allegations set forth in paragraph 1 through 66 of the Complaint.

47

68.    At all times relevant to the allegations in this Complaint, Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, acted jointly in concert and under the color of law.  42 U.S.C. § 1983 provides that:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

69.    The Fourteenth Amendment to the U.S. Constitution provides the right to be free from physical abuse and excessive force.

70.    As described in the Complaint, the Defendants physically abused and/or used unreasonably excessive force against Charles M. Byers.

71.    The Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, engaged in this injurious conduct with deliberate indifference to Charles M. Byers' health and safety, especially in light of his extensive and detailed record of mental health diagnoses and the fact that he had been ordered to receive treatment pursuant to a TDO, thereby placing Charles M. Byers in substantial risk of serious harm.

72.    The acts or omissions of the Defendants were conducted within the scope of their official duties and employment.

48

73.     As a direct, proximate, and foreseeable result of the Defendants' conduct, Charles M. Byers was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Defendants' actions, all attributable to the deprivation of his rights guaranteed by the Fourteenth Amendment to the U.S. Constitution.

74.     As a direct, proximate, and foreseeable result of the Defendants' conduct, Charles M. Byers died, all attributable to the deprivation of his rights guaranteed by the Fourteenth Amendment to the U.S. Constitution.

75.     The Defendants' aforesaid actions and omission constitute a willful, wanton, reckless, and conscious disregard of Charles M. Byer's rights.

76.     The Defendants' violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, jointly and severally, in the amount of Twenty-Five Million Dollars ($25,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest, attorney's fees, punitive damages in the amount of Ten Million Dollars ($10,000,000.00), or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem just and proper.  A trial by jury is hereby demanded.

## COUNT FOUR – DEPRIVATION OF CIVIL RIGHTS –42 U.S.C. § 1983
### (UNLAWFUL/FALSE ARREST – FOURTEENTH AMENDMENT)

77.     Plaintiffs restate and incorporate herein the allegations set forth in paragraph 1

49

through 76 of the Complaint.

78.    At all times relevant to the allegations in this Complaint, Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, acted jointly in concert and under the color of law.  42 U.S.C. § 1983 provides that:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

79.    The Fourteenth Amendment to the U.S. Constitution provides the right to be free from unreasonable seizure.

80.    As described in the Complaint, the Defendants unlawfully and falsely arrested Charles M. Byers.

81.    The Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, engaged in this injurious conduct with deliberate indifference to Charles M. Byers' health and safety, especially in light of his extensive and detailed record of mental health diagnoses and the fact that he had been ordered to receive treatment pursuant to a TDO, thereby placing Charles M. Byers in substantial risk of serious harm.

82.    The acts or omissions of the Defendants were conducted within the scope of their

50

official duties and employment.

83.     As a direct, proximate, and foreseeable result of the Defendants' conduct, Charles M. Byers was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Defendants' actions, all attributable to the deprivation of his rights guaranteed by the Fourteenth Amendment to the U.S. Constitution.

84.     As a direct, proximate, and foreseeable result of the Defendants' conduct, Charles M. Byers died, all attributable to the deprivation of his rights guaranteed by the Fourteenth Amendment to the U.S. Constitution.

85.     The Defendants' aforesaid actions and omission constitute a willful, wanton, reckless, and conscious disregard of Charles M. Byer's rights.

86.     The Defendants' violations of the Fourteenth Amendment to the U.S. Constitution establish a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages, attorney's fees and costs to the Estate.

        WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, jointly and severally, in the amount of Twenty-Five Million Dollars ($25,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest, attorney's fees, punitive damages in the amount of Ten Million Dollars ($10,000,000.00), or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem just and proper.  A trial by jury is hereby demanded.

## COUNT FIVE – WRONGFUL DEATH

### (NEGLIGENCE, GROSS NEGLIGENCE, AND WILLFUL AND WANTON NEGLIGENCE)

51

87.     Plaintiffs restate and incorporate herein the allegations set forth in paragraph 1 through 86 of the Complaint.

88.     At all times relevant to the allegations in this Complaint, Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, had, among other duties, duties to exercise reasonable care with regard to Charles M. Byers.

89.     At all times relevant to the allegations in this Complaint, Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, had, among other duties, duties to treat Charles M. Byers in accordance with recognized and accepted standards of medical care, health care, mental health care, and/or nursing care and treatment.

90.     The Defendants' conduct, as described throughout this Complaint, constituted negligence.

91.     The Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, were grossly negligent in that their actions and inactions, described throughout this Complaint, showed a level of indifference to Charles M. Byers so as to constitute an utter disregard of prudence, amounting to a complete neglect for Charles M. Byers' safety.  Additionally, the several acts of negligence of each of the Defendants, when combined, had the cumulative effect of showing a reckless and total disregard for Charles M. Byers.  Additionally, Defendants acted or failed to act in the manner described throughout this Complaint with a reckless indifference to the consequences to Charles M. Byers when they were aware of their conduct and also aware, from their knowledge of existing circumstances and

conditions, that their conduct would result in harm to Charles M. Byers.

92.     As a direct, proximate, and foreseeable result of the negligence, gross negligence and/or willful and wanton negligence of the Defendants, Charles M. Byers died.

93.     As a direct, proximate, and foreseeable result of the negligence, gross negligence and/or willful and wanton negligence of the Defendants, which contributed to and were the proximate cause of the death complained of herein, Charles M. Byers suffered great physical pain and mental anguish.

94.     As a direct, proximate, and foreseeable result of the negligence, gross negligence and/or willful and wanton negligence of the Defendants, which contributed to and were the proximate cause of the death complained of herein, Charles M. Byers' surviving beneficiaries have suffered, and will continue to suffer, sorrow, mental anguish, and the loss of the decedent's society, companionship, comfort, guidance, kindly offices and advice, as well as economic losses, and have incurred funeral costs and expenses.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants, HCA-Chippenham, Nurse Hyde, John / Jane Doe Security Guards (1-5), the City of Richmond, through the RPD, and Officer Gibson, jointly and severally, in the amount of Twenty-Five Million Dollars ($25,000,000.00), or in such greater amount to be determined at trial, costs, pre-judgment interest, attorney's fees, punitive damages in the amount of Ten Million Dollars ($10,000,000.00), or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem just and proper.  A trial by jury is hereby demanded.

**MARGARET P. BYERS** and **MICHAEL C. BYERS**, Co-Administrators of the Estate of **CHARLES M. BYERS,** Deceased**,**


BY:    /s/ Paul McCourt Curley
                    Counsel


Paul McCourt Curley, Esq. VSB No. 43794
SIX EAST LAW GROUP –
CURLEY LAW FIRM, PLLC
6 East Broad Street
Richmond, Virginia 23219
Telephone: (804) 355-8273
E-Mail: paul.curley@sixeastlaw.com
www.sixeastlaw.com
  *Counsel for Plaintiffs*

54