IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MARGARET P. BYERS, *et al.*        )
      Plaintiffs,        )
                )
          v.        )        Civil Action No. 3:23cv801 (RCY)
                )
CITY OF RICHMOND, *et al.*        )
      Defendants.        )
                )

## MEMORANDUM OPINION

This matter comes before the Court on the presently pending Motion for Leave to File Video Exhibit in Support of Motion to Dismiss ("Motion for Leave," ECF No. 19) and Motion to Dismiss (ECF No. 17). These motions were jointly filed by Defendant Chippenham & Johnston-Willis Hospitals, Inc. and Defendant David R. Hyde, Jr. Both motions have been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated herein, the Court will deny the Motion for Leave (ECF No. 19) and grant-in-part and deny-in-part the Motion to Dismiss (ECF No. 17).

### I. BACKGROUND

When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "accept[s] as true the plaintiff's well-pleaded allegations and views all facts and draws all reasonable inferences in the light most favorable to plaintiff." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Such a standard, however, does not require accepting any unreasonable inferences or a plaintiff's legal conclusions. *Id.* Additionally, a court may consider any documents attached to the complaint. *E.I. du Pont de Nemours & Co. v. Kolon*

*Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).  Applying these standards, the Court construes the facts in the Complaint as follows.

### A. The "Crisis Triage Center" at Tucker Pavilion

Chippenham & Johnston-Willis Hospitals, Inc. ("CJW") operates Chippenham Hospital, a medical and surgical facility located at 7101 Jahnke Road, in Richmond, Virginia.  Compl. ¶¶ 11, 14.  CJW also provides behavioral health services through its "Tucker Pavilion" at this location. *Id*. ¶ 14.  CJW touts Tucker Pavilion as a "safe haven and treatment center for children, teens, adults and seniors who need mental health services in Richmond, Virginia, providing compassionate care for those suffering from severe mental illness."  *Id.* (internal quotations omitted).

For "many years prior to and continuing through July 2023, [CJW] and the [Richmond Police Department ("RPD")] have engaged in a partnership whereby the RPD places officers inside of [Chippenham Hospital] to be stationed within . . . Tucker Pavilion." *Id.* ¶ 15.  This partnership traces its roots back to October 2013, when officials from the City of Richmond (the "City") and CJW unveiled the "Crisis Triage Center"[1] at Tucker Pavilion.[2]  *Id.*  According to CJW and the RPD, the partnership underlying the Crisis Triage Center "brings together law enforcement, medical, psychiatric and emergency mental health services in a single location."  *Id.*  Proponents of this arrangement claimed that it would "enable law enforcement personnel to connect individuals in mental health crisis with critically needed evaluation and treatment services without

---

[1] Plaintiffs note that "[a]t some point [CJW] and the RPD may have discontinued use of the name 'Crisis Triage Center.'"  Compl. ¶ 15 n.1.  However, Plaintiffs aver that "at all times relevant to the incidents giving rise to these actions, [CJW] and the RPD operated in the same manner as described" in the Complaint.  *Id.*

[2] The Crisis Triage Center was "funded in part through a grant from the Virginia Department of Behavioral Health and Developmental Services . . . which receives its funds from the federal Substance Abuse and Mental Health Services Administration."  Compl. ¶ 15.

delay and to divert them from unnecessary and inappropriate placement in jails and involvement in the justice system." *Id.*

The Crisis Triage Center at Tucker Pavilion is physically comprised of a "small office used by a nurse-receptionist and another locked room known as the 'patient interview room' or 'search room' that is equipped with a one-way observational window." *Id.* At all times relevant to this matter, "at least one officer from the RPD [was] stationed in the Crisis Triage Center inside [Tucker Pavilion]" around the clock. *Id.* RPD officers working within or stationed at Tucker Pavilion "perform[] such work for [CJW] <u>and</u> the RPD as 'Extra-Duty' officers of the RPD." *Id.* ¶ 16 (emphasis in original). RPD General Order 4-6 contains guidelines and definitions relevant to this type of "extra-duty" work. *Id.*; *see* Compl. Ex. B ("RPD General Order") 2[3], ECF No. 1-3. In relevant part, "Extra-Duty" work is defined as "any outside employment that is conditioned upon the *actual* or *potential* use of law enforcement powers." RPD General Order 2 (emphasis added).[4]

Pursuant to the arrangement outlined above, the RPD controls the stationing of RPD officers working within Tucker Pavilion. *Id.* ¶ 17. The RPD also "control[s] the rate of pay for the officers, generally 1½ times the officer's rate of pay, require[s] that the officers wear their uniforms and be fully armed, and control[s] the roster of officers who [a]re dispatched to Tucker Pavilion through an RPD police coordinator."[5] *Id.* CJW, in turn, uses these "extra-duty" officers—who maintain their full panoply of law enforcement powers—"as security and for the

---

[3] For this and all other filings, the Court utilizes the pagination assigned by the CM/ECF system and not the pagination appearing on the original document.

[4] By contrast, "Off-Duty" employment is defined as "any outside employment wherein the use of law enforcement powers is *not* anticipated." RPD General Order 2 (emphasis added).

[5] Plaintiffs do not specify who actually pays the officers. However, RPD General Order 4-6 indicates that extra-duty officers are either (a) paid directly by their extra-duty employer, or (b) paid by the City, which is then reimbursed by the extra-duty employer. RPD General Order 2. Under either arrangement, CJW therefore bears the financial burden of paying these extra-duty officers.

management of psychiatric patients with serious mental illnesses." *Id.*; *see* Compl. ¶¶ 16–17; RPD

General Order 2.  Despite this alleged delegation of certain police powers to CJW, the RPD did

not provide the officers stationed in Tucker Pavilion with any "specialized training for working

with mentally ill patients in a medical setting."  Compl. ¶ 17.  RPD also "failed to establish any

guidelines regarding the RPD officers' role in the behavior management of mentally ill patients in

a psychiatric hospital, particularly with respect to the use of force and . . . restraints and seclusion

with mentally ill patients." *Id.*  While CJW willingly accepted and used RPD officers "as security

and to manage psychiatric patients," it likewise "failed to provide specialized training to the RPD

officers for the management of psychiatric patients in a medical setting." *Id.* ¶ 18.  In fact, CJW

expressly and purposefully "excluded RPD from the application of its policies relative to the use

of force and use of restraints with patients."[6] *Id.*

## B. Prior Incidents and Alleged Conditions at CJW

CJW is a subsidiary of HCA Healthcare, Inc. ("HCA"), "the largest hospital company in

America." *Id.* ¶ 14.  Plaintiffs allege that "HCA routinely engages in practices that maximize

profits at the expense of patient care [and] working conditions." *Id.*  For instance, "in Virginia,

HCA staffs its hospitals at approximately 32% below the national average." *Id.*  Plaintiffs allege

that this understaffing has created an environment at Chippenham Hospital—and by extension,

Tucker Pavilion—wherein diminished and improper care for patients like their late son, Charles

M. Byers ("Mr. Byers"), is commonplace.  *Id.* (alleging that CJW's understaffing "directly

contribut[ed] to diminished patient care," and "played a significant role in laying the groundwork

---

[6] Plaintiffs suggest that CJW's exclusion of RPD officers from its policies constitutes an attempt by CJW and RPD to "circumvent the law, [by] allow[ing] [CJW] to manage mentally ill patients more 'conveniently.'" Compl. ¶ 18; *see id.* ¶ 24 (alleging that CJW's exclusion of RPD officers from its policies "allow[s] [CJW] to claim that any actions involving RPD officers and its patients . . . are official 'law enforcement actions' over which . . . [it] has no control," while simultaneously permitting the RPD to likewise shield itself from liability via its "ignorance of the laws and regulations applicable to mentally ill patients in a medical setting").

for the incidents complained of herein").  Plaintiffs further aver that the unchecked presence and

actions of RPD officers at Tucker Pavilion also significantly contributed to the issues raised herein.

*See id.* ¶ 24.

Backing up their allegations with statistics, Plaintiffs note that, over the past ten years,

there have been roughly three times as many incidents "involving RPD and . . . patients of

[Chippenham Hospital] or others located [there]," *id.*, than the next closest Richmond-area

hospital:

> One need only compare the incidents involving the RPD at [Chippenham Hospital]
> to the incidents involving the RPD at other hospitals located in the City . . . to
> understand how strong and pervasive the presence of RPD officers at [Chippenham
> Hospital] has been and how much [CJW] has used the police powers of the RPD
> for patient management during their partnership. . . .  For the same ten-year period,
> October 13, 2013, to October 13, 2023, there were approximately:
>
> - 1200 incidents involving RPD officers at [Chippenham Hospital] but only–
>
> - 200 incidents involving RPD officers at VCU/MCV hospital[;]
>
> - 380 incidents involving RPD officers at Richmond Community Hospital[;]
>
> - 180 incidents involving RPD officers at Retreat Hospital[.]

*Id.*; *see id.*  Despite the "obvious and pervasive RPD presence at [Chippenham Hospital]" revealed

by these statistics, Plaintiffs note that the RPD has conducted "virtually no internal investigations

by the RPD into the many incidents involving RPD officers and the patients of [Chippenham

Hospital]." *Id.*  In fact, in the last three years, the only investigation into such a police-patient

incident concerned the facts underlying this very case.  *Id.*  And even in this "rare instance (first

and only?) in which the RPD performed an internal investigation of incidents involving RPD

officers at [CJW], the RPD determined that 'no improper action' was taken" by its officer(s).  *Id.*

Plaintiffs suggest that this lack of investigations strengthens their claims, "as it further illustrates

that the RPD sanctions and approves of actions by its officers working at [Chippenham Hospital]" that violate the federally protected rights of CJW's patients.  *Id.*

Plaintiffs next reference numerous patient and employee reviews that are purportedly indicative of CJW's "understaffing and . . . use of RPD officers to bully and manage mentally ill patients, with no oversight . . . , as part of the partnership between the RPD and [CJW]."  *Id.* ¶ 25. A small sampling of these reviews is included below:

[Patient Reviews]

"They treat depression like it's illegal.  You get treated like an inmate."

"Tuckers [Pavilion] is a HORRIBLE place.  I wouldn't recommend it to my worst enemy. . . .  It feels more like a jail than a hospital."

"This place should not be in business.  They treat patients like inmates.  They try to talk you in to saying something that would enable them to lock you down for 72 hours or more.  Some of the nicer staff that actually have compassion confirmed this was the case and that I should complain.  This facility is [like] a jail cell."

"You're better off in jail. . . .  The nurses are callous and could care less about your basic needs. . . .  They will not tell you your rights or the facility rules."

"This place is just prison, I went there for depression and they treated me like I committed a crime."

"Do not recommend anyone ever check themselves in here – staff is rude & they'll end up putting you in their unit that looks like jail if you tell them they suck."

"Employees in the hospital's ER yelled, bullied, and threatened me into signing into this place.  If I did not, they insisted, they would consult the judge in charge of admission and he would both admit me and make sure I 'never got out.'"

[Employee Reviews]

"The morale at Chippenham [Hospital] is very poor.  Staff are dropping like flies and complaints are rampant about not having enough staffing for it to be safe for patients and employees.  Management is unhelpful and don't appear to care about . . . safety."

"I was contracted to work as a nurse at Chippenham Hospital, and was subject to caring for an unsafe ratio of patients. . . .  When my concern about staffing ratios

was mentioned to the . . . manager, she became defensive and said 'we are not going to talk about ratios.'"

*Id.* ¶ 25.

**C. Mr. Byers and the Events of July 5, 2023 – July 8, 2023.**

Mr. Byers's struggle with mental health issues began in 1999, when he was just nine years old. *Id.* ¶ 26. He and his family, with the assistance of a doctor, were able to effectively cope with these issues for some time. *See id.* ¶¶ 26–27. However, "[i]n or about August 2008, when [Mr. Byers] was [nineteen] years old, his mental health condition(s) precipitously worsened." *Id.* ¶ 27. As a result, Mr. Byers was "confined to a psychiatric facility under a temporary detention order ("TDO") for a period of approximately [eleven] days." *Id.* During this involuntary hospitalization, Mr. Byers "was diagnosed with schizoaffective disorder, a rare mental illness that, in [Mr. Byers's] case, is related to both schizophrenia and bipolar disorder." *Id.* According to the American Psychiatric Association's DSM-5—the "accepted authority on mental and personality disorders"—an individual with schizoaffective disorder has both a major mood disorder (in Mr. Byers's case, bipolar mania), *and also* meets the primary criteria for schizophrenia. *Id.* Schizoaffective disorder typically involves symptoms such as feelings of elation for an extended period of time, rapid speech, racing thoughts, bizarre behavior, agitation, grandiose delusions, and hallucinations. *Id.*

After his diagnosis with schizoaffective disorder, Mr. Byers was prescribed psychotropic medications and underwent various behavioral and meditation therapies. *Id.* ¶ 28. While Mr. Byers's treatment regimen permitted him to "go for long periods of time with little to no apparent symptoms," the severity of his mental health conditions nevertheless "caused him to be hospitalized at various times between 2008 and 2023." *Id.* ¶ 29. But, aside from his initial hospitalization in 2008, the remaining hospitalizations were voluntary as Mr. Byers and his parents

7

(i.e., Plaintiffs) "generally knew when [he] needed help with his mental health conditions" and would voluntarily seek the necessary treatment. *Id.*

Beginning in or around May 2023, Mr. Byers's condition began to worsen. *Id.* ¶ 30. Plaintiffs noticed that he was "decompensating, becoming more isolated, paranoid, and anxious." *Id.* For instance, Mr. Byers got in the habit of driving his car to soothe himself, "but would lose his car, which happened three times—having no idea where he left it." *Id.* In the days leading up to July 5, 2023, Mr. Byers told Plaintiffs that he needed help. *Id.* Around the same time, Plaintiffs noticed that Mr. Byers was particularly "anxious, confused, and delusional—often having conversations with someone who was not there, sometimes mumbling and laughing to himself." *Id.* Mr. Byers was clearly struggling with reality, and "desperately needed help for his mental illness." *Id.*

On July 5, 2023, at approximately 4:00 p.m., Mr. Byers's mother drove him to Chippenham Hospital and waited while he went through intake. *Id.* ¶ 31. At approximately 5:00 p.m., Mr. Byers was given a green gown, "indicating that he was going to the mental health unit at Tucker Pavilion." *Id.* Mr. Byers's mother was then told by a CJW employee that Mr. Byers "was being admitted and that [CJW employees] would contact her if there were any problems," since she was "[Mr. Byers's] ride." *Id.* (internal quotations omitted). Mr. Byers's mother "told the intake nurse . . . that if [Mr. Byers] was let unattended, he would wander and that he could possibly walk home from the hospital, as he had done on a previous visit." *Id.* In response, the nurse assured her that Mr. Byers "would be assigned a 'sitter' and that the hospital would contact her if there were any issues." *Id.* Receiving this assurance, Mr. Byers's mother departed. *Id.* ¶¶ 31–32.

Subsequently, Mr. Byers was "left alone in the waiting room for several hours and, in his confused and delusional state, began wandering the halls of the hospital." *Id.* ¶ 32. Mr. Byers was

eventually met by an unknown security guard and Lt. Waite of the RPD, "who was performing 'extra-duty' police services for [CJW], pursuant to the partnership between the RPD and [CJW]." *Id.* According to Lt. Waite, "it was obvious that [Mr. Byers] was having some type of mental health issue," as he was "mumbling under his breath and . . . hearing voices or seeing things that were not there." *Id.* (internal quotations omitted). Lt. Waite and the security guard subsequently "locked [Mr. Byers] in a room in the Tucker Pavilion intake," *id.* ¶ 33, before Lt. Waite then "issued a 'paperless' Emergency Custody Order ("ECO") for [Mr. Byers]" at approximately 7:47 p.m.[7] *Id.* It is unclear whether this ECO operated to transfer custody of Mr. Byers to CJW, or whether the RPD and Lt. Waite retained custody of Mr. Byers.[8] *Id.* ¶¶ 33–34.

At approximately 8:30 p.m. on July 5, 2023, Lt. Waite called the Richmond Behavioral Health Authority ("RBHA") to request an evaluation of Mr. Byers for a temporary detention order ("TDO"). *Id.* Following this call, Mr. Byers was evaluated in person by Julia Sauder, a licensed clinical social worker with the RBHA. *Id.* ¶ 35. In her progress note, Ms. Sauder indicated that she found Mr. Byers asleep when she arrived, but that he did wake up to talk to her. *Id.* (citing Compl. Ex. F ("Progress Note") 1, ECF No. 1-6). However, Ms. Sauder noted that "it was hard to get any information of substance from [Mr. Byers]" because he would tell her "one thing and then [tell her] another." Progress Note 1. Ms. Sauder also observed that Mr. Byers's appearance was "unusual in that he is sunburned and his pupils were pinpoint." *Id.* Finally, Ms. Sauder noted that, while Mr. Byers "sa[id] he wanted to be admitted and his mom says he always goes voluntarily," a TDO was nevertheless appropriate "given [Mr. Byers's] confusion and going back and forth on

---

[7] Notably, Lt. Waite did not document or record his issuance of this ECO until several days later—"only after [Mr. Byers] was dead." Compl. ¶ 34.

[8] This confusion, per Plaintiff, is yet "another example of blurred (or non-existent) lines between the RPD and [CJW]." *Id.* ¶ 34.

the information." *Id.*  Based on Ms. Sauder's evaluation, she found that Mr. Byers met the criteria for a TDO and stated that "one will be obtained before his ECO runs out." *Id.*

Ms. Sauder called Mr. Byers's mother at approximately 9:30 p.m. on July 5, 2023, to update her that (1) Tucker Pavilion would be "admitting [Mr. Byers], but [that] they were waiting for a bed," Compl. ¶ 36, and (2) "they [were] going to TDO [Mr. Byers]." *Id.* (internal quotations omitted).  Ms. Sauder also told Mr. Byers's mother that she would be "getting off at 7 a.m. and that she would call her with updates."[9]  *Id.*   Then, on July 6, 2023, at 2:08 a.m., Magistrate Martesha M. Bishop issued a TDO (TDO 763GM-2300000955) for Mr. Byers.  *Id.* ¶ 37.[10]  The TDO was served upon Mr. Byers at 2:51 a.m. on July 6, 2023.  *Id.* ¶ 39.  Despite this relatively prompt service of the TDO, Mr. Byers was not actually admitted to Tucker Pavilion until 3:00 p.m. on July 6, 2023—twelve hours later.  *Id.*

Mr. Byers was eventually "assigned to Room 354B at 'Tucker 3E,'" and the attending doctor assigned to him was Dr. Khalon.  *Id.*  Pursuant to Virginia Code § 37.2-813, this assignment triggered additional safeguards for Mr. Byers.[11]  *Id.* (citing Va. Code Ann. 37.2-813(A), (B)).  Specifically, upon (a) the issuance of the TDO and (b) Mr. Byers's assignment to Tucker Pavilion,

---

[9] This was apparently the last update that Plaintiffs received about their son while he was still alive.  *See* Compl. ¶¶ 31, 36.  *See generally* Compl.

[10] Virginia law provides that a TDO can only be issued as follows:

> A magistrate shall issue . . . a temporary detention order if it appears from all evidence readily available, including any recommendation from a physician, clinical psychologist, clinical social worker, or clinical professional counselor treating the person, that the person (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs; (ii) is in need of hospitalization or treatment; and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

Va. Code Ann. § 37.2-809(B); *see* Compl. ¶ 38 (quoting Va. Code Ann. § 37.2-809(B)).

[11] To be sure, Plaintiffs' allegations regarding these Virginia code provisions are legal conclusions of the sort courts are to disregard at the 12(b)(6) stage.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court has nevertheless independently determined the applicability of the referenced provisions.  *See infra* Part IV.B.7.b.

10

Mr. Byers could only be lawfully released from the TDO (and Tucker Pavilion) prior to his commitment hearing "[(1)] by a district court judge or special justice, upon finding that [Mr. Byers] no longer met the criteria for a TDO, or [(2)] by the director of . . . Tucker Pavilion, upon finding, based on an evaluation conducted by the psychiatrist or clinical psychologist treating [Mr. Byers], that [Mr. Byers] no longer met the criteria for a TDO."  Compl. ¶ 39 (citing Va. Code Ann. 37.2-813(A), (B)).  Per Plaintiffs, "[n]one of this ever happened. . . .  In fact, [Mr. Byers] was never evaluated by a psychiatrist or clinical psychologist." *Id.* (emphasis in original).

At approximately 5:30 p.m. on July 6, 2023, CJW staff, including Nurse David R. Hyde, Jr. ("Hyde") and John/Jane Doe Security Guards (1–5), sought to move Mr. Byers from his room on the third floor to the second floor. *Id.* ¶ 40.  While Plaintiffs concededly do not know why this move occurred, they allege that CJW staff "likely attempted to move [Mr. Byers] to the second floor because of understaffing or lack of beds at . . . Tucker Pavilion." *Id.*  When CJW staff initiated this move, Mr. Byers, in his paranoid and delusional state, told the "nurses and security officers that he did not want to take the elevator to the second floor, apparently believing that he was going to be harmed." *Id.* ¶ 41.  CJW staff therefore "called in the RPD officer stationed [in Tucker Pavilion] to bully [Mr. Byers] into following their instructions by threat of force, threat of arrest and the use of restraints." *Id.*  The RPD officer called to "enforce" the directives of CJW staff was Officer Steven M. Gibson ("Officer Gibson"). *Id.*

At roughly 5:40 p.m., Officer Gibson arrived on scene and ordered Mr. Byers to "follow the instructions of [CJW] staff to get on the elevator to go to the second floor." *Id.* ¶ 42.  Plaintiffs emphasize that Officer Gibson "had received no training on the rights of patients in a medical setting."[12] *Id.*  Moreover, prior to issuing this command to Mr. Byers, Officer Gibson had done

---

[12] Indeed, according to Plaintiffs, that is the crux of the issue:

"no investigation to independently establish" any of the attending facts and circumstances regarding why Mr. Byers was at Tucker Pavilion, what his condition was, why he was being moved, what options were available to facilitate his move, and whether he was under a TDO or ECO. *Id.* Instead, Officer Gibson merely followed the instructions of CJW staff by ordering Mr. Byers to comply. *See id.* ¶¶ 42–43.

