IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MARGARET P. BYERS, *et al.*          )
      Plaintiffs,                    )
                           )
            v.                        )          Civil Action No. 3:23CV801 (RCY)
                           )
CITY OF RICHMOND, *et al.*            )
      Defendants.                    )
                           )

**MEMORANDUM OPINION**

This matter comes before the Court on Defendant City of Richmond's Motion to Dismiss. The motion has been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated herein, the Court will grant in part and deny in part the City of Richmond's motion.

**I. BACKGROUND**

The Court previously outlined the relevant factual background in its Memorandum Opinion concerning the Motion for Leave and Motion to Dismiss filed by Defendants Chippenham & Johnston-Willis Hospitals, Inc. ("CJW") and David R. Hyde. *See Byers v. City of Richmond*, 2024 WL 3938830 (E.D. Va. Aug. 26, 2024). The Court largely borrows that factual recitation—with updated cites to the now-Amended Complaint—as set forth below.

**A. The "Crisis Triage Center" at Tucker Pavilion**

CJW operates Chippenham Hospital, a medical and surgical facility located at 7101 Jahnke Road, in Richmond, Virginia. Am. Compl. ¶¶ 14, 19. CJW also provides behavioral health services through its "Tucker Pavilion" at this location. *Id.* ¶ 19. CJW touts Tucker Pavilion as a "safe haven and treatment center for children, teens, adults and seniors who need mental health

services in Richmond, Virginia, providing compassionate care for those suffering from severe mental illness." *Id.* (internal quotations omitted).

For "many years prior to and continuing through July 2023, [CJW] and the [Richmond Police Department ("RPD")] have engaged in a partnership whereby the RPD places officers inside [Chippenham Hospital] to be stationed within . . . Tucker Pavilion." *Id.* ¶ 20. This partnership traces its roots back to October 2013, when officials from the City of Richmond (the "City") and CJW unveiled the "Crisis Triage Center"[1] at Tucker Pavilion.[2] *Id.* According to CJW and the RPD, the partnership underlying the Crisis Triage Center "brings together law enforcement, medical, psychiatric and emergency mental health services in a single location." *Id.* (internal quotations omitted). Proponents of this arrangement claimed that it would "enable law enforcement personnel to connect individuals in mental health crisis with critically needed evaluation and treatment services without delay and to divert them from unnecessary and inappropriate placement in jails and involvement in the justice system." *Id.* (internal quotations omitted).

The Crisis Triage Center at Tucker Pavilion is physically comprised of a "small office used by a nurse-receptionist and another locked room known as the 'patient interview room' or 'search room' that is equipped with a one-way observational window." *Id.* At all times relevant to this matter, "at least one officer from the RPD [was] stationed in the Crisis Triage Center inside [Tucker Pavilion]" around the clock. *Id.* RPD officers working within or stationed at Tucker Pavilion "perform[] such work for [CJW] <u>and</u> the RPD as 'Extra-Duty' officers of the RPD." *Id.*

---

[1] Plaintiffs note that "[a]t some point [CJW] and the RPD may have discontinued use of the name 'Crisis Triage Center.'" Am. Compl. ¶ 20 n.1. However, Plaintiffs aver that "at all times relevant to the incidents giving rise to these actions, [CJW] and the RPD operated in the same manner as described" in the Complaint. *Id.*

[2] The Crisis Triage Center was "funded in part through a grant from the Virginia Department of Behavioral Health and Developmental Services . . . which receives its funds from the federal Substance Abuse and Mental Health Services Administration." Am. Compl. ¶ 20.

¶ 21 (emphasis in original).  RPD General Order 4-6 contains guidelines and definitions relevant to this type of "extra-duty" work.  *Id.*; *see* Am. Compl. Ex. B ("RPD General Order") 2,[3] ECF No. 81-2.  In relevant part, "Extra-Duty" work is defined as "any outside employment that is conditioned upon the actual or potential use of law enforcement powers."  RPD General Order 2.[4]

Pursuant to the arrangement outlined above, the RPD controls the stationing of RPD officers working within Tucker Pavilion.  Am. Compl. ¶ 22.  The RPD also "control[s] the rate of pay for the officers, generally 1½ times the officer's rate of pay, require[s] that the officers wear their uniforms and be fully armed, and control[s] the roster of officers who [a]re dispatched to Tucker Pavilion through an RPD police coordinator."[5]  *Id.*  CJW, in turn, uses these "extra-duty" officers—who maintain their full panoply of law enforcement powers—"as security and for the management of psychiatric patients with serious mental illnesses."  *Id.*; *see id.* ¶¶ 21–22; RPD General Order 2.  Despite this alleged delegation of certain police powers to CJW, the RPD did not provide the officers stationed in Tucker Pavilion with any "specialized training for working with mentally ill patients in a medical setting."  Am. Compl. ¶ 22.  RPD also "failed to establish any guidelines regarding the RPD officers' role in the behavior management of mentally ill patients in a psychiatric hospital, particularly with respect to the use of force and . . . restraints and seclusion with mentally ill patients."  *Id.*  While CJW willingly accepted and used RPD officers "as security and to manage psychiatric patients," it likewise "failed to provide specialized training to the RPD officers for the management of psychiatric patients in a medical setting."  *Id.* ¶ 23.  In

---

[3] For this and all other filings, the Court utilizes the pagination assigned by the CM/ECF system and not the pagination appearing on the original document.

[4] By contrast, "Off-Duty" employment is defined as "any outside employment wherein the use of law enforcement powers is not anticipated."  RPD General Order 2.

[5] Plaintiffs do not specify who actually pays the officers.  However, RPD General Order 4-6 indicates that extra-duty officers are either (a) paid directly by their extra-duty employer, or (b) paid by the City, which is then reimbursed by the extra-duty employer.  RPD General Order 2.  Under either arrangement, CJW therefore bears the financial burden of paying these extra-duty officers.

fact, CJW expressly and purposefully "excluded the RPD from the application of its policies relative to the use of force and use of restraints with patients."[6]  *Id.*

**B. Prior Incidents and Alleged Conditions at CJW**

CJW is a subsidiary of HCA Healthcare, Inc. ("HCA"), "the largest hospital company in America."  *Id.* ¶ 19.  Plaintiffs allege that "HCA routinely engages in practices that maximize profits at the expense of patient care [and] working conditions."  *Id.*  For instance, "in Virginia, HCA staffs its hospitals at approximately 32% below the national average."  *Id.*  Plaintiffs allege that this understaffing has created an environment at Chippenham Hospital—and by extension, Tucker Pavilion—wherein diminished and improper care for patients like their late son, Charles M. Byers ("Mr. Byers"), is commonplace.  *See id.* (alleging that CJW's understaffing "directly contribut[ed] to diminished patient care," and "played a significant role in laying the groundwork for the incidents complained of herein").  Plaintiffs further aver that the unchecked presence and actions of RPD officers at Tucker Pavilion significantly contributed to the issues raised herein. *See id.* ¶ 29.

Citing to a report by RPD's Crime Information Center ("the RPD Report"), Plaintiffs note that, over the past ten years, there have been roughly three times as many incidents "involving RPD and . . . patients of [Chippenham Hospital] or others located [there]," *id.*, than the next closest Richmond-area hospital:

> One need only compare the incidents involving the RPD at [Chippenham Hospital] to the incidents involving the RPD at other hospitals located in the City . . . to understand how strong and pervasive the presence of RPD officers at [Chippenham Hospital] has been and how much [CJW] has used the police powers of the RPD

---

[6] Plaintiffs suggest that CJW's exclusion of RPD officers from its policies constitutes an attempt by CJW and RPD to "circumvent the law, [by] allow[ing] [CJW] to manage mentally ill patients more 'conveniently.'"  Am. Compl. ¶ 23; *see* Am. Compl. ¶ 29 (alleging that CJW's exclusion of RPD officers from its policies "allow[s] [CJW] to claim that any actions involving RPD officers and its patients . . . are official 'law enforcement actions' over which . . . [it] has no control," while simultaneously permitting the RPD to shield itself from liability via its "ignorance of the laws and regulations applicable to mentally ill patients in a medical setting").

for patient management during their partnership. . . .  For the same ten-year period, October 13, 2013, to October 13, 2023, there were approximately:

- 1200 incidents involving RPD officers at [Chippenham Hospital] but only–

- 200 incidents involving RPD officers at VCU/MCV hospital[;]

- 380 incidents involving RPD officers at Richmond Community Hospital[;]

- 180 incidents involving RPD officers at Retreat Hospital[.]

