IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MARGARET P. BYERS, *et al.*          )
      Plaintiffs,          )
                )
      v.          )          Civil Action No. 3:23cv801 (RCY)
                )
CITY OF RICHMOND, *et al.*          )
      Defendants.          )
                )

**MEMORANDUM OPINION**

This matter comes before the Court on Defendant Steven M. Gibson's Motion to Dismiss. The motion has been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated herein, the Court will grant-in-part and deny-in-part the Motion to Dismiss.

**I. BACKGROUND**

The Court previously outlined the relevant factual background in two prior opinions concerning the motions to dismiss filed by Defendants Chippenham & Johnston-Willis Hospitals, Inc. ("CJW") and David R. Hyde, *see Byers v. City of Richmond (Byers I)*, 2024 WL 3938830 (E.D. Va. Aug. 26, 2024), and City of Richmond, *see Byers v. City of Richmond (Byers II)*, 2024 WL 4267186 (E.D. Va. Sep. 23, 2024). For present purposes, the Court again largely borrows that factual recitation, as set forth below.

**A. The "Crisis Triage Center" at Tucker Pavilion**

Chippenham & Johnston-Willis Hospitals, Inc. ("CJW"), operates Chippenham Hospital, a medical and surgical facility located at 7101 Jahnke Road, in Richmond, Virginia. Am. Compl. ¶¶ 14, 19. CJW also provides behavioral health services through its "Tucker Pavilion" at this

location. *Id.* ¶ 19.  CJW touts Tucker Pavilion as a "safe haven and treatment center for children, teens, adults and seniors who need mental health services in Richmond, Virginia, providing compassionate care for those suffering from severe mental illness." *Id.* (internal quotations omitted).

For "many years prior to and continuing through July 2023, [CJW] and the [Richmond Police Department ("RPD")] have engaged in a partnership whereby the RPD places officers inside [Chippenham Hospital] to be stationed within . . . Tucker Pavilion." *Id.* ¶ 20.  This partnership traces its roots back to October 2013, when officials from the City of Richmond (the "City") and CJW unveiled the "Crisis Triage Center"[1] at Tucker Pavilion.[2]  *Id.*  According to CJW and the RPD, the partnership underlying the Crisis Triage Center "brings together law enforcement, medical, psychiatric and emergency mental health services in a single location." *Id.* (internal quotations omitted).  Proponents of this arrangement claimed that it would "enable law enforcement personnel to connect individuals in mental health crisis with critically needed evaluation and treatment services without delay and to divert them from unnecessary and inappropriate placement in jails and involvement in the justice system." *Id.* (internal quotations omitted).

The Crisis Triage Center at Tucker Pavilion is physically comprised of a "small office used by a nurse-receptionist and another locked room known as the 'patient interview room' or 'search room' that is equipped with a one-way observational window." *Id.*  At all times relevant to this matter, "at least one officer from the RPD [was] stationed in the Crisis Triage Center inside

---

[1] Plaintiffs note that "[a]t some point [CJW] and the RPD may have discontinued use of the name 'Crisis Triage Center.'"  Am. Compl. ¶ 20 n.1.  However, Plaintiffs aver that "at all times relevant to the incidents giving rise to these actions, [CJW] and the RPD operated in the same manner as described" in the Complaint.  *Id.*

[2] The Crisis Triage Center was "funded in part through a grant from the Virginia Department of Behavioral Health and Developmental Services . . . which receives its funds from the federal Substance Abuse and Mental Health Services Administration."  Am. Compl. ¶ 20.

[Tucker Pavilion]" around the clock. *Id.* RPD officers working within or stationed at Tucker Pavilion "perform[] such work for [CJW] <u>and</u> the RPD as 'Extra-Duty' officers of the RPD." *Id.* ¶ 21 (emphasis in original). RPD General Order 4-6 contains guidelines and definitions relevant to this type of "extra-duty" work. *Id.*; *see* Am. Compl. Ex. B ("RPD General Order") 2,[3] ECF No. 81-2. In relevant part, "Extra-Duty" work is defined as "any outside employment that is conditioned upon the actual or potential use of law enforcement powers." RPD General Order 2.[4]

Pursuant to the arrangement outlined above, the RPD controls the stationing of RPD officers working within Tucker Pavilion. Am. Compl. ¶ 22. The RPD also "control[s] the rate of pay for the officers, generally 1½ times the officer's rate of pay, require[s] that the officers wear their uniforms and be fully armed, and control[s] the roster of officers who [a]re dispatched to Tucker Pavilion through an RPD police coordinator."[5] *Id.* CJW, in turn, uses these "extra-duty" officers—who maintain their full panoply of law enforcement powers—"as security and for the management of psychiatric patients with serious mental illnesses." *Id.*; *see id.* ¶¶ 21–22; RPD General Order 2. Despite this alleged delegation of certain police powers to CJW, the RPD did not provide the officers stationed in Tucker Pavilion with any "specialized training for working with mentally ill patients in a medical setting." Am. Compl. ¶ 22. RPD also "failed to establish any guidelines regarding the RPD officers' role in the behavior management of mentally ill patients in a psychiatric hospital, particularly with respect to the use of force and . . . restraints and

---

[3] For this and all other filings, the Court utilizes the pagination assigned by the CM/ECF system and not the pagination appearing on the original document.

[4] By contrast, "Off-Duty" employment is defined as "any outside employment wherein the use of law enforcement powers is not anticipated." RPD General Order 2.

[5] Plaintiffs do not specify who actually pays the officers. However, RPD General Order 4-6 indicates that extra-duty officers are either (a) paid directly by their extra-duty employer, or (b) paid by the City, which is then reimbursed by the extra-duty employer. RPD General Order 2. Under either arrangement, CJW therefore bears the financial burden of paying these extra-duty officers.

seclusion with mentally ill patients." *Id.*  While CJW willingly accepted and used RPD officers "as security and to manage psychiatric patients," it likewise "failed to provide specialized training to the RPD officers for the management of psychiatric patients in a medical setting." *Id.* ¶ 23.  In fact, CJW expressly and purposefully "excluded the RPD from the application of its policies relative to the use of force and use of restraints with patients."[6]  *Id.*

## B.  Prior Incidents and Alleged Conditions at CJW

CJW is a subsidiary of HCA Healthcare, Inc. ("HCA"), "the largest hospital company in America." *Id.* ¶ 19.  Plaintiffs allege that "HCA routinely engages in practices that maximize profits at the expense of patient care [and] working conditions." *Id.*  For instance, "in Virginia, HCA staffs its hospitals at approximately 32% below the national average." *Id.*  Plaintiffs allege that this understaffing has created an environment at Chippenham Hospital—and by extension, Tucker Pavilion—wherein diminished and improper care for patients like their late son, Charles M. Byers ("Mr. Byers"), is commonplace.  *See id.* (alleging that CJW's understaffing "directly contribut[ed] to diminished patient care," and "played a significant role in laying the groundwork for the incidents complained of herein").  Plaintiffs further aver that the unchecked presence and actions of RPD officers at Tucker Pavilion also significantly contributed to the issues raised herein. *See id.* ¶ 29.

Backing up their allegations with statistics, Plaintiffs note that, over the past ten years, there have been roughly three times as many incidents "involving RPD and . . . patients of

---

[6] Plaintiffs suggest that CJW's exclusion of RPD officers from its policies constitutes an attempt by CJW and RPD to "circumvent the law, [by] allow[ing] [CJW] to manage mentally ill patients more 'conveniently.'"  Am. Compl. ¶ 23; *see* Am. Compl. ¶ 29 (alleging that CJW's exclusion of RPD officers from its policies "allow[s] [CJW] to claim that any actions involving RPD officers and its patients . . . are official 'law enforcement actions' over which . . . [it] has no control," while simultaneously permitting the RPD to shield itself from liability via its "ignorance of the laws and regulations applicable to mentally ill patients in a medical setting").

[Chippenham Hospital] or others located [there]," *id.*, than the next closest Richmond-area hospital:

> One need only compare the incidents involving the RPD at [Chippenham Hospital] to the incidents involving the RPD at other hospitals located in the City . . . to understand how strong and pervasive the presence of RPD officers at [Chippenham Hospital] has been and how much [CJW] has used the police powers of the RPD for patient management during their partnership. . . .  For the same ten-year period, October 13, 2013, to October 13, 2023, there were approximately:
>
> - 1200 incidents involving RPD officers at [Chippenham Hospital] but only–
>
> - 200 incidents involving RPD officers at VCU/MCV hospital[;]
>
> - 380 incidents involving RPD officers at Richmond Community Hospital[;]
>
> - 180 incidents involving RPD officers at Retreat Hospital[.]

*Id.*; *see id.*  Despite the "obvious and pervasive RPD presence at [Chippenham Hospital]" revealed by these statistics, Plaintiffs note that the RPD has conducted "virtually no internal investigations by the RPD into the many incidents involving RPD officers and the patients of [Chippenham Hospital]."  *Id.*  In fact, in the last three years, the only investigation into such a police-patient incident concerned the facts underlying this very case.  *Id.*  And even in this "rare instance (first and only?) in which the RPD performed an internal investigation of incidents involving RPD officers at [CJW], the RPD determined that 'no improper action' was taken" by its officers.  *Id.*  Plaintiffs suggest that this lack of investigations strengthens their claims, "as it further illustrates that the RPD sanctions and approves of actions by its officers working at [Chippenham Hospital]" that violate the federally protected rights of CJW's patients.  *Id.*

Plaintiffs next reference numerous patient and employee reviews that are purportedly indicative of CJW's "understaffing and . . . use of RPD officers to bully and manage mentally ill patients, with no oversight . . . , as part of the partnership between the RPD and [CJW]."  *Id.* ¶ 30.  A small sampling of these reviews is included below:

[Patient Reviews]

"They treat depression like it's illegal.  You get treated like an inmate."

"Tuckers [Pavilion] is a HORRIBLE place.  I wouldn't recommend it to my worst enemy. . . .  It feels more like a jail than a hospital."

"This place should not be in business.  They treat patients like inmates.  They try to talk you in to saying something that would enable them to lock you down for 72 hours or more.  Some of the nicer staff that actually have compassion confirmed this was the case and that I should complain.  This facility is [like] a jail cell."

