IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| MARGARET BYERS, *et al.*,<br>Plaintiffs,<br><br>v.<br><br>GORDON J. PAINTER, *et al.*,<br>Defendants. | Civil Action No. 3:23CV801 (RCY) |

**MEMORANDUM OPINION**

This case arises from the fatal shooting of Charles Byers by Gordon J. Painter, an officer with the Chesterfield County Police Department. Plaintiffs Margaret and Michael Byers, parents of Charles Byers, brought the action in their capacity as co-administrators of the Estate of Charles Byers. The matter is presently before the Court on Plaintiffs' and Defendant Chesterfield County's ("Defendant" or the "County") cross-Motions for Summary Judgment. The matters have been fully briefed, and the Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. E.D. Va. Loc. Civ. R. 7(J); Fed. R. Civ. P. 78. For the reasons stated below, the Court will DENY Plaintiffs' Motion for Summary Judgment and GRANT the County's Motion for Summary Judgment.

## I. STANDARD OF REVIEW

The relevant inquiry in the summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In reviewing cross-motions for summary judgment, the Court will consider each motion separately on its own merits to determine if either party deserves judgment as a matter of

law. *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 291 (4th Cir. 2021). The party seeking summary judgment bears the initial burden of showing (1) that there is no genuine dispute of material fact, and (2) that, on the undisputed record, it is entitled to judgment as a matter of law. *Richardson v. Clarke*, 52 F.4th 614, 618 (4th Cir. 2022) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585–86 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. A material fact is one that might affect the outcome of a party's case. *Id*. at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc*., 264 F.3d 459, 465 (4th Cir. 2001). A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable trier of fact to return a verdict in that party's favor. *Anderson*, 477 U.S. at 247–48.

To defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another," or the "mere existence of a scintilla of evidence" concerning a material fact. *Stone v. Liberty Mut. Ins. Co*., 105 F.3d 188, 191 (4th Cir. 1997) (citations omitted); *Anderson*, 477 U.S. at 252. Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate." *Thompson Everett, Inc. v. Nat'l Cable Adver., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995). "Thus, if the evidence [to support the non-movant's position] is merely colorable or not significantly probative, it may

not be adequate to oppose entry of summary judgment." *Id.* (cleaned up). In reviewing a motion for summary judgment, the Court exercises great care to resolve any factual disputes and "competing, rational inferences" in the light most favorable to the non-moving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (cleaned up); *Aleman v. City of Charlotte*, 80 F.4th 264, 283–84 (4th Cir. 2023) (noting that, on summary judgment, "the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party" (citing *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc))).

## II. BACKGROUND

Plaintiffs seek to hold Chesterfield County liable for the death of their son, Charles Byers, pursuant to 42 U.S.C. § 1983, asserting that Defendant Painter's shooting of Charles Byers constituted an unconstitutional use of force and that the County is responsible for this ultimately fatal deprivation of rights, based on an official policy or custom that proximately caused the same. *See* Second Am. Compl. ¶¶ 104–127 (Count Two – § 1983 *Monell*[1] Claim). The Court has concluded that the following narrative represents the undisputed facts for the purpose of resolving the pending cross-motions for summary judgment with respect to this claim:

### A. Factual Background

1. The July 8, 2023 Shooting of Charles Byers[2]

On July 8, 2023, two Chesterfield County police officers, Corporal Gordon J. Painter and Officer Osborne, were dispatched to a residential neighborhood in response to reports of attempted

[1] *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978). "A *Monell* claim refers to an action filed against a municipality for violating an individual's constitutional rights pursuant to 42 U.S.C. § 1983." *Johnson v. Balt. City*, 163 F.4th 808, 811 n.2 (4th Cir. 2026).

[2] Neither the County nor Plaintiffs include facts regarding the shooting incident itself in their statements of undisputed and disputed fact, respectively. Instead, the County's Motion for Summary Judgment addresses the shooting incident in a footnote, directing the Court to rely on the recitation of facts supplied in the separate motion for summary judgment filed by Defendant Painter. Plaintiffs do not object to the Court's reliance on facts from Defendant Painter's motion in their Memorandum in Opposition.

breaking and entering and vandalism. Painter Stmt. Undisp. Facts ("Painter SUF") ¶¶ 1–2, ECF No. 201. When they arrived on the scene, Corporal Painter and Officer Osborne encountered Charles Byers, who was holding a hatchet in his right hand. *Id.* ¶¶ 6–8.