Mr. Byers responded to Officer Gibson's initial order by telling him, "'I do not trust you specifically' and 'I do not trust the others.'" *Id.* ¶ 43. As this encounter continued, Mr. Byers exhibited numerous signs of his paranoia and delusions. *See, e.g., id.* (noting that Mr. Byers, at various points, suggested that Officer Gibson was a "fake police officer," and that the "nurses [were] also fake"). "Notwithstanding [Mr. Byers's] obvious paranoia and delusions, Officer Gibson directed [Mr. Byers] to cooperate and get on the elevator." *Id.* Mr. Byers responded that he could not cooperate and that he would instead wait until the "real cops" showed up. *Id.* While Mr. Byers was clearly paranoid and delusional, he was "calm and not combative in any way" during this exchange. *Id.* The standoff continued, and eventually "Hyde and the Jane / John Doe Security Guards (1–5), acting jointly and in concert with Officer Gibson, . . . resort[ed] to the use of force." *Id.* The group grabbed Mr. Byers, "who was sitting in a chair with his hands clasped and a threat to no one," and "violently wrestle[d] him to the ground[,] attempting to put him in handcuffs." *Id.* During this altercation, Mr. Byers was surrounded by as many as ten to twelve CJW employees. *Id.* ¶ 44. These employees "instruct[ed] and encourage[d] Officer Gibson to use force and handcuffs on [Mr. Byers] by saying things like 'we just need to "clink-clink" . . .

---

[A]s part of the longstanding . . . practice of the RPD and [CJW] . . . [CJW] staff used [RPD] officers . . . to enforce their instructions, apparently knowing that they [(the CJW staff)] could not act by themselves and use any methods that would violate the patient's rights . . . . [Instead, CJW staff] combin[ed] their actions     with . . . the RPD officers' (and the RPD's useful and purposeful ignorance of patient's rights) to violate patient's rights under the threat and color of law.

Compl. ¶ 42.

him . . . and put him in the elevator.'"  *Id.*  CJW nurses, including Hyde, likewise encouraged Officer Gibson "by saying things like 'put 'em [handcuffs] on and take him down.'"  *Id.*

Officer Gibson was ultimately unsuccessful in his attempt to handcuff Mr. Byers.  *Id.* Consequently, Officer Gibson "pulled out his taser, pointed it at [Mr. Byers], and screamed at [him] to comply or he would tase him."  *Id.*  While Mr. Byers remained non-combative, Officer Gibson nevertheless proceeded to threaten Mr. Byers by asking, "do you want to go to jail, or do you want to go to the second floor?"  *Id.*  Before Mr. Byers could respond, "Hyde said 'at this point, we just want you [Officer Gibson] to take him away,'" instructing Officer Gibson to arrest Mr. Byers "despite the . . . fact that [Mr. Byers] had committed no crime."  *Id.*  In response, Officer Gibson asked Hyde whether Mr. Byers had kicked him or anyone else.  *Id.*  Hyde replied in the affirmative, "even though [Mr. Byers] did not kick . . . [anyone]."[13]  *Id.*  Plaintiffs posit that this conversation constitutes a joint effort between Hyde and Officer Gibson to "fabricate[] an assault charge so that Officer Gibson could arrest [Mr. Byers]."  *Id.*

Officer Gibson thereafter arrested Mr. Byers and forcibly removed him from Tucker Pavilion, where he "had been ordered to stay for treatment of his mental illness."  *Id.*  Plaintiffs allege that, "to make their . . . arrest and removal of [Mr. Byers] . . . seem lawful, Officer Gibson asked . . . Hyde to provide him with [Mr. Byers's] 'discharge papers.'"  *Id.*  Hyde, for his part, "could not lawfully [provide such papers.]"  *Id.*  Rather, because Mr. Byers was under a TDO, he could only be released after certain procedural hurdles were satisfied, pursuant to Virginia Code § 37.2-813.  *Id.* (citing Va. Code Ann. § 37.2-813(A), (B)).  Even though such procedural hurdles remained uncleared, Hyde "printed off a form that appeared to be a discharge summary with a

---

[13] Plaintiffs hedge slightly on this point by noting that, at the very most, Mr. Byers "could have accidentally struck someone with his leg while Officer Gibson and . . . Hyde were attempting to . . . restrain, handcuff and arrest [him]."  Compl. ¶ 44.

scribbled signature in the middle . . . attempting to falsely show that [Mr. Byers] was being lawfully discharged to his home." *Id.*

Mr. Byers was then removed from Tucker Pavilion, "shackled to some type of specialized restraint chair and taken to a transport vehicle driven by Officer Pearce of the RPD." *Id.* Officer Pearce asked Officer Gibson "why was [Mr. Byers] here, wasn't he on the third floor—the most secure?" *Id.* Officer Gibson replied, "I have no idea." *Id.* (emphasis omitted). The two officers brought Mr. Byers to Richmond City Jail, located at 1701 Fairfield Way in Richmond, Virginia. *Id.* ¶ 45. There, Mr. Byers appeared before a magistrate with Officer Gibson. *Id.* At no point did Officer Gibson "inform the magistrate the [Mr. Byers] was under a TDO; that [he] had been hospitalized for his severe mental illness; . . . and/or that [he] was in need of mental health treatment." *Id.* Officer Gibson's failure to provide this information apparently led the magistrate to release Mr. Byers on his own recognizance without receiving the mental health treatment he "desperate[ly] needed." *Id.* Even more, Mr. Byers was still technically under a TDO and assigned to Tucker Pavilion "for care and treatment for his severe mental illness" at the time he was released. *Id.*

Upon his release in the evening hours of July 6, 2023—and still in a "paranoid and delusional state"—Mr. Byers walked from the Richmond City Jail to the general area of his home in Chesterfield, approximately fourteen miles away. *Id.* ¶ 46. Mr. Byers was unable to find his home and instead "wandered around his neighborhood and adjoining neighborhoods searching for his home for approximately thirty-six . . . hours." *Id.* Mr. Byers continued to exhibit delusional symptoms throughout this entire time period. *See id.* Eventually, someone in the neighborhood where Mr. Byers was wandering called the Chesterfield County Police Department ("CCPD"). *Id.*

On July 8, 2023, at approximately noon, the CCPD responded. *Id.* CCPD officers interacted with Mr. Byers, who, according to the CCPD, "was holding a hatchet that he had apparently found." *Id.* CCPD officers instructed Mr. Byers to drop the hatchet, "but, [Mr. Byers], who was paranoid, delusional, and likely suffering from his horrific experience with the RPD and [CJW staff]" refused to do so. *Id.* In response, a CCPD officer tased Mr. Byers. *Id.* But, according to the CCPD, the taser failed. *Id.* CCPD officers then shot Mr. Byers six times, killing him. *Id.* Mr. Byers "died in the street just a few blocks from his home, while still under a TDO and assigned to [Tucker Pavilion] for care and treatment for his severe mental illness." *Id.*

## II. PROCEDURAL HISTORY

Plaintiffs filed their five-count complaint on November 2, 2023, alleging numerous violations of state and federal law against CJW, Hyde, the City, Officer Gibson, and John/Jane Doe Security Guards 1–5. Compl. ¶¶ 47–94.[14] On January 26, 2024, CJW and Hyde jointly filed a Motion to Dismiss and Memorandum in Support thereof. ECF Nos. 17, 18. That same day, CJW and Hyde also filed a Motion for Leave to File Video Exhibit in Support of Motion to Dismiss ("Motion for Leave") and Memorandum in Support thereof. ECF Nos. 19, 20. Plaintiffs filed their Memorandum in Opposition to CJW and Hyde's Motion to Dismiss on February 16, 2024,

---

[14] Plaintiffs have since filed an Amended Complaint adding Chesterfield County and Officer Gordon J. Painter as parties to this action. *See* Order, ECF No. 80; Mot. Leave to File Am. Compl. ("Mot. Leave") 3, ECF No. 75; Mot. Leave Ex. 1 ("Am. Compl.") ¶¶ 17–18. The Amended Complaint does not, however, impact the substantive allegations lodged against the already-named defendants. *See* Order, ECF No. 80 ("The current defendants—the City of Richmond, Chippenham & Johnston-Willis Hospitals, Inc., Steven M. Gibson, and David Hyde, Jr.—shall not be required to file pleadings in response to the Amended Complaint, as their previously filed responsive motions and Answers shall be deemed fully responsive to the Amended Complaint[.]") (filed by agreement and stipulation of the parties). *See generally* Compl.; Am. Compl.

Because the Amended Complaint does not impact the original Complaint's allegations aimed at CJW and Hyde, and because CJW and Hyde's "previously filed responsive motions [are] fully responsive" to the Amended Complaint, the Court has primarily cited to the original Complaint. The holdings herein nevertheless apply with equal force to the Amended Complaint. *Cf. United States ex rel. Constructors, Inc. v. Gulf Ins. Co.*, 313 F. Supp. 2d 593, 596 (E.D. Va. 2004) ("A defendant is not required to file a new motion to dismiss simply because an amended pleading was introduced while his motion was pending. . . . Instead, the court may consider the motion as being addressed to the amended pleading." (internal citations omitted)).

and their Memorandum in Opposition to CJW and Hyde's Motion for Leave on February 17, 2024.

ECF Nos. 33, 34.  CJW and Hyde then filed their reply briefs in support of both motions on

February 22, 2024.  ECF Nos. 37, 38.

The City and Officer Gibson also filed separate Motions to Dismiss and memoranda in

support thereof on January 29, 2024.  ECF Nos. 23, 24, 25, 26.  Plaintiffs filed a Memorandum in

Opposition to the City's Motion to Dismiss on February 20, 2024, and a Memorandum in

Opposition to Officer Gibson's Motion to Dismiss on February 21, 2024.  ECF Nos. 35, 36.  The

City and Officer Gibson filed reply briefing in support of their respective Motions to Dismiss on

February 26, 2024.  ECF Nos. 41, 42.

Accordingly, four motions are ripe for review:  (1) CJW and Hyde's Motion to Dismiss,

(2) CJW and Hyde's Motion for Leave; (3) the City's Motion to Dismiss; and (4) Officer Gibson's

Motion to Dismiss.  The Court addresses CJW and Hyde's Motion to Dismiss and Motion for

Leave presently, and reserves analysis of the remaining Motions to Dismiss for later opinions.

### III. LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly,

it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of

defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A

Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1356 (1990)).  Dismissals under Rule

12(b)(6) are generally disfavored by the courts because of their res judicata effect.  *Fayetteville*

*Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1471 (4th Cir. 1991).  Federal Rule of Civil Procedure

8 only requires that a complaint set forth "'a short and plain statement of the claim showing that

the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is

and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2).  *Id.* (citations omitted).  "[A] motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support [their] claim and would entitle [them] to relief."  *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.*  However, the plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff.  *Id.* (citations omitted); *see also Martin*, 980 F.2d at 952.

## IV. DISCUSSION

Though filed after the Motion to Dismiss, the Court will first consider the Motion for Leave, as it impacts the universe of facts upon which the Court's 12(b)(6) analysis should rest.

### A. Motion for Leave

As a threshold matter, CJW and Hyde seek leave to file a video exhibit in support of their Motion to Dismiss.  Specifically, CJW and Hyde wish to have the Court consider body-worn

camera footage depicting portions of the complained-of events.  Mem. Supp. Mot. Leave 1–2, ECF No. 20.  The Court declines to do so.

When a defendant challenges a claim under Rule 12(b)(6), courts are typically limited to considering the allegations set forth in the complaint.  *Zak v. Chelsea Therapeutics, Int'l*, 780 F.3d 597, 606 (4th Cir. 2015).  That is because the purpose of a Rule 12 motion is to test the sufficiency of the pleadings, not to resolve factual disputes.  *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  However, under limited circumstances, a court *may* consider documents beyond the complaint when resolving a Rule 12 motion.  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).  Relevant here, courts may consider extrinsic evidence attached to a motion to dismiss so long as such evidence is "*integral to* and *explicitly relied on* in the complaint," and "the plaintiffs do not challenge its authenticity."  *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *see Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips*, 190 F. 3d at 618).[15]

A document is "integral" when "its very existence, and *not the mere information it contains*, gives rise to the legal rights asserted."  *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007) (emphasis added); *see Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (quoting *Walker*, 517 F. Supp. at 806).  For instance, where a complaint in a fraud action "references a document containing the alleged material misrepresentations, the referenced document may be considered part of the complaint."  *Walker*, 517 F. Supp. 2d at 806.  Similarly, "a newspaper article reporting allegedly fraudulent

---

[15] Courts may also "take judicial notice of matters of public record."  *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  That said, neither party contends that the body-camera footage at issue qualifies as such a public record.  *See* Mem. Supp. Mot. Leave 1–2; Pls.' Mem. Resp. Mot. Leave to File Video Exhibit ("Pls.' Opp'n Mot. Leave") 1–2, ECF No. 34.  The Court will therefore focus its inquiry on (1) whether the body-camera footage was "integral to and explicitly relied on in the complaint," and (2) whether Plaintiffs "challenge its authenticity."  *Phillips*, 190 F.3d at 618.

statements by a corporate officer may be considered part of the complaint in a securities fraud action," just as an "allegedly libelous magazine article referred to in a complaint may be considered part of the complaint in a libel action based on that article."  *Id.*

The "document" at issue here is body-worn camera footage that apparently captures portions of the events on July 6, 2023, that "are the subject of this lawsuit."  Mem. Supp. Mot. Leave 1.  While videos can qualify as "documents" that may be considered at the 12(b)(6) stage, *see, e.g., Zsigray v. Cnty. Comm'n*, 709 F. App'x 178, 179 (4th Cir. 2018), the Court is not persuaded that the body-worn camera footage here is "integral" to Plaintiffs' Complaint such as to warrant present consideration.  Simply, the footage in question does not, "by its very existence, give[] rise to the legal rights asserted."  *Walker*, 517 F. Supp. 2d at 806.  Rather, the rights asserted in the complaint exist separate and apart from the body-worn camera footage.  This scenario stands in contrast to those identified in *Walker* wherein the extrinsic evidence *itself* explicitly gave rise to the rights and claims asserted.  *See id.*  The mere fact that Plaintiffs needed to (partially) rely on the body-worn camera footage to draft the recitation of events in their complaint does not alter this analysis.  *See Brown v. Harford Bank*, 2022 WL 657564, at *7 (D. Md. Mar. 4, 2022); *cf. Slippi-Mensah v. Mills*, 2016 WL 4820617, at *3 (D.N.J. Sept. 14, 2016) ("Simply because a video that captured the events complained of in the complaint exists does not transform that video into a 'document' upon which the complaint is based.").

The Court is unmoved by CJW and Hyde's arguments to the contrary.  For instance, CJW and Hyde note that Plaintiffs' Complaint "heavily relies on, but does not attach . . . Officer Gibson's body worn camera footage."  Mem. Supp. Mot. Leave 1.  CJW and Hyde contend that this reliance, coupled with the fact that Plaintiffs "do not challenge the authenticity of the video," is sufficient to permit the Court to consider the video footage at this stage.  Reply Supp. Mot.

Leave 1–2, ECF No. 37.  However, this focus on "reliance" ignores the concurrent requirement that the footage also be "integral" to the Complaint.  *See Phillips*, 190 F.3d at 618; *Am. Chiropractic Ass'n, Inc.*, 367 F.3d at 234 (quoting *Phillips*, 190 F. 3d at 618).  CJW and Hyde also argue that there are no notice concerns, as Plaintiffs' reliance on the footage indicates that they are clearly aware of its existence.  *See* Reply Supp. Mot. Leave 3.  This argument likewise misses the point.  Even if Plaintiffs relied on the footage in drafting their Complaint, it remains to be seen how the footage is "integral" to their Complaint.

In the end, it is certainly true that documents or materials referenced in a complaint "may, in certain circumstances, be considered part of the complaint for the purpose of evaluation and motion to dismiss."  *Walker*, 517 F. Supp. 2d at 806.  But to be considered at this stage, such documents or materials must also be "integral to the claim," insofar as their "very existence, and not the mere information [they] contain[], give[] rise to the legal rights asserted."  *Id.*  For the reasons outlined above, the body-worn camera footage is not "integral" to Plaintiffs' Complaint and therefore will not be considered at this stage.  The Court has tailored its recitation of the facts to reflect the allegations in the Complaint as opposed to its (or CJW and Hyde's) independent interpretation of what the body-worn camera footage reveals.[16]

---

[16] In any event, district courts have "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5B Charles A. Wright, Arthur R. Miller & A. Benjamin Spencer, *Fed. Prac. & Proc.* § 1356 (4th ed. 2024 update) (hereinafter, "Wright, Miller & Spencer").  Regardless of its holding on the issue of whether the body-worn camera footage is "integral" to Plaintiffs' Complaint, the Court would have exercised its discretion to decline CJW and Hyde's invitation to consider the body-worn camera footage. In the Court's view, it is likely that considering such footage at this stage would have entailed, *inter alia*, resolving contests surrounding the facts—something courts are not to do at the 12(b)(6) stage.

**B. Motion to Dismiss[17]**

Having now determined which materials may be considered at this stage, the Court turns

to CJW and Hyde's Motion to Dismiss.  Plaintiffs have lodged five counts against CJW and Hyde.

*See* Compl. ¶¶ 47–94.  Counts I, II, III, and IV are federal claims brought pursuant to 42 U.S.C.

§ 1983.  S*ee id.* ¶¶ 47–56 (Count I, for "Denial and Withholding of Medical Care"), 57–66 (Count

II, for "Denial of Rights to Be Free from Physical and Mental Abuse, and Restraints and

Seclusion"), 67–76 (Count III, for "Excessive Force—Fourteenth Amendment"), 77–86 (Count

IV, for "Unlawful/False Arrest—Fourteenth Amendment").   Count V, on the other hand, is a

wrongful death claim based on Virginia state law.  *See id.* ¶¶ 87–94 (Count V, for "Negligence,

Gross Negligence, and Willful and Wanton Negligence").   CJW and Hyde have moved to dismiss

all five of these counts.  *See* Mot. Dismiss 1, ECF No. 17; Mem. Supp. Mot. Dismiss ("Mem.

Supp.") 3, 11–30, ECF No. 18.

CJW and Hyde first take aim at Plaintiffs' § 1983 claims, arguing that the statutes relied

upon by Plaintiffs in Counts I and II do not confer rights enforceable via § 1983.  *See* Mem. Supp.

15–17.  CJW and Hyde simultaneously argue that § 1983 is inapplicable anyway because they are

---

[17] At the outset, the Court notes that Plaintiffs did not respond to many of the arguments raised by CJW and Hyde in their Motion to Dismiss briefing.  Instead, Plaintiffs either ignored certain arguments altogether, *see* Mem. Opp'n 5–9 (addressing only state action and unambiguous conferral), or improperly attempted to incorporate forthcoming responses to later-filed Motions to Dismiss in this case, *see id*. at 9.  CJW and Hyde therefore argue that "Plaintiffs have conceded that dismissal of th[e unaddressed] claims is appropriate."  Reply Supp. Mot. Dismiss 3, ECF No. 38.  However, a plaintiff's failure to respond to each and every argument raised by a defendant does not automatically entitle that defendant to dismissal; the Court must still independently assess the sufficiency of the Complaint to determine whether dismissal is appropriate.  *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416 n.3 (4th Cir. 2014) ("[T]he district court . . . has an obligation to review [12(b)(6)] motions to ensure that dismissal is proper" even where the motion is unopposed.).  This principle is consistent with the nature of the burden at the 12(b)(6) stage.  Wright, Miller & Spencer § 1356 ("Ultimately, the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

Accordingly, the Court declines to treat Plaintiffs' failure to respond to certain arguments as a concession that dismissal of those unaddressed claims is appropriate.  Plaintiffs are nevertheless advised that more thorough and timely responses—i.e., not incorporating arguments from yet-to-be-filed briefs—will be expected at subsequent stages of this litigation.

private parties who did not act under color of state law.  *See* Mem. Supp. 11–14.  This lack of state

action, per CJW and Hyde, dooms Counts I, II, III, and IV.  *See id.*  CJW and Hyde next rely upon

the body-worn camera footage to argue that Plaintiffs' excessive force claim in Count III should

be dismissed, as "reasonable force was used."  Mem. Supp. 18; *see* Mem. Supp. 18–19.  Next,

CJW and Hyde contend that Plaintiffs' unlawful arrest claim in Count IV fails as a matter of law

because there was probable cause to support Mr. Byers's arrest.  *See* Mem. Supp. 19–20.  CJW

alone then argues, its previous contentions notwithstanding, that Plaintiffs have failed to satisfy

the *Monell* pleading standard.  *See* Mem. Supp. 20–22.  Finally, CJW and Hyde raise various

arguments to contend that Plaintiffs' allegations are insufficient to support the state law claims in

Count V.  *See* Mem. Supp. 22–30.

For the reasons outlined below, Count I will be dismissed.  In addition, Counts III and IV

will be dismissed as to CJW only.  However, the remainder of the Complaint survives as to both

CJW and Hyde.[18]

1. <u>Section 1983</u>

All of Plaintiffs' federal claims (i.e., those in Counts I, II, III, and IV) rely upon 42 U.S.C.

§ 1983.  Accordingly, a brief of review of the relevant principles is in order before consideration

of the specific issues before the court.

Section 1983 provides as follows:

> Every person who, under color of [state law], subjects . . . any citizen of the United
> States or other person within the jurisdiction thereof to the deprivation of any
> rights . . . secured by the Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other . . . proceeding for redress.

42 U.S.C. § 1983.  Drawing upon this language, the Supreme Court has held that to state a claim

for relief in a § 1983 action, the complaining party must establish that they were (1) deprived of a

---

[18] That said, Count V will be limited in certain respects, as specified herein.

right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999); *see West v. Atkins*, 487 U.S. 42, 48 (1988).