*Id.*; *see id.*  Despite the "obvious and pervasive RPD presence at [Chippenham Hospital]" revealed by these statistics, Plaintiffs note that the RPD has conducted "virtually no internal investigations by the RPD into the many incidents involving RPD officers and the patients of [Chippenham Hospital]."  *Id.*  In fact, in the last three years, the only investigation into such a police-patient incident concerned the facts underlying this very case.  *Id.*  And even in this "rare instance (first and only?) in which the RPD performed an internal investigation of incidents involving RPD officers at [CJW], the RPD determined that 'no improper action' was taken" by its officers.  *Id.*  Plaintiffs suggest that this lack of investigations strengthens their claims, "as it further illustrates that the RPD sanctions and approves of actions by its officers working at [Chippenham Hospital]" that violate the federally protected rights of CJW's patients.  *Id.*

Plaintiffs next reference numerous patient and employee reviews that are purportedly indicative of CJW's "understaffing and . . . use of RPD officers to bully and manage mentally ill patients, with no oversight . . . , as part of the partnership between the RPD and [CJW]."  *Id.* ¶ 30.  A small sampling of these reviews is included below:

[Patient Reviews]

"They treat depression like it's illegal.  You get treated like an inmate."

"Tuckers [Pavilion] is a HORRIBLE place.  I wouldn't recommend it to my worst enemy. . . .  It feels more like a jail than a hospital."

"This place should not be in business.  They treat patients like inmates.  They try to talk you in to saying something that would enable them to lock you down for 72 hours or more.  Some of the nicer staff that actually have compassion confirmed this was the case and that I should complain.  This facility is [like] a jail cell."

"You're better off in jail. . . .  The nurses are callous and could care less about your basic needs. . . .  They will not tell you your rights or the facility rules."

"This place is just prison, I went there for depression and they treated me like I committed a crime."

"Do not recommend anyone ever check themselves in here – staff is rude & they'll end up putting you in their unit that looks like jail if you tell them they suck."

"Employees in the hospital's ER yelled, bullied, and threatened me into signing into this place.  If I did not, they insisted, they would consult the judge in charge of admission and he would both admit me and make sure I 'never got out.'"

[Employee Reviews]

"The morale at Chippenham [Hospital] is very poor.  Staff are dropping like flies and complaints are rampant about not having enough staffing for it to be safe for patients and employees.  Management is unhelpful and don't appear to care about . . . safety."

"I was contracted to work as a nurse at Chippenham Hospital, and was subject to caring for an unsafe ratio of patients. . . .  When my concern about staffing ratios was mentioned to the . . . manager, she became defensive and said 'we are not going to talk about ratios.'"

*Id.* ¶ 30.

## C. Mr. Byers and the Events of July 5, 2023 – July 8, 2023.

Mr. Byers's struggle with mental health issues began in 1999, when he was just nine years old.  *Id.* ¶ 31.  He and his family, with the assistance of a doctor, were able to effectively cope with these issues for some time.  *See id.* ¶¶ 31–32.  However, "[i]n or about August 2008, when [Mr. Byers] was [nineteen] years old, his mental health condition(s) precipitously worsened."  *Id.* ¶ 32.  As a result, Mr. Byers was "confined to a psychiatric facility under a temporary detention order ("TDO") for a period of approximately [eleven] days."  *Id.*  During this involuntary hospitalization,

Mr. Byers "was diagnosed with schizoaffective disorder, a rare mental illness that, in [Mr. Byers's] case, is related to both schizophrenia and bipolar disorder." *Id.* According to the American Psychiatric Association's DSM-5—the "accepted authority on mental and personality disorders"—an individual with schizoaffective disorder has both a major mood disorder (in Mr. Byers's case, bipolar mania), and also meets the primary criteria for schizophrenia. *Id.* Schizoaffective disorder typically involves symptoms such as feelings of elation for an extended period of time, rapid speech, racing thoughts, bizarre behavior, agitation, grandiose delusions, and hallucinations. *Id.*

After his diagnosis with schizoaffective disorder, Mr. Byers was prescribed psychotropic medications and underwent various behavioral and meditation therapies. *Id.* ¶ 33. While Mr. Byers's treatment regimen permitted him to "go for long periods of time with little to no apparent symptoms," the severity of his mental health conditions nevertheless "caused him to be hospitalized at various times between 2008 and 2023." *Id.* ¶ 34. But, aside from his initial hospitalization in 2008, the remaining hospitalizations were voluntary, as Mr. Byers and his parents (i.e., Plaintiffs) "generally knew when [Mr. Byers] needed help with his mental health conditions" and would voluntarily seek out the necessary treatment. *Id.*

Beginning in or around May 2023, Mr. Byers's condition began to worsen. *Id.* ¶ 35. Plaintiffs noticed that he was "decompensating, becoming more isolated, paranoid, and anxious." *Id.* For instance, Mr. Byers got in the habit of driving his car to soothe himself, "but would lose his car, which happened three times—having no idea where he left it." *Id.* In the days leading up to July 5, 2023, Mr. Byers told Plaintiffs that he needed help. *Id.* Around the same time, Plaintiffs noticed that Mr. Byers was particularly "anxious, confused, and delusional—often having conversations with someone who was not there, sometimes mumbling and laughing to himself."

*Id.* Mr. Byers was clearly "struggling with reality," and "desperately needed help" with his mental illness." *Id.*

On July 5, 2023, at approximately 4:00 p.m., Mr. Byers's mother drove him to Chippenham Hospital and waited while he went through intake. *Id.* ¶ 36. At approximately 5:00 p.m., Mr. Byers was given a green gown, "indicating that he was going to the mental health unit at Tucker Pavilion." *Id.* Mr. Byers's mother was then told by a CJW employee that Mr. Byers "was being admitted and that [CJW employees] would contact her if there were any problems," since she was "[Mr. Byers's] ride." *Id.* (internal quotations omitted). Mr. Byers's mother "told the intake nurse . . . that if [Mr. Byers] was let unattended, he would wander and that he could possibly walk home from the hospital, as he had done on a previous visit." *Id.* In response, the nurse assured her that Mr. Byers "would be assigned a 'sitter' and that the hospital would contact her if there were any issues." *Id.* Receiving this assurance, Mr. Byers's mother departed. *Id.* ¶¶ 36–37.

Subsequently, Mr. Byers was "left alone in the waiting room for several hours and, in his confused and delusional state, began wandering the halls of the hospital." *Id.* ¶ 37. Mr. Byers was eventually met by an unknown security guard and Lt. Waite of the RPD, "who was performing 'extra-duty' police services for [CJW], pursuant to the partnership between the RPD and [CJW]." *Id.* According to Lt. Waite, "it was obvious that [Mr. Byers] was having some type of mental health issue," as he was "mumbling under his breath and . . . hearing voices or seeing things that were not there." *Id.* (internal quotations omitted). Lt. Waite and the security guard then "locked [Mr. Byers] in a room in the Tucker Pavilion intake," *id.* ¶ 38, before Lt. Waite "issued a 'paperless' Emergency Custody Order ("ECO") for [Mr. Byers]" at approximately 7:47 p.m.[7] *Id.*

---

[7] Notably, Lt. Waite did not document or record his issuance of this ECO until several days later—"only after [Mr. Byers] was dead." Am. Compl. ¶ 39.

It is unclear whether this ECO operated to transfer custody of Mr. Byers to CJW, or whether the RPD and Lt. Waite retained custody of Mr. Byers.[8]  *Id.* ¶¶ 38–39.