"You're better off in jail. . . .  The nurses are callous and could care less about your basic needs. . . .  They will not tell you your rights or the facility rules."

"This place is just prison, I went there for depression and they treated me like I committed a crime."

"Do not recommend anyone ever check themselves in here – staff is rude & they'll end up putting you in their unit that looks like jail if you tell them they suck."

"Employees in the hospital's ER yelled, bullied, and threatened me into signing into this place.  If I did not, they insisted, they would consult the judge in charge of admission and he would both admit me and make sure I 'never got out.'"

[Employee Reviews]

"The morale at Chippenham [Hospital] is very poor.  Staff are dropping like flies and complaints are rampant about not having enough staffing for it to be safe for patients and employees.  Management is unhelpful and don't appear to care about . . . safety."

"I was contracted to work as a nurse at Chippenham Hospital, and was subject to caring for an unsafe ratio of patients. . . .  When my concern about staffing ratios was mentioned to the . . . manager, she became defensive and said 'we are not going to talk about ratios.'"

*Id.* ¶ 30.

## C.  Mr. Byers and the Events of July 5, 2023 – July 8, 2023.

Mr. Byers's struggle with mental health issues began in 1999, when he was just nine years old.  *Id.* ¶ 31.  He and his family, with the assistance of a doctor, were able to effectively cope with these issues for some time.  *See id.* ¶¶ 31–32.  However, "[i]n or about August 2008, when [Mr.

6

Byers] was [nineteen] years old, his mental health condition(s) precipitously worsened." *Id.* ¶ 32. As a result, Mr. Byers was "confined to a psychiatric facility under a temporary detention order ("TDO") for a period of approximately [eleven] days." *Id.* During this involuntary hospitalization, Mr. Byers "was diagnosed with schizoaffective disorder, a rare mental illness that, in [Mr. Byers's] case, is related to both schizophrenia and bipolar disorder." *Id.* According to the American Psychiatric Association's DSM-5—the "accepted authority on mental and personality disorders"—an individual with schizoaffective disorder has both a major mood disorder (in Mr. Byers's case, bipolar mania), and also meets the primary criteria for schizophrenia. *Id.* Schizoaffective disorder typically involves symptoms such as feelings of elation for an extended period of time, rapid speech, racing thoughts, bizarre behavior, agitation, grandiose delusions, and hallucinations. *Id.*

After his diagnosis with schizoaffective disorder, Mr. Byers was prescribed psychotropic medications and underwent various behavioral and meditation therapies. *Id.* ¶ 33. While Mr. Byers's treatment regimen permitted him to "go for long periods of time with little to no apparent symptoms," the severity of his mental health conditions nevertheless "caused him to be hospitalized at various times between 2008 and 2023." *Id.* ¶ 34. But, aside from his initial hospitalization in 2008, the remaining hospitalizations were voluntary as Mr. Byers and his parents (i.e., Plaintiffs) "generally knew when [Mr. Byers] needed help with his mental health conditions" and would voluntarily seek out the necessary treatment. *Id.*

Beginning in or around May 2023, Mr. Byers's condition began to worsen. *Id.* ¶ 35. Plaintiffs noticed that he was "decompensating, becoming more isolated, paranoid, and anxious." *Id.* For instance, Mr. Byers got in the habit of driving his car to soothe himself, "but would lose his car, which happened three times—having no idea where he left it." *Id.* In the days leading up

to July 5, 2023, Mr. Byers told Plaintiffs that he needed help. *Id.* Around the same time, Plaintiffs noticed that Mr. Byers was particularly "anxious, confused, and delusional—often having conversations with someone who was not there, sometimes mumbling and laughing to himself." *Id.* Mr. Byers was clearly "struggling with reality," and "desperately needed help" with his mental illness." *Id.*

On July 5, 2023, at approximately 4:00 p.m., Mr. Byers's mother drove him to Chippenham Hospital and waited while he went through intake. *Id.* ¶ 36. At approximately 5:00 p.m., Mr. Byers was given a green gown, "indicating that he was going to the mental health unit at Tucker Pavilion." *Id.* Mr. Byers's mother was then told by a CJW employee that Mr. Byers "was being admitted and that [CJW employees] would contact her if there were any problems," since she was "[Mr. Byers's] ride." *Id.* (internal quotations omitted). Mr. Byers's mother "told the intake nurse . . . that if [Mr. Byers] was let unattended, he would wander and that he could possibly walk home from the hospital, as he had done on a previous visit." *Id.* In response, the nurse assured her that Mr. Byers "would be assigned a 'sitter' and that the hospital would contact her if there were any issues." *Id.* Receiving this assurance, Mr. Byers's mother departed. *Id.* ¶¶ 36–37.

Subsequently, Mr. Byers was "left alone in the waiting room for several hours and, in his confused and delusional state, began wandering the halls of the hospital." *Id.* ¶ 37. Mr. Byers was eventually met by an unknown security guard and Lt. Waite of the RPD, "who was performing 'extra-duty' police services for [CJW], pursuant to the partnership between the RPD and [CJW]." *Id.* According to Lt. Waite, "it was obvious that [Mr. Byers] was having some type of mental health issue," as he was "mumbling under his breath and . . . hearing voices or seeing things that were not there." *Id.* (internal quotations omitted). Lt. Waite and the security guard then "locked [Mr. Byers] in a room in the Tucker Pavilion intake," *id.* ¶ 38, before Lt. Waite "issued a

'paperless' Emergency Custody Order ("ECO") for [Mr. Byers]" at approximately 7:47 p.m.[7]  *Id.* It is unclear whether this ECO operated to transfer custody of Mr. Byers to CJW, or whether the RPD and Lt. Waite retained custody of Mr. Byers.[8]  *Id.* ¶¶ 38–39.

    At approximately 8:30 p.m. on July 5, 2023, Lt. Waite called the Richmond Behavioral Health Authority ("RBHA") to request an evaluation of Mr. Byers for a temporary detention order ("TDO").  *Id.* ¶ 39.  Following this call, Mr. Byers was evaluated in person by Julia Sauder, a licensed clinical social worker with the RBHA.  *Id.* ¶ 40.  In her progress note, Ms. Sauder indicated that she found Mr. Byers asleep when she arrived, but that he did wake up to talk to her. *Id.* (citing Am. Compl. Ex. F ("Progress Note") 1, ECF No. 81-6).  However, Ms. Sauder noted that "it was hard to get any information of substance from [Mr. Byers]" because he would tell her "one thing and then [tell her] another."  Progress Note 1.  Ms. Sauder also observed that Mr. Byers's appearance was "unusual in that he is sunburned and his pupils were pinpoint."  *Id.* Finally, Ms. Sauder noted that, while Mr. Byers "sa[id] he wanted to be admitted and his mom says he always goes voluntarily," a TDO was nevertheless appropriate "given [Mr. Byers's] confusion and going back and forth on the information."  *Id.*  Based on Ms. Sauder's evaluation, she found that Mr. Byers met the criteria for a TDO and stated that "one will be obtained before his ECO runs out."  *Id.*

    Ms. Sauder called Mr. Byers's mother at approximately 9:30 p.m. on July 5, 2023, to update her that (1) Tucker Pavilion would be "admitting [Mr. Byers], but [that] they were waiting for a bed,"  Am. Compl. ¶ 41, and (2) "they [were] going to TDO [Mr. Byers]."  *Id.* (internal

---

[7] Notably, Lt. Waite did not document or record his issuance of this ECO until several days later—"only after [Mr. Byers] was dead."  Am. Compl. ¶ 39.

[8] This confusion, per Plaintiff, is yet "another example of blurred (or non-existent) lines between the RPD and [CJW]."  *Id.* ¶ 39.

quotations omitted).  Ms. Sauder also told Mr. Byers's mother that she would be "getting off at 7 a.m. and that she would call her with updates."[9]  *Id.*  Then, on July 6, 2023, at 2:08 a.m., Magistrate Martesha M. Bishop issued a TDO (TDO 763GM-2300000955) for Mr. Byers.  *Id.* ¶ 42.[10]  The TDO was served upon Mr. Byers at 2:51 a.m. on July 6, 2023.  *Id.* ¶ 44.  Despite this relatively prompt service of the TDO, Mr. Byers was not actually admitted to Tucker Pavilion until 3:00 p.m. on July 6, 2023—twelve hours later.  *Id.*

Mr. Byers was eventually "assigned to Room 354B at 'Tucker 3E,'" and the attending doctor assigned to him was Dr. Khalon.  *Id.*  Pursuant to Virginia Code § 37.2-813, this assignment triggered additional safeguards for Mr. Byers.[11]  *Id.* (citing Va. Code Ann. 37.2-813(A), (B)).  Specifically, upon (a) the issuance of the TDO and (b) Mr. Byers's assignment to Tucker Pavilion, Mr. Byers could only be lawfully released from the TDO (and Tucker Pavilion) prior to his commitment hearing "[(1)] by a district court judge or special justice, upon finding that [Mr. Byers] no longer met the criteria for a TDO, or [(2)] by the director of . . . Tucker Pavilion, upon finding, based on an evaluation conducted by the psychiatrist or clinical psychologist treating [Mr. Byers],

---

[9] This was apparently the last update that Plaintiffs received about their son while he was still alive.  *See* Am. Compl. ¶¶ 36, 41; *see generally* Am. Compl.

[10] Virginia law provides that a TDO can only be issued as follows:

> A magistrate shall issue . . . a temporary detention order if it appears from all evidence readily available, including any recommendation from a physician, clinical psychologist, clinical social worker, or clinical professional counselor treating the person, that the person (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs; (ii) is in need of hospitalization or treatment; and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

Va. Code Ann. § 37.2-809(B); *see* Am. Compl. ¶ 43 (quoting Va. Code Ann. § 37.2-809(B)).

[11] To be sure, Plaintiffs' allegations regarding these Virginia code provisions are legal conclusions of the sort courts are to disregard at the 12(b)(6) stage. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court has nevertheless independently determined the applicability of the referenced provisions.  *See Byers I*, 2024 WL 393880, at *7–8, 41.

that [Mr. Byers] no longer met the criteria for a TDO." Am. Compl. ¶ 44 (citing Va. Code Ann.

37.2-813(A), (B)). Per Plaintiffs, "[n]one of this ever happened. . . . In fact, [Mr. Byers] was never

evaluated by a psychiatrist or clinical psychologist." *Id.* (emphasis in original).