After initially crossing a yard to position himself across from the officers, Byers began walking backwards and continued walking backwards throughout the encounter. *Id.* ¶¶ 16, 24. 35. Meanwhile, the officers repeatedly instructed Byers to drop the hatchet and, when he did not comply, deployed a taser. *Id.* ¶¶ 8, 11–12, 24, 31, 40. Byers disregarded the officers' commands and continued to hold the weapon low at his side, except that he "quickly" raised and lowered the hatchet after the taser deployment. *Id.* ¶ 37. Byers also "dropped" his shoulder back on his hatchet-bearing side before Corporal Painter fired his service weapon. *Id.* ¶ 42.

Corporal Painter fired seven rounds, which ultimately proved fatal. *Id.* ¶ 44. Corporal Painter testified that he did not regard Byers, who was continuing to walk backwards, as "fleeing" before initially discharging his firearm. Cnty.'s Stmt. Undisp. Facts ("Cnty. SUF") ¶ 4, ECF No. 199. Painter further testified that Byers was "fleeing" when describing the later sequence of the shooting, that he had concern that Byers could remain armed and continue through the neighborhood, and that he did not know whether the earlier shots he fired struck Byers. Pls.' Stmt. Undisp. Facts ("Pls.' SUF) ¶ 27, ECF No. 197. Reciting these circumstances, Painter stated: "That's why I fired the rounds that I fired." *Id.*

2. <u>County Governance and the Use of Force Policy</u>

The County of Chesterfield is a political subdivision of the Commonwealth of Virginia. Cnty. SUF ¶ 1. The County operates a Police Department pursuant to general law and Chesterfield County's Charter from the General Assembly. *Id.* ¶ 2.

The County maintains a written policy that governs the use of force by County police officers (the "UOF Policy"). *Id.* ¶ 5. The UOF Policy states that "[d]eadly force may be used only to combat an immediate threat of death or serious physical injury and shall be used only as specifically authorized in this policy." *Id.* ¶ 6. The UOF Policy then identifies the specific circumstances where the use of deadly force is permitted:

> 1. When an officer reasonably believes that they are in imminent danger of death or serious injury, or when the officer reasonably believes that another person is in imminent danger of death or serious injury.
>
> 2. To effect an arrest or prevent the escape from custody of a suspect whom the officer has probable cause to believe:
>
>> a. Has committed or attempted to commit a felony involving the use or threatened use of a deadly weapon and continues to pose an imminent threat of death or serious injury to the officer or others;
>>
>> b. Is attempting to escape by the use of a deadly weapon; or
>>
>> c. Is imminently likely to cause death or serious physical injury to another person unless apprehended without delay. Simply fleeing in a vehicle, even at high speeds, does not activate this subsection.

*Id.* ¶ 7 (citing UOF Policy, § IV.B).

On July 8, 2023, the UOF Policy was in place and governed County officers' use of force. Pls.' SUF ¶ 1. Defendant states that its written use-of-force policy and training materials "reflect and guide the practices of the police department." *Id.* ¶ 9.

Dr. Michael Smith, Plaintiffs' expert designated to opine in connection with their *Monell* claim against the County, described Section IV.B. of the UOF Policy as a "reasonable approximation[] of the constitutional standard in the Fourth Circuit for the use of deadly force by police and of professional use of force practices in effect nationally at the time Mr. Byers was killed." Cnty. SUF ¶ 10.

3. Trainings

New officers hired by Defendant are required to complete a 34-week Basic Academy before becoming sworn officers. *Id.* ¶ 13. The Basic Academy training is developed in compliance with the Virginia Department of Criminal Justice Services' (DCJS) requirements and periodically audited by DCJS. *Id.* DCJS audited the County's Basic Academy in 2010 and 2022 and certified its compliance with DCJS training requirements. *Id.*

Basic Academy participants are trained on the use of force, the UOF Policy, and Fourth Amendment principles. *Id.* ¶ 14. The training includes scenarios where weapons are present, but participants are expected to resolve situations without the use of force because the circumstances do not present an imminent threat. *Id.* ¶ 16.