The Supreme Court has further elaborated upon the first of these two requirements by observing that, while "federal statutes have the potential to create § 1983-enforceable rights, they do not do so as a matter of course." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023). Rather, Congress must "unambiguously confer" individual rights in order to make those rights "presumptively enforceable" under § 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280, 283–84 (2002); *see Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 160 (4th Cir. 2024) (noting that a plaintiff must assert the violation of a federal *right*, not merely a violation of federal law). To determine whether Congress has in fact "unambiguously conferred" "individual rights upon a class of beneficiaries," courts must employ "traditional tools of statutory interpretation." *Id.* at 283, 285–86. Importantly, "it must be determined that 'Congress intended to create a federal right' for the identified class, not merely that the plaintiffs fall 'within the general zone of interest that the statute is intended to protect.'" *Talevski*, 599 U.S. at 183 (quoting *Gonzaga*, 536 U.S. at 283) (emphasis omitted)*.*

This "unambiguous conferral" test is satisfied—and § 1983 enforceability inheres—where the provision in question is "phrased in terms of the persons benefitted" and contains "rights creating," individual-centric language with an "unmistakable focus on the benefitted class." *Gonzaga*, 536 U.S. at 284, 287 (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677 692 n. 13 (1979)). Conversely, the unambiguous conferral test is *not* satisfied—and there is no § 1983 enforceability—where the statutory provision "contain[s] no rights-creating language," has "an

aggregate, not individual, focus," and "serve[s] primarily to direct the [Federal Government's] distribution of public funds." *Id.* at 290.

As to the concurrent "under color of state law" requirement, the Supreme Court has clarified that such requirement is "identical" to the state action requirement of the Fourteenth Amendment. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982); *see Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). This requirement thus excludes from § 1983's reach all "merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 50. The Fourth Circuit has cautioned, however, that "[i]f the substance of § 1983 is not to be substantially eviscerated . . . 'its ambit cannot be a simple line between States and people operating outside formally governmental organizations.'" *Rossignol v. Voorhar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)). Section 1983 therefore includes within its scope "apparently private actions which have a 'sufficiently close nexus' with the State to be fairly treated as that of the State itself." *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)); *see S.P. v. City of Takoma Park*, 134 F.3d 260, 269 (4th Cir. 1998) ("A private entity regulated by the state acts under color of state law . . . when there is either a sufficiently close nexus, or joint action between the state and the private party.").[19]

Critically, there is no specific formula for defining state action under this standard. *Rossignol*, 316 F.3d at 523 (citing *Hicks v. S. Md. Health Sys. Agency*, 737 F.2d 399, 402 n.3 (4th Cir. 1984)). Rather, the question of what is fairly attributable to the state "is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Acad.*, 531 U.S. at 295.

---

[19] Two other scenarios may transform seemingly private conduct into state action for § 1983 purposes: when the state has, "through extensive regulation, exercised coercive power over, or provided significant encouragement to, the private actor," *S.P.*, 134 F.3d at 269, and when the "function performed by the private party has traditionally been an exclusive public function," *id.* (citing *Conner v. Donnelly*, 42 F.3d 220, 223–24 (4th Cir. 1994)).

With these principles in mind, the Court may now turn to consider whether Plaintiffs' Complaint is able to withstand CJW and Hyde's varied arguments for dismissal.

2. Unambiguous Conferral (Counts I and II) and State Action (Counts I–IV)

In Counts I–IV of their Complaint, Plaintiffs attempt to use § 1983 to assert violations of various federal rights. Compl. ¶¶ 47–66. CJW and Hyde argue that the statutes and regulations cited in Counts I and II—namely, 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. §§ 1395 *et seq.*, and 42 C.F.R. § 482.13—do not actually confer "private rights of action" that may be "used to support" a § 1983 claim.[20] Mem. Supp. 15; *see* Mem. Supp. 15–18. As such, CJW and Hyde contend that Counts I and II fail as a matter of law. *See* Mem. Supp. 15–18. CJW and Hyde also argue that Plaintiffs have failed to adequately plead that they—a private hospital and one of its nurses—were engaged in state action. If CJW and Hyde are correct in *this* assertion, none of Plaintiffs' federal claims in Counts I–IV can survive.

*a. Count II Relies Upon A Statute that Confers § 1983-Enforceable Rights*

Plaintiffs utilize §1983 in Counts I and II to allege violations of rights "unambiguously confer[red]" by 42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. §§ 1395 *et seq.*, and 42 C.F.R. § 482.13. Only the first of these provisions—§ 290ii(a)—unambiguously confers rights in the manner contemplated by the Supreme Court in *Gonzaga* and *Talevski*. Because Plaintiffs' § 1983 claim in Count II expressly relies upon § 290ii(a), it survives this step of the § 1983 inquiry. Count I, on the other hand, appears to rely upon provisions that do *not* unambiguously confer individually enforceable rights. For that reason, Count I will be dismissed.

---

[20] Elsewhere in the Complaint, Plaintiffs also suggest that "the Social Security Act § 1861" unambiguously confers rights enforceable via § 1983. *See, e.g.,* Compl. ¶ 1. However, Plaintiffs do not reference that statute in Counts I and II. *See* Compl. ¶¶ 49, 59. The Court will therefore focus on the provisions upon which Plaintiffs *do* explicitly rely in those Counts.

*i. 42 U.S.C. § 290ii(a)*

42 U.S.C. § 290ii is entitled "Requirement relating to the rights of residents of certain facilities." Section (a) of the statute reads:

> A public or private general hospital, nursing facility, intermediate care facility, or other health care facility, that receives support in any form from any program supported in whole or in part with funds appropriated to any Federal department or agency shall protect and promote the rights of each resident of the facility, including the right to be free from physical or mental abuse, corporal punishment, and any restraints or involuntary seclusions imposed for purposes of discipline or convenience.

42 U.S.C. § 290ii(a). The statute goes on to limit the use of restraints and seclusion on any resident(s) of a health care facility receiving federal funds. *Id.* § 290ii(b)(1)–(2). The portion of this statute titled "Regulation and enforcement" provides that "[a] facility to which this part applies that fails to comply with any requirement of this part . . . shall not be eligible for participation in any program supported in whole or in part by funds appropriated to any Federal department or agency." *Id.* § 290ii-2(c).

Applying the principles outlined above, the Court finds that § 290ii(a) *does* "unambiguously confer" rights upon patients such as Mr. Byers.[21] Assuming for present purposes that CJW and Hyde's conduct qualifies as "state action,"[22] Plaintiffs are thus entitled to bring their § 1983 claims in Counts I and II, to the extent those claims seek to enforce the rights so conferred.[23] In reaching this conclusion, the Court finds *Gonzaga*, *Talevski*, and *Planned Parenthood South Atlantic v. Kerr*, a recent Fourth Circuit decision, particularly instructive.

---

[21] At the time of his admission to CJW, Mr. Byers was a Medicaid recipient. Compl. ¶ 31. CJW thus falls within the ambit of § 290ii as a "private hospital . . . receiv[ing] support in any form from any program supported . . . in part . . . with funds appropriated to any Federal department or agency." 42 U.S.C. § 290ii(a).

[22] The issue of state action will be analyzed *infra*. *See* Part IV.B.1.b.

[23] As discussed *infra*, however, Claim I does not in fact seek to vindicate the rights conferred by § 290ii(a), hence the survival of Count II yet demise of Count I.

The Court begins with *Gonzaga*, one of the seminal cases on this topic.  There, a former student attempted to sue Gonzaga University under § 1983, alleging violations of the Family Educational Rights and Privacy Act ("FERPA").  *Gonzaga*, 536 U.S. at 276–77.  The relevant language in FERPA reads:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . . ) of students without the written consent of their parents to any individual, agency, or organization.

20 U.S.C. § 1232g(b)(1).  FERPA also directs the Secretary of Education (the "Secretary") to enforce this and the Act's other spending conditions.  *Id.* § 1232g(f).  To that end, the Secretary is required to establish an office and review board within the Department of Education for "investigating, processing, reviewing, and adjudicating violations of [the Act]."  *Id.* § 1232g(g). Funds may be terminated only if the Secretary determines that a recipient institution fails "to comply substantially with any requirement of [the Act]," and that such compliance "cannot be secured by voluntary means."  *Id.* §§ 1234c(a), 1232g(f).

Ultimately, the Supreme Court held that "there is no question that FERPA's . . . provisions fail to confer enforceable rights."  *Gonzaga*, 536 U.S. at 287.  The Court first noted that FERPA's provisions "entirely lack the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights."  *Id.*  Rather than focusing on the individuals purportedly receiving rights, the Court noted that "FERPA's provisions speak only to the Secretary of Education."  *Id.*  The Court also took issue with the fact that FERPA's provisions "speak only in terms of institutional policy and practice, not individual instances of disclosure."  *Id.* at 288.  Such an "aggregate focus," per the Court, reveals that the provisions "are not concerned with 'whether the needs of any particular person have been satisfied,' . . . and [thus] cannot 'give rise to individual

rights.'" *Id.* (quoting *Blessing v. Freestone*, 520 U.S. 329, 343–44 (1997)).  The Court rounded out its inquiry by observing that the provisions in question "serve primarily to direct the Secretary of Education's distribution of public funds to educational institutions," rather than to create rights "enforceable under § 1983." *Id.* at 290.

The Supreme Court recently revisited the issue of "unambiguous conferral" in *Talevski*. The statutory provisions considered in *Talevski* come from the Federal Nursing Home Reform Act ("FNHRA"), which exists to "ensure[] that nursing homes that receive Medicaid funding respect and protect their residents' health, safety, and dignity." *Talevski*, 599 U.S. at 171.  Relevant for present purposes, various provisions of FNHRA "refer to rights of nursing-home residents to be free from unnecessary physical and chemical restraints and to be discharged or transferred only when certain preconditions are satisfied." *Id.*  The Talevskis brought suit under § 1983 against a county-owned nursing home and its agents, alleging that the nursing home's use of certain restraints and persistent transfer attempts violated Mr. Talevski's rights under FNHRA. *See id.* at 171–74.  The nursing home challenged the Talevski's reliance on FNHRA, arguing that it does not unambiguously confer § 1983-enforceable rights. *Id.* at 174.

Applying the unambiguous conferral test outlined in *Gonzaga*, the Court held that FNHRA "satisf[ies] *Gonzaga*'s stringent standard," meaning that the rights explicitly recognized therein are "presumptively enforceable under § 1983." *Id.*  To begin, the Court noted that the unnecessary-restraint and predischarge notice provisions at issue are found in a section entitled "[r]equirements *relating to residents' rights*." *Id.* at 184.  Per the Court, such framing is "indicative of an individual 'rights-creating' focus." *Id.* (quoting *Gonzaga*, 536 U.S. at 284).  The Court then went on to discuss why both provisions "unambiguously confer[] rights upon the residents of nursing home facilities." *Id.*  Beginning with the unnecessary restraint provision, the Court noted that the

"provision requires nursing homes to," among other things, "protect and promote . . . *[t]he right* to be free from . . . any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms." *Id.* (quoting 42 U.S.C. § 1396r(c)(1)(A)(ii) (emphasis in original). The Court continued, "the provision's enumerated exceptions further sustain the focus on *individual* residents." *Id.* (noting that FNHRA provides that restraints may be utilized "to ensure the physical safety of the resident or other residents," but "only upon the written order of a physician" (quoting § 1396r(c)(1)(A)(ii)(I)–(II))). The Court then turned to the predischarge-notice provision, noting that it had "more of the same" individual-centric focus. *Id.*; *see id.* at 184–85.

The Supreme Court acknowledged that the provisions at issue "also establish who it is that must respect and honor these statutory rights; namely, the Medicaid-participant nursing homes in which these residents reside." *Id.* at 185. However, "that is not a material diversion from the necessary focus on the nursing-home residents." *Id.* As the Court observed, "it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights-bearers, the actors that might threaten those rights." *Id.; see also id.* at 185 n.12 ("The Fourteenth Amendment hardly fails to secure § 1983-enforceable rights because it directs state actors not to deny equal protection.").

The Court last distinguished the relevant FNHRA provisions from the FERPA provisions considered in *Gonzaga*. Specifically, the Court noted that, unlike the provisions considered in *Gonzaga*, FNHRA's unnecessary-restraint and predischarge-notice provisions "use clear rights-creating language, speak in terms of the persons benefited, and have an unmistakable focus on the benefited class." *Id.* at 185 (internal quotations omitted). By contrast, the FERPA provisions in *Gonzaga* "lacked 'rights-creating language,' primarily directed the Federal Government's

'distribution of public funds,' and had 'an aggregate, not individual, focus.'" *Id.* (quoting *Gonzaga*, 536 U.S. at 290). These differences satisfied that Court that the relevant FNHRA provisions "surmount[ed] th[e] significant hurdle" of securing § 1983-enforceable rights. *Id.* at 184; *see id.* at 184–85.

The final piece of this precedential puzzle is *Planned Parenthood South Atlantic v. Kerr*, a Fourth Circuit decision post-dating *Talevski*. The issue raised in *Kerr* concerned whether the "free-choice-of-provider provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(23), creates rights enforceable via 42 U.S.C. § 1983." *Kerr*, 95 F.4th at 155. While the Fourth Circuit acknowledged that "enforceable rights under § 1983 are dependent on congressional authorization, which under no circumstances may be casually implied," it nevertheless found that "a Medicaid beneficiary may use § 1983 to vindicate her right under the Medicaid Act to freely choose among qualified healthcare providers." *Id.* The court relied, in large part, on *Talevski* and *Gonzaga* in reaching such a conclusion. *See id.* at 162–66.

Turning to the relevant language, the Fourt Circuit first observed that "state plans under the Medicaid Act 'must . . . provide that . . . *any individual* . . . eligible for medical assistance . . . *may obtain* such assistance from *any* institution, agency, community pharmacy, or person, qualified to perform the services required . . . who undertakes to provide *him* such services.'" *Id.* at 165 (quoting 42 U.S.C. § 1396a(a)(23)) (emphasis added). Per the court, this language "'unambiguously confers rights upon' individual Medicaid recipients." *Id.* (quoting *Talevski*, 599 U.S. at 184). "Like the text at issue in *Talevski*, the 'necessary focus' of the provision is the 'rights-bearer[]'—specifically, 'any individual . . . eligible for medical assistance under the program.'" *Id.* (quoting *Talevski*, 599 U.S. at 185; 42 U.S.C. § 1396a(a)(23)). The court continued, "[b]y focusing on discrete beneficiaries and guaranteeing them a choice free from state interference, the

provision 'speak[s] "in terms of the persons benefited," and ha[s] an "unmistakable focus on the benefited class."'" *Kerr*, 95 F.4th at 165 (quoting *Talevski*, 599 U.S. at 186 (quoting *Gonzaga*, 536 U.S. at 284, 287, 290)).  The court also observed that the phrase "any individual" exemplifies "the kind of 'rights-creating' language required to confer a personal right on a discrete class of persons."  *Id.* (quoting *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 697 (4th Cir. 2019)).

Guided by the reasoning in these three cases, the Court finds that Plaintiffs have surmounted the significant hurdle of establishing that 42 U.S.C. § 290ii(a) creates individual rights enforceable via § 1983.  Crucially, the Court finds that the language used in § 290ii(a) is legally indistinguishable from the FNHRA language considered in *Talevski*.

Preliminarily, the Court notes that § 290ii(a) resides in a section entitled "Requirements *relating to the rights of residents* of certain facilities."  *See* 42 U.S.C. § 290ii (boldface omitted) (emphasis added); *see also West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (observing that statutory provisions "must be read in their context and with a view to their place in the overall statutory scheme").  This title is essentially identical to that of the statutory provision considered in *Talevski*.  *See Talevski*, 599 U.S. at 184 ("[W]e note that the [relevant provisions] reside in 42 U.S.C. § 1396r(c), which expressly concerns '[r]equirements *relating to residents' rights*'" (quoting 42 U.S.C. § 1396r(c))).  There, the Supreme Court noted that such framing is "indicative of an individual 'rights-creating' focus."  *Id.* at 184 (quoting *Gonzaga*, 536 U.S. at 284).  So too here, given the almost identical nature of the titles of each provision.

Moving on, § 290ii(a) requires hospitals and other facilities that receive federal funding or support to "protect and promote the *rights of each resident* of the facility."  42 U.S.C. § 290ii(a).  Section 290ii(a) goes on to provide a list of such individual "rights" that must be protected:  "the right to be free from physical or mental abuse, [the right to be free from] corporal punishment,

[and the right to be free from] any restraints or involuntary seclusions imposed for purposes of discipline or convenience." *Id.* This explicit reference to the rights of "*each* resident"—particularly when coupled with the subsequent list of enumerated rights—establishes that § 290ii(a) "focus[es] on discrete beneficiaries . . . , 'speak[s] "in terms of the persons benefited," and ha[s] an "unmistakable focus on the benefited class,"'" such as to unambiguously confer § 1983-enforceable rights. *Kerr*, 95 F.4th at 165 (quoting *Talevski*, 599 U.S. at 186 (quoting *Gonzaga*, 536 U.S. at 284, 287, 290)). Further solidifying this conclusion is the fact that § 290ii(a)'s language is almost *identical* to the FNHRA language examined by the Supreme Court in *Tavelski* and held to invest actionable, individual rights under § 1983. *See Tavelski*, 599 U.S. at 184–85 ("The unnecessary restraint provision requires nursing homes to 'promote and protect . . . *[t]he right* to be free from . . . any physical or chemical restraints imposed for the purposes of discipline or convenience.") (quoting 42 U.S.C. § 1396r(c)(1), (2)).[24]

The enumerated exceptions within § 290ii likewise serve to "sustain the focus on individual residents." *Talevski*, 599 U.S. at 184. For instance, § 290ii(b) provides that restraints and seclusions may be imposed on a resident "to ensure the physical safety *of the resident* . . . or others," but "only upon the written order of a physician . . . that specifies the duration and circumstances under which the restraints are to be used (except in emergency circumstances specified by the Secretary until such an order could reasonably be obtained)." § 290ii(b)(1)–(2) (emphasis added). Notably, the *Talevski* Court pointed to similar statutory language in support of its conclusion that FNHRA unambiguously confers rights upon the residents of nursing home

---

[24] The Court acknowledges that the FNHRA provisions at issue in *Talevski* are perhaps more comprehensive than those in § 290ii, insofar as they provide a lengthier, more detailed list of residents' rights. *See* § 1396r(c). However, this difference is immaterial as the relative length and depth of rights-investing provisions was not a factor considered by the Supreme Court in determining that § 1396r(c) unambiguously conferred rights upon nursing home residents. *See Talevski*, 599 U.S. at 183–86.

facilities.  *See Talevski*, 599 U.S. at 184 ("The provision's . . . exceptions . . . [also] focus on individual residents.  For example, nursing homes may use restraints 'to ensure the physical safety *of the resident or other residents*,' but 'only upon the written order of a physician that specifies the duration and circumstances under which the restraints are to be used' (absent emergency circumstances specified by the HHS Secretary)." (quoting § 1396r(c)(1)(A)(ii)(I)–(II) (emphasis in original)).  Section 290ii's exceptions therefore bolster the Court's conclusion that § 290ii unambiguously confers individual rights upon the residents of covered facilities.

Finally, the fact that § 290ii also establishes "who it is that must respect and honor these statutory rights," i.e.,  the hospitals and facilities receiving federal funding or assistance, is "not a material diversion from the necessary focus" on the individual rights-bearers.  *Id.*; *see* § 290ii(a) (providing that "public or private general hospitals, . . . or other health care facilit[ies]," that receive federal funding or assistance must "protect and promote the rights of each resident of the facilit[ies]" as outlined therein).  As the Supreme Court noted in *Talevski*, "it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights." *Talevski*, 599 U.S. at 186.  The Fourth Circuit in *Kerr* emphasized the very same point:  "*Talevski* rejected the argument that provisions that speak to and place obligations on third parties cannot create individual rights."  *Kerr*, 95 F.4th at 167.

While the above analysis largely resolves the unambiguous conferral inquiry, a comparison of § 290ii's provisions to the FERPA provisions considered in *Gonzaga* further solidifies the Court's conclusion.  Briefly, the statutory provisions analyzed in *Gonzaga* "entirely lack[ed] the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights."  *Gonzaga*, 536 U.S. at 287 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288–89

(2001). Instead, "FERPA's provisions speak only to the Secretary of Education, directing that '[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice.'" *Id.* (quoting 20 U.S.C. § 1232g(b)(1)). Per the Supreme Court, this focus on institutional policy and practice was "two steps removed from the interests of individual students and parents and clearly does not confer the sort of 'individual entitlement' that is enforceable under § 1983." *Id.* (quoting *Blessing v. Freestone*, 520 U.S. 329, 343 (1997)). By contrast, § 290ii establishes "Requirements relating to the *rights* of residents," 42 U.S.C. § 290ii (emphasis added), by *explicitly enumerating* such rights. *See* § 290ii(a). In other words, § 290ii's focus is not "two steps removed" from the rights of certain residents. Rather, its focus is *directly on* the rights of residents. Holding otherwise would run contrary to both the plain language of the statute and the Supreme Court's interpretation of nearly identical language in *Talevski*. *See id.*; *Talevski*, 599 U.S. at 184–86.

In sum, the touchstone of the unambiguous conferral inquiry is whether the provision in question is (1) phrased in terms of the persons benefitted, (2) contains rights-creating, individual centric language, and (3) has an unmistakable focus on the benefitted class. *Id.* (citing *Talevski*, 599 U.S. at 183). Section 290ii comfortably satisfies this inquiry. In turn, the rights recognized by § 290ii are "presumptively enforceable under § 1983." *Talevski*, 599 U.S. at 186.[25]

---

[25] Even where a statutory provision is held to unambiguously secure rights, "a defendant 'may defeat t[he] presumption by demonstrating that Congress did not intend' that § 1983 be available to enforce those rights." *Talevski*, 599 U.S. at 186 (quoting *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)). For evidence of such intent, courts may look to "the statute creating the right." *Rancho Palos Verdes*, 544 U.S. at 120. "A statute could, of course, expressly forbid § 1983's use." *Talevski*, 599 U.S. at 186. Absent such a sign, however, a defendant "must show that Congress issued the same command implicitly, by creating 'a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Id.* (quoting *Rancho Palos Verdes*, 544 U.S. at 120).