      At approximately 8:30 p.m. on July 5, 2023, Lt. Waite called the Richmond Behavioral Health Authority ("RBHA") to request an evaluation of Mr. Byers for a temporary detention order ("TDO").  *Id.* ¶ 39.  Following this call, Mr. Byers was evaluated in person by Julia Sauder, a licensed clinical social worker with the RBHA.  *Id.* ¶ 40.  In her progress note, Ms. Sauder indicated that she found Mr. Byers asleep when she arrived, but that he did wake up to talk to her. *Id.* (citing Am. Compl. Ex. F ("Progress Note") 1, ECF No. 81-6).  However, Ms. Sauder noted that "it was hard to get any information of substance from [Mr. Byers]" because he would tell her "one thing and then [tell her] another."  Progress Note 1.  Ms. Sauder also observed that Mr. Byers's appearance was "unusual in that he is sunburned and his pupils were pinpoint."  *Id.* Finally, Ms. Sauder noted that, while Mr. Byers "sa[id] he wanted to be admitted and his mom says he always goes voluntarily," a TDO was nevertheless appropriate "given [Mr. Byers's] confusion and going back and forth on the information."  *Id.*  Based on Ms. Sauder's evaluation, she found that Mr. Byers met the criteria for a TDO and stated that "one will be obtained before his ECO runs out."  *Id.*

      Ms. Sauder called Mr. Byers's mother at approximately 9:30 p.m. on July 5, 2023, to update her that (1) Tucker Pavilion would be "admitting [Mr. Byers], but [that] they were waiting for a bed,"  Am. Compl. ¶ 41, and (2) "they [were] going to TDO [Mr. Byers]."  *Id.* (internal quotations omitted).  Ms. Sauder also told Mr. Byers's mother that she would be "getting off at 7

---

[8] This confusion, per Plaintiff, is yet "another example of blurred (or non-existent) lines between the RPD and [CJW]."  *Id.* ¶ 39.

a.m. and that she would call her with updates."[9]  *Id.*  Then, on July 6, 2023, at 2:08 a.m., Magistrate Martesha M. Bishop issued a TDO (TDO 763GM-2300000955) for Mr. Byers.  *Id.* ¶ 42.[10]  The TDO was served upon Mr. Byers at 2:51 a.m. on July 6, 2023.  *Id.* ¶ 44.  Despite this relatively prompt service of the TDO, Mr. Byers was not actually admitted to Tucker Pavilion until 3:00 p.m. on July 6, 2023—twelve hours later.  *Id.*

Mr. Byers was eventually "assigned to Room 354B at 'Tucker 3E,'" and the attending doctor assigned to him was Dr. Khalon.  *Id.*  Pursuant to Virginia Code § 37.2-813, this assignment triggered additional safeguards for Mr. Byers.[11]  *Id.* (citing Va. Code Ann. 37.2-813(A), (B)). Specifically, upon (a) the issuance of the TDO and (b) Mr. Byers's assignment to Tucker Pavilion, Mr. Byers could only be lawfully released from the TDO (and Tucker Pavilion) prior to his commitment hearing "[(1)] by a district court judge or special justice, upon finding that [Mr. Byers] no longer met the criteria for a TDO, or [(2)] by the director of . . . Tucker Pavilion, upon finding, based on an evaluation conducted by the psychiatrist or clinical psychologist treating [Mr. Byers], that [Mr. Byers] no longer met the criteria for a TDO."  Am. Compl. ¶ 44 (citing Va. Code Ann.

---

[9] This was apparently the last update that Plaintiffs received about their son while he was still alive.  *See* Am. Compl. ¶¶ 36, 41; *see generally* Am. Compl.

[10] Virginia law provides that a TDO can only be issued as follows:

A magistrate shall issue . . . a temporary detention order if it appears from all evidence readily available, including any recommendation from a physician, clinical psychologist, clinical social worker, or clinical professional counselor treating the person, that the person (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs; (ii) is in need of hospitalization or treatment; and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

Va. Code Ann. § 37.2-809(B); *see* Am. Compl. ¶ 43 (quoting Va. Code Ann. § 37.2-809(B)).

[11] To be sure, Plaintiffs' allegations regarding these Virginia code provisions are legal conclusions of the sort courts are to disregard at the 12(b)(6) stage.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  However, the Court has independently determined the applicability of the referenced provisions.  *See Byers*, 2024 WL 393880, at *7–8, 41.

37.2-813(A), (B)).  Per Plaintiffs, "[n]one of this ever happened. . . .  In fact, [Mr. Byers] was never evaluated by a psychiatrist or clinical psychologist."  *Id.* (emphasis in original).

At approximately 5:30 p.m. on July 6, 2023, CJW staff, including Hyde, and John/Jane Doe Security Guards (1–5), sought to move Mr. Byers from his room on the third floor to the second floor.  *Id.* ¶ 45.  While Plaintiffs concededly do not know why this move occurred, they allege that CJW staff "likely attempted to move [Mr. Byers] to the second floor because of understaffing or lack of beds at . . . Tucker Pavilion."  *Id.*  When CJW staff initiated this move, Mr. Byers, in his paranoid and delusional state, told the "nurses and security officers that he did not want to take the elevator to the second floor, apparently believing that he was going to be harmed."  *Id.* ¶ 46.  CJW staff therefore "called in the RPD officer stationed [in Tucker Pavilion] to bully [Mr. Byers] into following their instructions by threat of force, threat of arrest and the use of restraints."  *Id.*  The RPD officer called to "enforce" the directives of CJW staff was Officer Steven M. Gibson ("Officer Gibson").  *Id.*

At roughly 5:40 p.m., Officer Gibson arrived on scene and ordered Mr. Byers to "follow the instructions of [CJW] staff to get on the elevator to go to the second floor."  *Id.* ¶ 47.  Plaintiffs emphasize that Officer Gibson "had received no training on the rights of patients in a medical setting."[12]  *Id.*  Moreover, prior to issuing this command to Mr. Byers, Officer Gibson had done "no investigation to independently establish" any of the attending facts and circumstances regarding why Mr. Byers was at Tucker Pavilion, what his condition was, why he was being

---

[12] Indeed, according to Plaintiffs, that is the crux of the issue:

> [A]s part of the longstanding . . . practice of the RPD and [CJW] . . . [CJW] staff used [RPD] officers . . . to enforce their instructions, apparently knowing that they [(the CJW staff)] could not act by themselves and use any methods that would violate the patient's rights . . . .  [Instead, CJW staff] combin[ed] their actions with . . . the RPD officers' (and the RPD's useful and purposeful ignorance of patient's rights) to violate patient's rights under the threat and color of law.

Am. Compl. ¶ 47.

moved, what options were available to facilitate his move, and whether he was under a TDO or ECO. *Id.* Instead, Officer Gibson merely followed the instructions of CJW staff by ordering Mr. Byers to comply. *See id.* ¶¶ 46–48.

Mr. Byers responded to Officer Gibson's initial order by telling him, "'I do not trust you specifically' and 'I do not trust the others.'" *Id.* ¶ 48. As this encounter continued, Mr. Byers exhibited numerous signs of his paranoia and delusions. *See, e.g., id.* (noting that Mr. Byers, at various points, suggested that Officer Gibson was a "fake police officer," and that the "nurses [were] also fake"). "Notwithstanding [Mr. Byers's] obvious paranoia and delusions, Officer Gibson directed [Mr. Byers] to cooperate and get on the elevator." *Id.* Mr. Byers responded that he could not cooperate and that he would instead wait "for [his] hearing" and for the "real cops" to show up. *Id.* (internal quotations omitted). While Mr. Byers was clearly paranoid and delusional, he was "calm and not combative in any way" during this exchange. *Id.* The standoff continued, and eventually "Hyde and the Jane / John Doe Security Guards (1–5), acting jointly and in concert with Officer Gibson, . . . resort[ed] to the use of force." *Id.* The group grabbed Mr. Byers, "who was sitting in a chair with his hands clasped and a threat to no one," and "violently wrestle[d him] to the ground[,] attempting to put him in handcuffs." *Id.* During this altercation, Mr. Byers was surrounded by as many as ten to twelve CJW employees. *Id.* ¶ 49. These employees "instruct[ed] and encourage[d] Officer Gibson to use force and handcuffs on [Mr. Byers] by saying things like 'we just need to "clink-clink" him . . . and put him in the elevator.'" *Id.* (alterations omitted). CJW nurses, including Hyde, likewise encouraged Officer Gibson "by saying things like 'put 'em [handcuffs] on and take him down.'" *Id.*