At approximately 5:30 p.m. on July 6, 2023, CJW staff, including Hyde, and John/Jane

Doe Security Guards (1–5), sought to move Mr. Byers from his room on the third floor to the

second floor. *Id.* ¶ 45. While Plaintiffs concededly do not know why this move occurred, they

allege that CJW staff "likely attempted to move [Mr. Byers] to the second floor because of

understaffing or lack of beds at . . . Tucker Pavilion." *Id.* When CJW staff initiated this move,

Mr. Byers, in his paranoid and delusional state, told the "nurses and security officers that he did

not want to take the elevator to the second floor, apparently believing that he was going to be

harmed." *Id.* ¶ 46. CJW staff therefore "called in the RPD officer stationed [in Tucker Pavilion]

to bully [Mr. Byers] into following their instructions by threat of force, threat of arrest and the use

of restraints." *Id.* The RPD officer called to "enforce" the directives of CJW staff was Officer

Steven M. Gibson ("Officer Gibson"). *Id.*

At roughly 5:40 p.m., Officer Gibson arrived on scene and ordered Mr. Byers to "follow

the instructions of [CJW] staff to get on the elevator to go to the second floor." *Id.* ¶ 47. Plaintiffs

emphasize that Officer Gibson "had received no training on the rights of patients in a medical

setting."[12] *Id.* Moreover, prior to issuing this command to Mr. Byers, Officer Gibson had done

"no investigation to independently establish" any of the attending facts and circumstances

---

[12] Indeed, according to Plaintiffs, that is the crux of the issue:

> [A]s part of the longstanding . . . practice of the RPD and [CJW] . . . [CJW] staff used [RPD] officers
> . . . to enforce their instructions, apparently knowing that they [(the CJW staff)] could not act by
> themselves and use any methods that would violate the patient's rights . . . . [Instead, CJW staff]
> combin[ed] their actions with . . . the RPD officers' (and the RPD's useful and purposeful ignorance
> of patient's rights) to violate patient's rights under the threat and color of law.

Am. Compl. ¶ 47.

regarding why Mr. Byers was at Tucker Pavilion, what his condition was, why he was being moved, what options were available to facilitate his move, and whether he was under a TDO or ECO. *Id.* Instead, Officer Gibson merely followed the instructions of CJW staff by ordering Mr. Byers to comply. *See id.* ¶¶ 46–48.

Mr. Byers responded to Officer Gibson's initial order by telling him, "'I do not trust you specifically' and 'I do not trust the others.'" *Id.* ¶ 48. As this encounter continued, Mr. Byers exhibited numerous signs of his paranoia and delusions. *See, e.g., id.* (noting that Mr. Byers, at various points, suggested that Officer Gibson was a "fake police officer," and that the "nurses [were] also fake"). "Notwithstanding [Mr. Byers's] obvious paranoia and delusions, Officer Gibson directed [Mr. Byers] to cooperate and get on the elevator." *Id.* Mr. Byers responded that he could not cooperate and that he would instead wait "for [his] hearing" and for the "real cops" to show up. *Id.* (internal quotations omitted). While Mr. Byers was clearly paranoid and delusional, he was "calm and not combative in any way" during this exchange. *Id.* The standoff continued, and eventually "Hyde and the Jane / John Doe Security Guards (1–5), acting jointly and in concert with Officer Gibson, . . . resort[ed] to the use of force." *Id.* The group grabbed Mr. Byers, "who was sitting in a chair with his hands clasped and a threat to no one," and "violently wrestle[d him] to the ground[,] attempting to put him in handcuffs." *Id.* During this altercation, Mr. Byers was surrounded by as many as ten to twelve CJW employees. *Id.* ¶ 49. These employees "instruct[ed] and encourage[d] Officer Gibson to use force and handcuffs on [Mr. Byers] by saying things like 'we just need to "clink-clink" him . . . and put him in the elevator.'" *Id.* (alterations omitted). CJW nurses, including Hyde, likewise encouraged Officer Gibson "by saying things like 'put 'em [handcuffs] on and take him down.'" *Id.*

Officer Gibson was ultimately unsuccessful in his attempt to handcuff Mr. Byers. *Id.* Consequently, Officer Gibson "pulled out his taser, pointed it at [Mr. Byers], and screamed at [him] to comply or he would tase him." *Id.* While Mr. Byers remained non-combative, Officer Gibson nevertheless proceeded to threaten Mr. Byers by asking, "do you want to go to jail, or do you want to go to the second floor?" *Id.* Before Mr. Byers could respond, "Hyde said 'at this point, we just want you [Officer Gibson] to take him away,'" instructing Officer Gibson to arrest Mr. Byers "despite the . . . fact that [Mr. Byers] had committed no crime." *Id.* In response, Officer Gibson asked Hyde whether Mr. Byers had kicked him or anyone else. *Id.* Hyde replied in the affirmative, "even though [Mr. Byers] did not kick . . . [anyone]."[13] *Id.* Plaintiffs posit that this conversation constitutes a joint effort between Hyde and Officer Gibson to "fabricate[] an assault charge so that Officer Gibson could arrest [Mr. Byers]." *Id.*

Officer Gibson thereafter arrested Mr. Byers and forcibly removed him from Tucker Pavilion, where he "had been ordered to stay for treatment of his mental illness." *Id.* Plaintiffs allege that, "to make their . . . arrest and removal of [Mr. Byers] . . . seem lawful, Officer Gibson asked . . . Hyde to provide him with [Mr. Byers's] 'discharge papers.'" *Id.* Hyde, for his part, "could not lawfully [provide such papers.]" *Id.* Rather, because Mr. Byers was under a TDO, he could only be released after certain procedural hurdles were satisfied, pursuant to Virginia Code § 37.2-813. *Id.* (citing Va. Code Ann. § 37.2-813(A), (B)). Even though such procedural hurdles remained uncleared, Hyde "printed off a form that appeared to be a discharge summary with a scribbled signature in the middle . . . attempting to falsely show that [Mr. Byers] was being lawfully discharged to his home." *Id.*

---

[13] Plaintiffs hedge slightly on this point by noting that, at the very most, Mr. Byers "could have accidentally struck someone with his leg while Officer Gibson and . . . Hyde were attempting to . . . restrain, handcuff and arrest [him]." Am. Compl. ¶ 49. Nevertheless, the thrust of the allegation is that Hyde and Gibson jointly concocted pretext to arrest Mr. Byers.

Mr. Byers was then removed from Tucker Pavilion, "shackled to some type of specialized restraint chair and taken to a transport vehicle driven by Officer Pearce of the RPD." *Id.* Officer Pearce asked Officer Gibson "why was [Mr. Byers] here, wasn't he on the third floor—the most secure?" *Id.* Officer Gibson replied, "I have no idea." *Id.* (emphasis omitted) The two officers brought Mr. Byers to Richmond City Jail, located at 1701 Fairfield Way in Richmond, Virginia. *Id.* ¶ 50. There, Mr. Byers appeared before a magistrate with Officer Gibson. *Id.* At no point did Officer Gibson "inform the magistrate the [Mr. Byers] was under a TDO; that [he] had been hospitalized for his severe mental illness; . . . and/or that [he] was in need of mental health treatment." *Id.* Officer Gibson's failure to provide this information apparently led the magistrate to release Mr. Byers on his own recognizance without receiving the mental health treatment he "desperate[ly] needed." *Id.* Even more, Mr. Byers was still technically under a TDO and assigned to Tucker Pavilion "for care and treatment for his severe mental illness" at the time he was released. *Id.*

Upon his release in the evening hours of July 6, 2023—and still in a "paranoid and delusional state"—Mr. Byers walked from the City of Richmond jail to the general area of his home in Chesterfield, approximately fourteen miles away. *Id.* ¶ 51. Mr. Byers was unable to precisely locate his home and instead "wandered around his neighborhood and adjoining neighborhoods searching for his home for approximately thirty-six . . . hours." *Id.* Toward the end of this timeframe, Mr. Byers apparently attempted to enter numerous homes that did not belong to his parents. *Id.* ¶ 52. At some point, he "entered a[] neighbor's garage . . . [and] picked up a small hatchet." *Id.* This behavior led a neighbor to call the Chesterfield County Police Department ("CCPD") on Mr. Byers just before 1:00 p.m. on July 8, 2024. *Id.* The CCPD subsequently dispatched officers to the location of the caller. *See id.*

At approximately 1:00 p.m., Officer Gordon J. Painter and another unnamed CCPD officer arrived on scene.  The first officer "pulled up and immediately drew her gun and pointed it at [Mr. Byers]." *Id.* ¶ 53.  Officer Painter did the same when he arrived, "startl[ing] Mr. Byers and causing him to "walk[] away from the two . . . officers."[14] *Id.*  Mr. Byers immediately began backing away from the two officers, "who had their guns drawn on him and were yelling at him to put down the hatchet." *Id.*  The first officer eventually fired her taser at Mr. Byers "but apparently missed." *Id.* While that officer was struggling to discharge her second taser cartridge, Officer Painter began shooting at Mr. Byers. *Id.*  When Officer Painter fired his first shot, Mr. Byers was "at least 25 feet away from Officer Painter . . . [with his] head . . . turned away." *Id.*  After the first three shots, Mr. Byers tried to turn and get away from Officer Painter. *Id.*  Officer Painter continued shooting, hitting Mr. Byers in the back three or four times; these shots were fatal. *Id.*  In total, Officer Painter "shot at [Mr. Byers] seven . . . times, hitting him five . . . times." *Id.*

## II.  RELEVANT PROCEDURAL HISTORY

Plaintiffs filed their original five-count Complaint on November 2, 2023, alleging numerous violations of state and federal law against CJW, Hyde, the City, Officer Gibson, and John/Jane Doe Security Guards 1–5.  Compl. ¶¶ 47–94.  On January 29, 2024, Officer Gibson filed a Motion to Dismiss and Memorandum in Support thereof.[15]  ECF Nos. 25, 26.  Plaintiffs filed a Memorandum in Opposition to Officer Gibson's Motion to Dismiss on February 21, 2024.  ECF

---

[14] Plaintiffs emphasize the fact that Officer Painter never attempted to (1) "speak to [Mr. Byers] in a . . . nonthreatening way or assess his medical condition or mental or psychological state," Am. Compl. ¶ 54, (2) use any "less-lethal force to gain control of the situation," *id.* ¶ 55, or (3) use any "de-escalation techniques [or] warn [Mr. Byers] that he would be shot," *id.* ¶ 56.