Once recruits graduate from Basic Academy and become sworn officers, they receive additional training. *Id.* ¶ 21. County officers are required to complete yearly Mandatory In-Service Training that includes use of force components. *Id.* ¶ 21. The Mandatory In-Service Training includes sessions involving suspects armed with edged weapons, threat assessment, and deescalation techniques. *Id.* ¶¶ 21–23. County officers also receive annual firearms training, including training on the UOF Policy. *Id.* ¶ 25. The annual firearm training includes scenarios requiring officers to "use less lethal force and utilize verbal commands when not faced with an imminent threat that justifies deadly force." *Id.* Finally, County officers also receive annual legal updates from the Commonwealth Attorney's Office, including instruction on recent Fourth Circuit decisions regarding use of force. *Id.* ¶¶ 26–29.

Painter testified that everything he did during the encounter was based upon training the County provided him, that he believed he was following the County's training and its use-of-force

policy, that each shot fired was consistent with that training, and that he continued to hold those beliefs at the time of his deposition. Pls.' SUF ¶¶ 28–29.

4. Investigation of the July 8, 2023 Shooting of Charles Byers

Following the use of deadly force against Mr. Byers, the County conducted two investigations: a criminal investigation conducted by the Criminal Investigations Division ("CID") and an internal investigation conducted by the Internal Affairs Division ("IA"). Cnty. SUF ¶ 38.

The CID investigation concluded with a recommendation to the Commonwealth Attorney's Office that the shooting was justified. *Id.* The Commonwealth Attorney's Office agreed. *Id.* ¶ 39. The IA investigation reviewed the CID materials, conducted additional interviews, and prepared an administrative report to determine whether Corporal Painter should be disciplined. *Id.* ¶ 40. The IA investigation concluded that no discipline or corrective action was warranted. *Id.* Upon review, Captain Peter Cimbal concluded that Painter displayed "sound judgment," and Acting Chief Bradford Badgerow concluded that Painter "properly responded based on the totality of the circumstances and according to training." Pls.' SUF ¶¶ 32–34.

On July 2, 2024, the County issued a statement wherein it stated its belief that Corporal Painter had relied on his training during the incident and took appropriate action. Cnty. SUF ¶ 41.

**B. Relevant Procedural History**

Plaintiffs first brought this action on November 22, 2023. Compl., ECF No. 1. On July 17, 2026, the Court granted Plaintiffs' Motion for Leave to File a Second Amended Complaint. Mem. Order, ECF No. 184. In that Complaint, Count Two alleges that Chesterfield County is liable under *Monell* for the deprivation of Charles Byers' civil rights in violation of 42 U.S.C. § 1983. Second Am. Compl. ("SAC") 19, ECF No. 185. The County filed its Answer to the SAC

on July 31, 2026, wherein it disputed its liability under *Monell.* Chesterfield Cnty. Ans., ECF No. 186.

On September 8, 2026, the County moved for Summary Judgment on the sole Count against it. Cnty. Mot. Summ. J., ECF No. 198; Mem. Supp. Cnty.'s Mot. Summ. J. ("Cnty. Mem. Supp."), ECF No. 199. Plaintiffs timely filed a Memorandum in Opposition ("Plaintiffs' Opposition"), ECF No. 209, and the County filed its Reply in support of the motion, ECF No. 214.

Plaintiffs contemporaneously moved for Partial Summary Judgment as to the County's liability. Pls.' Mot. Summ. J., ECF No. 196; Mem. Supp. Pls.' Mot. Summ. J. ("Pls.' Mem. Supp."), ECF No. 197. The County timely filed a Memorandum in Opposition ("Cnty. Mem. Opp'n"), ECF No. 206, and Plaintiffs filed a Reply in support of their motion, ECF No. 216.

## III. DISCUSSION

On the present cross-motions for summary judgement, the overarching issue to be decided is whether the evidence is sufficient to establish that, as of July 8, 2023, the County had an "express policy"[3] authorizing unconstitutionally excessive force, and that this policy proximately caused the shooting—and ultimately, the death—of Charles Byers. Because consideration of the County's Motion for Summary Judgment allows for evaluation of Plaintiffs' legal theory in the light most generous to Plaintiffs, the Court begins its analysis there.