Here, CJW and Hyde have made no such incompatibility arguments. Instead, the thrust of their argument on § 290ii is solely that it does not confer § 1983-enforceable rights in the first place. *See, e.g.,* Mem. Supp. 16 ("No private right of action is mentioned or even contemplated [in § 290ii]. Thus, 42 U.S.C. § 290ii cannot be used to support a claim under Section 1983.") Accordingly, CJW and Hyde have failed to carry their burden of establishing that § 290ii is incompatible with individual enforcement via § 1983. *See Talevski*, 599 U.S. § 186. Plaintiffs' § 290ii claim may therefore proceed to the state action portion of the § 1983 inquiry.

### *ii.. 42 U.S.C. § 10841*

42 U.S.C. § 10841, the "Restatement of Bill of Rights for Mental Health Patients," outlines numerous rights that individuals admitted to mental health facilities should enjoy.  *See generally* § 10841.  Before outlining such rights, however, § 10841 provides:

> *It is the sense of the Congress* that . . . each State *should* review and revise, if necessary, its laws to ensure that mental health patients receive the protection and services they require, and that in making such review and revision, States *should take into account* the *recommendations* of the President's Commission on Mental Health and the following.

*Id.* (emphasis added).  Unfortunately for Plaintiffs, this prelude to the more substantive portions of § 10841 undermines their attempt to rely upon it to bring a § 1983 claim.

Simply put, the language excerpted above reveals that § 10841 is, at most, an aspirational piece of legislation.  It tells states what they "should" do, in "the sense of Congress."  *Id.*  The use of such terms indicates that § 10841 is "merely precatory," *Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 995 (1st Cir. 1992), and therefore "creates no enforceable federal rights," *id. See id.*; *Mele v. Hill Health Ctr.*, 609 F. Supp. 2d 248, 255 (D. Conn. 2009) (concluding that § 10841 does not create a private right of action or enforceable federal right); *Brooks v. Johnson & Johnson, Inc.*, 685 F. Supp. 107, 108 (E.D. Pa. 1988) (holding that § 10841 is "clearly precatory [and thus] does not create enforceable rights and duties"); *Riddick v. Barber*, 2019 WL 6119715, at *8 (E.D. Va. Nov. 18, 2019) (holding that 42 U.S.C. § 9501, the Bill of Rights for Mental Health patients, which contains language nearly identical to that in § 10841, does not create a private right of action enforceable via § 1983).

In view of the above, the Court need not conduct a more searching analysis as to whether § 10841 unambiguously confers enforceable federal rights.  Instead, the aspirational nature of the

statutory language ensures that the inquiry ends just as soon as it begins.  Plaintiffs may not rely on § 10841 for the purposes of their § 1983 claims in Counts I and II.

### *iii. 42 U.S.C. § 1395*

Plaintiffs also purport to rely upon "42 U.S.C. §[§] 1395 *et seq.*" to bring their § 1983 claims in Counts I and II.  *See, e.g.*, Compl. ¶¶ 1, 49, 59.  However, Plaintiffs' general invocation of a statute—particularly one as comprehensive as § 1395—is insufficient to put either the Court or the defendants on notice of what enforceable federal right within that statute has allegedly been violated.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 555 (2007) (noting that a complaint should serve to give the defendant "fair *notice* of what the . . . claim is and the *grounds upon which it rests*") (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (emphasis added)).  This notice concern is especially acute where, as here, Plaintiffs aver that several provisions supposedly provide the rights at issue.  *Cf. Belanger v. Com. Clearing House, Inc.*, 25 F. Supp. 2d 83, 84 (D. Conn. 1998) ("It is unclear . . . whether plaintiff is asserting redundant claims for violations of the ADEA, ADA and Title VII, . . . or [whether] she is . . . asserting a claim under the CFEPA. Count Four . . . is [thus] confusing and does not give defendant fair notice of the claim.").[26]

Moreover, even in the face of CJW and Hyde's Motion to Dismiss, Plaintiffs fail to draw the Court's attention to any relevant, enforceable federal rights within "42 U.S.C. § 1395 *et seq.*"  Plaintiffs instead double down without providing any additional information:  "[I]t cannot be denied that, pursuant to . . . 42 U.S.C. [§]§ 1395 *et seq*[.] . . . Congress unambiguously conferred individually enforceable rights on mentally ill patients."  Mem. Opp'n 9–10.  Without more, it is impossible for the Court or CJW/Hyde to know which rights have supposedly been violated.

---

[26] By contrast, Plaintiffs helpfully point to specific language in every other provision that supposedly vests the enforceable rights upon which Plaintiffs rely to bring their § 1983 claims.  *See* Compl. ¶¶ 20–22.

As such, Plaintiffs may not rely upon "42 U.S.C. [§]§ 1395 *et seq*." to bring their § 1983 claims in Counts I and II.[27]

### iv. 42 C.F.R. § 482.13

Finally, Plaintiffs also purport to rely on 42 C.F.R. § 482.13 for their § 1983 claims in Counts I and II. *See, e.g.*, Compl. ¶¶ 1, 49, 59. This reliance is misplaced. Language in a regulation, alone, cannot "conjure up a private cause of action that has not been authorized by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). To analogize, "[a]gencies may play the sorcerer's apprentice[,] but not the sorcerer himself." *Id.* Thus, Plaintiffs may not rely on 42 C.F.R. § 482.13 to bring their § 1983 claims in Counts I and II.

### v. Implications of the Unambiguous Conferral Inquiry

To summarize, 42 U.S.C. § 10801, 42 U.S.C. §§ 1395 *et seq.*, and 42 C.F.R. § 482.13 do not unambiguously confer rights that may be enforced by way of a § 1983 action. Conversely, 42 U.S.C. § 290ii does confer such § 1983-enforceable rights. The Court therefore turns briefly to consider whether Counts I and II survive this holding, insofar as both Counts purport to rely upon *all* of these statutes and regulations.[28] *See* Compl. ¶ 49 (alleging in Count I that "42 U.S.C.

---

[27] In any event, the Court has conducted an independent review of potentially relevant provisions within 42 U.S.C. § 1395. The only provisions therein that appear to both pertain to the claimed rights *and* arguably possess the requisite rights-conferring language reside in § 1395bbb and § 1395i-3. However, these paragraphs pertain to individuals under the care of home health agencies and skilled nursing facilities, respectively. *See* 42 U.S.C. § 1395bbb(a)(1) ("The [home health] agency protects and promotes the rights of each individual under its care, including the following rights."); *id.* § 1395i-3(c) ("A skilled nursing facility must protect and promote the rights of each resident, including each of the following rights."). Plaintiffs have not pleaded that Mr. Byers was under the care of either a home health agency or a skilled nursing facility. Rather, Plaintiffs aver that Mr. Byers was under CJW's care at the Tucker Pavilion, a "psychiatric facility accepting mentally ill patients who are experiencing crisis and in need of medical care." Compl. ¶ 11; *see id.* ¶ 17 (referring to Tucker Pavilion as a "psychiatric hospital"). The Court therefore need not consider whether either of § 1395bbb or § 1395i-3 unambiguously confer § 1983-enforceable rights, as neither applies to Mr. Byers. Accordingly, Plaintiffs may not use "42 U.S.C. §[§] 1395 *et seq*." for the purposes of their § 1983 claims in Counts I and II.

[28] The Court notes that Defendants did not raise this particular challenge, instead relying on their other, broader arguments for 12(b)(6) dismissal. Nevertheless, the Court finds merit in the inquiry. *See Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290–91 (4th Cir. 2021) (noting that *sua sponte* dismissals of complaints under Rule 12(b)(6) may be appropriate where the complaint is inadequate).

§ 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. §[§] 1395 *et seq*[.], and 42 C.F.R. § 482.13, unambiguously confer the individually enforceable right to appropriate treatment . . . and the right to exercise the rights set forth in the above cited statutes and regulations without reprisal in the form of denial of treatment"); *id*. ¶ 59 (alleging in Count II that "42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. §[§] 1395 *et seq*[.], and 42 C.F.R. § 482.13, unambiguously confer the individually enforceable right to be free from physical or mental abuse and the right to be free from restraints and seclusion").

Count I asserts a claim for denial and withholding of medical care. Compl. Count I. More specifically, Count I avers that the statutes and regulations referenced above unambiguously confer the right to "appropriate treatment under an individualized, written, treatment plan in a setting and under circumstances that are most supportive of a patient's personal liberty and the right to exercise the rights set forth in the above cited statutes and regulations without reprisal in the form of denial of treatment." Compl. ¶ 49. This language is almost identical to that present in 42 U.S.C. § 10801:

> A person admitted to a program or facility for the purposes of mental health services should be accorded . . . [(1)] the right to appropriate treatment and related services in a setting and under conditions that . . . are the most supportive of such person's personal liberty[,] . . . [(2)] the right to an individualized, written, treatment or service plan[,] . . . [and (3)] the right to exercise the rights described in this section without reprisal, including reprisal in the form of denial of any appropriate, available treatment.

42 U.S.C. § 10801(1)(A)(i), (1)(B), (1)(N). This is problematic, as the Court has determined that § 10801 does not unambiguously confer rights enforceable via a § 1983 action. By contrast, Count I does *not* appear to track the language of § 290ii, the only referenced statute that unambiguously confers § 1983-enforceable rights. *See* 42 U.S.C. § 290ii(a) (conferring the rights to "be free from physical or mental abuse, corporal punishment, and any restraints or involuntary seclusions imposed for purposes of discipline or convenience"). Count I must therefore be dismissed, as it

improperly asserts a § 1983 claim to enforce rights that are not actually "secured by the Constitution or laws of the United States." *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 49.[29]

Count II, on the other hand, closely tracks the language of § 290ii(a). *Compare* Compl. ¶ 59 (alleging violations of the "right to be free from physical or mental abuse and the right to be free from restraints and seclusion"), *with* 42 U.S.C. § 290ii(a) (conferring the following rights upon individuals like Mr. Byers who reside in certain facilities: "the right to be free from physical or mental abuse . . . and any restraints or involuntary seclusion"). Count II has therefore been properly lodged, as it asserts a § 1983 claim based upon the unambiguously conferred and thus presumptively enforceable rights outlined in § 290ii(a).

### *vi. Summary*

In sum, Plaintiffs attempt to collectively rely upon 42 U.S.C. § 290ii, 42 U.S.C. § 10801, 42 U.S.C. §§ 1395 *et seq.*, and 42 C.F.R. § 482.13 to bring their § 1983 claims in Counts I and II. CJW and Hyde seek dismissal of these Counts, contending (in part) that these provisions do not provide actionable rights under § 1983. On review, 42 U.S.C. § 290ii is the only statute of this bunch that unambiguously confers § 1983-enforceable rights. Because Count I facially relies upon § 290ii but in substance relies on the other statutes referenced, it must be dismissed. To the extent Plaintiffs can cure this deficiency via amendment, the Court will freely grant leave to do so. *See Brown v. Cobb*, 2018 WL 3080064, at *4 (E.D. Va. June 21, 2018) (dismissing § 1983 claims but noting that the court would "freely grant leave to amend" the complaint, as the allegations

---

[29] While "'*sua sponte* dismissals of complaints under Rule 12(b)(6)'" are permitted, *Robertson*, 989 F.3d at 290 (quoting *Chute v. Walker*, 281 F.3d 314, 319 (1st Cir. 2002)), district courts may "only exercise their authority to *sua sponte* dismiss inadequate complaints if 'the procedure employed is fair to the parties.'" *Id.* (quoting 5B Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1357 (3d ed. Oct. 2020 update)). To that end, "a party whose complaint stands to be dismissed must be 'afforded notice and an opportunity to amend the complaint or otherwise respond.'" *Id.* (quoting *Chute*, 281 F.3d at 319). Given that the Court has deemed Count I *legally* inadequate based on its holding that the statutes referenced therein do not confer the rights Plaintiffs assert, the Court is skeptical that Plaintiffs could amend the Complaint such as to save Count I from dismissal. Plaintiffs will nevertheless be granted free leave to amend Count I, should they so choose to do so. *See Robertson*, 989 F.3d at 291.

suggested that the "plaintiffs could allege more facts" to adequately support their claims); *cf. Wynn v. City of Richmond*, 2022 WL 2318497, at *15 (E.D. Va. June 28, 2022) (dismissing § 1983 claims without prejudice and noting that the court would "allow [the plaintiff] to amend her [a]mended [c]omplaint").  Count II, on the other hand, clearly asserts violations of the rights unambiguously conferred by § 290ii.  Accordingly, Count II survives this particular argument for dismissal.  The Court now moves on to CJW and Hyde's next argument for dismissal of Plaintiffs' federal claims—that their alleged conduct was not "state action."

> b. *Plaintiffs Have Sufficiently Pleaded That CJW and Hyde Were Engaged in State Action*

As previously outlined, a plaintiff seeking relief in a § 1983 action must plead sufficient facts to establish that they were (1) deprived of a right secured by the Constitution or laws of the United States, and (2) that such deprivation was committed under color of state law.  *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999); *West v. Atkins*, 487 U.S. 42, 48 (1988). Having now dealt with the parties' arguments on the first of these two requirements, the Court turns to the second.  For their part, CJW and Hyde maintain that dismissal of Plaintiffs' federal law claims in Counts I–IV is appropriate because they are private parties and took no actions attributable to the state.  *See* Mem. Supp. 12–14; Reply 4–8.  Yet again, the Court disagrees.

To reiterate, "merely private conduct, no matter how discriminatory or wrongful," is not actionable via § 1983.  *Am. Mfrs. Mut. Ins. Co., 526 U.S. at 50.*  However, § 1983's ambit is not "a simple line between States and people operating outside formally governmental organizations." *Rossignol v. Voorhar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)).  Instead, § 1983 also includes within its scope "apparently private actions which have a 'sufficiently close nexus' with the State to be fairly treated as that of the State itself."  *Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351

(1974)); *see S.P. v. City of Takoma Park*, 134 F.3d 260, 269 (4th Cir. 1998) ("A private entity regulated by the state acts under color of state law . . . when there is either a sufficiently close nexus, or joint action between the state and the private party").  There is no specific formula for defining state action under this standard.  *Rossignol*, 316 F.3d at 523 (citing *Hicks v. S. Md. Health Sys. Agency*, 737 F.2d 399, 402 n.3 (4th Cir. 1984)).  Rather, the question of what is fairly attributable to the State "is a matter of normative judgment, and the criteria lack rigid simplicity."  *Brentwood Acad.*, 531 U.S. at 295; *see Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 184 (4th Cir. 2009) (noting that "the totality of the circumstances in this setting is determinative").

For guidance on this "matter of normative judgment," *Brentwood Acad.*, 531 U.S. at 295, the Court has identified several cases that are particularly instructive.  The Court begins with *Jackson v. Pantazes*.  There, the Fourth Circuit considered whether a bail bondsman engaged in state action when he "obtained significant aid from . . . [a] police officer, who was unquestionably exercising state authority."  *Jackson v. Pantazes*, 810 F.2d 426, 429 (4th Cir. 1987).  The officer in question assisted in (1) gaining entrance to an individual's home, (2) dragging said individual from the doorway, and (3) restraining the individual "both physically and by oral advice" while the bail bondsman conducted a search.  *Id.*  The officer also served a warrant on the individual for alleged assault and harboring a fugitive.  *Id.*  Under these circumstances, the Fourth Circuit held that it was "readily apparent that [the bail bondsman] was a state actor."  *Id.* at 428.  In reaching this conclusion, the Court observed that a private party "is a state actor . . . subject to suit under § 1983" where that private party "act[s] jointly" with a public official "to produce the constitutional violation."  *Id.* at 429.  The court continued, "[t]his holds true . . . even in the absence of any state

statute, custom or policy which authorizes the private party's conduct; joint activity, alone, is sufficient." *Id.* The Fourth Circuit thus permitted the bail bondsman to be sued under § 1983. *Id.*

The next case for consideration is *Mentavlos v. Anderson*. In that case, Mentavlos brought a § 1983 suit against two cadets at The Citadel, a state-sponsored, four-year military college in South Carolina. *See Mentavlos v. Anderson*, 249 F.3d 301, 305–06 (4th Cir. 2001). The Fourth Circuit ultimately held that the cadets in question—Anderson and Saleeby—were not state actors. *Id.* at 318. In so holding, the court opined that because Anderson and Saleeby were private students, "they may not be held to constitutional standards unless there is a sufficiently 'close nexus' between the State and their challenged actions such that 'the latter may be fairly treated as that of the State itself.'" *Id.* at 318 (quoting *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 52). As part of this inquiry, the court noted that the state's mere adoption of a passive position toward the private conduct—in this case, sexual harassment, intimidation, and abuse by cadets—is insufficient to establish state action. Rather, courts must "look for 'indices of the Government's encouragement, endorsement, and participation' in the challenged action." *Id.* (quoting *Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 615–16 (1989)). Finding insufficient "indices," the Fourth Circuit affirmed the district court's grant of summary judgment to the cadet defendants. *See id.* at 318–23.

Beyond *Jackson* and *Mentavlos*, the Court has identified several cases that illustrate the sorts of fact patterns that are sufficient for courts to find that private actors engaged in state action. For instance, in *Mills v. PPE Casino Resorts Maryland, LLC*, the court held that a private casino and one of its employees were state actors for the purposes of § 1983. *See* 2017 WL 2930460, at *3 (D. Md. July 10, 2017). Critical to this conclusion was the fact that the casino, PPE, and its employee, Coulter, actively "direct[ed] the actions" of the police officers who were working

secondary employment at the casino.[30]  *Id.*  In fact, one of the officers specifically testified that Coulter was the person who gave him directions and assignments while working at PPE.  *Id.*  The court also noted, "[t]hat the officers were working to carry out a private goal of PPE" was further made clear by one of the statements an officer made to the plaintiff "in the secured back hallway [of the casino]: 'You can't leave here unless we I.D. who you are.  So either you can give 'em your I.D., or you can go with us and we can fingerprint you, find out who you are, and then . . . release you.'"  *Id.*  These circumstances satisfied the Court that private actors PPE and Coulter "were jointly engaged in [the police officer's] official actions" towards the plaintiff and, accordingly, "may be liable as state actors under § 1983."  *Id.*

A few other fact patterns in which courts have held that private actors were engaged in state action for the purposes of a § 1983 action involve (1) private hospitals with standing police details, *see, e.g.*, *Off. of Pub. Guardian v. Elliot Hosp.*, 630 F. Supp. 3d 345, 348, 352–56 (D.N.H. 2022); (2) private hospitals with fully-authorized *private* security/police forces, *see, e.g.*, *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 624–25, 627–30 (7th Cir. 1999), *Stokes v. Nw. Mem'l Hosp.*, 1989 WL 84584, at *2–5 (N.D. Ill. July 24, 1989); and (3) private colleges and universities with their own fully-operational police forces, *see, e.g.*, *Fleck v. Trustees of Univ. of Pa.*, 995 F. Supp. 2d 390, 400–03 (E.D. Pa. 2014), *Torres v. Univ. of Notre Dame Du Lac*, 2012 U.S. Dist. Lexis 40038, at *18–26 (N.D. Ind. Mar. 23, 2012).

By contrast, courts have declined to find state action where (1) police are "mere[ly] presen[t]" while private actors engage in the challenged conduct, *see, e.g.*, *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1450–51 (10th Cir. 1995), *Soldal v. Cnty. of Cook*, 942 F.2d

---

[30] While the court did not specify, it appears that the police officers in question must have retained their law enforcement powers as part of their secondary employment at PPE.  *See Mills v. PPE Casino Resorts Md., LLC*, 2017 WL 1862474, at *2 (D. Md. May 8, 2017) (noting that the police officer defendants were "Anne Arundel County Police Officers working secondary employment at the casino").

1073, 1075 (7th Cir.1991) (en banc), *rev'd on other grounds,* 506 U.S. 56 (1992); (2) private actors act in accordance with a state statutory scheme, *see, e.g.*, *S.P. v. City of Takoma Park*, 134 F.3d 260, 268–70 (4th Cir. 1998); and (3) private actors cooperate with an investigation or merely "request [that law enforcement] arrest someone," *see, e.g.*, *Cox v. Duke Energy*, 876 F.3d 625, 633–34 (4th Cir. 2017), *Allen v. Columbia Mall Inc.*, 47 F. Supp. 2d 605, 612–13 (D. Md. 1999).

Guided by the reasoning in these cases, the Court finds that Plaintiffs have sufficiently alleged that CJW and Hyde were engaged in state action for the purposes of their § 1983 claims.[31] That is because the totality of the circumstances reveals that CJW and Hyde's private actions had a "sufficiently close nexus" with the state such as "to be fairly treated as [those] of the [s]tate itself." *Rossignol*, 316 F.3d at 523 (quoting *Jackson*, 419 U.S. at 321).

Returning briefly to the allegations, Plaintiffs aver that CJW and the RPD "engaged in a partnership whereby the RPD places officers inside . . . Tucker Pavilion . . . to act as security and to help facilitate the transfer of seriously mentally ill patients from police custody to the Tucker Pavilion." Compl. ¶ 15.  This partnership was touted as "bring[ing] together law enforcement, medical, psychiatric, and emergency health services in a single location," by ensuring that Tucker Pavilion was "staffed at all times by a mental health clinician and Richmond police officers." *Id.* The officers so stationed "perform[] such work for [CJW] *and* the RPD as 'Extra-Duty' officers of the RPD." *Id.* ¶ 16.  The "Extra-Duty" designation means that RPD officers' employment with CJW is "conditioned upon the *actual* or *potential* use of law enforcement powers." *Id.*  RPD officers stationed in Tucker Pavilion thus retain—and may use—their full panoply of police powers. *Id.*  Notably, however, RPD officers working at Tucker Pavilion do not receive any specialized training from either CJW or the RPD "for working with mentally ill patients in a

---

[31] To clarify, this holding is applicable to Counts II, III, and IV.  While the same allegations and analysis likely apply to Count I, the Court has already determined that Count I must be dismissed on separate grounds.

medical setting." *Id.* ¶ 17; *see id.* (noting that "the RPD conceded that it did not provide any specialized training to the officers working at [Tucker Pavilion]," and that "[CJW] expressly . . . and . . . purposefully exclude[s] the RPD from the application of its policies relative to the use of force and restraints with patients").