Officer Gibson was ultimately unsuccessful in his attempt to handcuff Mr. Byers. *Id.* Consequently, Officer Gibson "pulled out his taser, pointed it at [Mr. Byers], and screamed at

Mr. Byers was then removed from Tucker Pavilion, "shackled to some type of specialized restraint chair and taken to a transport vehicle driven by Officer Pearce of the RPD." *Id.* Officer Pearce asked Officer Gibson "why was [Mr. Byers] here, wasn't he on the third floor—the most secure?" *Id.* Officer Gibson replied, "I have no idea." *Id.* (emphasis omitted). The two officers brought Mr. Byers to Richmond City Jail, located at 1701 Fairfield Way in Richmond, Virginia. *Id.* ¶ 50. There, Mr. Byers appeared before a magistrate with Officer Gibson. *Id.* At no point did Officer Gibson "inform the magistrate the [Mr. Byers] was under a TDO; that [he] had been hospitalized for his severe mental illness; . . . and/or that [he] was in need of mental health treatment." *Id.* Officer Gibson's failure to provide this information apparently led the magistrate to release Mr. Byers on his own recognizance without receiving the mental health treatment he "desperate[ly] needed." *Id.* Even more, Mr. Byers was still technically under a TDO and assigned to Tucker Pavilion "for care and treatment for his severe mental illness" at the time he was released. *Id.*

Upon his release in the evening hours of July 6, 2023—and still in a "paranoid and delusional state"—Mr. Byers walked from the City of Richmond jail to the general area of his home in Chesterfield, approximately fourteen miles away. *Id.* ¶ 51. Mr. Byers was unable to precisely locate his home and instead "wandered around his neighborhood and adjoining neighborhoods searching for his home for approximately thirty-six . . . hours." *Id.* Toward the end of this timeframe, Mr. Byers apparently attempted to enter numerous homes that did not belong to his parents. *Id.* ¶ 52. At some point, he "entered a[] neighbor's garage . . . [and] picked up a small hatchet." *Id.* This behavior led a neighbor to call the Chesterfield County Police Department ("CCPD") on Mr. Byers just before 1:00 p.m. on July 8, 2024. *Id.* The CCPD subsequently dispatched officers to the location of the caller. *See id.*

At approximately 1:00 p.m., Officer Gordon J. Painter and another unnamed CCPD officer arrived on scene.  The first officer "pulled up and immediately drew her gun and pointed it at [Mr. Byers]."  *Id.* ¶ 53.  Officer Painter did the same when he arrived, "startl[ing] Mr. Byers and causing him to "walk[] away from the two . . . officers."[14]  *Id.*  Mr. Byers immediately began backing away from the two officers, "who had their guns drawn on him and were yelling at him to put down the hatchet."  *Id.*  The first officer eventually fired her taser at Mr. Byers "but apparently missed."  *Id.* While that officer was struggling to discharge her second taser cartridge, Officer Painter began shooting at Mr. Byers.  *Id.*  When Officer Painter fired his first shot, Mr. Byers was "at least 25 feet away from Officer Painter . . . [with his] head . . . turned away."  *Id.*  After the first three shots, Mr. Byers tried to turn and get away from Officer Painter.  *Id.*  Officer Painter continued shooting, hitting Mr. Byers in the back three or four times; these shots were fatal.  *Id.*  In total, Officer Painter "shot at [Mr. Byers] seven . . . times, hitting him five . . . times."  *Id.*

## II. RELEVANT PROCEDURAL HISTORY

Plaintiffs filed their original five-count Complaint on November 2, 2023, alleging numerous violations of state and federal law against CJW, Hyde, the City, Officer Gibson, and John/Jane Doe Security Guards 1–5.  Compl. ¶¶ 47–94.  The Court subsequently permitted Plaintiffs to file an Amended Complaint, which added new claims against Officer Painter and Chesterfield County.  *See* Order, ECF No. 80; Am. Compl. ¶¶ 1, 4, 17–18, 51–114.  On January 29, 2024, the City[15] filed a Motion to Dismiss and Memorandum in support thereof.  ECF Nos. 23,

---

[14] Plaintiffs emphasize the fact that Officer Painter never attempted to (1) "speak to [Mr. Byers] in a . . . nonthreatening way or assess his medical condition or mental or psychological state," Am. Compl. ¶ 54, (2) use any "less-lethal force to gain control of the situation," *id.* ¶ 55, or (3) use any "de-escalation techniques [or] warn [Mr. Byers] that he would be shot," *id.* ¶ 56.

[15] As referenced, *supra*, CJW and Hyde filed a joint Motion to Dismiss on January 26, 2024, ECF No. 17, and Officer Gibson filed a separate Motion to Dismiss on January 29, 2024, ECF No. 25.  The Court ruled on the CJW-Hyde Motion to Dismiss on August 26, 2024, *see Byers*, 2024 WL3938830, and it will take up Officer Gibson's Motion to Dismiss in due course.

24.  Plaintiffs filed a Memorandum in Opposition to the City's Motion to Dismiss on February 20, 2024,  ECF No. 35, and the City filed its Reply on February 26, 2024, ECF No. 41.

Accordingly, the City's Motion to Dismiss is ripe for review.

### III. LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1356 (1990)).  Dismissals under Rule 12(b)(6) are generally disfavored by the courts because of their res judicata effect. *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1471 (4th Cir. 1991).  Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2).  *Id.* (citations omitted).  "[A] motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support [their] claim and would entitle [them] to relief." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.* However, the plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Id.* (citations omitted); *see also Martin*, 980 F.2d at 952.

## IV. DISCUSSION

Plaintiffs bring five counts against the City. Counts I, II, III, and IV are federal claims brought pursuant to 42 U.S.C. § 1983. S*ee* Am. Compl. ¶¶ 64–73 (Count I, "Denial and Withholding of Medical Care"), 74–83 (Count II, "Denial of Rights to Be Free from Physical and Mental Abuse, and Restraints and Seclusion"), 84–96 (Count III, "Excessive Force—Fourth and Fourteenth Amendment"), 97–106 (Count IV, "Unlawful/False Arrest—Fourth and Fourteenth Amendment"). Count V, on the other hand, is a wrongful death claim based on Virginia state law. *See id.* ¶¶ 107–114 (Count V, "Negligence, Gross Negligence, and Willful and Wanton Negligence"). The City has moved to dismiss all five Counts. The City first[16] briefly argues that the statutes cited in Counts I and II only "apply to health care facilities, not the City," meaning that they cannot form the basis of a § 1983 claim against it. City's Mem. Supp. Mot. Dismiss ("Mem.

---

[16] Technically, the City's *first* argument is that Plaintiffs' Amended Complaint "fails to comply with Federal Rule of Civil Procedure 8(a)(2)," City's Mem. Supp. Mot. Dismiss 6, ECF No. 24, which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(d)(1). It is true that the Amended Complaint is lengthy. However, the Court already waded through the myriad allegations involved in this action when considering CJW and Hyde's Motion to Dismiss. *See Byers*, 2024 WL 3938830. Given its familiarity with this matter, the Court declines to entertain the City's Rule 8 argument at this juncture. *See* 5 Charles A. Wright, Arthur R. Miller & Benjamin A. Spencer, *Fed. Prac. & Proc.* § 1217 (4th ed. 2024) (noting that "the proper length and level of clarity for a pleading . . . is largely a matter that is left to the discretion of the trial court," and that "[t]he judicial tendency is to disregard the deficiencies of a lengthy, unorganized complaint"). That said, Plaintiffs' counsel is encouraged to provide more streamlined allegations in future filings.

Supp.") 6; *see id*. at 6–8. Alternatively, the City argues that Counts I and II fail because Plaintiffs have failed to adequately plead "facts supporting a *Monell* claim against the City." *Id.* at 7; *see generally id.* at 7–8. The City makes similar arguments in response to Counts III and IV, contending that Plaintiffs have failed to plead facts supporting an unlawful "custom or practice by hospital-based officers." *Id.* at 9–10; *see id.* at 8–10. Finally, the City argues that Count V should be dismissed as "sovereign immunity protects municipalities from tort liability arising from the exercise of governmental functions" such as the "'maint[enance of] a police force.'" *Id.* at 10–11 (quoting *Carter v. Morris*, 164 F.3d 215, 221 (4th Cir. 1999)).