[15] The other Defendants in this action similarly filed motions to dismiss; the Court has resolved two thus far. *See Byers I*, 2024 WL 3938830*; Byers II*, 2024 WL 4267186.

No. 36.  Officer Gibson then filed a reply brief in support of his Motion to Dismiss on February 26, 2024.  ECF No. 41.  Accordingly, Officer Gibson's Motion to Dismiss is ripe for review.[16]

### III.  LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1356 (1990)).  Dismissals under Rule 12(b)(6) are generally disfavored by the courts because of their res judicata effect.  *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1471 (4th Cir. 1991).  Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2).  *Id.* (citations omitted).  "[A] motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support [their] claim and would entitle [them] to relief."  *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when

---

[16] On July 10, 2024, the Court permitted Plaintiffs to file an Amended Complaint to add claims against Officer Painter and Chesterfield County; because the Amended Complaint does not materially alter the facts alleged and the claims against CJW, Hyde, the City, or Officer Gibson, the Court ordered that the parties did not need to re-brief their then-pending motions to dismiss.  *See* Order, ECF No. 80; Am. Compl. ¶¶ 1, 4, 17–18, 51–114.

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.* However, the plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Id.* (citations omitted); *see also Martin*, 980 F.2d at 952.

## IV.  DISCUSSION

Plaintiffs bring five counts against Officer Gibson.  Counts I, II, III, and IV are federal claims brought pursuant to 42 U.S.C. § 1983.  *See* Am. Compl. ¶¶ 64–73 (Count I, "Denial and Withholding of Medical Care"), 74–83 (Count II, "Denial of Rights to Be Free from Physical and Mental Abuse, and Restraints and Seclusion"), 84–96 (Count III, "Excessive Force—Fourth and Fourteenth Amendment"), 97–106 (Count IV, "Unlawful/False Arrest—Fourth and Fourteenth Amendment").  Count V, on the other hand, is a wrongful death claim based on Virginia state law. *See id.* ¶¶ 107–114 (Count V, "Negligence, Gross Negligence, and Willful and Wanton Negligence").  Officer Gibson has moved to dismiss all five Counts.  Officer Gibson first[17] argues that, to the extent Counts I, II, III, and IV "attempt to state survival causes of action, they must be dismissed."  Mem. Supp. 7.  Next, Officer Gibson argues that Counts I and II fail to state a claim against him because the statutes these counts rely upon neither apply to him nor create rights

---

[17] Officer Gibson's *actual* first argument for dismissal is that Plaintiffs' Amended Complaint "[f]ails to [c]omply with Federal Rule of Civil Procedure 8[(a)(2)]," Mem. Supp. 4, which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2).  For the reasons stated in its prior motion to dismiss opinions, *see Byers II*, 2024 WL 4267186, at *9 n.16, the Court declines to entertain this Rule 8 argument.

enforceable by way of a § 1983 action. *Id.* at 10.  Officer Gibson then argues that he enjoys

qualified immunity as to all of the federal counts brought by Plaintiffs.[18]  *See id.* at 14–21.  Finally,

Officer Gibson raises several arguments for dismissal of Plaintiffs' state law claim in Count V.

Specifically, Officer Gibson argues that (1) he is not a health care provider and cannot be liable

for medical negligence, (2) he is entitled to sovereign immunity as to a portion of the negligence

claim, (3) Plaintiffs' allegations are insufficient to establish any heightened degree of negligence,

and (4) his actions could not have been a proximate cause of Mr. Byers's death.  *See id.* at 21–

28.[19]

    For the reasons outlined below, Counts I and II of the Amended Complaint will be

dismissed as to Officer Gibson.  Counts III, IV, and V, on the other hand, may proceed.

## A. Counts I and II

    In Counts I and II of the Complaint, Plaintiffs attempt to use 42 U.S.C. § 1983 to assert

violations of various federal rights.  Specifically, Plaintiffs contend that "42 U.S.C. § 290ii(a), 42

U.S.C. § 10841, 42 U.S.C. § 1395 *et seq*, and 42 C.F.R. § 482.13 unambiguously confer" rights

---

[18] Officer Gibson also briefly argues that Counts III and IV should be dismissed as Plaintiffs improperly "base[] those claims on the Fourteenth Amendment" rather than the Fourth Amendment. Mem. Supp. 14. However, the Court has previously construed these claims as being brought pursuant to the Fourth Amendment. *See Byers II*, 2024 WL 4267186, at *10 n.17. Plaintiffs have also filed an Amended Complaint clarifying that Counts III and IV are based on *both* the Fourth and Fourteenth Amendments. *See, e.g.*, Am. Compl. ¶¶ 88, 104. Accordingly, the Court declines Officer Gibson's invitation to dismiss on this basis.

[19] The Court notes that Plaintiffs did not respond to many of the arguments Officer Gibson raised in his Motion to Dismiss briefing. *See* Pls.' Mem. Opp'n 10–12 (failing to respond to most of Officer Gibson's arguments with respect to Count V). Officer Gibson therefore argues that "Plaintiffs have conceded" those arguments that they have failed to address. *See* Reply 2, ECF No. 41. However, a plaintiff's failure to respond to each and every argument raised by a defendant does not automatically entitle that defendant to dismissal; the Court must still independently assess the sufficiency of the Complaint to determine whether dismissal is appropriate. *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416 n.3 (4th Cir. 2014) ("[T]he district court . . . has an obligation to review [12(b)(6)] motions to ensure that dismissal is proper" even where the motion is unopposed.). This principle is consistent with the nature of the burden at the 12(b)(6) stage. Wright & Miller, *supra*, § 1356 ("Ultimately, the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

    Accordingly, the Court declines to treat Plaintiffs' failure to respond to certain arguments as a concession that dismissal of those unaddressed claims is appropriate. Plaintiffs are nevertheless advised that more thorough and timely responses will be expected at subsequent stages of this litigation.

that they may enforce by way of a § 1983 suit.  Am. Compl. ¶¶ 66, 76.  Officer Gibson retorts that

the referenced provisions "deal with health care facilities or providers," not individuals.  Mem.

Supp. 10.  For that reason, Officer Gibson argues that Counts I and II must be dismissed.  *See id.*

at 9–10.  The Court agrees.

In its decision on CJW/Hyde's Motion to Dismiss, this Court held that "42 U.S.C. § 290ii

is the only statute [relied upon by Plaintiffs] that unambiguously confers § 1983-enforceable

rights."  *Byers I*, 2024 WL 3938830, at *20.  Section 290ii(a) provides as follows:

> A public or private general hospital, nursing facility, intermediate care facility, or
> other health care facility, that receives support in any form from any program
> supported in whole or in part with funds appropriated to any Federal department or
> agency shall protect and promote the rights of each resident of the facility, including
> the right to be free from physical or mental abuse, corporal punishment, and any
> restraints or involuntary seclusions imposed for purposes of discipline or
> convenience.

42 U.S.C. § 290ii(a).  So, for Plaintiffs' claims in Counts I and II to proceed against Officer Gibson,

§ 290ii(a) would need to apply to Officer Gibson.  The Court need go no further than the plain

language of § 290ii(a) to hold that it does not so apply.  *See id.* (requiring "public or private general

hospital[s], nursing facilit[ies], intermediate care facilit[ies], or other health care facilit[ies], that

receive" federal funding to "promote and protect" the rights delineated therein); *see Maine v.

Thiboutot*, 488 U.S. 1, 4–10 (relying upon the plain language of § 1983 to determine its

applicability); *Health & Hosp. Corp. of Marion Cnty. v. Talevski,* 599 U.S. 166, 183 (2023) (same).

Because Officer Gibson is an individual rather than a facility falling within § 290ii(a)'s ambit,

Counts I and II will be dismissed as to him.[20]

---

[20] Notably, Hyde did not raise this argument in his Motion to Dismiss.  *See* CJW & Hyde's Mem. Supp. Mot.
Dismiss 15–16, ECF No. 18.  Hyde instead opted to argue *only* that the provisions relied upon by Plaintiffs do not
provide "private rights of action" enforceable via a § 1983 suit.  *Id.* at 15.  The Court therefore finds no conflict
between the outcome of Hyde's motion and the outcome here.  *See* Wright & Miller, *supra*, § 1356 ("Ultimately, the
burden is on the moving party to prove that no legally cognizable claim for relief exists.").

**B. Counts III and IV**

In Counts III and IV, Plaintiffs allege that Officer Gibson violated Mr. Byers's Fourth and Fourteenth Amendment rights and seek redress pursuant to § 1983. Officer Gibson raises two arguments with respect to these counts: (1) to the extent they "attempt to state survival causes of action, they must be dismissed," Mem. Supp. 7, and (2) regardless, he is entitled to qualified immunity, *see* Mem. Supp. 14–21. The Court analyzes these arguments in turn.

1. Plaintiffs Adequately Plead Alternative Survival and Wrongful Death Causes of Action

By way of background, 42 U.S.C. § 1988 "recognizes that in certain areas, 'federal law is unsuited or insufficient "to furnish suitable remedies."'" *Robertson v. Wegmann*, 436 U.S. 584, 588 (quoting *Moore v. County of Alameda*, 411 U.S. 693, 703 (1973) (quoting § 1988)). Where federal law is so "insufficient," *id.*, § 1988 instructs courts to "turn to 'the common law, as modified and changed by the constitution and statutes of the [forum] State,' as long as these are 'not inconsistent with the Constitution and laws of the United States." *Id.* (quoting § 1988). One area not covered by federal law—and thus requiring resort to the forum state's law under § 1988— is "that relating to 'the survival of civil rights actions under § 1983 upon the death of . . . the plaintiff." *Id.*

Under Virginia law, when a plaintiff dies "as a result of the injury for which the action is pending, the pending action must be amended to become an action for wrongful death pursuant to [Virginia] Code § 8.01-56." *McKinney v. Va. Surgical Assocs.*, 284 Va. 455, 459 (2012). In such circumstances, "the wrongful death action is the plaintiff's sole remedy." *Id.* (citing *Centra Health, Inc. v. Mullins*, 277 Va. 59, 77 (2009)); *see El-Meswari v. Wash. Gas & Light Co.*, 785 F.2d 483, 490 (4th Cir. 1986) (holding that "[Virginia Code] § 8.01–25 defers to the wrongful death statute as the exclusive statement of grievances Virginia will recognize when a tort victim

dies of her injuries").  If, on the other hand, a plaintiff's death is caused by something "other than the injury for which he sued . . . the pending action survives by virtue of [Virginia] Code § 8.01-25."  *Id.*; *see Jones v. Prince George's Cnty.*, 541 F. Supp. 2d 761 (D. Md. 2008), *aff'd*, 355 F. App'x 724 (4th Cir. 2009) (interpreting Virginia law and noting that "a cause of action survives the death of a person, whether or not it is related to the death, but if it is related, it then becomes a wrongful death claim; if it is not related, then, the action is one that survives." (citing *Wright v. Eli Lilly & Co.*, 2004 WL 2157420, at *7 (Va. Cir. Ct. Sept. 21, 2004))).