### A. Chesterfield County's Motion for Summary Judgment

The County asserts that it is entitled to summary judgment because there is no genuine dispute of material fact and because neither facts nor the law support Plaintiffs' attempted *Monell*

[3] While demonstration of an express policy is not the only avenue by which a plaintiff asserting a *Monell* claim can prove their case, this is the avenue that Plaintiffs appear to expressly pursue, at the expense of all others. *See, e.g.*, Pls.' Mem. Supp 3, ECF No. 197 (explicitly rejecting the framing of their *Monell* claim as "as omission-based Canton claim," referring to the failure-to-train avenue of proving a *Monell* claim established in *City of Canton v. Harris*, 489 U.S. 378 (1989)).

Claim. In assessing the Motion, the Court begins by outlining Plaintiffs' theory of liability as to the County. Having done so, the Court assesses the materiality of any genuine factual disputes presented in the papers. Finally, the Court considers whether, with all facts and all reasonable inferences viewed in Plaintiffs' favor, Defendant is entitled to summary judgment. Because the Court ultimately finds that, even predicated on the most favorably construed factual record, Plaintiffs' legal theory fails as a matter of law, the Court will grant the County's Motion for Summary Judgment.

1. Plaintiffs' *Monell* Theory

Generally speaking, "[p]ursuant to *Monell*, a plaintiff may 'hold a municipality liable for a constitutional violation under § 1983, [by establishing] that the execution of a policy or custom of the municipality caused the violation.'" *Johnson v. Balt. City*, 163 F.4th at 811 n.2 (alteration in original) (quoting *Misjuns v. City of Lynchburg*, 139 F.4th 378, 384 (4th Cir. 2025)). The Fourth Circuit has identified four avenues by which a § 1983 plaintiff may demonstrate the existence of a *Monell* policy or custom: "(1) [T]hrough an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Howard v. Durham*, 68 F.4th 934, 952 (4th Cir. 2023) (emphasis added).

As noted above, in pursuing summary judgment on their *Monell* claim against the County, Plaintiffs rely on the first such avenue: an "express policy" theory. Plaintiffs contend that such a policy existed, albeit not in the form of any one written policy in particular but rather as the County's "operational standard." Pls.' Mem. Supp. 11–12, ECF No. 197; Pls.' Mem. Opp'n 1, 3, ECF No. 209; *see also supra* n4. The County vehemently disagrees, arguing both that no express

policy exists, as a factual matter, and that no conglomeration of written guidelines and cultural norms can coalesce into an "express policy" for *Monell* purposes, as a legal matter. Def.'s Mem. Supp. 17, ECF No. 199.[4] This is a debate of mixed law and fact. Specifically, the parties debate, as a factual matter, whether any policy in fact exists that applies to the circumstances of Defendant Painter's encounter with and shooting of Charles Byers. The parties also debate whether, as a legal matter, supposed "operational standards" gleaned from various written policies, training practices, and cultural norms can coalesce into an "express policy" for *Monell* purposes.

2. <u>A Genuine Issue of Fact Exists as to Whether Charles Byers was Attempting to Escape or Flee</u>

On the factual side of the parties' debate is the question of whether some Chesterfield County policy addresses the circumstances presented in the interaction between Charles Byers and Defendant Painter and so "authorized" Painter's ultimate act of shooting Charles Byers. If the answer is no, Plaintiffs' claim is a non-starter, because the County cannot be held liable absent some policy serving as the driving force behind Painter's act. But to answer this question with either a yes or a no requires defining the circumstances of the encounter—and these circumstances are disputed.

Specifically, the County contends that Byers was not fleeing and that Byers' potential flight did not explain Painter's conduct, but he instead was responding to the totality of the circumstances surrounding the encounter. Cnty. SUF ¶ 4. In support of their position, the County cites Painter's testimony that Byers had not attempted to flee prior to discharging his firearm. *Id.* Thus, the County asserts that the armed escape provision could not have any bearing on the alleged

[4] The County does not concede that Painter violated Byers' rights as an initial matter. Def.'s Mem. Supp. 29, ECF No. 199. The issue of Painter's individual liability is still an open question being litigated in Counts I and III of Plaintiffs' operative Complaint. *See* Second Am. Compl. ¶¶ 93–103 (Count One – Excessive Force), 128–133 (Count Three – Wrongful Death), ECF No. 185. For purposes of the present cross-motions, however, the Court assumes an underlying constitutional violation.

constitutional violation because it was unrelated to the circumstances of the encounter. Def.'s Mem. Supp. 26, ECF No. 199.