Despite this lack of training, Plaintiffs allege that CJW nevertheless "employ[s] and . . . jointly work[s] with" these RPD officers to "manage mentally ill patients in its Tucker Pavilion." *Id.* ¶ 24.  This characterization of the RPD-CJW relationship is amply supported by Plaintiffs' allegations.  For instance, shortly after he arrived at Tucker Pavilion, Mr. Byers was left alone to wander the halls in a "confused and delusional state." *Id.* ¶ 32.  Sometime thereafter, Mr. Byers was approached by Lt. Waite, an RPD officer performing "extra-duty" police services for CJW.  *Id.* ¶ 33.  Lt. Waite apparently sensed that Mr. Byers was having "some type of mental health issue," *id.* ¶ 32, and so "locked [Mr. Byers] in a room in the Tucker Pavilion intake" before issuing a paperless ECO.  *Id.* ¶ 34.  Lt. Waite then reached out to the RBHA to request an evaluation of Mr. Byers for a TDO.  *Id.*  These sorts of actions indicate that Lt. Waite was "working to carry out a private goal of [CJW]"—i.e., the provision of mental health services—while interacting with Mr. Byers.  *Mills*, 2017 WL 2930460, at *3; *see Mentavlos*, 249 F.3d at 318 (noting that "'indices of the Government's encouragement, *endorsement, and/or participation*' in the challenged [private] action" are relevant to the state action inquiry (quoting *Skinner*, 489 U.S. at 615–16)).

While Lt. Waite's interactions with Mr. Byers represent one relevant instance of joint state/private conduct, the eventual encounter between Mr. Byers, CJW staff, and Office Gibson is an even more telling example of such conduct.  At that time, CJW staff—including Hyde— summoned Officer Gibson of the RPD to "bully [Mr. Byers] into following their instructions by threat of force, [and] threat of arrest and the use of restraints."  Compl. ¶ 41.  On arrival, Officer

Gibson demanded that Mr. Byers "follow the instructions of [CJW] staff to get on the elevator to go to the second floor." *Id.* ¶ 42.  Mr. Byers, suffering from his mental illness and in a paranoid and delusional state, neglected to comply. *Id.* ¶¶ 41–42.  Eventually, Officer Gibson and the CJW staff on scene "jointly . . . resort[ed] to the use of force" to get Mr. Byers to comply. *Id.* ¶ 43.

During this altercation, CJW staff repeatedly instructed and encouraged Officer Gibson to handcuff Mr. Byers. *Id.* ¶ 44.  After "unsuccessfully attempting to handcuff [Mr. Byers]," Officer Gibson "pulled out his taser, pointed it at [Mr. Byers], and screamed at [him] to comply [with the orders of CJW staff] or he would tase him." *Id.*  Officer Gibson also threatened to jail Mr. Byers if he did not comply, rhetorically asking him whether he "want[ed] to go to jail, or . . . to the second floor?" *Id.*  At that point, "Hyde said . . . 'we just want you [Officer Gibson] to take him away,'" instructing Officer Gibson to arrest Mr. Byers. *Id.*  Officer Gibson obliged, apparently coordinating with Hyde to both concoct an assault charge and prepare false discharge papers to justify Mr. Byers's arrest and removal from Tucker Pavilion. *Id.*

These allegations lead the Court to conclude that CJW and Hyde were engaged in state action for the purposes of § 1983.  In short, Plaintiffs allege (1) joint action between a state actor—Officer Gibson—on the one hand, and private actors—CJW, Hyde, and other CJW staff—on the other; and (2) that this joint action violated certain of Mr. Byers's federal statutory and constitutional rights.  A straightforward reading of *Jackson* instructs that private actors like CJW and Hyde necessarily engage in state action when these two elements are present:  "In cases where a private party and a public official [(1)] act jointly to [(2)] produce the . . . violation [of federal rights], . . . the [state action] test [is] satisfied." *Jackson*, 810 F.2d at 429.[32]  The *Jackson* Court

---

[32] Also critical to this conclusion is the fact that Officer Gibson (1) retained the full scope of his police powers while working in an "extra-duty" capacity at Tucker Pavilion, and (2) *used* or *threatened* to use those powers to carry out CJW's private goals.  *See Jackson*, 810 F.2d at 429 (holding that a private party engaged in state action where he

emphasized this point by noting that "even in the absence of any state statute, custom or policy which authorizes the party's conduct[,] *joint action, alone, is sufficient*" to establish state action on behalf of the private party.  *Id.* (emphasis added); *see Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982) ("[W]e have consistently held that a private party's joint participation with state officials in the [deprivation of an individual's federal rights] is sufficient to characterize that party as a 'state actor.'")*.*  Indeed, it is difficult to envision circumstances where the challenged private action has a "close[r] nexus" with the state than where, as here, private and public parties act jointly.  *See Rossignol*, 316 F. 3d at 523 (quoting *Jackson*, 319 U.S. at 351).

The Court's conclusion is bolstered by the District of Maryland's persuasive holding in *Mills*, where the court relied on facts akin to those alleged here to hold that a private casino and one of its employees were engaged in state action.  *See Mills*, 2017 WL 2930460, at *3.  Both here and in *Mills*, the staff at a private institution (1) contracted with state actors (i.e., police officers who retained their full scope of authority), (2) directed those state actors to leverage their state authority to carry out a goal of the private institution, and (3) jointly participated alongside those state actors.  *See id.*  Also noteworthy is the fact that Officer Gibson's statement here is identical in all relevant respects to a statement deemed particularly compelling by the court in *Mills*. *Compare id.* ("You can't leave here unless we I.D. who you are.  So, either you can give 'em your I.D., or you can go with us and we can fingerprint you."), *with* Compl. ¶ 44 ("[D]o you want to go to jail, or do you want to go to the second floor?").  A smattering of decisions from within other circuits further serve to reinforce the Court's state action conclusion.  *See, e.g., Off. of Pub. Guardian*, 630 F. Supp. 3d at 348, 352–56 (permitting a § 1983 claim against private hospital to proceed where the plaintiff alleged that the hospital engaged in joint action with officers from a

---

"obtained significant aid from . . . [a] police officer, who was *unquestionably exercising state authority*" at the time of the relevant events); *see also Mills*, 2017 WL 2930460.

police department that maintained a detail at the hospital); *cf. Stokes*, 1989 WL 84584, at *2–5 (holding that officers in a hospital's private police force were state actors because they were vested with "state power," and that the hospitals could therefore be sued via § 1983 for those officers' alleged constitutional violations).

CJW and Hyde raise two main arguments in an attempt to persuade the Court otherwise. First, relying heavily on the Fourth Circuit's decision in *S.P. v. City of Takoma Park*, CJW and Hyde argue that they cannot be deemed state actors for merely acting in accordance with the guidelines in Virginia's statutory scheme for involuntary commitment. *See* Mem. Supp. 13; Reply 5–6. Second, CJW and Hyde argue that the actions which allegedly violated Mr. Byers's federal rights were "unquestionably decisions and actions of law enforcement and judicial process, not the CJW Defendants." Mem. Supp. 13; *see* Mem. Supp. 13–14 (citing *Cox v. Duke Energy*, 876 F.3d 625 (4th Cir. 2017)); Reply 6–8. The Court is not persuaded by either argument.

Beginning with CJW and Hyde's first argument, the Court is unconvinced that *S.P.* is relevant to the instant inquiry. The plaintiff in *S.P.* brought a § 1983 suit against a private hospital and several of its personnel. *S.P.*, 134 F.3d at 263. The plaintiff contended that these private individuals qualified as state actors under § 1983 because "Maryland's involuntary commitment statute required them to conduct the evaluation that led to her involuntary commitment." *Id.* at 268. The Fourth Circuit observed that the relevant statutory scheme "provide[s] guidelines to mental healthcare providers," but "does *not* coerce, or even encourage, physicians to involuntarily commit individuals." *Id.* at 270. The court therefore held that the private hospital and its personnel were not state actors for purposes of § 1983. Importantly, *S.P.* did *not* involve any allegations suggesting that the private hospital and its personnel engaged in joint action with state actors simultaneously employed by the hospital. *See id.* at 263–65, 268–70. By contrast, such joint

action allegations form the heart of Plaintiffs' Complaint.  For that reason, *S.P.* is largely inapposite.[33]  Moreover, the handful of cases to consider factual scenarios and allegations more akin to those at issue here *did* find state action on behalf of the private actors involved.  *See, e.g., Off. of Pub. Guardian*, 630 F. Supp. 3d at 348, 352–56 (finding state action on behalf of a private hospital and its staff where the hospital's staff engaged in joint action with a police officer stationed at the hospital); *Mills*, 2017 WL 2930460, at *3 (finding state action on behalf of a private casino and its employee where such employee engaged in joint action with a local police officer "secondar[ily] employ[ed]" by the casino).

The Court is similarly unpersuaded by CJW and Hyde's alternative argument, i.e., that the actions which allegedly violated Mr. Byers's federal rights were solely "decisions and actions of law enforcement and judicial process, not the CJW Defendants."  Mem. Supp. 13.  In support of this argument, CJW and Hyde cite to *Cox v. Duke Energy, Inc.*  There, the plaintiff alleged that the private actor defendants—Duke Energy and its vice president—were liable under § 1983 since they "'act[ed] in a quasi-governmental capacity' and thereby 'contributed to the deprivation of [his] constitutional rights.'"  *Cox*, 876 F.3d at 633.  However, the record reflected only that Duke Energy's security personnel (1) called the police after observing plaintiff's glider flying over their power plant, (2) "dispatched members of [the security] . . . team" to a nearby airport where they photographed the plaintiff's glider, (3) asked the plaintiff a single question after he had been taken into police custody, (4) provided inaccurate information when they initially called the police, and (5) assisted law enforcement in their ensuing investigation of the incident.  *See id.* at 633–34.  After

---

[33] Indeed, Plaintiffs do not even contend that CJW and Hyde are state actors because they acted pursuant to Virginia's involuntary commitment statutes.  *See generally* Compl.  Rather, Plaintiffs' state action allegations appear to rest solely on the joint action between private and public actors.  *See, e.g.*, Compl. ¶ 1 ("[CJW] and its employees, as named herein, and the City of Richmond, through [the RPD], . . . acted jointly in concert and under the color of law to deprive [Mr. Byers] of the individually enforceable rights unambiguously conferred upon him.").

reviewing these facts, the court held that there was insufficient evidence to suggest that "Duke Energy had the requisite relationship to [law enforcement] so as to convert its conduct into state action." *Id.*

CJW and Hyde's reliance on *Cox* is misplaced.  The portion of *Cox* relied upon by CJW and Hyde essentially just stands for the unremarkable proposition that a "request to arrest" someone does not, without more, "make the requester a state actor." *Id.*  Plaintiffs rightly do not argue otherwise. *See* Mem. Opp'n 5–8.  Rather, Plaintiffs contend that this case has the something "more" that the allegations in *Cox* lacked.  Where the state action allegations in *Cox* largely just painted a picture of a standard 911 call and ensuing police investigation, *see Cox*, 876 F.3d at 633–34, Plaintiffs' allegations here go further.  Specifically, Plaintiffs aver that the RPD's officers (both in this case and as a matter of course) acted jointly with CJW and its employees, leveraging their official powers to help CJW carry out its private goals.  Such allegations are distinguishable from those in *Cox*, and are plainly sufficient at this stage to deem CJW and Hyde state actors for the purposes of § 1983. *See Jackson*, 810 F.2d at 429; *Mills*, 2018 WL 2930460, at *3.  It would require a disingenuous and impermissibly unfavorable reading of the Complaint to find otherwise.

At bottom, Plaintiffs have alleged sufficient "'indices of the Government's encouragement, endorsement, and participation' in the challenged action[s]," to permit a finding that CJW and Hyde are state actors potentially subject to § 1983 liability. *Mentavlos*, 249 F.3d at 318 (quoting *Skinner*, 489 U.S. at 615–16).  Coupled with the Court's previous finding regarding § 290ii, this means that Counts II, III, and IV clear the state action hurdle raised by CJW and Hyde's Motion to Dismiss.

3. <u>Excessive Force</u>

CJW and Hyde next take issue with Count III of Plaintiffs' Complaint, which asserts a Fourteenth Amendment excessive force claim. *See* Mem. Supp. 18. CJW and Hyde argue, in large part, that Count III should be dismissed because reasonable force was used. At this stage of the litigation, the Court cannot agree.

When addressing an excessive force claim brought under § 1983, courts must first identify "the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Relevant here, all claims that an individual used excessive force in the course of an arrest "or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395; *see Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985) (claim of excessive force to effect arrest analyzed under Fourth Amendment standard).

The next step of the excessive force inquiry concerns whether the force used to affect a particular seizure is in fact "reasonable" under the Fourth Amendment. In making this determination, courts must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake. *Garner*, 471 U.S. at 8 (quoting *United States v. Place,* 462 U.S. 696, 703 (1983)); *see Graham*, 490 U.S. at 396. The Fourth Circuit has held that four factors are "central to th[is] inquiry": (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight; and (4) the extent of the plaintiff's injuries. *Hupp v. Cook*, 931 F.3d 307, 322 (4th Cir. 2019) (citing *Graham*, 490 U.S. at 396; *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003)). This inquiry requires that courts pay "careful attention to the facts and

circumstances of each particular case." *Graham*, 490 U.S. at 396; *see Hupp*, 931 F.3d at 322 ("Ultimately, we must decide 'whether the totality of the circumstances justifie[d] a particular sort of . . . seizure.'" (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2018) (omission in original)); *Wiggins v. Quesenberry*, 222 F. Supp. 3d 490, 500 (E.D. Va. 2016).

Finally, at the 12(b)(6) stage, a plaintiff must simply "allege enough facts relevant to the reasonableness of the officers' actions to 'raise a right to relief above the speculative level.'" *Wiggins*, 222 F. Supp. 3d at 500 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Courts are "not to resolve contests surrounding the facts, [or] the merits of a claim." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). Instead, the question is merely whether a claim "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Applying the aforementioned four-factor test to the facts[34] of this case, the Court concludes that Plaintiffs have sufficiently alleged that CJW and Hyde's actions constituted excessive force.

> ### a. Mr. Byers Had Committed No Crime When First Encountered by CJW Staff and Officer Gibson

Beginning with the first factor, the Fourth Circuit has recognized that "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance . . . are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal." *Estate of Armstrong ex. rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) (citations omitted). Thus, "[t]he use of force that may be justified by the government's interest in seizing a mentally ill person . . . differs both in degree and in kind from the use of force that would be justified against

---

[34] The Court reiterates that it will not consider the body-worn camera footage at this stage. *See supra* Part IV.A. Rather, the Court will consider only the substance of Plaintiffs' allegations and any reasonable inferences that can be drawn therefrom.

a person who has committed a crime or who poses a threat to the community." *Id.* For that reason, counseling a mentally ill individual "is ordinarily advisable, where feasible, and may provide the best means of ending a crisis." *Id.* (citation omitted). And "even when this ideal course is *not* feasible, officers who encounter an unarmed and minimally threatening individual who is exhibiting conspicuous signs that he is mentally unstable must de-escalate the situation and adjust the application of force downward." *Id.* (cleaned up).

Here, Mr. Byers had not committed a crime when CJW staff and Officer Gibson encountered him. Much to the contrary—Mr. Byers was merely "seated in a chair with his hands clasped," ostensibly "a threat to no one." Compl. ¶ 43. The Fourth Circuit has recognized that under such circumstances, the first excessive force factor "weighs heavily in [the subject's] favor." *Armstrong*, 810 F.3d at 899; *see Smith v. Town of South Hill*, 611 F. 3d 148, 172 (E.D. Va. 2020) (quoting *Armstrong*, 810 F.3d at 899).

To be sure, the Fourth Circuit has also acknowledged that the first excessive force factor "is intended as a proxy for determining whether an officer had any reason to believe that the subject of a seizure was a potentially dangerous individual." *Armstrong*, 810 F.3d at 900. That Mr. Byers was under a TDO at the time of these events is therefore relevant. The TDO indicated that Mr. Byers had a mental illness and there existed a "substantial likelihood that, as a result of [such] mental illness," Mr. Byers will, "in the near future, (a) cause serious physical harm to himself or others, . . . or (b) suffer serious harm due to his . . . lack of capacity to protect him[]self from harm." Compl. Ex. 7 ("TDO") 1, ECF No. 1-7. By way of this TDO, CJW staff and Officer Gibson had at least *some* reason to believe that Mr. Byers posed a risk to others. However, when CJW staff and Officer Gibson confronted Mr. Byers, he was sitting peacefully in a facility purportedly equipped to care for individuals in mental health crises. Such circumstances belie any

preconceived notions Hyde, Officer Gibson, and other CJW staff may have had regarding Mr. Byers as a result of his TDO. Thus, viewing these facts in the light most favorable to Plaintiffs, this factor weighs in Plaintiffs' favor. *See Armstrong*, 810 F.3d at 900 n.2, 899–901; *see also Smith*, 611 F. Supp. 3d at 172–74 (holding that this factor applied neutrally where the individual in question was suffering from mental illness but (1) was *not yet* in custody and (2) the affidavit in support of his ECO *explicitly* indicated that he posed a danger to others).

> b. *Mr. Byers Did Not Pose an Immediate Threat to Others, Though He Did Defy Orders*

The second and third excessive force factors concern whether Mr. Byers "threatened the safety of others and resisted seizure." *Armstrong*, 810 F.3d at 901. Considered together here, these factors justify, at most, some limited use of force. *See id.*

As outlined above, the TDO reflected that Mr. Byers was suffering from mental illness, and that there existed a substantial likelihood that, "as a result of [such] mental illness, [Mr. Byers] will, in the near future, (a) cause serious physical harm to him[]self or others . . . or (b) suffer serious harm due to his[] lack of capacity to protect him[]self from harm." TDO 1. The progress note in support of this TDO, however, did not indicate any concern that Mr. Byers would physically harm others. *See* Progress Note 1 (outlining the reasons underlying Mr. Byers's TDO). Rather, Ms. Sauder indicated that Mr. Byers's primary symptoms appeared to be confusion, anxiety, brain fog, and restlessness. *Id.*; *see id.* ("[G]iven his confusion and his going back and forth on . . . information, it seems that a TDO might be . . . appropriate at this time."). The TDO therefore provides only shaky evidence that Mr. Byers posed a threat to others.

On the other hand, Mr. Byers behavior within Tucker Pavilion could and should have largely allayed any concern that he posed a threat to others. Again, when encountered by CJW staff and Officer Gibson, Mr. Byers was "seated in a chair with his hands clasped," posing "a threat

to no one." Compl. ¶ 43.  Of course, Mr. Byers did refuse to cooperate with CJW staff and Officer Gibson when they sought to move him from the third floor of Tucker Pavilion to the second floor. However, his refusal to cooperate was "calm and not combative."  Compl. ¶ 43.  And even when a physical struggle eventually ensued, there is no indication that Mr. Byers acted in such a way as to threaten anyone else's safety.  Indeed, the fact that he was surrounded by as many as "10–12 or more" CJW employees at the time of this encounter largely mitigates any such concern.  Thus, "the degree of force necessary" to seize or arrest Mr. Byers for his refusal to move "is obviously quite limited." *Armstrong*, 810 F.3d at 901.[35]

The analysis is much the same for the third factor.  Mr. Byers was concededly resisting attempts by CJW staff and Officer Gibson to move him.  While noncompliance with such orders perhaps justifies "some use of force," the level of justified force nevertheless "varies based on the risks posed by the resistance." *Id.* (citing *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010)).  Here, the factual circumstances demonstrate little risk.  Mr. Byers was stationary, non-violent, and surrounded by people supposedly trying to help him through his mental health crisis. That Mr. Byers was not allowing himself to be moved, "while cause for some concern, do[es] not import much danger or urgency into a situation that was, in effect, a static impasse." *Id.* Accordingly, to the extent that *any* force was justified, it should have been very limited. *See id.*; *Smith*, 611 F. Supp. 3d at 174.

---

[35] Importantly, Plaintiffs aver that Mr. Byers "did not kick . . . Hyde or anyone else" during this struggle. Compl. ¶ 44.  CJW and Hyde dispute this contention and attempt to draw the Court's attention to the body-worn camera footage. Mem. Supp. 19.  But again, the Court is not considering such footage at this stage.  Instead, the Court focuses on the allegations within the Complaint, construing all allegations and reasonable inferences therefrom in Plaintiffs' favor.

### c. The Extent of Mr. Byers's Injuries Resulting from the Use of Force Is Unclear

The fourth and final factor for consideration concerns "the extent of the plaintiff's injuries." *Hupp*, 931 F.3d at 322.

Given the unfortunate circumstances of this case, Plaintiffs are unable to provide concrete allegations regarding the extent of injuries suffered by Mr. Byers as a result of the alleged excessive force. Nonetheless, it is likely that Mr. Byers likely suffered both physical and psychological injuries as result of the challenged use of force. For starters, Officer Gibson and several CJW employees "violently wrestle[d]" Mr. Byers to the ground while attempting to handcuff him. Compl. ¶ 43. Later, Officer Gibson threatened Mr. Byers with his taser—a weapon "designed to 'caus[e] . . . excruciating pain.'" *Armstrong*, 810 F.3d at 902 (quoting *Cavanaugh v. Woods Cross City,* 625 F.3d 661, 665 (10th Cir.2010)). Even though Officer Gibson ultimately refrained from deploying his taser, the psychological harm associated with this threat still merits consideration. *See Hupp*, 931 F.3d at 322 (considering emotional trauma as well as physical injuries); *cf. Nazario v. Gutierrez*, 103 F.4th 213, 235 (4th Cir. 2024) (considering the "psychological effects" of pepper spray as among its "adverse effects" meriting consideration under the fourth excessive force factor).