For the reasons outlined below, the Court largely agrees with the City's arguments regarding Counts I, II, and V, and will dismiss these claims as to the City of Richmond. Counts III and IV, however, survive the City's Motion to Dismiss.

## A. Counts I and II

In Counts I and II of the Complaint, Plaintiffs attempt to use 42 U.S.C. § 1983 to assert violations of various federal rights. Specifically, Plaintiffs contend that "42 U.S.C. § 290ii(a), 42 U.S.C. § 10841, 42 U.S.C. § 1395 *et seq.*, and 42 C.F.R. § 482.13 unambiguously confer" rights that they may enforce by way of a § 1983 suit. Am. Compl. ¶¶ 66, 76. The City retorts that the referenced provisions apply to "health care facilities, not the City." Mem. Supp. 6. For that reason, the City argues that Counts I and II must be dismissed. *See id.* at 6–8. The Court agrees.

The analysis of this issue invites relative brevity. In its prior decision, this Court held that "42 U.S.C. § 290ii is the only statute [relied upon by Plaintiffs] that unambiguously confers § 1983-enforceable rights." *See Byers*, 2024 WL 393880, at *29. Section 290ii(a) provides as follows:

> A public or private general hospital, nursing facility, intermediate care facility, or other health care facility, that receives support in any form from any program

> supported in whole or in part with funds appropriated to any Federal department or agency shall protect and promote the rights of each resident of the facility, including the right to be free from physical or mental abuse, corporal punishment, and any restraints or involuntary seclusions imposed for purposes of discipline or convenience.

42 U.S.C. § 290ii(a).  In order for Plaintiffs' claims in Counts I and II to proceed against the City, § 290ii(a) would need to *apply* to the City.  The Court need go no further than the plain language of § 290ii(a) to hold that it does not so apply.  *See id.* (requiring "public or private general hospital[s], nursing facilit[ies], intermediate care facilit[ies], or other health care facilit[ies], that receive" federal funding to "promote and protect" the rights delineated therein); *see Maine v. Thiboutot,* 488 U.S. 1, 4–10 (relying upon the plain language of § 1983 to determine its applicability); *Health & Hosp. Corp. of Marion Cnty. v. Talevski,* 599 U.S. 166, 183 (2023) (same).  Because the City is not a "facility" falling within § 290ii(a)'s ambit, Counts I and II will be dismissed as to the City.

## B. Counts III and IV

With Counts III and IV, Plaintiffs allege that the City violated Mr. Byers's Fourth Amendment[17] rights, again seeking redress pursuant to § 1983.  Specifically, Plaintiffs allege violations of Mr. Byers's right to be free from excessive force and right to be free from unlawful arrest.  Plaintiffs' claims—having been levied against a municipality—must satisfy the strictures of the *Monell* doctrine to survive.  *Khattab v. Janowski*, 2024 WL 1889841, at *3 (E.D. Va. Apr. 30, 2024).  The City contends that the Plaintiffs' allegations are insufficient in this regard.  The Court disagrees and declines to dismiss Counts III and IV as to the City of Richmond.

---

[17] The Plaintiffs additionally cite to the Fourteenth Amendment.  Am. Compl. ¶¶ 84–106.  However, excessive force and unlawful arrest are analyzed under the Fourth Amendment reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Accordingly, the Court reads these counts to arise solely under the Fourth Amendment and performs its analysis accordingly.

1. *Monell* Liability Generally

For the purposes of § 1983, "a municipality is considered a 'person' and thus is subject to suit." *Hunter v. Town of Mocksville*, 897 F.3d 538, 553 (4th Cir. 2018) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). While an underlying constitutional violation is a necessary element of municipal liability, it is not sufficient; a municipality cannot "be held liable *solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691; *see Hunter*, 897 F.3d at 553. In other words, municipalities "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691; *see Hunter*, 897 F.3d at 553–54. Instead, liability attaches only where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under § 1983." *Monell*, 436 U.S. at 694; *see Hunter*, 897 F.3d at 553–54.

The Fourth Circuit has identified four avenues by which a § 1983 plaintiff may demonstrate the existence of a *Monell* "policy or custom":

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens;" or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). Reading the Complaint in the light most favorable to Plaintiffs, they allege the existence of a constitutionally injurious policy or custom on the third and fourth of these theories. *E.g.*, Pl.'s Mem. Opp'n Mot. Dismiss ("Mem. Opp'n") 5, ECF No. 35 (positing that Plaintiffs' claims "fit most squarely under" the third and fourth theories of *Monell* liability). The Court will

refer to these avenues of liability as the "failure to train" theory and the "condonation" theory, respectively.  The Court considers both in turn, below.

*a. Failure to Train Theory*

To successfully plead *Monell* liability based on a failure to train theory, a plaintiff must allege:  (1) a violation of the plaintiff's constitutional rights by the defendant's subordinates; (2) that the municipality was deliberately indifferent to the alleged inadequacy of the training, or that the constitutional duty at issue was so obvious that failure to train officers amounts to "reckless disregard for the constitutional rights of those within police force jurisdiction;" and (3) a causal nexus between the allegedly inadequate training policy and the constitutionally violative conduct. *Spell v. McDaniel*, 824 F.2d 1380, 1388, 1390 (4th Cir. 1987); *see also Brown v. Mitchell*, 308 F. Supp. 2d 682, 702 (E.D. Va. 2004); *City of Canton v. Harris*, 489 U.S. 378, 388–92 (1989).

Here, the City argues that Plaintiffs have not met their burden because they cannot demonstrate a widespread pattern of unconstitutional behavior, the absence of which destroys an inference of deliberate indifference.  Reply 6.  Yet, the Court is convinced that the City's obligation to train officers on their Fourth Amendment obligations in a psychiatric ward is obvious under these particular circumstances, and the City's alleged failure to do so amounts to deliberate indifference.  Thus, Plaintiffs have adequately alleged *Monell* liability based on the City's failure to train officers regarding both unlawful arrests and excessive force.

i. Constitutional Violation: Unlawful Arrest and Excessive Force

The first element of a *Monell* failure to train claim is perhaps the most obvious: the plaintiff must adequately allege a constitutional violation by the defendant's subordinates.  *See, e.g.*, *Brown*, 308 F. Supp. 2d at 702.  The City argues that Officer Gibson arrested Mr. Byers in a reasonable

21

(and therefore lawful) manner because the seizure did not result in injury.[18]  Mem. Supp. 8–9.  The Court, however, finds that the Complaint plausibly alleges that Officer Gibson arrested Mr. Byers without sufficient cause—and used excessive force in doing so.

An arrest is unlawful if it lacks probable cause.  U.S. Const. amend. IV; *e.g., Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  The probable cause determination is based on a consideration of the "totality of the circumstances" from the officer's point of view, *Illinois v. Gates*, 462 U.S. 411, 424 (1976), and is satisfied if "facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense."  *United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir. 1984).  While an officer's subjective intent is not relevant to the calculation, *Whren v. United States*, 517 U.S. 806, 813 (1996), an officer may not fabricate facts to create probable cause.  *See Franks v. Delaware,* 438 U.S. 154, 168 (1978); *Unus v. Kane*, 565 F.3d 103, 124–25 (4th Cir. 2009).

Plaintiffs' allegations create a reasonable inference that Officer Gibson and Nurse Hyde tacitly fabricated the only fact supporting probable cause—that Mr. Byers had kicked Nurse Hyde. Officer Gibson first began to seize Mr. Byers when Office Gibson "violently wrestle[d]" Mr. Byers to the ground, based solely on the prompting of the hospital staff.  Am. Compl. ¶ 48.  Officer Gibson struggled to handcuff Mr. Byers, prompting Officer Gibson to aim his taser at Mr. Byers and threaten him with force and arrest.  *Id.*  Finally, after Nurse Hyde requested that Officer Gibson arrest Mr. Byers, Officer Gibson asked Nurse Hyde if Mr. Byers had kicked him.  *Id.*  Officer Gibson allegedly asked this question without any prompting or knowledge of a kick.  *Id.* Nonetheless, Nurse Hyde responded that Mr. Byers had kicked him.  *Id.*  Then, on the request of

---

[18] The City additionally contends that Officer Gibson witnessed Mr. Byers kick Nurse Hyde, which created probable cause.  Mem. Supp. 10.  However, the Rule 12(b)(6) Motion to Dismiss standard requires courts to take each allegation in the Complaint as true.  *Ashcroft*, 556 U.S. at 678.  Therefore, the Court constrains its analysis to the facts alleged by the Plaintiffs.