The framework outlined above ensures that "a person may not recover for the same injury under the survival statute and the wrongful death statute." *Hendrix v. Daugherty*, 249 Va. 540, 547 (1995).  That said, "[a] plaintiff does not necessarily have to decide before trial whether the facts support a personal injury [(i.e., survival)] action or a wrongful death action." *Green v. Diagnostic Imaging Assocs.*, 299 Va. 1, 12 (2020) (citing *Centra Health, Inc.*, 277 Va. at 78–79). Rather, a plaintiff may bring a survival claim *and also* assert a wrongful death claim in the alternative, if the plaintiff is unsure of his ability to ultimately prove that "the decedent's death resulted from  the . . . injury" alleged. *Id.* (citing *Antisdel v. Ashby*, 279 Va. 42, 49 (2010)).  The precise contours of what such "alternative pleading" must entail are not well-defined.  However, at the very least, a plaintiff must include "separate counts *or* allegations in order to advise the court and opposing counsel" of their intention to plead both survival and wrongful death actions.  Walter E. Hoffman, *Recovery in Wrongful Death Actions in Virginia*, 8 Wash. & Lee L. Rev. 169, 170 (1951) (emphasis added); *see Adams v. NaphCare, Inc.*, 2016 WL 10455885, at *5 (E.D. Va. Dec. 19, 2016), *report and recommendation adopted*, 232 F. Supp. 3d 866 (E.D. Va. 2017); *Winkler v. Medtronic, Inc.*, 2018 WL 6271055, at *3 n.4 (D. Md. Nov. 29, 2018) (citing *Adams*, 2016 WL 1045585, at *5 n.2).

Viewing the allegations and drawing all reasonable inferences in the light most favorable to Plaintiffs, the Court finds that the Amended Complaint does alternatively allege survival and wrongful death causes of action for the purposes of Counts III and IV.  Starting from the top, Plaintiffs first allege that they are bringing their "claims pursuant to Virginia's wrongful-death *and* survival claims statutes."   Am. Compl. ¶ 1 (emphasis added).   Plaintiffs later allege that supplemental jurisdiction exists to hear their state law claims, to include "claims alleged pursuant to Virginia Code § 8.01-50, *et seq.* (wrongful death statute), or, *alternatively*, pursuant to Virginia Code § 8.01-25, *et seq.* (survival statute)."  *Id.* ¶ 5 (emphasis added).  Plaintiffs also note that they seek "[a]ll relief available under these *statutes*."  *Id.*   And finally, Plaintiffs allege that, "[a]s a direct, proximate, and foreseeable result of the Defendants' conduct, [Mr.] Byers was injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish."  *Id.* ¶ 93 (in Count III); *see id.* ¶ 103 (same allegation but with respect to Count IV).  Taken together, the reasonable inference to be drawn from these allegations is that Plaintiffs seek to alternatively plead survival and wrongful death causes of action.  Virginia law plainly permits them to do so.  *See Green*, 299 Va. at 12 (citing *Centra Health, Inc.*, 277 Va. at 78–79); *Antisdel*, 279 Va. at 49.

Officer Gibson's primary argument against allowing Plaintiffs' survival claim to proceed is that "when a person dies as a result of the actions complained of, the only action is one for wrongful death, not a survival action."  Mem. Supp. 6 (citing *Winkler*, 2018 WL 6271055, at *3).  Per Officer Gibson, "[t]his is especially so when the plaintiff has not pled separate counts and has, in no way, suggested that the death was not caused by the allegedly tortious acts."  Mem. Supp. 7 (citing *Adams*, 2016 WL 10455885, at *3) (emphasis in original).  To be sure, Plaintiffs do allege that the same constitutional deprivations were a proximate cause of both Mr. Byers's injuries *and*

his eventual death.  *See* Am. Compl. ¶¶ 93 (in Count III, alleging that "as a direct, proximate, and foreseeable result of the Defendants' conduct, [Mr.] Byers was injured in various respects"); Am. Compl. ¶ 94 (in Count III, alleging that "as a direct, proximate, and foreseeable result of the Defendants' conduct, [Mr.] Byers died"); *see* Am. Compl. ¶¶ 103–04 (same two allegations but with respect to Count IV).  However, within the broader context of Plaintiffs' Amended Complaint, it is apparent that Plaintiffs seek to alternatively plead their survival and wrongful death causes of action.[21]  *See, e.g.*, Am. Compl. ¶ 1 (noting that Plaintiffs are bringing their claims "pursuant to Virginia's wrongful-death *and* survival claims statutes" (emphasis added)); Am. Compl. ¶ 5 (noting that Plaintiffs' claims have been alleged "pursuant to Virginia Code § 8.01-50, *et seq.* (wrongful death statute), or, *alternatively*, pursuant to Virginia Code § 8.01-25, *et seq.* (survival statute)" (emphasis added)).

Moreover, Plaintiffs' allegations that Defendants' conduct caused injuries to Mr. Byers are *separate* from their allegations that Defendants' actions also caused Mr. Byers's death.  *See* Am. Compl. ¶¶ 93, 103.  The fact that Plaintiffs lodge both types of allegation is of no moment; Virginia law clearly permits such alternative allegations, particularly at this early stage.[22]  *See Green*, 299

---

[21] Given this context, the Court is also unpersuaded that Plaintiffs needed to explicitly plead that Defendants' conduct caused Mr. Byers's injuries but *not* his death.  Dismissing a portion of Plaintiffs' claim on such a technical distinction would run contrary to the spirit of the Federal Rules of Civil Procedure.  *See* Charles A. Wright, Arthur R. Miller & A. Benjamin Spencer, *Fed. Prac. & Proc.* § 1202 (4th ed. 2024).

[22] The cases cited by Officer Gibson to argue otherwise are easily distinguishable.  For instance, the plaintiff in *Adams* alleged—in a single paragraph—that as a result of the defendant's actions, the plaintiff's "condition worsened, he suffered great physical pain and mental anguish, and he died."  *Adams*, 2016 WL 10455885, at *2.  There were no further allegations indicating that the plaintiff meant to alternatively plead survival and wrongful death causes of action.  *See id.* at *1–2.  The same cannot be said here.  For one, Plaintiffs make clear their intent to rely on Virginia's survival *and* wrongful death statutes.  *See* Am. Compl. ¶¶ 1, 5.  Plaintiffs even explicitly note that they are bringing their claims based upon these statutes "alternatively."  *Id.* ¶ 5.  Moreover, Plaintiffs separate their survival and wrongful death allegations into two distinct paragraphs, indicating that, at least in some respects, the injuries Mr. Byers incurred were independent from his eventual death.  *See id.* ¶¶ 93–94, 103–04.

*Winkler* is likewise distinguishable.  There, the court noted that while "Virginia does allow a survivorship claim to be pleaded in the alternative," the plaintiffs pleaded only that the defendant's actions resulted in the decedent's death (i.e., presenting a wrongful death claim) and they included no such alternative pleading.  *Winkler*, 2018 WL 6271055, at *3 n.4.  As a result, the court dismissed the plaintiffs' survivorship claim.  *Id.* at *3.  Here, Plaintiffs *have*

Va. at 12 ("A plaintiff does not . . . have to decide before trial whether the facts support a [survival] action or a wrongful death action. . . .   A plaintiff may bring a [survival] action and assert a wrongful death action in the alternative, if the plaintiff is unsure of his ability to prove that the decedent's death resulted from the decedent's injury." (citing *Central Health, Inc.*, 277 Va. at 78–79; *Antisdel*, 279 Va. at 49)).

Eventually, Plaintiffs will have to elect which route they wish to pursue. *See Hendrix*, 249 Va. at 547 ("[A]t an appropriate time after discovery has been completed, the plaintiffs must be required to elect whether they will proceed . . . [with] the prosecution of the wrongful death action or . . . the survival action.").   And in doing so, Plaintiffs may wish to consider which of their causation arguments they feel are strongest (i.e., whether the alleged Fourth Amendment violations (a) caused Mr. Byers's injuries or (b) caused Mr. Byers's death).   But that is not an election they need to make at this juncture.  *See Centra Health, Inc.*, 277 Va. at 77–78.

In sum, Plaintiffs alternatively plead survival and wrongful death causes of action for the purposes of Counts III and IV.   Virginia law permits them to do so at this stage.   The Court therefore declines to dismiss the survival portion of Plaintiffs' claims.

### 2.   The Court Declines to Reach the Issue of Qualified Immunity at This Stage

Officer Gibson next argues that he is entitled to qualified immunity as to Plaintiffs' Excessive Force and Unlawful Arrests claims in Counts III and IV.  *See Mem. Supp. 16–21.[23]

---

pleaded a survivorship claim in the alternative.  *See Am. Compl.* ¶¶ 1, 5, 93, 103.  *Winkler* therefore has little bearing on the instant analysis.

[23] In the papers before the Court, Officer Gibson does briefly argue that Plaintiffs' allegations fail to plausibly establish either of the constitutional violations alleged in Counts III and IV.  *See, e.g.*, Mem. Supp, 16–21.  However, he does so within the broader context of urging that he is entitled to qualified immunity.  *See e.g., id.* at 14 ("Counts . . . III[] and IV of the Complaint [f]ail as a [m]atter of [l]aw, as Officer Gibson has [q]ualified [i]mmunity."); *see also id.* at 16–21 (arguing that, to the extent Counts III and IV state claims for excessive force and unlawful arrest, Officer Gibson would be entitled to qualified immunity)*.   The Court will therefore construe Officer Gibson's overarching argument as one asserting entitlement to qualified immunity.