Plaintiffs dispute this version of events. Plaintiffs assert that Painter was concerned about Byers's "prospective armed escape" and that such concern formed part of the circumstances behind Painter's conduct. Pls.' Stmt. Disp. Facts. ¶ 4, ECF No. 209. In support of their position, Plaintiffs cite Painter's testimony describing Byers as "fleeing" in connection with the later sequence of shots. *Id.* Plaintiffs also rely on Painter's testimony identifying his concern that Byers might continue through the neighborhood with the hatchet and his uncertainty that the earlier rounds he fired struck Byers, before concluding: "That why I fired the rounds I fired." *Id.*

Because the Court presently analyzes the County's Motion for Summary Judgment, the Court finds it appropriate to draw reasonable inferences in Plaintiffs' favor and so to adopt Plaintiffs' construction of the circumstances of the encounter, in order to move on to the second aspect of the pivotal question: whether a County policy encompasses these specific circumstances.

3. <u>No Single Policy Directly Addresses the Initial Encounter and First Shots Fired</u>

Having concluded for present purposes that the circumstances of the shooting involved prospective armed escape, the question remains whether those circumstances invoke any provision of County policy.

With respect to the County's written policy, the County contends that Plaintiffs and their designated expert, Dr. Smith, have isolated a single subsection of the UOF Policy—the fleeing felon provision in subsection IV.B.2(b)—in support of their claim. Def.'s Mem. Supp. 25, ECF No. 199. The County disclaims Painter's reliance on armed escape during any portion of the encounter. Def.'s Mem. Supp. 26, ECF No. 199. Accordingly, while the County maintains that the armed escape provision is constitutionally defensible, it simultaneously argues that the

provision is ultimately unrelated to Painter's use of force and "has no bearing on" the County's liability. *Id.*

Plaintiffs, meanwhile, assert the UOF Policy's relevance because it "expressly address[es] deadly force to prevent armed escape." Pls.' Mem. Opp'n 24, ECF No. 209. For the reasons discussed *supra* in Part III.A.2, Plaintiffs contend that Painter's explanation for the shots he fired included Byers' armed escape, thus rendering the UOF Policy relevant. Yet, Plaintiffs recognize the fact, undisputed in the record, that Painter did not regard Byers as attempting flight before firing the initial shots. Pls.' Mem. Opp'n 24, ECF No. 209. Instead, Plaintiffs expressly connect Painter's recognition of Byer's flight to "the later sequence" of shots. *Id.* As such, Plaintiffs do not assert that the armed escape provision of the County's written policy was related to Painter's initial conduct or commencement of the shooting. Accordingly, even construing the circumstances in Plaintiffs' favor, Plaintiffs have not identified a specific policy that drove the first shots fired. However, as explained in more detail, *infra*, they rely on a theory that written policies *plus* institutional training combine to create an "operational framework" that authorized all of the shots and, correspondingly, the constitutional violations alleged in this case. But for the reasons set forth in Part III.A.5, below, the Court concludes that the "policies-plus" theory as advanced by Plaintiffs does not support *Monell* liability, as a matter of law.

4. <u>When Viewed in Plaintiffs' Favor, the Facts of Shots 6 and 7 Implicate the "Armed Escape" Provision of the County's UOF Policy</u>

Construing the applicable facts and circumstances in Plaintiffs' favor, the Court infers that Corporal Painter's testimony regarding the shooting invokes the UOF Policy's armed escape provision in Section IV.B.2(b), which authorizes the use of deadly force "[t]o effect an arrest or prevent the escape from custody of a suspect whom the officer has probable cause to believe . . . [i]s attempting to escape by the use of a deadly weapon." Cnty. SUF ¶ 7; *see* Pls.' Mem. Opp'n