These allegations, though fairly scant, are enough to tip the fourth factor slightly in Plaintiffs' favor. *See Nazario*, 103 F.4th at 235 (holding that the fourth factor weighed in the plaintiff's favor even though his injuries were neither permanent nor particularly grievous).

### d. Plaintiffs Have Adequately Alleged that Mr. Byers Was Subjected to Excessive Force

Analyzing these four factors cumulatively, the Court finds that Plaintiffs have adequately alleged that the force used by Hyde, Officer Gibson, and CJW staff was excessive. While numerous considerations animate this finding, it largely boils down to the following: (1) Mr. Byers

had committed no crime when he was initially confronted by Hyde, Officer Gibson, and other CJW staff; (2) to the extent Mr. Byers represented *any* threat to others, that threat was mitigated by the fact that he was (a) already present in a facility for mental health treatment and (b) surrounded by a group of individuals who were purportedly there to help him; (3) Mr. Byers's resistance was passive and therefore did not "import much danger or urgency into a situation that was, in effect, a static impasse," *Armstrong*, 810 F.3d at 901; and (4) Mr. Byers suffered at least *some* injuries at the hands of Hyde, Officer Gibson, and other CJW employees. Plaintiffs' excessive force claim in Count III therefore survives this argument for dismissal.[36]

### 4. Unlawful/False Arrest

In Count IV, Plaintiffs assert a Fourth[37] Amendment claim for "unlawful/false arrest." Compl. ¶¶ 77–86. CJW and Hyde argue that this claim fails as a matter of law for two reasons: (1) "there was probable cause to support Mr. Byers's arrest," and (2) "a neutral and detached magistrate issued the Warrant of Arrest." Mem. Opp'n 19. The Court is not persuaded by either argument.

CJW and Hyde first argue that there was probable cause to arrest Mr. Byers because "there is no question that Mr. Byers kicked . . . Hyde." Mem. Opp'n 19. That kick, per CJW and Hyde, provided Officer Gibson with probable cause to arrest Mr. Byers for assault and battery under to Virginia Code § 18.2-57. At this stage, the Court cannot agree. The cited statutory provision reads, "[a]ny person who commits a simple assault or assault and battery is guilty" of either a

---

[36] The Court is also unpersuaded by CJW and Hyde's argument that they are "not liable for the acts or omissions of Officer Gibson." Mem. Supp. 19 n.5. Even assuming this contention is correct, the allegations reveal that CJW staff and Hyde jointly participated with Officer Gibson in his purported use of excessive force. Thus, they are potentially exposed to liability for *their own* use of excessive force.

[37] Plaintiffs technically style their false arrest claim as arising under the Fourteenth Amendment. *See* Compl. ¶ 79. However, § 1983 false arrest claims "are properly analyzed as unreasonable seizures under the Fourth Amendment." *McPhearson v. Anderson*, 874 F. Supp. 2d 573, 580 (E.D. Va. 2012). The Court therefore construes Count IV as alleging a *Fourth* Amendment false arrest claim brought pursuant to § 1983. *See id.*

misdemeanor or felony.[38]  Va. Code Ann. § 18.2-57(A)–(C).  In Virginia, an assault occurs when an individual engages in an overt act that was either (a) "intended to inflict bodily harm with the present ability to inflict such harm," or (b) "'intended to place the victim in fear or apprehension of bodily harm, which did in fact create 'such reasonable fear or apprehension in the victim.'" *Blankenship v. Commonwealth*, 838 S.E.2d 568, 573–74 (Va. Ct. App. 2020) (quoting *Clark v. Commonwealth*, 676 S.E.2d 332, 336 (Va. Ct. App. 2009) (en banc)).  Battery, on the other hand, occurs when an individually "'willful[ly] or unlawful[ly] touch[es]' . . . another." *Kelley v. Commonwealth*, 822 S.E.2d 375, 379 (Va. Ct. App. 2019) (quoting *Parish v. Commonwealth*, 693 S.E.2d 315, 318 (Va. Ct. App. 2010)).

An action is willful when it is "intentional, or knowing, or voluntary, as distinguished from accidental." *Pelloni v. Commonwealth*, 781 S.E.2d 368, 371 (Va. Ct. App. 2016) (quoting *Barrett v. Commonwealth*, 268 Va. 170, 183 (2004)).  Additionally, the word "willful" generally means "an act done with a bad purpose." *Id.*  "One cannot be convicted of assault and battery without an intention to do bodily harm—either an actual intention or an intention imputed by law." *Parish*, 693 S.E.2d at 319 (citing *Adams v. Commonwealth*, 534 S.E.2d 347, 350 (Va. Ct. App. 2000)).  Unlawful intent may be imputed where the touching is "done in a rude, insolent, or angry manner." *Adams*, 534 S.E.2d at 350.

Here, taking the allegations as true and drawing all reasonable inferences in the light most favorable to Plaintiffs, Mr. Byers either did not kick Hyde at all, or "[a]t the very most, . . . could have accidentally struck someone with his leg while Officer Gibson and . . . Hyde were attempting

---

[38] Whether the assault and/or battery qualifies as a misdemeanor or felony depends upon the identity and profession of the person assaulted and/or battered.  *See, e.g.,* Va. Code Ann. § 18.2-7(A)–(B) ("Any person who commits a simple assault or assault and battery is guilty of a Class 1 misdemeanor. . . .  However, if a person intentionally selects the person against whom an assault and battery resulting in bodily injury is committed because of his race, religious conviction, [or other protected characteristic], the  person is guilty of a Class 6 felony.").

to . . . restrain, handcuff, and arrest him." Compl. ¶ 44.[39]  If the kick did not occur, then there was

no unlawful touch and thus no probable to arrest Mr. Byers for assault and battery.  *See Kelley*,

822 S.E.2d at 379.  If the kick did occur but was accidental, then Mr. Byers may not have possessed

the requisite willful mental state to commit the crime of assault and battery.  *See Wood v.*

*Commonwealth*, 701 S.E.2d 810, 818 (Va. Ct. App. 2010) ("[W]illful conduct must be knowing

or intentional, rather than accidental."); *Barrett*, 268 Va. at 183 (noting that "willful" in criminal

statutes typically denotes an act done with a bad purpose); *Parish*, 693 S.E.2d at 330–31 (noting

that an affirmative intent to do bodily harm is a necessary component of a Virginia assault and

battery conviction).  Given the present procedural posture and the relatively underdeveloped state

of the facts on this issue, the Court is unable to dispose of Mr. Byers's false arrest claim at this

time.  *See Alexander v. Alexander*, 229 F.3d 111, 116–17 (4th Cir. 1956) ("When the facts relied

on to show probable cause are in dispute, their existence is a question of fact for the determination

of the jury."); *Whitley v. Prince George's County*, 2013 WL 3659949, at *6 (D. Md. July 11, 2013)

(quoting *Alexander*, 229 F.3d at 116–17).

  In the alternative, CJW and Hyde contend that Count IV should be dismissed because

Officer Gibson obtained a warrant for Mr. Byers's arrest, and "when an officer consults a

magistrate requesting a warrant of arrest, the officer is entitled to a presumption that they acted

with objective reasonableness."  Mem. Opp'n 19–20 (citing *Torchinsky v. Siwinski*, 942 F.2d 257,

262 (4th Cir. 1991)).  There are two problems with this line of argument.  First, the cases CJW and

Hyde cite in support of this proposition involve situations wherein a warrant was obtained *prior*

---

[39] CJW and Hyde contend that "there is no question that Mr. Byers kicked Nurse Hyde and acknowledges having done so."  Mem. Opp'n 19.  This "unquestionable fact" is apparently drawn from the body-worn camera footage.  But again, the Court is not considering that footage at this stage.  And even putting aside the fact that viewing such footage is better reserved for later stages of the litigation, such as summary judgment, the Cout is skeptical of whether the willfulness of Mr. Byers's supposed kick would be apparent—let alone "unquestionable"—from such footage.

the individual's arrest.  *See* Mem. Opp'n 19–20 (citing *Torchinsky*, 942 F.2d at 262; *Mead v. Shaw*, 716 F. App'x 175, 178 (4th Cir. 2018); *Thweatt v. Rhodes*, 2023 WL 4231724, at *4 (4th Cir. June 28, 2023)).   In those situations, CJW and Hyde's argument makes good sense because the magistrate's *intervening* probable cause determination resets the causal chain.  *See Thweatt*, 2023 WL 4231724, at *4 ("The intervening acts of a decision maker such as a magistrate can act as a superseding cause that breaks the causal chain and shields an investigating officer from liability." (citing *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012))).   Here, though, it appears that Officer Gibson arrested Mr. Byers and *thereafter* obtained a warrant from a magistrate to justify the arrest.  Defendants have cited no cases to suggest—and the Court is accordingly skeptical as to whether—such a post-hoc warrant can be deemed the sort of "intervening act" that "breaks the causal chain and shields an investigating officer from liability."  *Id.* (citing *Evans*, 703 F.3d at 647).

The second issue with CJW and Hyde's argument is this:  even where a warrant is issued, a party can nevertheless be held liable "if they have misled, unduly pressured, or lied to a magistrate."  *Id.* (citing *Evans*, 703 F.3d at 647).  Plaintiffs here clearly aver that CJW, Hyde, and Officer Gibson worked in concert to "fabricate[] an assault charge" so that Mr. Byers could be arrested.  Compl. ¶ 44.  Plaintiffs further allege that Officer Gibson continued this deceit by failing to adequately inform the magistrate of the circumstances surrounding Mr. Byers's arrest.  *See id.* ¶¶ 44–45.  Taken together, such allegations are sufficient at this stage to shield Plaintiffs' false arrest claim from dismissal.  *Cf. Thweatt*, 2023 WL 4231724, at *4 (noting that liability for a § 1983 malicious prosecution claim may attach where the plaintiff alleges that officers "have misled . . . or lied to a magistrate" (citing *Evans*, 703 F.3d at 647)).

In sum, none of the issues raised by CJW and Hyde with respect to Count IV warrant dismissal thereof at this stage.[40]

5. *Monell*

CJW alone raises the final argument with respect to Plaintiffs' federal claims—that Plaintiffs have failed to state *any* of their § 1983 claims against it, "because they have not identified an unconstitutional policy, custom, or practice." Mem. Supp. 20 (boldface omitted).[41]  CJW is only partly correct.

For the purposes of Section 1983, "a municipality is considered a 'person' and thus is subject to suit." *Hunter v. Town of Mocksville*, 897 F.3d 538, 553 (4th Cir. 2018) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).  This theory of liability has been extended to include private entities operating under color of state law as well, meaning that the standards applicable to municipalities in the *Monell* context are equally applicable to private corporations acting under color of state law.  *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir. 1999); *see See Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 355 (4th Cir. 2003).[42]  To that end, private entities acting under color of state law cannot be held liable under § 1983 *solely* because they employ a tortfeasor.  *Monell*, 426 U.S. at 691; *see Austin*, 195 F.3d at 727 (noting that the Supreme Court has consistently refused to impose § 1983 liability "upon a theory of *respondeat superior*").  Rather, such entities are only subject to § 1983 liability when they cause

---

[40] As discussed *infra*, Counts III and IV will nevertheless be dismissed as to CJW for failing to satisfy the strictures of *Monell*.

[41] CJW also apparently "disputes that . . . Hyde is a tortfeasor, and . . . that Officer Gibson is somehow liable to Plaintiffs." Mem. Opp'n 20 n.7.  CJW thus claims that "[b]ecause Plaintiffs have not stated claims against . . . Hyde and Officer Gibson, CJW cannot be held liable under *Monell*." *Id.*  at 20–21 n.7.  While not made explicit, it seems this argument must be premised upon CJW and Hyde's related argument that Plaintiffs have not raised any § 1983-enforceble claims in the first place.  Having found otherwise, the Court focuses its analysis on *Monell*'s latter requirement—that Mr. Byers's alleged injuries resulted from CJW's official policies or customs.

[42] The Court will thus cite to municipality and private entity *Monell* cases interchangeably throughout its analysis.  *See Austin*, 195 F. 3d at 727–28.

a deprivation of federally conferred rights through an official "policy or custom." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). Since the Court has already held that Plaintiffs have adequately alleged deprivations of federal conferred rights, the only remaining issue concerns whether CJW's official policies or customs caused Mr. Byers's alleged injuries.

The Fourth Circuit has identified four avenues through which a § 1983 plaintiff may demonstrate the existence of a *Monell* "policy or custom":

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). Reading the Complaint in the light most favorable to Plaintiffs, they allege the existence of an unconstitutional policy or custom on the first, third, and fourth of these theories. The Court will briefly outline the guiding principles for each theory, before then turning to consider whether, in view of such principles, Plaintiffs' allegations pass muster.

### a. Express Policy

A private entity "may deprive a plaintiff of [their] constitutional rights, triggering *Monell* liability under Section 1983, through an express policy embodied in written ordinances or regulations." *Moody v. City of Newport News*, 93 F. Supp. 3d 516, 531 (E.D. Va. 2015).

### b. Deliberate Indifference Through Failure to Train

A municipality or private entity's failure to properly hire, supervise, or train may establish § 1983 liability where such failure amounts to deliberate indifference to the rights of the citizens with whom its employees come into contact, and is the "moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see Austin*, 195 F.3d at 727–29.

This theory of liability therefore has two components in addition to an underlying constitutional violation: deliberate indifference and causation.

To constitute "deliberate indifference," a failure to train must reflect the private entity's "deliberate" or "conscious" choice. *City of Canton*, 489 U.S. at 379. A "deliberate" choice requires that the entity have "fair *notice* that subordinates are engaged in constitutional or statutory deprivations," and, regardless, "consciously chose[] a particular course of action in response." *Brown v. Mitchell*, 308 F. Supp. 2d 682, 703 (E.D. Va. 2004). A plaintiff may establish deliberate indifference in two ways. First, they may show that "policymakers were aware of, and acquiesced in, a pattern of constitutional [or statutory] violations." *Moody*, 93 F. Supp. 3d at 538 (quoting *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 726 (E.D. Va. 2014)). Second, a plaintiff may demonstrate that the entity has failed to train its employees on "an obvious . . . duty that the particular employees are certain to face." *Gallimore*, 38 F. Supp. 3d at 726; *see Moody*, 93 F. Supp. 3d at 538 (quoting *Gallimore*, 38 F. Supp. 3d at 726)*.* This second method is "limited . . . to a 'narrow scope' of . . . duties." *Wynn v. City of Richmond*, 2022 WL 2318497, at *10 (E.D. Va. June 28, 2022).[43]

A plaintiff must also demonstrate a "causal nexus" between the deficient training and the alleged constitutional violation. *Brown*, 308 F. Supp. 2d at 694. Generally, a plaintiff cannot demonstrate a causal connection "by proof of a single incident of [unlawful] activity alone." *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994). Instead, a plaintiff must show that "the deficiency in training actually caused" the violation. *City of Canton*, 489 U.S. at 391. That said, under limited circumstances, a single incident *can* establish the requisite causal connection where the constitutional or statutory duty is so obvious that without proper training,

---

[43] For instance, the "paradigmatic example" of an obvious constitutional duty that police officers are certain to face involves the use of deadly force. *Moody*, 93 F. Supp. 3d at 539.

"the specific violation [was] 'almost bound to happen, sooner or later.'"  *Spell v. McDaniel*, 824

F.2d 1380, 1390 (4th Cir. 1987) (quoting *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1983));

*see Moody*, 93 F. Supp. 3d at 540.

### c. *"Persistent and Widespread" Customs or Practices*

Finally, plaintiffs may also sue entities for constitutional or statutory deprivations

"pursuant to governmental 'custom,' even though such a custom has not received formal approval

through the body's official decision[-]making channels." *Monell*, 436 U.S. at 690.  To show that

a practice is persistent enough to constitute a custom with the force of law, a plaintiff must

demonstrate that the "duration and frequency" of the practice "indicate[s] that policymakers (1)

had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their

'deliberate indifference.'" *Owens v. Balt. City State Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014)

(internal citations omitted).  The plaintiff must also identify a "direct causal link" between such

policy or custom and the alleged constitutional or statutory deprivation. *City of Canton*, 489 U.S.

at 385; *see Wynn*, 2022 WL 2318497, at *10.

### d. *Only Plaintiffs' Allegations in Count II Satisfy* Monell*'s Strictures*

Applying the foregoing principles, the Court finds that Plaintiffs have sufficiently pleaded

that CJW embraced a policy or custom amounting to the statutory violation asserted in Count II.

However, the same cannot be said for Counts III and IV.

To reiterate, Plaintiffs appear to rely on express policy, failure to train, and "persistent and

widespread" practices theories to argue that CJW is liable under § 1983.  *See, e.g.,* Compl. ¶¶ 16–

18, 23–25, 33, 42–44.  Because each theory represents an alternative route by which a plaintiff

may establish the existence of a *Monell* "policy or custom," Plaintiffs' allegations need only be

sufficient under one of these theories to survive CJW's Motion to Dismiss.

*i. Count II*

Beginning with Count II, Plaintiffs have sufficiently alleged that Mr. Byers was deprived of federally conferred rights—to wit, a patient's "right to be free from physical or mental abuse, corporal punishment, and any restraints or involuntary seclusions imposed for purposes of discipline or convenience." 42 U.S.C. § 290ii(a); *see supra* Part IV.B.2.a.i.  But for a *Monell* claim, that is only half the battle.  *See Austin*, 195 F.3d at 728.  Plaintiffs must also allege that this "deprivation of federal rights" was *caused* by "an official policy or custom" of CJW.  *Id.*  A review of the Plaintiffs' allegations confirms that they have surmounted this additional hurdle.

Starting from the top, Plaintiffs first outline how CJW contracts with the RPD to place officers inside of Tucker Pavilion.  Compl. ¶ 15.  Next, Plaintiffs allege that CJW uses the RPD officers so stationed to actively manage mentally ill patients.  *Id.* ¶ 16.  Despite this setup, neither CJW nor the RPD provide these officers with the necessary, specialized training to "work[] with mentally ill patients in a medical setting," and in fact, CJW *expressly excludes* RPD officers from its policies on the use of restraints and seclusion.  *Id.* ¶ 17; *see id.* ¶¶ 17–18, 23.  Plaintiffs then suggest that the RPD's pervasive presence at Tucker Pavilion, coupled with their lack of site-specific training, is causally related to statistics showing that Chippenham Hospital substantially outpaces other Richmond-area hospitals in terms of "incidents involving the RPD and either patients of [Chippenham Hospital] or others located [there]."  *Id.* ¶ 24.  Plaintiffs also cite the concerns raised by myriad former patients regarding Tucker Pavilion's alleged prison-like conditions.  Compl. ¶ 25.  Plaintiffs round out their *Monell* allegations by noting that, "even though there has been an obvious and pervasive RPD presence at [Chippenham Hospital and Tucker Pavilion] . . . , there have been virtually no internal investigations by the RPD into the many incidents involving RPD officers and the [CJW's] patients."  Compl. ¶ 24.

65

In the Court's view, the above allegations demonstrate the existence of a *Monell* "policy or custom" relative to Count II in one of two ways:  (1) deliberate indifference through failure to train, and/or (2) "persistent and widespread" customs or practices.  As to the former avenue, a plaintiff may proceed by alleging either (a) that policymakers were "aware of, and acquiesced in, a pattern of constitutional violations," *Moody*, 93 F. Supp. 3d at 538 (quoting *Gallimore*, 38 F. Supp. 3d at 726), or (b) that the entity has failed to train its employees on "an obvious . . . duty that the particular employees are certain to face," *Gallimore*, 38 F. Supp. 3d at 726.  Here, Plaintiffs' allegations—and particularly their reference to patient reviews—plausibly establish that CJW employees routinely skirt their obligations under § 290ii(a), and in doing so, engage in a pattern of constitutional or statutory deprivations.  *See Moody*, 83 F. Supp. 3d at 538; *see, e.g.*, Compl. ¶ 25 (indicating, *inter alia*, that CJW staff "treat[s] patients like inmates," "try to talk you in to saying something that would enable them to lock you down for 72 hours or more," and will "end up putting you in their unit that looks like jail" if you complain).  These same allegations, when taken as true, further establish that CJW's policymakers are "aware of, and acquiesce[] in" this pattern of deprivations, insofar as they reveal ongoing issues at Tucker Pavilion that CJW has seemingly failed to address.  *See Owens*, 767 F.3d at 403; *Brown*, 308 F. Supp. 2d at 703.

Plaintiffs alternatively satisfy the "failure to train" avenue by alleging that CJW failed to train its employees on "an obvious . . . duty" that they were "certain to face."  *Gallimore*, 38 F. Supp. 3d at 726.  The following allegations compel this conclusion:  (1) CJW employs extra-duty RPD officers; (2) CJW uses these RPD officers to manage mentally ill patients; and (3) neither CJW nor the RPD provides these officers with specialized training regarding (a) the myriad federal regulations applicable to facilities like Tucker Pavilion and (b) how to interact with patients in compliance with these federal regulations.  In other words, Plaintiffs allege that the RPD officers

stationed at Tucker Pavilion are improperly thrust into the dual role of law enforcement officer and CJW employee, despite only having the necessary training for the former role.  Accordingly, the Court finds that CJW's alleged failure to train these officers on the "obvious [federal statutory] dut[ies]" that they would be certain to face is sufficient to support Plaintiffs' *Monell* claim in Count II.[44]  *Gallimore*, 38 F. Supp. 3d at 726.

For similar reasons, Plaintiffs' allegations are likewise sufficient to support their *Monell* claim in Count II via the "persistent and widespread" custom or practice pathway.  Simply, the allegations outlined above adequately establish that CJW's policymakers "had actual or constructive knowledge of the [challenged] conduct" and nevertheless "fail[ed] to correct it due to their 'deliberate indifference.'"  *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1391); *see* Compl. ¶¶ 24–25 (outlining the inordinate number of RPD-patient incidents at CJW and the numerous patient reviews detailing the supposed prison-like conditions in Tucker Pavilion); *cf.* *Owens*, 767 F.3d at 403 (permitting a *Monell* claim to proceed where the plaintiff alleged that officers "withheld information" or otherwise acted improperly on "multiple occasions"); *Haley v. City of Boston*, 657 F.3d 39, 45, 53 (1st Cir. 2011) (holding that the plaintiff plausibly stated a *Monell* claim against the police department "in view of the 'wholly unexplained' nature of its' officers suppression of evidence and the alleged . . . 'volume of cases' involving similar violations").