Officer Gibson, Nurse Hyde printed out "false" discharge papers stating that Mr. Byers was being "discharged to home," to allegedly conceal the fact that Mr. Byers's arrest violated his TDO and Va. Code Ann. § 37.2-813.  *Id.* at ¶ 49.

Taken together, these allegations reasonably support Plaintiffs' assertion that Officer Gibson and Nurse Hyde "fabricated an assault charge" to create probable cause.  *Id.*  In fact, the allegations imply that Mr. Byers was arrested because the presenting symptoms of his mental illness had become burdensome to the hospital staff—not because he had committed a crime.  An arrest under these alleged circumstances lacks sufficient cause and is therefore unlawful.

Plaintiffs additionally assert that Officer Gibson used excessive force against Mr. Byers, which gives the Court occasion to consider the reasonableness of the force allegedly involved in Mr. Byers's seizure.  To comply with the constraints of the Fourth Amendment, an arresting officer may use only "reasonable" force.  *Graham*, 490 US at 396.  Reasonableness is an objective test, based on the perspective and knowledge of the defendant officer.  *Id.*; *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015).  In assessing whether the type and degree of force used in a particular case was reasonable, courts look to the three *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.

Taking the Complaint as true, Officer Gibson first used actual force against Mr. Byers when he "wrestle[d]" him to the ground.  Am. Compl. ¶ 48.  Plaintiffs aver that, at that point, Mr. Byers was "calm and not combative in any way."  *Id.*  Further, none of the hospital staff nor Officer Gibson had mentioned any criminal conduct by Mr. Byers.  *See id.*  Therefore, applying the *Graham* factors, the use of force by Officer Gibson was plainly disproportionate to the circumstance:  there was no crime at issue, serious or otherwise, and Mr. Byers posed no threat to

those around him.  *See Graham*, 490 U.S. at 396.  While Mr. Byers was arguably resisting arrest, the lack of evidence of criminality and risk outweighs his resistance.  *See Byers,* 2024 WL 393880, at *28.  "Accordingly, to the extent that *any* force was justified, it should have been very limited."  *Id.*

The City argues that Plaintiffs have failed to establish excessive force by Officer Gibson because Plaintiffs do not contend that the arrest resulted in injury.  Mem. Supp. 10.  Lack of injury, however, does not mean that a use of force was *per se* reasonable.  Rather, police officers trespass upon an individual's Fourth Amendment rights when they use force beyond that which is required by the circumstances.  *Graham*, 490 U.S. at 396.  Here, if all the facts alleged are taken as true, Officer Gibson's act of wrestling Mr. Byers to the ground could plausibly be found to constitute excessive force, due to the total absence of criminal allegations or any immediate threat presented by Mr. Byers at the time.

The City also appears to argue that mere threats of force (such as Officer Gibson aiming his taser at Mr. Byers) are not relevant to the excessive force analysis.  However, to pass Fourth Amendment muster, the entirety of an officer's seizing conduct must be grounded in reasonableness.  *See Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014).  The Court may therefore consider any use of actual force, as well as an officer's threats of force.  *See Nazario v. Gutierrez*, 103 F.4th 213, 232 (4th Cir. 2024) ("The Fourth Amendment, which is grounded in reasonableness, can be transgressed by an unwarranted threat of deadly force."); *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) ("An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest, . . . but that right is circumscribed by the Fourth Amendment's insistence on reasonableness." (citing *Graham*, 490 U.S. at 396)).

24

Here, the Complaint alleges that Officer Gibson threatened Mr. Byers with a taser multiple times throughout their encounter.  Am. Compl. ¶ 49.  Per the Fourth Circuit, these allegations should be considered alongside the allegations regarding actual force used.  *See Nazario*, 103 F.4th at 232.  Because the Court has already found that the allegations concerning actual force plausibly state an excessive force claim, the Court easily finds that the allegations concerning threatened force bolster that claim.  Therefore, Plaintiffs' allegations concerning Officer Gibson's unreasonable-seizure-through-excessive-force "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555.

Based on the above analysis, Plaintiffs have plausibly alleged the first element of a *Monell* failure to train claim regarding both unlawful arrest and excessive force. [19]

<u>ii. Element Two: Deliberate Indifference or Obvious Constitutional Duty</u>

To satisfy the second element, a plaintiff must allege that the municipality was deliberately indifferent to the alleged training inadequacy such that the failure to train fairly reflects the municipality's "deliberate" or "conscious" choice.  *City of Canton*, 489 U.S. at 379.  A plaintiff may establish "deliberate indifference" in two ways.  First, they may demonstrate that "policymakers were aware of, and acquiesced in, a pattern of constitutional violations."  *Moody v. Newport News*, 93 F. Supp. 3d 516, 538 (E.D. Va. 2015) (citing *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 7216 (E.D. Va. 2014)).  Alternatively, a plaintiff may show that the municipality has "failed to train its employees on an obvious constitutional duty that particular employees are certain to face."  *Id.* at 538.  A constitutional duty is "obvious" when "the underlying constitutional right is quite clear and is one that the subordinates reasonably can be expected to confront with some regularity."  *Brown v. Mitchell*, 308 F. Supp. 2d 682, 704–05 (E.D. Va. 2004).

---

[19] These conclusions mirror those of the Court in its earlier motion to dismiss Opinion.  *Byers*, 2024 WL 393880, at *26–27.

In a case where the "the supervisory power [has] fail[ed] to train subordinates who will almost certainly encounter situations implicating the constitutional right, it is fair to state that the supervisory power has made a 'deliberate or conscious choice.'" *Id.* (quoting *City of Canton*, 489 U.S. at 389).

In this case, Plaintiffs adequately allege that the City has failed to train its subordinates on an obvious constitutional duty:  to protect the Fourth Amendment rights of psychiatric patients they were certain to encounter at their CJW placement.  *See* Am. Compl. ¶ 22.

This Court and others have recognized that mental illness and behavioral health issues, when present in a suspect or civilian, create complicated Fourth Amendment questions for police officers encountering them.  *See Basilica v. Harris*, 658 F. Supp. 3d 285, 297 (E.D. Va. 2023) (holding that the plaintiff sufficiently alleged a § 1983 supervisory claim based on failure to train officers on Fourth Amendment protections of those with behavioral health conditions); *Dean v. Campbell*, 2023 WL 5281945, at *7 (W.D.N.C. July 14, 2023) (holding that the plaintiff had sufficiently alleged a failure to train claim where municipality had not provided officers with any training on the use of force regarding psychiatric restraints), *report and recommendation adopted*, 2023 WL 5281514 (W.D.N.C. Aug. 16, 2023); *Clopp v. Sparks*, 2023 WL 2538177 at *11 (D. Nev. Mar. 16, 2023) (discussing the constitutionality of the use of force against a mentally ill individual and citing *Dearle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001), for the proposition that "Even when an emotionally distributed individual is 'acting out' . . . the governmental interest in using . . . force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."); *see also* Joseph McKechnie, Note, *A Community Caretaking Policy: Why Mental Health Professionals Should Respond to Welfare Checks When No Exigencies Are Present*, 55 Creighton L. Rev. 227, 246–47

(2022) (describing the regular, unjustified use of force against those with mental health issues); Darcy R. Samuelsohn, *Educate, Don't Escalate: Reforming the Qualified Immunity Standard for Those with Mental Illnesses to Incentivize Effective Police Training*, 95 Tul. L. Rev. 741, 751–52 (2021) (describing how officers struggle to differentiate between "mental illness and danger"). Yet, when confronted with these cases, courts often hold that the municipality at issue did not fail to train officers in an *obvious* constitutional duty because those officers were not regularly encountering individuals with behavioral or mental health issues. *See, e.g.*, *Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 671–72 (D. Md. 2003), *aff'd sub nom. Simms v. Bruce*, 104 F. App'x 853 (4th Cir. 2004); *Robinson v. Cnty. of Shasta*, 384 F. Supp. 3d 1137, 1161–62 (E.D. Cal. 2019); *Pace v. Town of Southampton*, 678 F. Supp. 2d 79, 88 (E.D.N.Y. 2010); *MacLean-Patterson v. Erie Cnty., Ohio*, 488 F. Supp. 3d 581, 590 (N.D. Ohio 2020).