Given the undeveloped nature of the record before it, the Court declines to presently reach the issue of qualified immunity.

It is well settled that qualified immunity is an affirmative defense. *Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000); *Ridpath v. Bd. Governors Marshall Univ.*, 447 F.3d 292, 305 (4th Cir. 2006). Its designation as such is particularly relevant here for two main reasons. First, courts may only consider affirmative defenses on a Rule 12(b)(6) motion "when the face of the complaint *clearly* reveals the existence of a meritorious affirmative defense." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996) (emphasis added); *see E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 185 (4th Cir. 2000) (quoting *Brooks*, 85 F.3d at 181). Second, and perhaps even more importantly, courts may utilize their discretion to postpone dealing with an affirmative defense at the 12(b)(6) stage by "deciding that a motion for summary judgment— which provides an opportunity for an investigation of the facts surrounding the bare allegations in the pleading—is a more appropriate procedural device to deal with [an affirmative defense] than a motion to dismiss under Rule 12(b)(6)." Charles A. Wright, Arthur R. Miller & A. Benjamin Spencer, *Fed. Prac. & Proc.* § 1357 (4th ed. 2024).

With respect to the affirmative defense of qualified immunity specifically, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest stage possible in litigation." *Hunter v. Bryan*, 502 U.S. 224, 227 (1991); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter*, 502 U.S. at 227). The Fourth Circuit, however, has recognized that "[o]rdinarily, the question of qualified immunity should be decided at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005). This recognition is rooted in an understanding that the summary judgment stage *is* often the "earliest stage possible of litigation" at which it is feasible to resolve questions of immunity. *See id.*; *Rowley v. McMillan*, 502 F.2d

1326, 1335 (4th Cir. 1974) (reasoning that a claim of qualified immunity was premature at the motion to dismiss stage because its application depended upon a determination of all the circumstances as they "reasonably appeared at the time of the action[s] on which liability is sought to be based," the record of which had "not yet been fully developed"); *Basilica v. Harris*, 658 F. Supp. 3d 285, 297–98 (E.D. Va. 2023) ("Because further factual development will assist the [c]ourt in deciding whether to grant qualified immunity at summary judgment, the [c]ourt will not consider the affirmative defense at [the 12(b)(6) stage].")"; *Deavers v. Spotsylvania Cnty. Sheriff's Dep't*, 2014 WL 2993445, at *4 (E.D. Va. July 2, 2013) ("As the Fourth Circuit has frequently noted, qualified immunity is peculiarly well-suited for resolution as the summary judgment stage with the benefit of a more fulsome record.").

Here, Officer Gibson urges the Court to grant him qualified immunity as to Plaintiffs' excessive force and unlawful arrest claims based on the limited—and disputed[24]—record presently before it. *See* Mem. Supp. at 16–21. The Court declines to do so. Instead, the Court will exercise its discretion and refrain from considering this affirmative defense until the summary judgment stage. *See Basilica*, 658 F. Supp. 3d at 297–98. At that time, the Court will have the "benefit of a more fulsome record," *Deavers*, 2014 WL 2993445, at *4, and will thus be in a better position to make the factual and legal determinations necessary for the qualified immunity inquiry.

---

[24] In arguing for his entitlement to qualified immunity, Officer Gibson apparently takes issue with Plaintiffs' characterization of the events at Tucker Pavilion. *See, e.g.,* Mem. Supp. 17. To make his argument, he thus partially relies upon the body-worn camera footage that purportedly depicts some of the events that took place at Tucker Pavilion. *See, e.g.*, Mem. Supp. 17. However, the Court previously declined to consider that footage at this early stage since it is not "'integral' to Plaintiffs' Complaint." *Byers I*, 2024 WL 3938830, at *9. Moreover, the Court is not permitted to resolve factual disputes at this stage, anyway. *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts." (citing Wright & Miller, *supra*, § 1356 (1990))).

### C. Count V

With Count V, Plaintiffs assert a Virginia wrongful death claim based upon Officer Gibson's alleged negligence, gross negligence, and willful and wanton negligence. Officer Gibson raises several arguments in support of his position that Count V, or at least some portions thereof, should be dismissed. The Court is unmoved by these arguments and will allow Count V to proceed.

#### 1. Officer Gibson's Role

Officer Gibson's first argument is a narrow one. He argues that because he "is not a health care provider," he owed "no duty [to Mr. Byers] with respect to 'recognized and accepted standards of medical care, health care, mental health care, and/or nursing care and treatment." Mem. Supp. 21–22; *see* Rebuttal Mem. Supp. Mot. Dismiss ("Reply") 10, ECF No. 41. Officer Gibson thus argues that the allegations in paragraph 109—which specifically allege that he owed such duties to Mr. Byers—should be dismissed.[25] Mem. Supp. 21–22; *see* Reply 10. The Court disagrees.

In Virginia, tort claims alleging negligence in the provision of professional services by health care providers are classified as medical malpractice or medical negligence actions. *See* Va. Code Ann. § 8.01-581.1; *Coston v. Bio-Med. Applications of Va., Inc.*, 275 Va. 1, 5 (2008). Section 8.01-581.1, in turn, outlines those entities and persons that qualify as "health care provider[s]":

> [A] person, corporation, facility or institution licensed by this Commonwealth to provide health care or professional services as a physician or hospital . . . or . . .

---

[25] Officer Gibson technically moves for dismissal of paragraph eighty-nine of Plaintiffs' Complaint. *See* Mem. Supp. 21–22; Reply 10. However, the relevant allegations are now found in paragraph 109 of the Amended Complaint. *Compare* Compl. ¶ 89 (alleging that Officer Gibson had, among other duties, "duties to treat [Mr.] Byers in accordance with recognized and accepted standards of medical care, health care, mental health care, and/or nursing care and treatment"), *with* Am. Compl. ¶ 109 (alleging that Officer Gibson had, among other duties, "duties to treat [Mr.] Byers in accordance with recognized and accepted standards of care, medical care, health care, mental health care, and/or nursing care and treatment").

The substance of paragraph 109 differs slightly from what Plaintiffs originally alleged, insofar as Plaintiffs now include mention of "accepted standards of care" more generally. Am. Compl. ¶ 109. The Court will nevertheless consider Officer Gibson's argument as to the medical negligence-specific allegations that remain in paragraph 109.

> [an] employee, independent contractor, or agent of the persons or entities referenced herein, acting within the course and scope of his employment or engagement as related to health care or professional services.

Va. Code Ann. § 8.01-581.1.  In other words, a hospital's employees or agents may be deemed "health care provider[s]" to the to the extent that their employment relates to the provision of health care or professional services.  *See id.*

Here, Plaintiffs allege that "at all relevant times, Officer Gibson was . . . employed by and acting as an agent for the RPD," as well as "for [CJW], as an 'extra-duty' officer."  Am. Compl. ¶ 13.  Plaintiffs further allege that, "[p]ursuant to this officially sanctioned dual-agency," Officer Gibson acted as an agent for both the RPD and CJW.[26]  *Id.*  Elsewhere in the Amended Complaint, Plaintiffs allege that RPD officers stationed in Tucker Pavilion—such as Officer Gibson—are regularly called upon to serve in a patient-management capacity.  *See, e.g.*, Am. Compl. ¶¶ 46–47 (noting, *inter alia*, that CJW staff regularly used RPD officers to "enforce their instructions" to patients).  And in fact, Plaintiffs allege that Officer Gibson acted in precisely that capacity in this case.  *See, e.g., id.* ¶¶ 46–49.

In view of the above, the Court finds that Plaintiffs have plausibly alleged that, at least in some respects, Officer Gibson acted as a covered health care provider—inasmuch as he was an employee, independent contractor, or agent of CJW—and as such may be held liable for medical negligence.  Further factual development will ultimately be necessary to determine in which capacities Officer Gibson was working at which times.  But that is not an issue to be resolved at

---

[26] While neither party explicitly raises the issue, the Supreme Court of Virginia has repeatedly recognized that a police officer may be simultaneously employed as both a public and private employee.  *See, e.g.*, *City of Alexandria v. J-W Enter., Inc.*, 279 Va. 711, 717 (2010); *Glenmar Cinestate, Inc. v. Farrell*, 223 Va. 728, 734–35 (1982); *Clinchfield Coal Corp. v. Redd*, 123 Va. 420, 431 (1918).  When a police officer is so employed, thorny questions of agency—like those present here—often arise.  *See, e.g.*, *Glenmar Cinestate, Inc.*, 223 Va. at 735 (noting that if a privately employed police officer "was engaged in the protection of the [private] employer's property, ejecting trespassers, or enforcing rules and regulations promulgated by the [private] employer, it becomes a jury question as to whether he was acting a public officer," or instead as "an agent, servant, or employee").

this stage.  *See City of Alexandria v. J-W Enter., Inc.*, 279 Va. 711, 717 (2010) (noting that, in the dual agency context, it is ultimately "a factual question whether the officer was acting as an employee of the private or employer," or instead "as a public officer enforcing a public duty," when the allegedly tortious conduct occurred).  Accordingly, the Court declines to strike the challenged portion of paragraph 109 of the Amended Complaint.

    2.  <u>Gross Negligence and Willful and Wanton Negligence</u>

Officer Gibson next argues that Plaintiffs' allegations fail to establish that he was grossly negligent or willfully and wantonly negligent.  He therefore seeks dismissal of the portions of Count V attempting to rely upon such theories of negligence.

Virginia courts have recognized three "levels" of negligence.  *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 486 (2004).  The first level, simple negligence, "involves the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another."  *Id.* (citing *Gossett v. Jackson*, 249 Va. 549, 554 (1995); *Griffin v. Shively*, 227 Va. 317, 321 (1984)).