23–24, ECF No. 209. While Painter testified that Byers did not attempt to flee before he began firing, they note that Painter described Byers as "fleeing" while discussing a later sequence—what the Court identifies as shots 6 and 7 of the seven total rounds fired. *Id.* at 24. Further, Painter "identified the danger that Byers could remain armed and continue through the neighborhood, stated he did not know whether or to what extent his *earlier* rounds had struck Byers, and concluded: 'That's why I fired the rounds I fired.'" *Id.* (emphasis added). Thus, a reasonable factfinder could conclude that Painter's testimony "expressly connects prospective armed escape to his explanation for the rounds he fired." *Id.* And so, the question becomes whether the UOF Policy is unconstitutional in and of itself or otherwise constituted the "driving force" behind Painter's allegedly unconstitutional acts, rather than simply making the violation "likely." *See Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987) ("Neither the existence of [an unconstitutional] policy or custom nor the necessary causal connection can be established by proof alone of the single violation charged.").

5. <u>The UOF Policy is Not *Per Se* Unconstitutional, And Plaintiffs' "Policy-Plus" Theory Cannot Constitute an Express Policy as a Matter of Law</u>

Proceeding under a theory of express policy, i.e., a municipality's direct authorization of an unconstitutional act, is "understandably rare" because "'[o]fficial' statements of law enforcement policy almost inevitably will specifically condemn rather than condone uses of excessive force or other unconstitutional conduct by police." *Spell*, 824 F.2d at 1388. Further, it is "difficult if not impossible to imply an official municipal policy directly authorizing conduct at odds with federal and state constitutions and laws" absent an official statement respecting specific conduct. *Id.* The County argues that, as a matter of law, its UOF Policy is not unconstitutional, and further that Plaintiffs' attempted construction of an "express policy" out of the combination of policy-plus-training fails as a matter of law. The Court agrees on both fronts.

*a. The UOF Policy is Not Unconstitutional on its Own*

Plaintiffs endeavor to show that the UOF Policy is unconstitutional through expert testimony[5] criticizing the armed escape provision's "omission of an express imminent threat limitation." Pls.' Mem. Opp. 23, ECF No. 209. Plaintiffs' expert describes the UOF Policy as "ambiguous" and "confusing" because its armed escape provision could lead officers to believe that deadly force is permitted when a fleeing felon merely possesses or references a weapon, even absent an imminent threat. *See* Michael R. Smith Expert Rep. 7–9, ECF No. 199-7. But for *Monell* purposes, "an 'express policy' . . . is 'formal rules or understandings . . . that are intended to, and do, establish *fixed* plans of action to be followed under similar circumstances *consistently and over time*.'" *Howard*, 68 F.4th at 952 (second alteration in original) (emphases added) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)). Even crediting this testimony, then, *see supra* n5, a policy that is "ambiguous" is inherently not one that "establish[es] fixed plans" to be followed "consistently." *Id.* On the contrary, a plan that is ambiguous invites *inconsistency*. As such, Plaintiffs have not demonstrated that UOF Policy is an express unconstitutional policy or otherwise a policy that, *on its own*, drove Painter's actions in this case. *See Spell*, 824 F.2d at 1388 ("Proof merely that such a policy or custom was 'likely' to cause a particular violation is not sufficient; there must be proven at least an 'affirmative link' between policy or custom and

---

[5] Specifically, Plaintiffs' *Monell* expert, Dr. Michael Smith. The Court acknowledges that there is a pending motion to exclude parts of Dr. Smith's testimony. When a *Daubert* motion and motion for summary judgment are both pending before the Court, the Court may grant the motion for summary judgement without first resolving the *Daubert* motion by "accepting the expert's conclusions as true but concluding [other party] is still entitled to summary judgment." *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 562 (4th Cir. 2024), *rev'd on unrelated grounds sub nom.*, *West Virginia v. B.P.J.*, 146 S. Ct. 2356, 225 L. Ed. 2d 1040 (2026). A court need not accept an expert's legal conclusions as true, however—simply the expert's opinions regarding the interpretation of evidence. *See United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) (noting that Federal Rule of Evidence 702 does not permit experts to "give testimony that states a legal standard or draws a legal conclusion by applying law to the facts, because [doing so] supplies the jury with no information other than the witness's view of how the verdict should read." (cleaned up)). Thus, the Court accepts Dr. Smith's testimony, short of his legal conclusions, for the purposes of assessing the County's motion for summary judgment.

violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact."); Pls.' Mem. Opp'n 24, ECF No. 209 (conceding that Painter may not have "mentally identif[ied] the particular [UOF Policy] subsection" nor acted with "conscious reliance on its text" when using deadly force); *id.* at 24–25 (arguing that the County's written policy, combined with training and post-incident approval, *collectively* demonstrate that the County's "operational standard" was the "driving force" behind the asserted violation); *cf.* Def.'s Mem. Supp. 5 (noting that Dr. Smith conceded that the deadly force section of the UOF Policy is a "reasonable approximation[] of the constitutional standard in the Fourth Circuit for the use of deadly force by police and of professional use of force practices in effect nationally at the time Mr. Byers was killed."). Indeed, they effectively concede this point, noting that "Plaintiffs do not reduce their [express policy] theory to that subsection or depend upon proving Painter's conscious reliance on its text." Pl.'s Mem. Opp'n 24. The Court accordingly must now consider whether Plaintiffs' express policy theory premised on the written policy *plus* procedures, training, and "operational premise" holds water.

*b. Plaintiffs' "Policy-Plus" Theory Does Not Establish an Express Policy as a Matter of Law*

Beyond the UOF Policy, i.e., the only written policy identified as relevant to the circumstances of this case, Plaintiffs rely on a theory that the Chesterfield County Police Department's "operational standards" constitute an express policy of the County, and that these standards were the driving force behind Defendant Painter's unconstitutional acts—both with respect to the first shots fired, *see supra* Part III.A.3, and with respect to the separate volley of shots 6 and 7, *see* Pls.' Opp'n 11–12, 23. In furthering this theory, Plaintiffs argue that the Fourth Circuit does not impose a categorical requirement that an express policy take the form of a written policy only. *Id.* at 10 (citing *Johnson*, 163 F.4th at 822, and *Howard*, 68 F.4th at 952). They also

contend that this Court previously endorsed the validity of an express policy based on more than just a written policy alone in its July 17, 2026 Order granting leave to amend the Complaint. *Id.* (citing July 17, 2026 Order 2–3, ECF No. 184). Because Plaintiffs point to this Court's own words in advancing their position, the Court begins by explaining why Plaintiffs' current approach is distinguishable from the legal theory preliminarily accepted by the Court.

On July 17, 2026, the Court issued an Order granting Plaintiffs leave to file their Second Amended Complaint ("SAC"). *Id.* Therein, the Court concluded that the SAC alleged sufficient facts to support a plausible *Monell* claim against the County. *Id.* at 1. Based on Plaintiffs' insistence that they were pursuing an express policy theory, the Court began by defining "express policy" as stated in *Howard v. Durham*, 68 F.4th 934 (4th Cir. 2023): "formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Id.* at 2 (quoting *Howard*, 68 F.4th at 952). Then, following the arguments of the parties, the Court noted the logic underlying the express policy path, i.e., that Courts recognize that governing municipal bodies "may of course in theory directly authorize unconstitutional police conduct," although such express authorization is "rare." *Id.* (citing *Spell*, 824 F.2d at 1388). Against this backdrop, the Court found that Plaintiffs plausibly alleged that the County's "policies-as-training"—specifically based on the County's alleged edged-weapon training, annual firearm training and annual use-of-force instruction—had "directly authorized" Painter's use of deadly force, and that direct authorization through policies-as-training could constitute an express policy under *Monell*. *Id.* at 3 (citing SAC ¶¶ 40–66). It does not appear that discovery has fully borne out these allegations, however, and so Plaintiffs now endeavor to stretch the express policy theory that the Court previously acknowledged into a new shape.

Specifically, on the present motion, Plaintiffs now contend that the County's "operational framework," comprised of County policies, ambiguous training, and interpretation-heavy evaluation standards, all retroactively blessed by the post-shooting incident evaluation predating this suit, constitute the relevant "express policy" underwriting unconstitutional police action. Pls.' Mem. Opp'n 10, 12, 15, ECF No. 209. The Court refers to this as Plaintiffs' "policy-plus" theory.