Having identified multiple viable avenues through which Plaintiffs have established a *Monell* policy or custom, the only remaining question concerns whether Plaintiffs have sufficiently

---

[44] CJW maintains that it should not be held liable for the actions of RPD officers.  This argument misses the point.  The real issue here is that CJW exempted the officers stationed at Tucker Pavilion from the training and policies that rank-and-file CJW employees need to abide by, while simultaneously using those officers as an extension of their patient care staff.  CJW cannot have it both ways.  They can either (a) be held liable for using RPD officers in such a way, or (b) avoid liability by ensuring that the RPD officers stationed at CJW only engage in standard law enforcement duties.  Because the allegations suggest that the status quo is more reflective of the first scenario, CJW cannot now try to put up an arbitrary barrier between *their* actions and the actions of RPD officers stationed in Tucker Pavilion.

alleged a causal link between such policy or custom, on the one hand, and the treatment Mr. Byers received, on the other. The Court is satisfied that Plaintiffs have carried this burden. Plaintiffs must plausibly allege that the purported policy or custom "in fact caused the ultimate violation" of Mr. Byers's rights. *Jordan*, 15 F.3d at 341; *see City of Canton*, 489 U.S. at 391. The requisite causal link exists where "the specific violation" was made "reasonably probable by the permitted continuation" of the alleged policy or custom. *Spell*, 824 F.2d at 1391. Put differently, "failure to correct the known practices must be such as to make the specific violation 'almost bound to happen sooner or later,' rather than merely 'likely to happen in the long run.'" *Id.*; *see Moody*, 93 F. Supp. 3d at 540 (citing *Spell*, 824 F.2d at 1391).

In Count II, Plaintiffs allege that CJW has a policy and custom of violating patients' rights to be "free from physical or mental abuse and . . . to be free from restraints and seclusion." Compl. ¶ 59. Plaintiffs further allege that this policy and custom caused Mr. Byers to suffer from "physical[] and mental[] abuse . . . and unlawful[] restrain[ts] and . . . seclusion" while at CJW. *Id.* ¶ 60. In the end, the Court has little issue finding that the alleged violation of these rights was made "reasonably probable" by any of the policy and custom theories outlined above. *Spell*, 824 F.2d at 1391. Under either formulation of the policy and custom—whether it be CJW's total failure to train RPD officers stationed at Tucker Pavilion on the federal rights that patients enjoy, *or* CJW's failure to train or otherwise correct the allegedly impermissible practices of its staff—a violation of the rights enumerated in § 290ii(a) was "almost bound to happen sooner or later." *Id.*[45] Accordingly, Plaintiffs' allegations "establish beyond the speculative level" that CJW's

---

[45] The Court is particularly struck by CJW's exclusion of RPD officers from its use of force and restraint and seclusion policies. Given the allegations that CJW routinely enlisted the RPD officers stationed in Tucker Pavilion to manage patients, it seems those officers certainly should have been trained on the rights that such patients enjoy. Allowing this state of affairs to continue would essentially permit CJW to skirt its federal obligations by delegating the impermissible use of restraints and seclusion to RPD officers.

policy and custom of violating patients' rights to be "free from physical or mental abuse and . . . to be free from restraints and seclusion" *actually caused* the complained-of deprivations. *Moody*, 93 F. Supp. 3d at 540.

To summarize, Plaintiffs have alleged both that CJW has an unlawful policy and custom of failing to protect patients' rights under § 290ii(a), *and* that such policy and custom actually caused Mr. Byers to suffer deprivations of these rights while at CJW. Ultimately, to prevail on the merits, Plaintiffs will need to *prove* these allegations. *Owens*, 767 F.3d at 404. But at this early stage in the proceedings, Plaintiffs have pleaded sufficient factual content to shield their *Monell* claim in Count II from dismissal.

### *ii. Counts III and IV*

In Counts III and IV, Plaintiffs have sufficiently alleged that Mr. Byers's Fourth Amendment rights against the use of excessive force and false arrest were violated. *See supra* Part IV.B.3; Part IV.B.4. But again, that is not the end of the inquiry for Plaintiffs' *Monell* claim against CJW. Plaintiffs must also allege that this deprivation of rights was caused by "an official policy or custom" of CJW. *Austin*, 195 F.3d at 728. Plaintiffs fall short of doing so.

Succinctly, the Complaint lacks any allegations indicating that CJW has a policy or custom of either utilizing excessive force or subjecting its patients to unlawful arrests. *See generally* Compl. To be clear, Plaintiffs do allege the following: (1) that there have been 1,200 incidents involving RPD officers and "patients or others at [Chippenham Hospital] being charged and/or arrested" over the last ten years; (2) that there has been only *one* internal investigation by the RPD into the 326 such incidents at Chippenham Hospital in the last three years; (3) that CJW exempts RPD officers from its use of force and restraint/seclusion policies; and (4) that patient and employee reviews are suggestive of questionable, restrictive conditions at Tucker Pavilion. *See*

Compl. ¶ 23–25.  However, none of these allegations suffice to establish an impermissible policy or custom.

Beginning with (1), Plaintiffs do not lodge any allegations suggesting that these incidents/arrests involved the use of excessive force or were otherwise unlawful.  *See* Compl. ¶ 24.  Instead, it appears that Plaintiffs primarily reference these statistics as evidence of the "strong and pervasive" RPD presence at CJW.  *Id.*  Such allegations therefore do not move the needle in terms of establishing an impermissible policy or custom of excessive force or unlawful arrests on behalf of CJW.  *See Wynn*, 2022 WL 2318497, at * 12 (holding that a plaintiff's *Monell* allegations were insufficient because she did not, for example, state that the defendant "had received several other complaints relating to unlawful searches or uses of force, . . . [or] allege even one other instance of similar unconstitutional conduct"); *cf. Moody*, 93 F. Supp. 3d at 535–37 (holding that a plaintiff's *Monell* allegations were sufficient because he "enhanced [his otherwise] conclusory allegations . . . with factual allegations concerning" other prior, impermissible uses of force).

The second bucket of allegations—those concerning RPD's internal investigation statistics—faces a similar pitfall.  Without further information about the circumstances surrounding the incidents referenced, a lack of investigations does not necessarily indicate that CJW was aware of and acquiesced in a pattern of constitutional violations.  *See Moody*, 93 F. Supp. 3d at 535–37; *Tobey v. Napolitano*, 808 F. Supp. 2d 830, 842 (E.D. Va. 2011) (emphasizing that for *Monell* liability to attach, a plaintiff must generally articulate specific deficiencies *as well as* a pattern of constitutional violations); *Wynn*, 2022 WL 2318497, at *12.  For all the Court knows, those incidents may all have involved entirely lawful arrests or uses of force.  Moreover, the internal investigation statistics cited are those of RPD, not CJW.  To prove an unlawful policy or custom on behalf of CJW, citation to CJW's investigation statistics would be more probative

The third set of allegations fares no better.  As outlined above, CJW's exclusion of RPD officers from its restraint and seclusion policies is certainly relevant to Count II.  That is because RPD officers are not otherwise trained on the rights possessed by patients of medical facilities like Tucker Pavilion.  In turn, using such untrained officers to manage patients is likely to lead to the deprivation of these statutory rights.  For essentially the same reason, though, RPD's exclusion from CJW's use of force and restraint and seclusion policies is *not* relevant to Counts III and IV, as Plaintiffs make no allegations suggesting that RPD officers are not generally trained to (1) make lawful arrests, and (2) to use the proper quantum of force when making arrests.  And in fact, it seems highly likely that RPD officers *are* trained on such issues independently of their employment with CJW.[46]  For the purposes of Plaintiffs' excessive force and unlawful arrest claims in Counts III and IV, it is therefore irrelevant that the RPD officers working at CJW were not beholden to CJW's use of force and restraint and seclusion policies.

---

[46] To further elaborate, Plaintiffs allege that the RPD "willingly provided . . . officers to [Chippenham Hospital and Tucker Pavilion] without providing to those officers any specialized training for working with mentally ill patients in a medical setting."  Compl. ¶ 17.  Plaintiffs also allege that the RPD "failed to establish any guidelines regarding the RPD officers' role in the behavior management of mentally ill patients, particularly with respect to the use of force and the use of restraints and seclusion with mentally ill patients." *Id.*  As noted above, these averments are certainly relevant to Count II, insofar as the RPD officers stationed at Tucker Pavilion are alleged to have regularly acted in a *patient management* capacity. *See supra* Part IV.B.5.d.i.  There are, however, no allegations that the RPD fails to *train* its officers on the duties generally relevant to Counts III and IV—i.e., the use of reasonable force, and making lawful arrests. *See, e.g.,* Compl. ¶ 17 (alleging that the RPD failed to establish "guidelines" regarding its officers "use of force" with respect to "mentally ill patients").

Also notable is the fact that Plaintiffs apparently requested documentation regarding "training received by RPD officers regarding interaction with citizens with mental illness," but did not include any allegations about the existence (or lack thereof) of that training.  Am. Compl. Ex. C 2, ECF No. 81-3.  If the City does in fact neglect to train officers on how to interact with such citizens, it is possible that Plaintiffs can revise their allegations such as to survive this argument for dismissal. *See, e.g., Moody*, 93 F. Supp. 3d at 539 (holding that the deliberate indifference prong of *Monell* may be satisfied where a municipality fails to train its officers on "obvious constitutional duties [that its] officers are certain to face").  And if that is the case, Plaintiffs are encouraged to seek leave to amend their Complaint accordingly. *See Brown v. Cobb*, 2018 WL 3080064, at *4 (E.D. Va. June 21, 2018) (dismissing § 1983 claims but noting that the court would "freely grant leave to amend" the complaint, as the allegations suggested that the "plaintiffs could allege more facts" to adequately support their claims).  But that is not the substance of the allegations presently before the Court.

Turning finally to Plaintiffs' allegations regarding patient and employee reviews, there is simply nothing in these reviews to suggest a policy or custom of Fourth Amendment violations. Instead, the reviews are most reasonably read to relate to the questionable conditions at Tucker Pavilion, *see, e.g.*, Compl. ¶ 25 ("This place is just prison."), the heavy-handed use of scare tactics by CJW staff, *see, e.g.*, *id.* ("The staff is atrocious and mean and constantly threatened to report patients to doctors as 'non-compliant' which, they sneered, would ensure we would 'never get out.'"), and unsafe levels of understaffing, *see, e.g.*, *id.* ("Staff are dropping like flies and complaints are rampant about not having enough staffing for it to be safe for patients and employees."). These allegations simply fail to establish that CJW has a policy and custom of violating patients' Fourth Amendment rights to be free from excessive force and false arrest.[47]

In sum, Plaintiffs fail to assert any non-conclusory allegations that CJW has a policy or custom of "us[ing] unreasonably excessive force" against its patients in violation of the Fourth Amendment. *Id.* ¶ 70. *See generally id.* Plaintiffs similarly fail to assert any non-conclusory allegations that CJW has a policy or custom of "unlawfully and falsely arrest[ing] patients." *Id.*

---

[47] There is an additional issue with Count IV in particular. While Plaintiffs' allegations are sufficient to show that CJW has a policy or custom of imposing restraints or seclusion for purposes of discipline or convenience, the allegations do not show that CJW has a policy or custom of subjecting patients to false *arrests*. *See Sowers v. City of Charlotte*, 659 F. App'x 738. 739 (4th Cir. 2016) ("To state a claim for false arrest or imprisonment under § 1983, a plaintiff must demonstrate that he was arrested without probable cause." (citing *Street v. Surdyka*, 492 F.2d 368, 372–73 (4th Cir. 1974)); *Street*, 492 F.2d at 372–73 ("[T]here is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause.").

That said, the present allegations do reveal that a Fourth Amendment *Monell* claim for unreasonable *seizures*—as opposed to false arrests—may be feasible. In that respect, the allegations suggest that CJW and its staff short-circuit or otherwise manipulate Virginia's TDO processes in order to keep patients admitted (and under TDOs/ECOs) longer than necessary. *See* Compl. ¶¶ 23–25. And Plaintiffs did reference the Fourth Amendment right to be free from unreasonable seizure in stating their claim, *see id.* ¶ 79, though the remainder of their pleading (and subsequent 12(b)(6) briefing) focused on the false arrest iteration of Fourth Amendment rights. Thus, while the Court is dismissing Count IV as to CJW in its current state, i.e., as it pertains to false arrest, the Court will freely grant Plaintiffs leave to amend Count IV, should they later articulate a Fourth Amendment unreasonable seizure claim pursuant to *Monell*. *See Brown*, 2018 WL 3080064, at *4 (E.D. Va. June 21, 2018) (dismissing *Monell* claim but granting leave to amend since the plaintiffs' allegations suggested that they could allege other facts to support their claim).

¶ 80.  *See generally id.*  Counts III and IV, which attempt to assert such claims against CJW, must therefore be dismissed.

### 6. Summary of Federal Claims (Counts I–IV)

The Court pauses briefly to recap the state of affairs following its analysis of Plaintiffs' federal claims.  Count I will be dismissed as to both CJW and Hyde.  Conversely, Count II will be permitted to proceed against both CJW and Hyde.  Finally, Counts III and IV may proceed against Hyde, but not as to CJW.

### 7. State Law Claim (Count V)

With Count V, Plaintiffs assert a Virginia state law wrongful death claim based upon the defendants' alleged negligence, gross negligence, and willful and wanton negligence.  *See* Compl. ¶¶ 87–94.  CJW and Hyde raise three main arguments for dismissal of Count V—(1) Plaintiffs have failed to allege any tort duties recognized under Virginia law; (2) Plaintiffs' allegations do not rise to the level of gross or willful and wanton negligence; and (3) Plaintiffs' allegations fail to establish proximate cause.  *See* Mem. Supp. 22–30.  The Court is largely unmoved by these arguments and will allow most of Count V to proceed.

#### a. Plaintiffs Adequately Allege that CJW and Hyde Owed a Duty of Care to Mr. Byers

In Virginia, tort actions alleging negligence in the provision of professional services by "health care providers" are classified as medical malpractice or medical negligence actions.  *See* Va. Code Ann. § 8.01-581.1; *Coston v. Bio-Med. Applications of Va., Inc.*, 275 Va. 1, 5 (2008).  Because CJW and Hyde are "health care providers," Plaintiffs' claims against them are governed by Virginia's medical malpractice framework.  *See* Va. Code Ann. § 8.01-581.1 (including hospitals and nurses within the definition of "[h]ealth care provider[s]").

To prove a medical malpractice claim in Virginia, a plaintiff must establish (1) the applicable standard of care, (2) a deviation from that standard, and (3) that such deviation proximately caused the plaintiff's injuries. *Bryan v. Burt*, 254 Va. 28, 34 (1997); *Raines v. Lutz*, 231 Va. 110, 113 (1986); *see Bitar v. Rahman*, 272 Va. 130, 137 (quoting *Bryan*, 254 Va. at 34). Typically, parties must present expert testimony to establish the applicable standard of care. *Perdieu v. Blackstone Fam. Prac. Ctr., Inc.*, 264 Va. 408, 420 (2002) (quoting *Raines v. Lutz*, 231 Va. 110, 113 (1986)).  However, under certain circumstances, expert testimony is unnecessary. *See Beverly Enters.-Va., Inc. v. Nichols*, 247 Va. 264, 267 (1994).  Such circumstances arise where "the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience." *Id.*; *Coston*, 275 Va. at 5.

Here, CJW and Hyde argue that Count V should be dismissed because Plaintiffs "fail to incorporate the necessary elements of a medical negligence claim."  Mem. Supp. 23.  Specifically, CJW and Hyde argue that Plaintiffs' "conclusory allegations . . . say nothing about who was supposed to do what and when, and how any failure by [CJW or Hyde] caused Mr. Byers's death." *Id.* at 24.  Consequently, CJW and Hyde contend that Plaintiffs' allegations "are insufficient to establish that [CJW and Hyde] owed [Mr. Byers] a duty in tort," thus requiring dismissal of Plaintiffs' negligence claims in Count V. *Id.* at 24.  While Plaintiffs do not respond to this portion of CJW and Hyde's argument (and in fact, do not respond to most of CJW and Hyde's state law arguments), the Court nevertheless declines to dismiss Count V for failing to adequately allege an applicable tort duty and/or standard of care.  Several considerations compel such a holding.

To begin, Plaintiffs generally allege that CJW and Hyde had a duty to treat Mr. Byers "in accordance with recognized and accepted standards of medical care, health care, mental health care, and/or nursing care and treatment."  Compl. ¶ 89.  So, CJW and Hyde's suggestion that the

74

Complaint is bereft of *any* duty-related allegations is simply incorrect.  The Court is similarly unpersuaded by CJW and Hyde's interpretation of their purported duty.  *See* Mem. Supp. 23 ("Plaintiffs . . . cannot . . . plausibly plead that there was a duty owed by [CJW or Hyde] to intervene with a law enforcement officer's authority or respective duties, including that of making a lawful arrest.").  Viewing the allegations and drawing all reasonable inferences in the light most favorable to Plaintiffs, they allege *not* that CJW staff should have intervened when Officer Gibson arrested Mr. Byers, but instead, that CJW and Hyde had a duty to provide adequate medical and mental health care to Mr. Byers.  *See, e.g.,* Compl ¶¶ 1–2, 41–44, 89.  Plaintiffs further allege that by using RPD officers to "bully and manage mentally ill patients" like Mr. Byers, CJW and Hyde breached this duty.  Compl. ¶ 25.  Thus, the allegations plausibly establish the existence of a duty on the part of CJW and Hyde.

Finally, to the extent that CJW and Hyde contend that Plaintiffs need to provide an expert witness to establish the appropriate standard of care, the Court disagrees.  At this stage, expert testimony is unnecessary because "the alleged acts of negligence clearly lie within the range of the [finder of fact's] common knowledge and experience."  *Coston*, 275 Va. at 5; *see Coston*, 275 Va. at 5–7 (collecting cases).  In the Court's view, the question of whether a reasonably prudent hospital and its staff would use police officers to "bully and manage mentally ill patients" is one that falls within the common knowledge and experience of a jury.  Compl. ¶ 25; *see Coston* 275 Va. at 5; *Beverly Enterprises-Va., Inc.*, 247 Va. at 3–4.  To be sure, Plaintiffs will need to ultimately prove that their allegations accurately describe the state of affairs at Tucker Pavilion.  *See Hancock v. United States*, 2023 WL 8719627, at *5 (W.D. Va. Dec. 18, 2023).  But whether they can do so is not a proper issue for resolution at the 12(b)(6) stage.  *Id.*

In sum, Plaintiffs have adequately alleged that CJW and Hyde owed Mr. Byers certain tort duties under Virginia law.  As such, CJW and Hyde's first argument for dismissal of Count V fails.

> b. *Plaintiffs Adequately Allege Willful and Wanton Negligence, But Not Gross Negligence*

CJW and Hyde also argue that Plaintiffs' allegations do not rise to the level of either gross negligence or willful and wanton negligence.  The Court agrees that Plaintiffs' allegations fall short of establishing gross negligence.  However, the Court finds that Plaintiffs' allegations plausibly allege willful and wanton negligence on behalf of CJW and Hyde.

Virginia courts have recognized three "levels" of negligence.  *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 486 (2004).  The first level, simple negligence, "involves the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another."  *Id.* (citing *Gossett v. Jackson*, 249 Va. 549, 554 (1995); *Griffin v. Shively*, 227 Va. 317, 321 (1984)).

The second level, gross negligence, is a degree of negligence "showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person."  *Id.* at 487.  Virginia's standard for gross negligence is thus one of indifference, not inadequacy. *Kuykendall v. Young Life*, 261 F. App'x 480, 491 (4th Cir. 2008); *Cantrell v. McCoy*, 553 F. Supp. 3d 295, 306 (W.D. Va. 2021).  This "uniquely high standard" bars gross negligence claims where the allegations or evidence reveal that the defendant exercised at least "some degree of care."  *Cantrell*, 553 F. Supp. 3d at 306  (citing *Elliot v. Carter*, 292 Va. 618, 622 (2016)); *see Chapman v. City of Virginia Beach*, 252 Va. 186, 190 (1996) (describing gross negligence as "a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care" (citations and internal quotations marks omitted)).

The third level of negligent conduct is willful and wanton negligence. *Cowan*, 268 Va. at 487. This conduct is defined as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Id.* (citing *Etherton v. Doe*, 268 Va. 209, 213–14 (2004) (quoting *Griffin*, 227 Va. at 231)). Various courts in this circuit have recognized that Virginia's willful and wanton negligence standard "closely mirrors the subjective prong of the [federal] deliberate indifference test." *Boley v. Armor Corr. Health Servs., Inc.*, 2022 WL 16950290, at *10 (E.D. Va. Nov. 15, 2022); *see Hixson v. Hutcheson*, 2018 WL 814059, at *5 (W.D. Va. Feb. 9, 2018) (noting that Virginia's willful and wanton negligence standard "nearly mirrors" the subjective prong of the Eight Amendment deliberate indifference test).

Critically, the Supreme Court of Virginia has clarified that "the difference between ordinary negligence and gross negligence is one of degree," whereas the difference between "any form of negligence and . . . willful and wanton conduct . . . is a matter of kind."[48] *Green v. Ingram*, 269 Va. 281, 292 (2005) (citing *Infant C. v. Boy Scouts of Am., Inc.*, 239 Va. 572, 582 (1990)). That is because negligence "conveys the idea of heedlessness, inattention, [or] inadvertence," whereas willful and wanton conduct "convey[s] the idea of purpose or design, actual or constructive." *Boward v. Leftwich*, 197 Va. 227, 231 (1955). Importantly, willful and wanton conduct—i.e., willful and wanton negligence—is distinguishable from *intentional* misconduct: "An actor guilty of intentional misconduct must intend to cause harm to another . . . . An actor

---

[48] The terms "'willful and wanton conduct' and '[w]illful and wanton negligence'" are simply "different names for the same tort." *Kaltman v. All Am. Pest Control, Inc.*, 281 Va. 483, 493 n.5 (2011) (citing *Infant C.*, 239 Va. at 581–82). The Court will therefore use the two terms interchangeably.

guilty of willful and wanton conduct intends his act, but not the resulting harm." *Green*, 269 Va. at 292.