Here, however, RPD affirmatively placed officers at CJW knowing those officers would be stationed in Tucker Pavilion, a psychiatric ward. Am. Compl. ¶ 20. The partnership between RPD and CJW means that RPD officers are, with more than "some regularity," *Brown*, 308 F. Supp. 2d at 704–05, forced to navigate the constraints of the Fourth Amendment in the context of a psychiatric ward. The officers' constitutional duty to comply with the Fourth Amendment protections of those with mental illnesses was an obvious one. *See id.* Taking the Plaintiff's allegations as true, the City of Richmond was required to train officers placed with CJW on this obvious constitutional duty, and its alleged failure to do so, if proven, would amount to deliberate indifference.[20]  *See id.*

---

[20] The alleged "blurred" lines in the relationship between RPD and CJW, Am. Compl. ¶ 39, exacerbates the already existing Fourth Amendment sensitivity of policing in a psychiatric ward. For example, it is unclear whether ECOs transfer patients to police custody or whether officers placed at CJW blindly execute instructions by hospital staff. *Id.* Even officers readily trained in general Fourth Amendment requirements would have a difficult time navigating such a landscape.

### iii. Element Three: Causal Nexus

Finally, a plaintiff must allege a "causal" nexus between the deficient training and the alleged constitutional violation. *Brown*, 308 F. Supp. 2d at 694. Simply put, the plaintiff must plausibly demonstrate that the defendant's failure to train the relevant subordinates was the "cause in fact" of the plaintiff's injuries. *Id.* In determining if the plaintiff has plausibly alleged such a nexus, the court should ask: is it reasonable to infer that an adequately trained subordinate would have behaved this manner? *See id.* If this imaginary subordinate—whose training does not suffer from the alleged inadequacies of the defendant's actual training policy—would not have engaged in the constitutional violation, then the plaintiff has alleged the requisite causation. *See id.*; *Bd. of Cnty. Commr's v. Brown*, 520 U.S. 397, 404 (1997); 3B Kevin F. O'Malley et al., Fed. Jury Prac. Instr. § 165:27 (6th ed. 2024).

The causal nexus between the alleged constitutional violations and the City's failure to train officers regarding Fourth Amendment constraints in psychiatric wards is clear. Plaintiffs adequately alleged that Officer Gibson used excessive force in response to the presenting symptoms of Mr. Byers's mental illness, despite Mr. Byers not being a physical threat. *See* Am. Compl. ¶¶ 48–49. Additionally, as described above, the facts alleged create a reasonable inference that Officer Gibson arrested Mr. Byers without probable cause after Mr. Byers's mental illness caused Mr. Byers to fear the instructions of Nurse Hyde. *Id.* Had Officer Gibson received specialized training, he may have better understood that the Fourth Amendment does not condone seizures of mentally ill individuals in the way it might a fleeing suspect. Thus, Officer Gibson's allegedly violative behavior in this case was a plausible result of his inadequate training. The Plaintiffs have adequately alleged the third and final element of a *Monell* failure to train theory and may advance their excessive force and unlawful arrest claims accordingly.

*b. Condonation Theory*

The condonation theory arises from courts' recognition that, "[w]ithout having been directly authorized . . . or inadequately trained in specific ways by responsible municipal policymakers, police officers . . . may fall into patterns of unconstitutional conduct." *Spell*, 824 F.2d at 1390.  In effect, the theory creates liability where a municipality was aware of a pattern of unconstitutional conduct and failed to intervene.  *See id.* at 1391.  A successful plaintiff must allege:  (1) a pattern of unconstitutional conduct; (2) "actual or constructive knowledge of its existence by responsible policymakers;" and (3) a causal nexus between the failure to correct and the specific alleged violation.  *Id.*

"Prevailing under [the condonation] theory is no easy task."  *Owens v. Balt. City State's Att'y's Off.*, 767 F.3d 379, 402–03 (4th Cir. 2014).  However, "simply alleging such a claim, is by definition, easier."  *Id.*  After all, a Rule 12(b)(6) motion based on a failure to state a claim should *only* be dismissed where it "appears beyond doubt that the plaintiff can prove *no* set of facts in support of the claim."  *Conley*, 355 U.S. at 45 (emphasis added).

The City argues that the only allegation tending to show a pattern of unconstitutional behavior is the RPD Report, and that it alone is insufficient to support *Monell* liability.  Mem. Supp. 8–9.  However, taken together, the RPD Report and the alleged circumstances of this particular incident creates a reasonable inference that RPD officers placed at CJW have engaged in a pattern of unlawful arrests about which the City was constructively aware.

First, the grossly disproportionate number of arrests coming from CJW—compared against the other area hospitals in the report—allow for a reasonable inference that officers stationed there[21] have a pattern of unjustifiably arresting those presenting symptoms of mental illness.

---

[21] While the RPD Report tracked incidents occurring at CJW generally, Am. Compl. ¶ 29, RPD officers

Further, the facts alleged specific to Mr. Byers's experience tend to show that this was not the first time an RPD officer at CJW arrested a patient without cause at the behest of nursing staff:  Nurse Hyde instructed Officer Gibson to arrest Mr. Byers as if probable cause was a non-issue, Am. Compl. ¶ 49, which Nurse Hyde supported with false discharge papers. *Id.*  Then, the transporting officer, Officer Pearce, accepted without pause the directive to transport Mr. Byers to Richmond City Jail, despite the fact he knew Mr. Byers should be "on the third floor—the most secure" and that Officer Gibson professed ignorance of any just cause for transporting this patient away from the hospital and to the Jail. *Id.*

Admittedly, the allegations supporting this theory are limited.  However, the Court finds they are nevertheless sufficient to "raise the right to belief beyond a speculative level." *Bell Atl. Corp.*, 550 U.S. at 555.  Therefore, the Plaintiff has adequately alleged that a pattern of unlawful arrests existed.

The remainder of the analysis is straightforward.  The RPD record creates a reasonable inference that City had at least constructive knowledge of this pattern, since the record is maintained by the RPD. *Id.* at ¶ 29.  Finally, should a pattern of unlawful arrests exist, this specific alleged instance of unjustified arrest is clearly part of that pattern.  Therefore, Plaintiffs have adequately stated a claim for *Monell* liability based on the City's alleged condonation of unlawful arrests.

Conversely, the Complaint does not demonstrate that the City condoned a pattern of excessive force.  The RPD record does not mention uses of force and there are no allegations supporting the existence of a pattern of excessive force, much less knowledge by RPD of that

---

were only stationed at Tucker Pavilion. *Id.* at ¶ 20.  The Court thus finds it reasonable to infer that most, if not all, of the arrests cited in the report likewise came from incidents at Tucker Pavilion.

pattern. *See id.* Therefore, while Plaintiffs have adequately alleged *Monell* liability for unlawful arrests under a condonation theory, they have not done so in relation to their excessive force claim.

As a result of the foregoing, the Court finds that Plaintiffs have adequately stated a claim for § 1983 liability against the City in Count III, by way of a *Monell* claim for failure to train, and in Count IV by way of either a *Monell* claim for failure to train or based on a condonation theory. Thus, Counts III and IV may proceed accordingly.[22]

## C. Count V

Plaintiffs last assert in Count V that the City is vicariously liable for the negligence, gross negligence, and willful and wanton negligence of the RPD officers involved in this case. *See* Compl. ¶¶ 107–14. Unfortunately for Plaintiffs, sovereign immunity shields the City from all potential liability under Count V.