The second level, gross negligence, is a degree of negligence "showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person."  *Id.* at 487.  Virginia's standard for gross negligence is thus one of indifference, not inadequacy.  *Kuykendall v. Young Life*, 261 F. App'x 480, 491 (4th Cir. 2008); *Cantrell v. McCoy*, 553 F. Supp. 3d 295, 306 (W.D. Va. 2021).  This "uniquely high standard" bars gross negligence claims where the allegations or evidence reveal that the defendant exercised at least "some degree of care."  *Cantrell*, 553 F. Supp. 3d at 306  (citing *Elliot v. Carter*, 292 Va. 618, 622 (2016)); *see Chapman v. City of Va. Beach*, 252 Va. 186, 190 (1996) (describing gross negligence as "a heedless and palpable violation of legal duty respecting the rights of others which amounts to the

29

absence of slight diligence, or the want of even scant care" (citations and internal quotations marks omitted)).

The third level of negligent conduct is willful and wanton negligence.  *Cowan*, 268 Va. at 487.  This conduct is defined as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another."  *Id.* (citing *Etherton v. Doe*, 268 Va. 209, 213–14 (2004) (quoting *Griffin*, 227 Va. at 231)); *see Boward v. Leftwich*, 197 Va. 227, 231 (1955) ("Willful or wanton negligence involves . . . an actual *or* constructive consciousness of the danger involved." (emphasis added)).  Virginia's willful and wanton negligence standard "closely mirrors the subjective prong of the [federal] deliberate indifference test."  *Boley v. Armor Corr. Health Servs., Inc.*, 2022 WL 16950290, at *10 (E.D. Va. Nov. 15, 2022); *see Hixson v. Hutcheson*, 2018 WL 814059, at *5 (W.D. Va. Feb. 9, 2018) (noting that Virginia's willful and wanton negligence standard "nearly mirrors" the subjective prong of the Eight Amendment deliberate indifference test).  Importantly, willful and wanton conduct—i.e., willful and wanton negligence[27]—is distinguishable from *intentional* misconduct:  "An actor guilty of intentional misconduct must intend to cause harm to another . . . .  An actor guilty of willful and wanton conduct intends his act, but not the resulting harm."  *Green*, 269 Va. at 292.

Here, Officer Gibson argues that Plaintiffs' allegations are insufficient to state a claim for either gross negligence or willful and wanton negligence.  *See* Mem. Supp. 22–24.  After a thorough review of the Amended Complaint, the Court cannot agree.

---

[27] The terms "'willful and wanton conduct' and '[w]illful and wanton negligence'" are simply "different names for the same tort."  *Kaltman v. All Am. Pest Control, Inc.*, 281 Va. 483, 493 n.5 (2011) (citing *Infant C. v. Boy Scouts of Am., Inc.*, 239 Va. 572, 581–82 (1990)).  The Court will therefore use the two terms interchangeably.

With respect to Officer Gibson's involvement in the relevant events, Plaintiffs allegations establish the following:  (1) Officer Gibson was initially summoned by CJW staff to "bully Mr. Byers into following their instructions," Am. Compl. ¶ 46; (2) Officer Gibson, having received no training on patients' rights and having done no independent investigation of the attending circumstances, simply followed the directives of CJW staff and ordered Mr. Byers to get on the elevator; (3) after an unsuccessful attempt to handcuff and forcefully move Mr. Byers, Officer Gibson threatened to tase him and take him to jail; (4) Officer Gibson requested improper and misleading discharge papers so that he could bring Mr. Byers to the Richmond City Jail; and (5) Officer Gibson did not inform the magistrate at Richmond City Jail that Mr. Byers was technically still under a TDO and suffering from severe mental illness at the time he appeared before the magistrate, leading to Mr. Byers being released on his own recognizance.[28]  *See id.* ¶¶ 46–50.

In view of the above, the Court finds that Plaintiffs have lodged sufficient allegations to support their gross negligence and willful and wanton negligence claims in Count V.  Beginning with the former, the allegations could plausibly support a finding that Officer Gibson's actions amounted to "the absence of slight diligence, or the want of even scant care." *Chapman*, 252 Va. at 190.  Officer Gibson, knowing he had few—if any—of the necessary qualifications to involve himself in patient management, arrived on scene and promptly ordered Mr. Byers to follow the directives of CJW staff.  He conducted no independent investigation or inquiry to determine *any* of the attending circumstances before so involving himself.  He did not ask why Mr. Byers was being moved.  He did not ask whether Mr. Byers's doctor had been consulted.  He did not even

---

[28] Based on the allegations, it is unclear whether Officer Gibson definitively knew that Mr. Byers was under a TDO while at Tucker Pavilion.  Nevertheless, it is likely something he could have easily discovered by asking the CJW staff present.  And in any event, Mr. Byers's presence at Tucker Pavilion, coupled with his actions on the evening of July 6, 2023, should have put Officer Gibson on notice that Mr. Byers potentially met the criteria for an ECO or TDO.  Indeed, the RPD officer who had earlier interacted with Mr. Byers—Lt. Waite—quickly recognized the need for such measures upon encountering Mr. Byers.

ask whether Mr. Byers was suffering from some severe mental illness.  Instead, he immediately sprung into aggressive and confrontational action at the behest of CJW staff.  Moreover, Officer Gibson then requested improper and misleading discharge papers so that he could arrest Mr. Byers and take him from the safe, controlled, and treatment-oriented environment of Tucker Pavilion to Richmond City Jail.  And once at the Richmond City Jail, he failed to disclose all necessary and relevant information to the presiding magistrate.  Accepting these allegations as true, it would not be unreasonable for a jury to ultimately find that Officer Gibson's actions "show[ed] indifference to [Mr. Byers] and an utter disregard of prudence that amount[ed] to a complete neglect of the safety of [Mr. Byers]."  *Cowan*, 268 Va. at 487.[29]  Plaintiffs have therefore pleaded sufficient facts to support their gross negligence claim.

For similar reasons, the Court holds that Plaintiffs have also pleaded sufficient facts to support their willful and wanton negligence claim.  Again, the allegations reflect that Officer Gibson—despite being unqualified and inadequately informed to do so—inserted himself into the obviously precarious situation with Mr. Byers.  Officer Gibson then contributed to the escalation of the situation by shouting at Mr. Byers, attempting to handcuff Mr. Byers, and later threatening to tase him and take him to jail for his noncompliance.  To top it off, Officer Gibson requested that misleading and improper discharge papers be generated for Mr. Byers, and then failed to inform the magistrate and Richmond City Jail that Mr. Byers was technically still under a TDO.  These allegations plainly support Plaintiffs' willful and wanton negligence claim against Officer Byers,

---

[29] The Court previously held that Plaintiffs insufficiently pleaded gross negligence as to CJW and Hyde.  *See Byers I*, 2024 WL 3938830, at *30–42.  That is because the allegations as to CJW and Hyde, though troubling in their own right, reveal that CJW and Hyde exercised at least "some degree of care" with respect to Mr. Byers.  *Id.*  And "because Virginia's standard for gross negligence 'is one of indifference, not inadequacy,'" Plaintiffs' gross negligence claim against CJW and Hyde could not proceed.  *See id.* (quoting *Elliott v. Carter*, 791 S.E.2d 730, 730 (Va. 2016).  The allegations as to Officer Gibson, on the other hand, certainly sound in indifference for the reasons outlined above.

especially in view of the underlying requirements for the issuance and dissolution of a TDO. *See* Va. Code Ann. § 37.2-809(B) (providing that a TDO should be issued where the individual "has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others . . . , or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs"). In other words, Plaintiffs plausibly allege that Officer Gibson "act[ed] consciously in disregard of [Mr. Byers's] rights," with actual or constructive knowledge that his "conduct probably would cause injury to [Mr. Byers]."[30] *Cowan*, 268 Va. at 487; *see Boward*, 197 Va. at 231 (noting that "actual or constructive consciousness of the danger involved" is an "essential ingredient" of willful and wanton negligence).

In sum, Plaintiffs' allegations with respect to Officer Gibson are sufficient to support their gross negligence and willful and wanton negligence claims at this early stage. The Court therefore will deny the Motion to Dismiss with respect to the relevant portions of Count V.

3. <u>Sovereign Immunity</u>

Officer Gibson next argues that the standard negligence claim in Count V should be dismissed, as he "enjoys sovereign immunity." Mem. Supp. 24. Given the present posture of the case, the Court declines to take up this issue.

The Supreme Court of Virginia has outlined four factors to use in determining whether an individual that works for an immune government entity[31] enjoys sovereign immunity against a

---

[30] To further elaborate, Plaintiffs essentially allege that Officer Gibson acted in concert with Hyde and CJW to not only defy standard TDO procedures to get Mr. Byers sent to jail despite the risks he posed to himself and others, *see* Va. Code Ann. § 37.2-813(B), but also that he did so in such a way as to make it unlikely that the presiding magistrate at Richmond City Jail would be informed that Mr. Byers was and/or still should have been under a TDO. Va. Code Ann. § 37.2-813(B).

[31] Because Officer Gibson works for the RPD, the relevant government entity here is the City of Richmond. The City of Richmond, in turn, enjoys sovereign immunity for tort liability related to its maintenance of a police force. *Niese v. City of Richmond*, 564 S.E.2d 127, 132 (Va. 2002) ("'A municipal corporation acts in its governmental capacity in . . . maintaining a police force.' Accordingly, a municipality is immune from liability for a police officer's

claim of simple negligence:  (1) the nature of the function the employee performs; (2) the extent of the government's interest and involvement in the function; (3) the degree of control and direction exercised over the employee by the government; and (4) whether the act in question involved the exercise of discretion and judgment.  *James v. Jane*, 282 S.E.2d 864 (Va. 1980); *Messina v. Burden*, 321 S.E.2d 657, 664 (Va. 1984) (citing *James*, 282 S.E.2d at 869.); *Ziegler v. Dunn*, 2024 WL 761860, at *5 (E.D. Va. Feb. 23, 2024).

Officer Gibson's factor-based argument is brief.  He asserts that, at all relevant times, he was using his discretion and exercising his duties as a law enforcement officer.  *See* Mem. Supp. 26 ("Officer Gibson was using his discretion in attempting to keep the peace at [Tucker Pavilion]. Moreover, when the assault allegedly occurred, Officer Gibson was exercising his duties as a law enforcement officer. . . .  In addition, he was not exercising mere ministerial duties.").  While Officer Gibson is apparently confident in these conclusions, the Court is less certain.