In arguing that their policy-plus theory is borne out by the evidence, Plaintiffs note inconsistencies between the County's training materials and the application of those materials to County officers. For example, they acknowledge that Painter successfully completed training on edged-weapon scenarios that did not present an immediate threat justifying the use of deadly force. *Id.* at 19. They also note that the County's firearms coordinator testified that he "had never been trained" that furtive or threatening weapon movement was required. *Id.* at 18. Plaintiffs argue that the firearms expert's testimony reflects "the ambiguity in Chesterfield's affirmative instruction," and that "Chesterfield's own training materials drew [a] distinction" not uniformly applied, as evidenced by the firearms expert's testimony. *Id.* Plaintiffs conclude that the resulting ambiguity created an operational framework where the "'totality of the circumstances' risks becoming not a constitutional constraint, but a label permitting possible future danger." *Id.*

The County, meanwhile, vigorously defends the constitutionality of its trainings. The County states that its "Basic Academy, annual in-service courses, legal updates, and scenario-based exercises . . . consistently teach[] that deadly force is justified only when an objectively reasonable officer would perceive an imminent threat of death or serious bodily injury." Def.'s Mem. Supp. 23, ECF No. 199. They further posit that County officers are instructed on controlling Fourth Circuit cases, like *Graham* and *Garner*, and that such instruction shows that the County's edge-weapon curriculum is constitutionally sufficient. *Id.* at 24.

On the record before the Court, the County prevails. The evidence shows that the County's training materials invoked constitutionally compliant guidelines. *See* Cnty. SUF ¶¶ 13–29; *id.* ¶ 10 (quoting Plaintiffs' own *Monell* expert's testimony that the UOF Policy was a "reasonable approximation[] of the constitutional standard in the Fourth Circuit for the use of deadly force by police"). While the Court employed a standard deferential to Plaintiffs' allegations in its earlier Order, it is not obliged to accept as true legal conclusions that are inconsistent with the now-developed factual record on the present cross-motions for summary judgment. Put another way, the discovery process has not borne out what was alleged: that the County's policies-as-training *directly* authorized unconstitutional acts by County police.

Perhaps in acknowledgement of this, Plaintiffs have pivoted their theory to argue that the County's operational framework, its policies-plus-training-plus-interpretative norms, produce a level of uncertainty that leaves the door open to a constitutional violation. But that is insufficient to establish an express policy sufficient to support a *Monell* claim. *See Spell*, 824 F.2d at 1388 (challenged policy must either be unconstitutional on its face or otherwise constitute the "driving force" behind a violation of rights, rather than simply making the violation "likely"). Because Plaintiffs' case for an express policy does not establish that the "operational framework" in place in the County *drove* constitutional violations, including the violation allegedly suffered by Charles Byers, Plaintiffs' evidence is insufficient to establish a claim for *Monell* liability against the County, and the County is entitled to judgment as a matter of law.

**B. Plaintiffs' Motion for Summary Judgment**

Having found that summary judgment is appropriate for the County on Plaintiff's *Monell* claim, the Court need not expend much ink in discussing Plaintiffs' Motion for Summary Judgment. There is utility in one specific note, however. While the Court, in analyzing the

County's Motion for Summary Judgment, *supra*, resolved the competing rational inference with respect to whether Charles Byers was fleeing in Plaintiffs' favor, the Court would be required to resolve this inference in the County's favor when analyzing Plaintiff's Motion for Summary Judgment. In other words, on Plaintiffs' Motion, the Court would instead adopt Defendant's construction of the video evidence and find that Charles Byers was standing firm when he was shot. This would render the County's UOF Policy regarding fleeing suspects inapplicable to the shooting, and thus any argument predicated on the unconstitutional nature of that policy would be inapposite to the question before the Court.

Beyond this single point of debate, the motion otherwise ultimately turns on the viability of Plaintiffs' "policy-plus" theory, as discussed above. And, based on the Court's determination, *supra*, that this theory is not cognizable in the manner advanced by Plaintiffs, Plaintiffs are not entitled to judgment as a matter of law. Plaintiffs' Motion for Summary Judgment must therefore be denied.

## IV. CONCLUSION

For the foregoing reasons, the Court finds it appropriate to grant Chesterfield County's Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

/s/ RCY
Roderick C. Young
United States District Judge

Date: November 18, 2026
Richmond, Virginia