Here, CJW and Hyde argue that Plaintiffs' allegations are insufficient to establish either gross negligence or willful and wanton negligence. *See* Mem. Supp. 24–26. An analysis of the Complaint reveals that CJW and Hyde are only partly correct.

Beginning with Plaintiffs' gross negligence claim, the Complaint establishes that CJW and Hyde provided Mr. Byers with "some degree of care." *Elliot*, 292 Va. at 622. As such, Plaintiffs' gross negligence claim must fail. *See id.* A brief summary of the events at Tucker Pavilion crystallizes this point. Mr. Byers was brought to Tucker Pavilion on July 5, 2023. He was then left unattended for several hours before Lt. Waite and a CJW security guard discovered him wandering the halls. At that point, Lt. Waite issued an ECO and requested that Mr. Byers be evaluated for a TDO. Julie Sauder, a licensed social worker, conducted an in-person evaluation of Mr. Byers and concluded that a TDO was appropriate. A magistrate later issued a TDO for Mr. Byers, which was served upon him in the early morning hours of July 6, 2023. Mr. Byers was again left alone for a long stretch of time, perhaps locked in seclusion, before he was ultimately assigned a doctor and a room. A few hours after being taken to his room, CJW staff (including Nurse Hyde) and Officer Gibson attempted to move Mr. Byers to another floor. After the ensuing altercation, Mr. Byers was arrested and taken out of Tucker Pavilion.

No doubt, the above allegations paint a troubling picture of the degree of care Mr. Byers received. However, they fail to establish gross negligence on behalf of CJW or Hyde as both provided Mr. Byers with at least "some degree of care." *Id.*; *Cowan*, 268 Va. at 487 (describing gross negligence as "an utter disregard of prudence that amounts to a *complete* neglect of [the] safety" of another) (emphasis added); *Chapman*, 252 Va. at 190 (describing gross negligence as

"the absence of slight diligence, or the want of even scant care"). And because Virginia's standard for gross negligence "is one of indifference, not inadequacy," Plaintiffs' gross negligence claim cannot proceed. *Elliot*, 292 Va. at 622 (quoting *Kuykendall*, 261 F. App'x at 491).

Conversely, Plaintiffs *do* plausibly allege their claim for willful and wanton negligence. Particularly relevant to this finding are Plaintiffs' allegations that CJW and its staff rely upon RPD officers—who are not trained on proper patient management protocol—to "bully and manage mentally ill patients" like Mr. Byers. Compl. ¶ 25; *see* Compl. ¶¶ 16–18, 23–25. Operating Tucker Pavilion in such a way plainly evinces a "conscious[] disregard" of patients' rights, with CJW and Hyde "aware, from [their] knowledge of existing circumstances and conditions, that [this] conduct probably would cause injury to another." *Cowan*, 268 Va. at 487. That is, CJW and its staff knew or should have known that using RPD officers to manage, bully, or threaten patients going through mental health crises would likely exacerbate the situation and lead to injurious outcomes.[49] *Cf. Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst,* 810 F.3d 892, 900 (4th Cir. 2016) (noting that "the use of officers and others *trained in the art of counseling* is ordinarily advisable" when dealing with "unarmed, emotionally distraught individual[s]" (emphasis added) (internal citations and quotations omitted)); *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (1st Cir. 2001) ("The tactics to be employed against[] an unarmed, emotionally distraught individual who is creating a disturbance . . . are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal. . . . In the former instance, increasing the use of force may . . . exacerbate the situation.").

---

[49] Plaintiffs' allegations regarding (1) the patient and employee reviews of Tucker Pavilion and (2) the disproportionate amount of incidents involving RPD officers at CJW lend further support to the Court's conclusion that CJW and its staff were "aware" that their conduct "would cause injury" to others. *Cowan*, 268 Va. at 487. Both sets of allegations suggest that CJW was or should have been aware of the dangerous environment it was fostering at Tucker Pavilion, as well as how it was negatively impacting its patients' experiences.

Also relevant to Plaintiffs' willful and wanton negligence claim is their allegation that Hyde and Officer Gibson fabricated Mr. Byers's discharge form to facilitate his release from Tucker Pavilion and his transport to the Richmond City Jail. Plaintiffs emphasize that the form made no mention of the fact that Mr. Byers was under a TDO. Plaintiffs also correctly note that under Virginia law, the form could *not* have lawfully released Mr. Byers from his TDO. *See* Va. Code Ann. § 37.2-813(C) (providing that an individual under a TDO may only be lawfully released prior to a commitment hearing (a) by a district court judge or special justice, or (b) by the director of the facility where the individual is detained). These allegations plainly support Plaintiffs' willful and wanton negligence claim, especially in view of the underlying requirements for the issuance and dissolution of a TDO. *See* Va. Code Ann. § 37.2-809(B) (providing that a TDO should be issued where the individual "has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others . . . , or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs"). In other words, Plaintiffs plausibly allege that by improperly releasing Mr. Byers to be taken to the Richmond City Jail, Hyde and CJW "act[ed] consciously in disregard of [Mr. Byers's] rights, . . . aware, from [their] knowledge of existing circumstances," that their "conduct probably would cause injury to [Mr. Byers]."[50] *Cowan*, 268 Va. at 487.

CJW and Hyde's main argument for dismissal of Plaintiffs' willful and wanton negligence claim is that they "did everything in their power for nearly 20 minutes to convince Mr. Byers to

---

[50] To put a finer point on the issue, Plaintiffs essentially allege that CJW and Hyde not only defied standard TDO procedures to get Mr. Byers sent to jail despite the risks he posed to himself and others, *see* Va. Code Ann. § 37.2-813(B), but also that they did so in such a way as to make it unlikely that the presiding magistrate at Richmond City Jail would be informed that Mr. Byers was and/or still should have been under a TDO. Va. Code Ann. § 37.2-813(B).

go voluntarily to the second floor where he could be given appropriate evaluations and care." Mem. Supp. 26. This argument fails for two reasons. First, it explicitly relies upon "the facts, as shown by the [body-worn camera] footage," not to mention drawing impermissible conclusions in Defendants' favor about their subjective mindset vis-à-vis their efforts. *Id.* But as already discussed *supra*, the Court is not considering that footage at this stage. *See supra* Part IV.A. Second—and perhaps more importantly—this argument tracks the considerations applicable to a gross negligence claim, not a willful and wanton negligence claim. That is, CJW and Hyde essentially argue that Mr. Byers's willful and wanton negligence claim must fail because he was given *some* degree of care. *See* Mem. Supp. 26. To be sure, such a finding precludes a claim for gross negligence. *See Cantrell*, 553 F. Supp. 3d at 306 (citing *Elliot v. Carter*, 292 Va. 618, 622 (2016)). It does not, however, preclude a claim for willful and wanton negligence. *See Cowan*, 268 Va. at 487 (noting that willful and wanton negligence involves "acting in disregard of another person's rights . . . with the defendant aware . . . that his conduct probably would cause injury to another").

A couple final points are warranted. First, the Court acknowledges that persuasive authority exists suggesting that where a plaintiff cannot prove gross negligence, that plaintiff "cannot as a matter of law prove willful and wanton negligence." *Kuykendall*, 261 F. App'x at 491; *Cantrell*, 553 F. Supp. 3d at 307. The Court respectfully disagrees with such authority. The Supreme Court of Virginia has been very clear that "the difference between ordinary negligence and gross negligence is a matter of degree," but that the difference between "any form of negligence and willful and wanton [negligence] is a matter of kind."[51] *Green*, 269 Va. at 292;

---

[51] There also exists caselaw holding that "negligent conduct and willful and wanton conduct merely refer to different degrees of proof that can be applied to the same theory of liability." *Wilby v. Gostel*, 265 Va. 437, 445 (2003); *see Wolfe v. Baube*, 241 Va. 462, 465 (1991) (describing willful and wanton negligence as "greater in degree than gross negligence"). But those cases are bookended by pronouncements that ordinary and gross negligence differ

*Infant C.*, 239 Va. at 582.  Where two levels of negligence differ in degree, the Court agrees that a negative finding on the "lower" of the two levels would necessarily lead to a negative finding on the "higher" of the two levels of negligence.  Surely, if a plaintiff's allegations are insufficient to establish that a defendant's conduct was minimally negligent, their allegations would likewise be insufficient to establish that a defendant's conduct was *grossly* negligent.

The same logic simply does not follow where the levels of negligence differ in *kind*.  An inability to prove one *kind* of tort does not conclusively establish an inability to prove a different kind of that same tort.  The Supreme Court of Virginia's analysis of willful and wanton negligence in *Infant C.* is particularly illuminating on this point:

> The hallmark of [willful and wanton negligence] is the defendant's consciousness of his act, his awareness of the dangers or probable consequences, and his reckless decision to proceed notwithstanding that awareness.  Because such consciousness and awareness are prerequisites, the use of the term "negligence," in defining the tort, is a misnomer, to the extent that negligence is equated with inadvertent neglect of a duty. . . .   Negligence conveys the idea of heedlessness, inattention, inadvertence; willfulness and wantonness convey the idea of purpose or design, actual or constructive.
>
> Although the plaintiff's Count IV referred to [the defendant's] duty to "use reasonable care" . . . it alleged that the duty was breached with reckless and conscious disregard of the plaintiff's health, safety, and welfare.  Thus, although the allegations refer to a breach of duty, they do not charge that the breach was done with the "heedlessness, inattention, [or] inadvertence" which is the hallmark of

---

in *kind* from willful and wanton negligence.  *See Infant C.*, 239 Va. at 582 (decided in 1990); *Green*, 269 Va. at 292 (decided in 2005).  The Court adopts the Supreme Court of Virginia's most recent characterization.

Additionally, neither *Wilby* nor *Wolfe* considered the exact issue before the Court—i.e., whether a claim for willful and wanton negligence may proceed where a claim for gross negligence cannot.  For its part, *Wilby* largely appears to stand for the proposition that willful and wanton conduct is one kind of negligent conduct.  *See Wilby*, 265 Va. at 445 ("Gostel alleged that this conduct was 'negligent' and also that it was 'willful and wanton.'  However, these two allegations do not represent separate claims or theories of liability.  Rather, in this context, negligent conduct and willful and wanton conduct merely refer to different degrees of proof that can be applied to the same theory of liability.").  This holding is essentially just a repackaging of the Supreme Court of Virginia's earlier holding in *Infant C.  See Infant C.*, 239 Va. at 581 (noting that "willful and wanton conduct" and "willful and wanton negligence" designate "tortious conduct of a single species").  *Wolfe*, on the other hand, dealt with a scenario wherein the evidence perhaps supported findings of regular and gross negligence, but not the perceivably more severe willful and wanton negligence.  *See Wolfe*, 241 Va. at 465.  Such a scenario is clearly distinct from that presented here.  Accordingly, neither *Wilby* nor *Wolfe* provide much useful guidance.

> negligence. Rather, they charge the recklessness and consciousness characteristic
> of willful and wanton conduct.

*Infant C.*, 239 Va. at 581–82.  This excerpt makes clear that the sort of allegations sufficient to support a claim for willful and wanton negligence necessarily differ from the sort of allegations sufficient to support standard or gross negligence.  *See id.* (noting that the "hallmark[s]" of a standard negligence claim—heedlessness, inattention, or inadvertence—differ from those of a willful and wanton negligence claim—recklessness and consciousness).  Thus, Plaintiffs' inability to establish gross negligence does not bar their claim for willful and wanton negligence from proceeding.

Finally, the Court observes that "Virginia's uniquely high standard for gross negligence claims allows a deliberate indifference claim to succeed where a gross negligence claim cannot." *Cantrell*, 553 F. Supp. 3d at 306.  Given the similarities between Virginia's willful and wanton negligence standard, on one hand, and the deliberate indifference standard, on the other, it should come as no surprise that a willful and wanton negligence claim can proceed where a gross negligence claim cannot.  *See Boley*, 2022 WL 16950290, at *10; *see Hixson*, 2018 WL 814059, at *5.

To summarize, the Court agrees with CJW and Hyde that Plaintiffs' allegations do not give rise to a claim for gross negligence.  Plaintiffs' gross negligence claim will therefore be severed from Count V and dismissed.  Plaintiffs' willful and wanton negligence claim, on the other hand, rests upon sufficient allegations to survive this argument for dismissal.

### c. *Plaintiffs Adequately Allege that CJW and Hyde's Conduct Proximately Caused Mr. Byers's Death*

CJW and Hyde's final argument for dismissal of Plaintiffs' state law wrongful death claim is that "Plaintiffs' conclusory allegations fail to establish proximate cause." In view of Virginia's relatively broad interpretation of proximate cause, the Court cannot agree.

Under Virginia law, the proximate cause of an event is "the act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Kellermann v. McDonough*, 278 Va. 478, 493 (2009) (internal quotations omitted) (quoting *Beverly Enters.-Va.*, 247 Va. at 269 (quoting *Coleman v. Blankenship Oil Corp.*, 221 Va. 124, 131 (1980))). There may be more than one proximate cause of an event. *Id.* (citing *Williams v. Le,* 276 Va. 161, 167 (2008); *Atkinson v. Scheer,* 256 Va. 448, 454 (1998); *Panousos v. Allen,* 245 Va. 60, 65 (1993); *Coleman,* 221 Va. at 131)). Ordinarily, proximate cause is "a question that goes to the jury, unless the facts in the case are 'susceptible of but one inference,' and therefore there is no issue for the jury to decide." *Coles v. Jenkins*, 34 F. Supp. 2d 381, 388 (W.D. Va. 1998) (quoting *Riggle v. Wadell*, 216 Va. 577, 580 (1976)); *Scott v. Simms*, 188 Va. 808, 816 (1949) ("The question of proximate cause . . . is a question of fact. Its existence or nonexistence becomes a question of law only when the evidence is such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from it.").

Importantly, "[a] subsequent proximate cause may or may not relieve a defendant of liability for [their] negligence." *Williams*, 276 Va. at 167. Put differently, "not every intervening cause is a superseding cause" that starts the chain of liability anew. *Coleman*, 221 Va. at 131. Rather, in order to relieve a defendant of liability for their negligent act, "the negligence intervening between the defendant's negligent act and the injury must *so entirely supersede* the

operation of the defendant's negligence that *it alone*, without *any* contributing negligence by the defendant in the *slightest degree*, causes the injury." *Atkinson*, 256 Va. at 454 (emphases added) (quoting *Jenkins v. Payne*, 251 Va. 122, 128 (1996)).  Moreover, "an intervening cause is not a superseding cause if it was 'put into operation by the defendant's wrongful act or omission.'" *Coleman*, 221 Va. at 131 (quoting *Jefferson Hosp., Inc. v. Van Lear*, 186 Va. 74, 81 (1947)). Because of the inherently fact-intensive nature of the superseding cause inquiry, courts in Virginia have "consistently held that whether an intervening act was so extraordinary as to supersede any prior act of negligence as the proximate cause is usually a question for the jury." *Coles*, 34 F. Supp. 2d at 386.

One additional point: a defendant's negligence can be the proximate cause of an injury even if the defendant could not foresee the precise injury that occurred.  *Interim Personnel of Cent. Va., Inc. v. Messer*, 263 Va. 435, 442 (2002); *Blondel v. Hays*, 241 Va. 467, 475 (1991); *Scott*, 188 Va. at 818; *APV Crepaco, Inc. v. Alltransport, Inc.*, 683 F. Supp. 1031, 1033 (E.D. Va. 1987) (citing *Scott*, 188 Va. at 818).  Rather, "[i]t is sufficient if an ordinary, careful and prudent person ought, under the circumstances, to have foreseen that *an* injury might probably result from the negligent act." *Scott*, 188 Va. at 818 (emphasis added); *see Interim Personnel*, 263 Va. at 442 (citing *Scott*, 188 Va. at 818); *Blondel*, 241 Va. at 475 (same).

Here, CJW and Hyde argue that "Plaintiffs have failed to . . . state a claim for negligence because they have altogether failed to plead that CJW or . . . Hyde's conduct proximately caused Mr. Byers'[s] death."  Mem. Supp. 27.  In support of this position, CJW and Hyde advance two primary arguments: (1) Plaintiffs cannot plausibly plead that "the 'natural' result of CJW and . . . Hyde's failure to intervene with a law enforcement officer's . . . duties or prevent the [RPD] from making an arrest caused Mr. Byers to wander a neighborhood wielding a hatchet and

be shot by the [CCPD] two days later," *id.*, and (2) Plaintiffs cannot plausibly plead proximate cause "because superseding causes are established by the Complaint itself," *id.*; *see id.* at 27–29 (arguing that the events following Mr. Byers's removal from Tucker Pavilion constitute superseding causes of his death). The Court is unpersuaded by either argument.

CJW and Hyde's first argument suffers from two main flaws. First, it rests upon an unduly narrow interpretation of Plaintiffs' allegations. In the Court's view, Plaintiffs do *not* allege that it was CJW and Hyde's "failure to intervene with a law enforcement officer's duties" that caused Mr. Byers to "wander a neighborhood wielding a hatchet and be shot by the [CCPD] two days later." *Id.* Rather, Plaintiffs allege that CJW and Hyde (a) fomented the environment at Tucker Pavilion that made Mr. Byers's arrest likely; and (b) caused incomplete, improper discharge forms to be generated for Mr. Byers, ensuring his release from Tucker Pavilion *as well as* his transport to and release from Richmond City Jail. *See supra* note 49 (noting that the discharge papers were generated in such a way as to obscure the fact of Mr. Byers's TDO from the presiding magistrate at Richmond City Jail). Plaintiffs further allege that these actions, coupled with CJW and Hyde's knowledge that Mr. Byers posed a danger to himself and others, made it foreseeable that *some* injury would flow from Mr. Byers's improper release from Tucker Pavilion. So construed, the Court finds that Plaintiffs have sufficiently pleaded that CJW and Hyde engaged in several "act[s] or omission[s] which, in natural and continuous sequence, produce[d] the event," namely, Mr. Byers's untimely death. *Beverly Enters.-Va.*, 247 Va. at 269 (quoting *Coleman*, 221 Va. at 131); *see Interim Personnel*, 263 Va. at 442 ("Negligence carries with it liability for consequences that . . . could reasonably have been anticipated by a prudent person."); *see also Kellerman*, 278 Va. at 493 (noting that multiple proximate causes may exist).

Another flaw with CJW and Hyde's first argument is this:  a defendant's negligence can be the proximate cause of an injury *even if* the defendant could not foresee the precise injury that occurred.  *Interim Personnel*, 263 Va. at 442; *Blondel*, 241 Va. at 475; *APV Crepaco, Inc.*, 683 F. Supp. at 1033.  So, even if CJW and Hyde could not have foreseen that Mr. Byers would be shot and killed by the CCPD, their alleged negligence may still be a proximate cause of Mr. Byers's death.  *See Interim Personnel*, 263 Va. at 442; *Blondel*, 241 Va. at 475; *APV Crepaco, Inc.*, 683 F. Supp. at 1033.  CJW and Hyde's granular focus on the specific details attending to Mr. Byers's death is therefore misplaced.

The second and final argument advanced by CJW and Hyde is that Plaintiffs' allegations establish superseding causes that cut off their potential liability.  *See* Mem. Supp. 27–29.  Like their other arguments, however, this one cannot prevail.  Succinctly, the issue of whether an intervening act is "so extraordinary as to supersede any prior act of negligence as the proximate cause" of an event is "usually a question for the jury."  *Coles*, 34 F. Supp. 2d at 386; *see Kellerman*, 278 Va. at 493 ("Generally, issues of . . . proximate causation are questions of fact for the jury's determination." (citing *Moses v. Sw. Va. Transit Mgmt. Co.*, 273 Va. 672, 679 (2007); *Jenkins*, 251 Va. at 128; *Brown v. Koulizakis*, 229 Va. 524, 531 (1985); *Armstrong v. Rose*, 170 Va. 190, 200 (1938)); *Srock v. United States*, 2006 WL 2460771, at *8 (E.D. Mich. Aug. 23 2006) (interpreting Virginia law, and noting that "because of the inherently fact-intensive nature of [the intervening versus superseding cause] inquiry," courts in Virginia consistently hold that "whether an intervening act was so extraordinary as to supersede any prior act of negligence as the proximate cause is usually a question for the jury." (quoting *Coles*, 34 F. Supp. 2d at 386)).  The Court declines to stray from the overwhelming weight of the caselaw on this issue.

In sum, Plaintiffs allegations are sufficient to establish proximate cause at this early stage. And in any event, the issue of proximate causation—and particularly that of whether an event rises to the level of a superseding cause—is one better suited for a jury.

*d. Count V Summary*

In Count V, Plaintiffs assert a state law wrongful death claim based upon theories of negligence, gross negligence, and willful and wanton negligence. CJW and Hyde are correct that Plaintiffs' allegations are insufficient to establish gross negligence. However, the remainder of Count V may proceed.

8. Summary

To recap, Plaintiffs assert five counts against CJW and Hyde. Counts II, III, IV, and V may proceed as to Hyde. Counts II and V may proceed as to CJW. Count I is dismissed in its entirety, and Counts III and IV are dismissed as to CJW only. [52]

## V. CONCLUSION

For the foregoing reasons, the Court will deny CJW and Hyde's Motion for Leave (ECF No. 19), and grant-in-part and deny-in-part CJW and Hyde's Hyde's Motion to Dismiss (ECF No. 17), as outlined herein.

An appropriate Order shall issue.

_____ /s/ RCY

Roderick C. Young
United States District Judge

Richmond, Virginia
Date: August 26, 2024

---

[52] As noted above, Plaintiffs will nevertheless be granted free leave to amend their allegations as to Counts I, III, and IV, should they seek to do so. *See supra* notes 29, 46–47.