Sovereign immunity "protects municipalities from tort liability arising from the exercise of governmental functions." *Niese v. City of Alexandria*, 564 S.E.2d 127, 132 (Va. 2002). A function is "governmental" when it is "directly tied to the health, safety, and welfare of the citizens," *Edwards v. City of Portsmouth*, 375 S.E.2d 747, 750 (Va. 1989), and involves "the exercise of an entity's political, discretionary, or legislative authority," *Carter v. Chesterfield Cnty. Health Comm'n*, 527 S.E.2d 747, 750 (Va. 2000). Municipalities enjoy immunity for both

---

[22] Notably, this conclusion diverges from that in *Byers*, 2024 WL 393380 at *35–38, where this Court found that Plaintiffs could not establish *Monell* liability against CJW because Plaintiffs had not alleged an unlawful "policy or custom" by CJW. CJW is distinct from the City of Richmond in two vital ways: First, Plaintiffs did not allege that CJW is a policymaker as to the RPD's officer training. *Monell* liability only incurs against those with final policymaking authority. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Conversely, common sense dictates that the City of Richmond possesses such authority over its own officers. Second, the inferences arising from the RPD Report against the City of Richmond do not carry the same force against CJW. For the purposes of a Rule 12(b)(6) Motion to Dismiss, the Report gives rise to a plausible inference of the City of Richmond's constructive knowledge of unlawful arrests, since the Crime Information Center is maintained by RPD. However, there are no allegations that CJW was even aware of this Report or would have any reason to independently track arrest data and dispositions. Thus, the constructive knowledge inference that the Court may plausibly draw against the City would be implausible as to CJW.

negligence and intentional torts stemming from governmental functions. *Niese*, 564 S.E.2d at 133. The maintenance of a police force qualifies as a governmental function, meaning that municipalities enjoy immunity for their police officers' torts in the "performance of [their] duties as . . . police officer[s]." *Id.* at 132; *see id.*

The sovereign immunity inquiry here is straightforward. To the extent the officers involved were performing public duties in their capacity as police officers, the City is immunized from tort liability for their conduct. *See Niese*, 564 S.E.2d at 133; *Khattab*, 2024 WL 1889841, at *9 (holding that "sovereign immunity shield[ed]" the City from liability for the actions of certain officers, where those officers "committed the alleged . . . torts during the performance of their duties as police officers"); *Brown*, 2018 WL 3080064, at *4–5 (same). Alternatively, to the extent the officers were performing *private* duties on behalf of CJW, the City cannot be held vicariously liable for their conduct. *See City of Alexandria v. J-W Enter.*, 691 S.E.2d 769, 772 (Va. 2010) (citing *Clinchfield Coal Corp. v. Redd*, 96 S.E.2d 836, 839 (Va. 1918)); *Glenmar Cinestate, Inc. v. Farrell*, 292 S.E.2d 366, 369–70 (Va. 1982) (same); *cf. Khattab*, 2024 WL 1889841, at *10 ("[I]f [the officers] were not performing a government function on behalf of the [municipality] at the time of the incident, the [municipality] cannot be held vicariously liable for their actions."). To be sure, it is ultimately a factual question as to "whether the officer was acting as an employee of the private employer," or if they were instead acting "as a public officer enforcing a public duty." *J-W Enter.*, 691 S.E.2d at 772; *see Glenmar Cinestate, Inc.*, 292 S.E.2d at 369–70. But no factual resolution is needed here because all roads lead to the same conclusion: no liability on behalf of the City.[23]

---

[23] The distinction discussed in this paragraph also helps to further explain why Counts I and II cannot proceed against the City: the officers stationed at Tucker Pavilion were either carrying out their public functions and answerable to the City, as opposed to a covered health care facility, *or* they were carrying out private functions for

Plaintiffs seek to avoid this conclusion by arguing that "neither Officer Gibson nor the City of Richmond were engaged in governmental functions at any time relevant to the allegations in the [C]omplaint bur [sic] rather were engaged in a private or proprietary partnership with [CJW]." Mem. Opp'n 9.  And because municipalities *can* be held liable for the negligence associated with the performance of proprietary functions, Plaintiffs argue that sovereign immunity presents no bar here.  *Id.* (quoting *Niese*, 564 S.E.2d at 133; *Burson v. City of Bristol*, 10 S.E.2d 541, 544 (Va. 1940)).  But no amount of artful argument changes the fact that, at bottom, the City's role here relates to an immunized governmental function—the maintenance or provision of a police force. *See, e.g.*, Am. Compl. ¶¶ 20–21 (noting that the RPD, by way of its outside employment policies, "places officers inside [Chippenham Hospital] to be stationed within . . . Tucker Pavilion to act as security and to help facilitate the transfer of seriously mentally ill patients from police custody to . . . Tucker Pavilion"); Response to FOIA Request 2 (clarifying that RPD officers are "permitt[ed] to work off-duty assignments" at Tucker Pavilion, not placed there by way of a formal "partnership"); RPD General Order 1 (permitting officers to work "approved outside employment").[24]

Plaintiffs also argue that, "in any case, the City [can] still be liable for simple negligence under the Virginia Tort Claims Act and would not be immune from claims of gross negligence." Mem. Opp'n 10.  However, Plaintiffs cite to no authority in support of this proposition, *see id*., and the Court is independently unaware of any authority that would support Plaintiffs' position. Much to the contrary, in fact—numerous courts in this circuit have held that sovereign immunity

CJW, for which the City cannot not be held vicariously liable.  Either way, the City itself cannot be liable for the violations alleged in Counts I and II.

[24] That CJW has allegedly utilized the officers so stationed to further *private* functions does not aid Plaintiffs' allegations as to the City's liability.  It does, however, support Plaintiffs' state action allegations against CJW for the reasons discussed in this Court's prior opinion.  *See Byers*, 2024 WL 3938830, at *21–27.

*does* bar claims for both standard and heightened degrees of negligence. *See, e.g., Brown*, 2018 WL 3080064, at *1, 4–5 (holding that sovereign immunity barred the plaintiff's claims for negligence, gross negligence, and willful and wanton conduct); *Khattab*, 2024 WL 1889841, at *9–10 (same); *cf. Hales v. v. City of Newport News,* 2011 WL 4621182, at *4 (E.D. Va. Sept. 20, 2011) ("Virginia adheres to the principle that a city's sovereign immunity for torts allegedly committed by police officers during the course of their employment is broad enough to render such city immune from liability for *all* forms of torts." (emphasis added)).

Plaintiffs' confusion on this point perhaps arises from the more limited scope of sovereign immunity accorded to state or municipal employees who receive derivative sovereign immunity by virtue of their profession. *See James v. Jane*, 282 S.E.2d 864, 868–69 (Va. 1980). But the Supreme Court of Virginia has been clear that a distinction is properly made "between the state, whose immunity is absolute unless waived, and the employees and officials of the state, whose immunity is qualified."[25] *Id.*; *see McLenagan v. Karnes*, 27 F.3d 1002, 1009 n.10 (4th Cir. 1994). Accordingly, the City enjoys immunity from *all* theories of negligence asserted by Plaintiffs in Count V.

All told, Plaintiffs' state law claims against the City fail no matter how they are framed. At the time of the relevant events, RPD officers were either (a) performing governmental functions on behalf of the City, triggering the City's sovereign immunity, or (b) *not* performing a governmental function on behalf of the City, rendering vicarious liability inapplicable altogether. Count V must therefore be dismissed as to the City.

---

[25] While this quotation refers to the "state" and the immunity it enjoys, *James*, 282 S.E.2d at 869, more recent decisions have clarified that when a municipality performs a governmental function, it "acts as a [designated] agency of the state" and is therefore similarly "exempt from liability for the exercise of [its governmental powers] in a negligent or improper manner." *Hoggard*, 200 S.E. 610, 611 (Va. 1939); *see Niese*, 564 S.E.2d at 132 (quoting *Hoggard*, 200 S.E. at 147–48).

**V. CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part the City's Motion to Dismiss (ECF No. 23).  An appropriate Order shall issue.

_____

/s/ RCY

Roderick C. Young
United States District Judge

Date: September 23, 2024
Richmond, Virginia

35