Take, for instance, the first factor—the nature of the function the employee performs.  By way of his extra-duty designation, Officer Gibson is alleged to have performed various functions; some of these functions may ultimately qualify as governmental, whereas others may be deemed private or proprietary in nature.  *See City of Alexandria v. J-W Enter., Inc.,* 279 Va. 711, 717 (2010) (in the dual agency context, noting that it is ultimately "a factual question whether the officer was acting as an employee of the private or employer," or instead "as a public officer enforcing a public duty").  Without the benefit of further factual development, though, the "blurred . . . lines between the RPD and [CJW]" make it difficult to presently determine which functions Officer Gibson was

---

[torts] in the performance of his duties as a police officer." (quoting *Hoggard v. Richmond*, 200 S.E. 610, 611 (Va. 1939))).  The primary question for resolution on this motion is therefore whether Officer Gibson enjoys derivative sovereign immunity.  *See Messina v. Burden*, 321 S.E.2d 657, 664 (Va. 1984) (holding that if a defendant works for an "immune body," the primary question becomes whether the other criteria outlined in *James v. Jane*, 282 S.E.2d 864 (Va. 1980), have been met).

performing at which times.  Am. Compl. ¶ 39; *See Ziegler v. Dunn*, 2024 WL 761860, at *7 (E.D. Va. Feb. 23, 2024) (noting that insufficient factual development may render the 12(b)(6) stage inappropriate for a sovereign immunity determination as to a police officer); Wright, Miller & Spencer, *supra*, § 1357 ("[T]he district court in its discretion may . . . decide that a motion for summary judgment—which provides an opportunity for an investigation of the facts surrounding the bare allegations in the pleading—is a more appropriate procedural device to deal with a built-in defense than a motion to dismiss under Rule 12(b)(6)."); *cf. Basilica*, 658 F. Supp. 3d at 297–98 (deferring disposition of the defendant's qualified immunity defense until the summary judgment stage).  Moreover, making such a factual determination—particularly on the limited record presently before the Court—would seemingly be improper at the 12(b)(6) stage.  *See Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992) (noting that "[a] motion to dismiss under Rule    12(b)(6) . . . does not resolve contests surrounding the facts").[32]

Put simply, unless and until the Court has sufficient facts in front of it to definitively ascertain in which capacities Officer Gibson was working at which times, the issue of sovereign immunity must be shelved.  *See Ziegler*, 2024 WL 761860, at *7; Wright, Miller & Spencer, *supra*, § 1357.  Because such facts are presently lacking, the Court cannot analyze Officer Gibson's claim of sovereign immunity at this juncture.

---

[32] The Court does not mean to suggest that Officer Gibson will not ultimately be entitled to sovereign immunity for any governmental functions that he may have performed.  Rather, the Court holds only that it will not *presently* engage in the line-drawing required to make such a fact-intensive determination at this stage of the litigation.  Such a determinations are better reserved for later stages where the parties and the Court have the benefit of a more fulsome record.

4. Proximate Cause

Officer Gibson's last argument for dismissal of Count V is that "[a]ny action by Officer Gibson could not have been the proximate cause of [Mr.] Byers'[s] death." Mem. Supp. 26; *see* Mem. Supp. 26–28. This argument, like several others raised by Officer Gibson, misses the mark.

Under Virginia law, the proximate cause of an event is "the act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Beale v. Jones*, 171 S.E.2d 851, 853 (Va. 1970). There may be more than one proximate cause of an event. *E.g.*, *Williams v. Le,* 662 S.E.2d 73, 77 (Va. 2008); *Atkinson v. Scheer,* 508 S.E.2d 68, 71 (Va. 1998); *Panousos v. Allen,* 425 S.E.2d 496, 499 (Va. 1993). Ordinarily, proximate cause is "a question that goes to the jury, unless the facts in the case are 'susceptible of but one inference,' and therefore there is no issue for the jury to decide." *Coles v. Jenkins*, 34 F. Supp. 2d 381, 388 (W.D. Va. 1998) (quoting *Riggle v. Wadell*, 221 S.E.2d 142, 145 (Va. 1976)); *Scott v. Simms*, 51 S.E.2d 250, 253–54 (Va. 1949) ("The question of proximate cause . . . is a question of fact. Its existence or nonexistence becomes a question of law only when the evidence is such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from it.").

Critically, "[a] subsequent proximate cause may or may not relieve a defendant of liability for [their] negligence." *Williams*, 662 S.E.2d at 77. Put differently, "not every intervening cause is a superseding cause" that starts the chain of liability anew. *Coleman v. Blankenship Oil Corp.*, 267 S.E.2d 143, 148 (Va. 1980). Rather, in order to relieve a defendant of liability for their negligent act, "the negligence intervening between the defendant's negligent act and the injury must *so entirely supersede* the operation of the defendant's negligence that *it alone*, without *any* contributing negligence by the defendant in the *slightest degree*, causes the injury." *Atkinson*, 508

S.E.2d at 72 (emphases added) (quoting *Panousos*, 425 S.E.2d at 499).  Moreover, "an intervening cause is not a superseding cause if it was 'put into operation by the defendant's wrongful act or omission.'"  *Coleman*, 267 S.E.2d at 147 (quoting *Jefferson Hosp. v. Van Lear*, 41 S.E.2d 441, 444 (Va. 1947)).  Because of the inherently fact-intensive nature of the superseding cause inquiry, courts in Virginia have "consistently held that whether an intervening act was so extraordinary as to supersede any prior act of negligence as the proximate cause is usually a question for the jury." *Coles v. Jenkins*, 34 F. Supp.2d 381, 386 (W.D. Va. 1998).

One additional point: a defendant's negligence can be the proximate cause of an injury even if the defendant could not foresee the precise injury that occurred.  *Interim Personnel of Cent. Va. v. Messer*, 559 S.E.2d 704, 708 (Va. 2002); *Blondel v. Hays*, 403 S.E.2d 340, 345 (Va. 1991); *Scott*, 51 S.E.2d at 254; *APV Crepaco, Inc. v. Alltransport, Inc.*, 683 F. Supp. 1031, 1033 (E.D. Va. 1987) (citing *Scott*, 51 S.E.2d at 254).  Rather, "[i]t is sufficient if an ordinary, careful and prudent person ought, under the circumstances, to have foreseen that *an* injury might probably result from the negligent act."  *Scott*, 51 S.E.2d at 254 (emphasis added); *see Interim Personnel*, 559 S.E.2d at 708; *Blondel*, 403 S.E.2d at 345.

Here, Officer Gibson's overarching position is that his actions could not have proximately caused Mr. Byers's death.  *See* Mem. Supp. 26.  Officer Gibson advances two primary arguments in support of this position:  (1) he could not have reasonably foreseen the specific events that followed his failure to "inform[] the magistrate of a TDO for [Mr.] Byers," *id.* at 26–27; and (2) regardless, the intervening events are superseding causes that operate to break the chain of causation, *see id.* at 27.  The Court is unpersuaded by either argument.

Officer Gibson's first argument is flawed insofar as it evinces a granular focus on the specific details attending to Mr. Byers's death.  Contrary to what Officer Gibson suggests, a

defendant's negligent conduct can still be a proximate cause of an injury *even if* the defendant could not foresee the precise series of events that followed or injury that resulted. *See Interim Personnel*, 559 S.E.2d at 708 ("[T]he precise injury need not be foreseen by a defendant. It is sufficient that an ordinary, prudent person ought, under the circumstances, to have foreseen that *an* injury might probably . . . result from the negligent act." (emphasis added)); *Blondel*, 403 S.E.2d at 345; *Norfolk Shipbuilding & Drydock Co. v. Scovel*, 397 S.E.2d 884, 886 (Va. 1990) (holding that a negligent act or omission is actionable when the actor, "in light of the attendant circumstances," reasonably should have foreseen the probability of "injurious *consequences*" (emphasis added)). To the extent Officer Gibson suggests otherwise, he is incorrect.

Officer Gibson's second argument—that "there are far too many events that occurred after any alleged act or omission by Officer Gibson that superseded the chain of causation"—fares no better. Succinctly, the issue of whether an intervening act is "so extraordinary as to supersede any prior act of negligence as the proximate cause" of an event is "usually a question for the jury." *Coles*, 34 F. Supp. 2d at 386; *see Kellerman v. McDonough*, 684 S.E.2d 786, 793 (Va. 2009) ("Generally, issues of . . . proximate causation are questions of fact for the jury's determination." (citing *Moses v. Sw. Va. Transit Mgmt.*, 643 S.E.2d 156, 160 (Va. 2007); *Srock v. United States*, 2006 WL 2460771, at *8 (E.D. Mich. Aug. 23 2006) (interpreting Virginia law, and noting that "because of the inherently fact-intensive nature of [the intervening versus superseding cause] inquiry," courts in Virginia consistently hold that "whether an intervening act was so extraordinary as to supersede any prior act of negligence as the proximate cause is usually a question for the jury." (quoting *Coles*, 34 F. Supp. 2d at 386)). The Court declines to stray from the overwhelming weight of the caselaw on this issue.[33]

---

[33] On this point, it is worth reiterating that the issue of proximate causation more generally is, likewise, one that ordinarily "goes to the jury." *Coles*, 34 F. Supp. 2d at 388. It only becomes a question of law for courts to

At bottom, Officer Gibson's proximate cause arguments either (a) rely upon an unduly restrictive interpretation of proximate cause or (b) request that the Court make certain findings that are ill-suited for the 12(b)(6) stage.  In either event, the Court must decline Officer Gibson's invitation to dismiss Count V on proximate causation grounds.

## V.  CONCLUSION

For the foregoing reasons, the Court will grant-in-part and deny-in-part Officer Gibson's Motion to Dismiss (ECF No. 25), as outlined herein.

An appropriate Order shall issue.

_____ /s/ _____

Roderick C. Young
United States District Judge

Richmond, Virginia
Date: September 25, 2024

---

determine when "the evidence is such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from it."  *Scott*, 188 Va. at 816.  At this stage of the proceedings, it is not apparent to the Court that reasonable persons could have "*no* difference[s] in . . . judgment," *id.* (emphasis added), as to the reasonably foreseeable consequences of Officer Gibson's conduct, insofar as his actions led to an individual—who should otherwise have remained in the security of Tucker Pavilion—wandering the streets of Richmond and Chesterfield in the midst of a serious mental health episode.